No. 24-1291

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

TRAVIS DARDAR, NICOLE DARDAR, KENT DUHON, MARY ALICE
NASH, JERRYD TASSIN, ANTHONY THERIOT, FISHERMEN INVOLVED
IN SUSTAINING OUR HERITAGE, FOR A BETTER BAYOU, and
NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

---

## JOINT PETITION FOR REVIEW

---

Pursuant to Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), and

Federal Rule of Appellate Procedure 15(a), Petitioners Travis Dardar, Nicole

Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, Fishermen

Involved in Sustaining Our Heritage, For a Better Bayou, and Natural Resources

Defense Council, ("Petitioners") respectfully petition the United States Court of

Appeals for the District of Columbia Circuit to review and set aside the following

orders of the Federal Energy Regulatory Commission ("FERC" or "Commission"):

1. Order Granting Authorizations Under Section 3 and 7 of the Natural Gas Act, *Venture Global CP2 LNG, LLC,* Nos. CP22-21-000 & CP22-22-000, 187 FERC ¶ 61,199 (June 27, 2024) ("Authorization Order") (attached as Exhibit A); and

2. Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-000 & CP22-22-000, 188 FERC ¶ 62,109 (August 29, 2024) (attached as Exhibit B).

These orders concern applications by Venture Global CP2 LNG, LLC and Venture Global CP Express, LLC, to construct and operate a 20 million metric ton per annum liquified natural gas export terminal called the CP2 LNG Project in Cameron Parish, Louisiana, and a new natural gas pipeline called the CP Express Pipeline Project that would include an approximately 85.4-mile-long mainline pipeline from Jasper County, Texas, to the proposed CP2 LNG export Project in Cameron Parish, Louisiana, as well as appurtenant facilities. Petitioners and, in the case of those petitioners that are organizations, their members have been and will be aggrieved by the approval, construction, and operation of the CP2 LNG Project and CP Express Pipeline Project.

Petitioners intervened before the Commission and timely requested rehearing of the Authorization Order.[1] This Court has jurisdiction and venue is proper under Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b). In accordance with Federal Rule of Appellate Procedure 15(c), the list of parties served with copies of this Joint Petition is attached as Exhibit C. This Petition for Review is timely because the Commission issued its Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration on August 29, 2024, and this Petition for Review was filed within sixty days.

---

[1] FERC granted all but one of Petitioners' respective motions to intervene in the proceeding below. However, FERC denied intervention to Petitioner Fishermen Involved in Sustaining Our Heritage. *See* Authorization Order PP 15-17. Petitioners challenged this denial in their pending request for rehearing before FERC and take the position that the denial was arbitrary and capricious. Petitioners remain hopeful FERC will correct this unlawful and unjust error.

DATED: September 4, 2024

Respectfully submitted,

 */s/ Megan C. Gibson*

Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington DC, 20005
Telephone: (202) 717-8341
Email: creiser@nrdc.org

Thomas Zimpleman
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington DC, 20005
Telephone: (202) 513-6244
Email: tzimpleman@nrdc.org

Morgan Johnson
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington DC, 20005
Telephone: (202) 289-2399
Email: majohnson@nrdc.org

*Counsel for Natural Resources Defense Council*

Megan C. Gibson
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
Email: mgibson@selcdc.org

Spencer Gall
Deirdre Dlugoleski
Southern Environmental Law Center
120 Garrett Street, Suite 400
Charlottesville, Virginia 22902
Telephone: (434) 977-4090
Email: sgall@selcva.org

*Counsel for Travis Dardar, Nicole Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, For a Better Bayou, and Fishermen Involved in Sustaining Our Heritage*

**EXHIBITS**

**Exhibit A:**  Order Granting Authorizations Under Section 3 and 7 of the Natural

Gas Act, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-000 & CP22-

22-000, 187 FERC ¶ 61,199 (June 27, 2024).

**Exhibit B:**  Notice of Denial of Rehearing by Operation of Law and Providing for

Further Consideration, *Venture Global CP2 LNG, LLC*, Nos. CP22-

21-000 & CP22-22-000, 188 FERC ¶ 62,109 (August 29, 2024).

**Exhibit C:**  Official Service List in Federal Energy Regulatory Commission

Docket Nos. CP22-21-000 and CP22-22-000.

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

TRAVIS DARDAR, NICOLE DARDAR, KENT DUHON, MARY ALICE NASH, JERRYD TASSIN, ANTHONY THERIOT, FISHERMEN INVOLVED IN SUSTAINING OUR HERITAGE, FOR A BETTER BAYOU, and NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

No. _____

**CORPORATE DISCLOSURE STATEMENT**

Fishermen Involved in Sustaining Our Heritage (FISH) is a community based non-profit organization based in Louisiana dedicated to championing the rights of commercial fishermen to flourish and prosper. FISH has no parent companies, and there are no publicly owned corporations that have a ten-percent or greater ownership interest in FISH.

For a Better Bayou is a community based non-profit organization based in Louisiana dedicated to protecting the people and environment of Southwest Louisiana. For a Better Bayou has no parent companies, and there are no publicly

6

owned corporations that have a ten-percent or greater ownership interest in For a Better Bayou.

Natural Resources Defense Council (NRDC) is a non-profit environmental and public health organization committed to protecting the public and environment through research and advocacy. NRDC has no parent companies, and there are no publicly owned corporations that have a ten-percent or greater ownership interest in NRDC.

DATED: September 4, 2024           /s/ *Megan C. Gibson*
                                   Megan C. Gibson
                                   Southern Environmental Law Center

## CERTIFICATE OF SERVICE

I certify that, on September 4, 2024, copies of this Petition for Review and exhibits were served on all parties admitted to participate in the agency proceedings by email to the official service list in Federal Energy Regulatory Commission Docket Nos. CP22-21-000 and CP22-22-000. As required by Federal Rule of Appellate Procedure 15(c)(2), a list of those so served is attached as Exhibit C.

In accordance with D.C. Cir. Rule 15(a), I further certify that I emailed a copy of the foregoing to the following:

Robert Solomon
Solicitor
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426
Robert.solomon@ferc.gov


DATED: September 4, 2024            */s/ Megan C. Gibson*
                                    Megan Gibson
                                    Southern Environmental Law Center

# EXHIBIT A

187 FERC ¶ 61,199
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
                        Allison Clements and Mark C. Christie.

| | |
|---|---|
| Venture Global CP2 LNG, LLC | Docket Nos.  CP22-21-000 |
| Venture Global CP Express, LLC | CP22-22-000 |

ORDER GRANTING AUTHORIZATIONS UNDER SECTIONS 3 AND 7 OF THE
NATURAL GAS ACT

(Issued June 27, 2024)

1.      On December 2, 2021, Venture Global CP2 LNG, LLC (CP2 LNG) filed a
request, in Docket No. CP22-21-000, under section 3 of the Natural Gas Act (NGA)[1] and
Part 153 of the Commission's regulations[2] for authorization to site, construct, and operate
a new liquefied natural gas (LNG) export terminal with 20 million metric tons per annum
(MTPA) of nameplate liquefaction capacity and associated facilities on the east side of
the Calcasieu Ship Channel in Cameron Parish, Louisiana (CP2 LNG Project or LNG
project).  The CP2 LNG Project would be constructed in two phases and include a
liquefaction plant consisting of eighteen liquefaction blocks, four aboveground full
containment LNG storage tanks, and two marine LNG loading docks.

2.      In the same application, Venture Global CP Express, LLC (CP Express) filed a
request, in Docket No. CP22-22-000, under NGA section 7(c)[3] and Parts 157 and 284 of
the Commission's regulations,[4] for a certificate of public convenience and necessity to
construct and operate a new interstate natural gas pipeline system to connect the CP2
LNG Project to the existing natural gas pipeline grid in east Texas and southwest
Louisiana (CP Express Pipeline Project or pipeline project).  The CP Express Pipeline
Project would comprise an approximately 85.4-mile-long mainline pipeline from Jasper
County, Texas, to the LNG Project in Cameron Parish, Louisiana, an approximately
6.0-mile-long lateral pipeline in Calcasieu Parish, Louisiana, and associated aboveground
facilities in Louisiana and Texas.  The pipeline project is designed to transport feed gas to

---

[1] 15 U.S.C. § 717b.

[2] 18 C.F.R. pt. 153 (2023).

[3] 15 U.S.C. § 717f(c).

[4] 18 C.F.R. pts. 157, 284 (2023).

the CP2 LNG Project and would allow CP Express to provide up to 4,400,000 dekatherms per day (Dth/day) of firm transportation service. CP Express also requests a blanket certificate under Part 157, Subpart F of the Commission's regulations to perform certain routine construction activities and operations, and a blanket certificate under Part 284, Subpart G of the Commission's regulations to provide open-access natural gas transportation services, with pre-granted abandonment approval.

3.     For the reasons discussed below, we grant the requested authorizations for the CP2 LNG Project and CP Express Pipeline Project, subject to the conditions discussed herein.

## I.  **Background and Proposal**

4.     CP2 LNG and CP Express (collectively, the applicants) are Delaware limited liability companies with their primary place of business in Arlington, Virginia. CP2 LNG and CP Express are direct, wholly owned subsidiaries of Venture Global LNG, Inc. (Venture Global).[5] Upon commencing operations proposed in its application, CP Express will become a natural gas company within the meaning of section 2(6) of the NGA,[6] and, as such, will be subject to the Commission's jurisdiction. Because its operations will not be in interstate commerce, CP2 LNG will not be a "natural gas company" as defined in the NGA but will be subject to the Commission's jurisdiction under NGA section 3.

### A.  **CP2 LNG Project (Docket No. CP22-21-000)**

5.     CP2 LNG requests authorization to site, construct, and operate the CP2 LNG Project on an approximately 737.3-acre site on the east side of the Calcasieu Ship Channel.[7] The project is designed with a nameplate liquefaction and export capacity of approximately 20 MTPA, and a peak achievable capacity of 28 MTPA under optimal

---

[5] Venture Global is also the parent company of: Venture Global Calcasieu Pass, LLC and TransCameron Pipeline LLC, which received authorizations from the Commission to construct and operate an LNG terminal and pipeline, respectively, in Cameron Parish, Louisiana, *Venture Global Calcasieu Pass, LLC*, 166 FERC ¶ 61,144 (2019) (*Calcasieu Pass LNG*); and, Venture Global Plaquemines LNG, LLC and Venture Global Gator Express, LLC, which received authorizations from the Commission to construct and operate an LNG terminal and pipeline, respectively, in Plaquemines Parish, Louisiana, *Venture Global Plaquemines LNG, LLC*, 168 FERC ¶ 61,204 (2019) (*Plaquemines LNG*).

[6] 15 U.S.C. § 717a(6).

[7] CP2 LNG states that it has contractually secured through agreements with landowners all land required for the construction and operation of the CP2 LNG Project. Application at 8.

operating conditions.  The project will receive natural gas via the proposed CP Express Pipeline Project.

6.      The project will be constructed in two phases, each phase designed with a nameplate liquefaction and export capacity of 10 MTPA, and a peak achievable capacity of 14 MTPA.  Each phase of construction will take approximately 36 months to complete.  CP2 LNG states that it will place each liquefaction block into service upon completion, with initial operations beginning approximately 24 months after the start of construction.  CP2 LNG anticipates Phase II construction will start 12 months after the start of Phase I construction.

7.      The proposed CP2 LNG Project consists of liquefaction facilities, LNG storage tanks, marine facilities, and associated infrastructure and support facilities.  Specifically, CP2 LNG proposes to construct:

- One natural gas gate station (constructed during Phase I);

- Six pretreatment facilities (three pretreatment facilities constructed during each phase);[8]

- Eighteen liquefaction blocks and ancillary support facilities (nine blocks constructed during each phase);[9]

- Four full-containment, underground LNG storage tanks, each with a net usable capacity of approximately 200,000 cubic meters (two tanks constructed during each phase);

- Two boil-off, flash, and gas relief systems (one constructed during each phase);

---

[8] Each pretreatment facility will contain:  an amine gas-sweetening system to remove carbon dioxide ($CO_2$) and hydrogen sulfide ($H_2S$); and a molecular sieve dehydration system to remove water and heavy hydrocarbons from the natural gas received from the CP Express Pipeline.

[9] Each liquefaction block will have a nameplate liquefaction capacity of approximately 1.1 MTPA and will contain two single mixed refrigerant process units, each with a refrigerant make-up system.  The liquefaction blocks will all be operated by a single distributed control system for all process and power control and connected to a common refrigerant storage area.

- Two LNG loading docks,[10] each designed to accommodate LNG carriers of 120,000 to 185,000 cubic meters, with accompanying turning basins within a shared recessed area along the southwest shoreline of Monkey Island, on the east side of the Calcasieu Ship Channel; a utility dock; and marine flare for gas-up/cooldown of LNG carriers (both loading docks, the utility dock, and the marine flare constructed during Phase I);

- Two electric power generation plants with a combined nameplate capacity of 1,470 megawatts (MW) (a 750 MW plant constructed in Phase I and a 720 MW plant constructed in Phase II);[11]

- Safety and security systems; and

- Other appurtenant facilities.

8.      CP2 LNG received authorization from the Department of Energy, Office of Fossil Energy (DOE/FE) to export annually up to approximately 28 MTPA of natural gas in the form of LNG to countries with which the United States has a Free Trade Agreement.[12]  In addition, CP2 LNG currently has pending before DOE/FE an application to export LNG to other nations with which the U.S. permits such trade, but has not entered into a Free Trade Agreement.[13]

9.      CP2 LNG states that it intends to construct and operate carbon capture and sequestration (CCS) facilities that will capture, compress, and sequester approximately 500,000 tons of carbon dioxide ($CO_2$) from feed gas entering the CP2 LNG Project.  As part of the pretreatment process, $CO_2$ will be removed from the feed gas as $CO_2$ vapor[14]

---

[10] Each loading dock will include:  one pipe trestle; one loading platform; one gangway; four marine loading arms; associated aids to navigation; four berthing dolphins; and, six mooring dolphins.

[11] August 15, 2022 Supplement to Previously Filed Project Information.

[12] *Venture Global CP2 LNG, LLC*, FE Docket No. 21-131-LNG, Order No. 4812 (April 22, 2022).

[13] Venture Global CP2 LNG, LLC, December 2, 2021 Application, FE Docket No. 21-131-LNG.

[14] First, the feed gas will be sent through an acid gas absorber column where the acid gas components ($CO_2$ and hydrogen sulfide [$H_2S$]) will be removed from the feed gas through accumulation in an amine solution.  The acid-gas-rich amine solution will then be routed to an amine regenerator distillation column where the acid gases will be boiled out, creating a lean, regenerative amine solution to be cycled back to the absorber

Document Accession #: 20240627-3107          Filed Date: 06/27/2024

and sent to the on-site carbon capture facility, where the $CO_2$ vapor will be compressed, condensed into a liquid, and pumped to a higher pressure.[15]  The resulting $CO_2$ liquid will then be routed to a $CO_2$ send-out pipeline for injection into saline aquifers approximately three miles offshore.[16]

## B.  CP Express Pipeline Project (Docket No. CP22-22-000)

10.    CP Express proposes to construct a new interstate natural gas pipeline system to supply feed gas to the proposed CP2 LNG Project, providing up to 4,400,000 Dth/day of firm natural gas transportation service.  The CP Express Pipeline will originate at interconnections with Transcontinental Gas Pipe Line's interstate system and Midcoast Energy's CJ Express pipeline in Jasper County, Texas, extend through Newton County, Texas, and Calcasieu and Cameron Parishes, Louisiana, and terminate at the CP2 LNG Project.  CP Express estimates that the CP Express Pipeline Project will cost approximately $1.483 billion.[17]

11.    CP Express proposes to construct and operate the pipeline project in two phases in conjunction with construction of the CP2 LNG Project.  Facilities constructed during Phase I would provide 2,200,000 Dth/day of firm transportation service, transporting enough feed gas for the nine liquefaction blocks to be constructed in Phase I of the CP2 LNG Project.  During Phase I, CP Express proposes to construct and operate the following facilities:

---

column and a vapor stream containing the acid gases.  Next, the vapor stream will be sent through a sulfur removal unit to remove the $H_2S$.  The resulting $CO_2$ vapor stream will then be routed to the carbon capture facilities.

[15] In the event the CCS system is unavailable, the acid gas stream will be routed to thermal oxidizers, where the $CO_2$, trace amounts of $H_2S$ not removed in the sulfur removal unit, and trace amounts of hydrocarbons will be incinerated and discharged to the atmosphere.  In the event the thermal oxidizers are also out-of-service during operations, the acid gas will be routed to the flare and emitted to the atmosphere.

[16] The geological sequestration of $CO_2$ is subject to the U.S. Environmental Protection Agency's (EPA's) jurisdiction under the Underground Injection Control (UIC) Program.  The state of Louisiana has primary enforcement authority for CCS projects under the federal UIC program.  The Louisiana Department of Natural Resources (Louisiana DNR) administers the UIC Class VI program in Louisiana.  State of Louisiana Underground Injection Control Program; Class VI Primacy, 89 Fed. Reg. 703 (Jan. 5, 2024).

[17] Application at Ex. K.

Document Accession #: 20240627-3107          Filed Date: 06/27/2024

- An approximately 85.4-mile-long, 48-inch-diameter mainline pipeline from Jasper County, Texas, to the CP2 LNG Project, with interconnections to existing natural gas transmission pipelines;[18]

- An approximately 6-mile-long, 24-inch-diameter lateral pipeline in Calcasieu Parish, Louisiana (Enable Gulf Run Lateral);

- The Moss Lake Compressor Station, near milepost (MP) 44.4 of the CP Express Pipeline, with two 34,800-horsepower (hp) natural-gas-fired compressor units;

- Five meter stations at interconnects with existing pipelines along the mainline, with a 48-inch-diameter pig launcher at the Transco & CJ Express Interconnect Meter Station at MP 0.0 and a 24-inch-diameter pig receiver at the Enable Interconnect Meter Station at MP 6.0;

- A 24-inch-diameter pig launcher at MP 0.0 of the Enable Gulf Run Lateral; and

- A gas gate station[19] (i.e., meter station) for gas deliveries at the CP2 LNG Project.

12.     Phase II would provide an additional 2,200,000 Dth/day of firm transportation service, transporting feed gas for the nine additional liquefaction blocks constructed in Phase II of the CP2 LNG Project.  In Phase II, CP Express proposes to construct and operate three additional natural-gas-fired, 34,800-hp compression units and one natural-gas-fired, 13,000-hp booster unit at the Moss Lake Compressor Station.

13.     CP Express also requests:  (1) a blanket certificate of public convenience and necessity pursuant to Part 284, Subpart G of the Commission's regulations authorizing CP Express to provide transportation service to customers requesting and qualifying for transportation service under its proposed FERC Gas Tariff, with pre-granted abandonment authorization; (2) a blanket certificate of public convenience and necessity pursuant to Part 157, Subpart F of the Commission's regulations authorizing certain

---

[18] CP Express plans interconnections to the following pipeline systems: Transcontinental Gas Pipe Line and Midcoast Energy's CJ Express Project in Jasper County, Texas; Texas Eastern Transmission and Gulf South Pipeline in Newton County, Texas; and Florida Gas Transmission and Tennessee Gas Pipeline in Calcasieu Parish, Louisiana.

[19] The gas gate station will include a pig receiver, filter/separators, custody transfer meters, pressure regulators, emergency shutdown valves, and gas analyzers.

future facility construction, operation, and abandonment; and (3) approval of its pro forma tariff.

14.     CP Express states that it held a binding open season for the proposed firm transportation services to the CP2 LNG Project, and that as a result it executed a binding precedent agreement with CP2 LNG for 100% of the firm transportation service provided by Phases I and II of the CP Express Pipeline Project for a term of twenty years at negotiated rates.  CP Express received no other bids or expressions of interest during the open season.[20]

## II.     Notice, Interventions, and Comments

15.     Notice of CP2 LNG and CP Express's joint application was issued on December 16, 2021, and published in the *Federal Register* on December 23, 2021.[21]  The notice established January 6, 2022, as the deadline to file interventions, comments, and protests. Timely, unopposed motions to intervene[22] were filed by:  Public Citizen; Natural Resources Defense Council (NRDC); Healthy Gulf; Cheniere Creole Trail Pipeline; Driftwood LNG and Driftwood Pipeline; Southeast Laborers' District Council; the State of Louisiana; Restore Explicit Symmetry To Our Ravaged Earth (RESTORE); the American Gas Association; Travis and Nicole Dardar; Anthony Theriot and Kent Duhon; and Sierra Club, Turtle Island Restoration Network, Louisiana Bucket Brigade, Louisiana Environmental Action Network, Port Arthur Community Action Network, and, Texas Campaign for the Environment (collectively, Environmental Coalition).

16.     Between January 7, 2022 and October 30, 2023, out-of-time motions to intervene were filed by:  Golden Pass LNG; Golden Pass Pipeline LLC; Commonwealth LNG; Bernard and Georgia Webb and Jerryd Tassin; Mary Alice Nash; Niskanen Center; For a

---

[20] Application at 10.  CP Express provided a copy of the open season notice and proof of publication.  October 17, 2022 Response to Data Request.

[21] 86 Fed. Reg. 72,939 (Dec. 23, 2021).

[22] Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's regulations.  18 C.F.R. § 385.214 (2023).  Timely motions to intervene include those filed dealing with environmental issues during the comment period for the draft environmental impact statement (EIS).  *See* 18 C.F.R. § 380.10(a)(1)(i) (2023).  Because Travis and Nicole Dardar, Anthony Theriot and Kent Duhon, and the American Gas Association filed unopposed motions to intervene during the comment period for the draft EIS (January 19, 2023 – March 13, 2023), their motions are timely.

Better Bayou; and Adley and Judy Dyson.  These late-filed interventions were granted by Secretary's Notices on November 13, 2023.

17.    On April 18, 2024, Fishermen Involved in Sustaining our Heritage (FISH) filed a late motion to intervene in the proceedings.  In its motion, FISH states that it is a coalition of 60 commercial fishermen who fish in and around the waters of Cameron, Louisiana, where the project will be located, and that its participation is in the public interest because it is the only organization dedicated to championing the rights of commercial fisherman in Southwest Louisiana.[23]  FISH explains that it was unable to intervene during the intervention window because it did not exist until November 2023.[24]  We find that FISH failed to demonstrate that good cause exists to grant its motion to intervene out of time.  Although FISH states that it was formed in November 2023, it did not seek to intervene in the proceedings until April 18, 2024.  The Commission has previously explained that an entity cannot "sleep on its rights" and then seek untimely intervention.[25]  Further, FISH's interests are adequately represented by other parties to the proceeding, including its Executive Director, Travis Dardar,[26] as well as For a Better Bayou and Louisiana Bucket Brigade, with which FISH jointly filed comments on January 17, 2024, regarding the project's impacts on commercial fishing and shrimping. Last we note that on its website, FISH states that it partners with other groups and NGOs, including several that are intervenors in these proceedings:  Healthy Gulf; Sierra Club; For a Better Bayou; and Louisiana Bucket Brigade.[27]  Therefore, FISH's late motion to intervene is denied.

18.    On January 6, 2022, the Environmental Coalition jointly filed a protest.[28]  On March 3, 2023, CP2 LNG and CP Express filed an answer to the Environmental

---

[23] FISH April 18, 2024 Motion to Intervene at 1-2.

[24] *Id.* at 3.

[25] *See Cal. Dept. of Water Resources*, 120 FERC ¶ 61,057, at P 14 (2007) (footnote omitted), *reh'g denied*, 120 FERC ¶ 61,248, *aff'd sub nom. Cal. Trout and Friends of the River v. FERC*, 572 F.3d 1003 (9th Cir. 2009) ("an entity cannot 'sleep on its rights' and then seek untimely intervention").

[26] Travis and Nicole Dardar March 3, 2023 Motion to Intervene.

[27] *Fishermen Involved in Sustaining our Heritage (FISH)*, https://fishermenfightback.org (last accessed May 22, 2024).

[28] On October 12, 2022, Louisiana Bucket Brigade filed, in this and several other Commission gas project dockets, a letter addressed to President Biden expressing general opposition to LNG export terminals on environmental, economic, climate, and national security grounds and sharing information about its *Defend U.S. Consumers* campaign,

Coalition's protest. Although the Commission's Rules of Practice and Procedure do not permit answers to protests,[29] we will accept the answer herein because it clarifies the concerns raised and provides information that has assisted in our decision making.

19.     The Environmental Coalition asserts that the applicants have not demonstrated market need for the project and that the project's climate impacts render it not consistent with the public interest. Individuals and other entities also filed comments expressing similar concerns. In addition, the Commission received comments in support of the project, citing an increase in job opportunities and local economic investment, as well as comments from international energy companies and utilities that executed sales purchase agreements with CP2 LNG urging that the project is needed. The protests and comments were addressed in the EIS, and as appropriate, below.

## III.     Discussion

### A.     CP2 LNG Project (Docket No. CP22-21-000)

#### 1.     Jurisdiction over CCS Facilities

20.     CP2 LNG contends that the CCS facilities are not subject to the Commission's jurisdiction, noting that certain components will be subject to the regulatory authority of other entities.[30] Healthy Gulf asserts that the CCS facilities must be considered a part of the project,[31] and Sierra Club argues that the carbon capture facility within the terminal boundary should be considered a part of the proposed project and subject to the Commission's jurisdiction like other pollution control equipment at LNG terminals.[32]

---

which Louisiana Bucket Brigade states will increase public awareness about the risks associated with continued gas export terminal development. Louisiana Bucket Brigade October 12, 2022 Letter at 1-4. The Bucket Brigade's October 12th letter generally expresses the same issues already raised in its joint protest and environmental comments in this proceeding.

[29] 18 C.F.R. § 385.213(a)(2) (2023).

[30] Application at 12; CP2 LNG July 7, 2023 Response to Environmental Information Request at General Attachment 1-a. *See infra* note 40 (discussing facilities subject to both the Commission's and another agency's jurisdiction).

[31] Healthy Gulf January 5, 2022 Intervention at 1-2.

[32] Environmental Coalition January 6, 2022 Protest at 5. LNG Terminals often include selective catalytic reduction systems to minimize emissions of nitrogen oxides

21.     We conclude that the CCS facilities located within the terminal fence-line up to the entry point of the send-out pipeline[33] are subject to the Commission's jurisdiction under section 3(e) of the NGA.[34]  The Commission has consistently exercised its jurisdiction over pretreatment facilities within an LNG terminal's fence-line[35] that remove trace constituents[36] from the feed gas, as well as over on-site facilities for the disposition of trace constituents.[37]  The fact that another agency may have jurisdiction over some aspect of a facility within the fence-line of an LNG terminal does not serve to remove that facility from Commission jurisdiction.  Many facilities within an LNG

_____

(NOx) from combustion turbines.  *See, e.g.*, final EIS at 4-365; January 2019 Final EIS for Port Arthur Liquefaction Project at 2-9 (filed in Docket No. CP17-20-000).

[33] The send-out pipeline would mostly be located outside the terminal fence-line, but the proposed entry point is located under the southern portion of the terminal's floodwall.  CP2 LNG July 22, 2022 Response to Environmental Information Request at 2-3.  The Department of Transportation's Pipelines and Hazardous Materials Safety Administration (PHMSA) states that it would have jurisdiction over the send-out $CO_2$ pipeline starting from the first flange connection downstream of the on-site $CO_2$ pipeline pumps.  Final EIS at 4-397 to 4-398.

[34] 15 U.S.C. § 717b(e).  We note that, consistent with this finding, the EIS evaluated the on-site CCS facilities.

[35] "LNG terminal" includes facilities at the terminal site that are used to process natural gas.  15 U.S.C. § 717a(11).  *See, e.g.*, *supra* note 8 (describing jurisdictional pretreatment facilities that remove $CO_2$, $H_2S$, water, and heavy hydrocarbons from feed gas); September 2022 Final EIS for the Commonwealth LNG Project at 4-264 (describing jurisdictional pretreatment facilities to remove mercury, $CO_2$, $H_2S$, water, and heavy hydrocarbons from feed gas) (filed in Docket No. CP19-502-000).  *But see Freeport LNG Dev., L.P.*, 175 FERC ¶ 61,237, at n.9 (2021) (finding that an off-site helium processing facility is not jurisdictional because "…the helium plant will be separated by a unit fence and have minimal impacts on the safety and reliability of the pretreatment facility.").

[36] Pipeline-quality natural gas typically contains trace constituents such as nitrogen, oxygen, $CO_2$, and water.  Trace constituents have no significant effect on the operational efficiency of natural gas when used as an energy source but can negatively affect liquefaction equipment and product purity when present in feed gas for LNG production.

[37] For instance, in the event the CCS facilities are unavailable, the $CO_2$ removed from the feed gas will be routed to the jurisdictional facilities and equipment for final disposition.  *See supra* note 15.

Document Accession #: 20240627-3107          Filed Date: 06/27/2024

terminal's fence-line are both jurisdictional to the Commission and subject to other regulatory authorities.[38]

## 2. Public Interest Standard Under Section 3 of the NGA

22.      Because the proposed facilities will be used to export natural gas to foreign countries, the construction and operation of the proposed facilities and site of their location require approval by the Commission under section 3 of the NGA.[39]   Commenters argue that the NGA does not contain a legal standard for the authorization of LNG terminals under section 3(e), and that the Commission has not articulated a coherent policy for exercising this authority.[40]   NRDC contends that the NGA requires the

---

[38] For example, while CP2 LNG states that the emissions from the on-site combustion turbine powering the $CO_2$ compressors are included in its air permit application submitted to the Louisiana Department of Environmental Quality (Louisiana DEQ) (CP2 LNG's July 22, 2022 Response to Environmental Information Request at 3.), we note that the air permit application also covers emissions from all facilities undisputedly subject to the Commission's jurisdiction, including the project's eighteen liquefaction blocks and two power plants.  Final EIS at 4-357; CP2 LNG's August 1, 2022 Response to Environmental Information Request at Attachment 1.f.v-1. Additionally, the regulatory authorities with jurisdiction over components of the CCS system highlighted by CP2 LNG—PHMSA and EPA under the UIC permitting program—have jurisdiction over the $CO_2$ pipeline and geological sequestration of carbon dioxide, respectively, but do not have jurisdiction over the $CO_2$ extraction and compression facilities located at the CP2 LNG Project terminal site.

[39] 15 U.S.C. § 717b(a).  The regulatory functions of NGA section 3 were transferred to the Secretary of Energy in 1977 pursuant to section 301(b) of the Department of Energy Organization Act.  Pub. L. No. 95-91, 42 U.S.C. § 7101 *et seq.* (2012).  In reference to regulating the imports or exports of natural gas, the Secretary of Energy subsequently delegated to the Commission the authority to approve or disapprove the construction and operation of natural gas import and export facilities and the site at which such facilities shall be located.  The most recent delegation is in DOE Delegation Order No. S1-DEL-FERC-2006, effective May 16, 2006.  Applications for authorization to import or export natural gas must be submitted to the Department of Energy (DOE). The Commission does not authorize importation or exportation of the commodity itself. *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016) (detailing how regulatory oversight for the export of LNG and supporting facilities is divided between the Commission and DOE).

[40] *See, e.g.*, Better Bayou et al. March 13, 2023 Comments at 1-3; NRDC March 13, 2023 Comments at 2-3; Niskanen Center March 13, 2023 Comments at 8-9.

Commission to "meaningfully evaluate this proposed [p]roject through a genuine framework to balance those relevant costs against assessed benefits."[41]

23.     We disagree that we lack a coherent standard.  Section 3 provides that an application shall be approved if the Commission finds the proposal "will not be [in]consistent with the public interest," subject to "such terms and conditions as the Commission [may] find necessary or appropriate."[42]  The U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) has explained that the NGA section 3 standard "sets out a general presumption favoring . . . [such] authorization[s]."[43]  To overcome this favorable presumption and support denial of an NGA section 3 application, there must be an "affirmative showing of inconsistency with the public interest."[44]  In addition, NGA section 3(c) provides that the exportation of gas to nations with which there is in effect a free trade agreement (FTA nations) "shall be deemed to be consistent with the public interest."[45]  As noted above, CP2 LNG has received authorization to export to FTA nations.[46]

24.     We received comments contending that CP2 LNG fails to provide evidence of market need for the proposed project and that authorization of the project may lead to

---

[41] NRDC March 13, 2023 Comments at 2-3.

[42] 15 U.S.C. § 717b(a), (e)(3).  For a discussion of the Commission's authority to condition its approvals of LNG facilities under section 3 of the NGA, *see, e.g.*, *Distrigas Corp. v. FPC*, 495 F.2d 1057, 1063-64 (D.C. Cir. 1974), *cert. denied*, 419 U.S. 834 (1974); *Dynegy LNG Prod. Terminal, L.P.*, 97 FERC ¶ 61,231 (2001).

[43] *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023) (*Alaska LNG*) (quoting *W. Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982)); *EarthReports v. FERC*, 828 F.3d at 953 (same); *see also Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 203 (D.C. Cir. 2017).

[44] *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d at 203 (quoting *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F.2d 1105, 1111 (D.C. Cir. 1987)).  *See also KeySpan LNG, L.P.*, 112 FERC ¶ 61,028, at PP 3, 29 (2005) (finding that authorization of a proposed LNG import terminal would be inconsistent with the public interest where the proposed facilities would not fully comply with current safety standards even though the project would provide "a new source of reliable LNG imports in New England, where gas is critically needed.").

[45] 15 U.S.C. § 717b(c).

[46] *See supra* P 8.

Document Accession #: 20240627-3107    Filed Date: 06/27/2024

overbuilding U.S. LNG export capacity.[47]  The Institute for Energy Economics & Financial Analysis claims that global demand for LNG exports was artificially inflated by the conflict in Ukraine and that future LNG demand growth is uncertain.[48]  Louisiana Bucket Brigade asserts that LNG companies are exploiting Russian hostilities to garner support for their proposed LNG projects and that expanding the number of LNG terminals poses national security risks.[49]  RESTORE states that the project's contribution to climate change outweighs any public benefits it may provide.[50]  NRDC argues that DOE's approval of exports of the natural gas commodity does not necessitate the Commission's approval of the proposed export facility, and that the Commission cannot solely rely on DOE's export approval to demonstrate the public benefits of the proposed project.[51]

25.    We also received comments from international energy companies and utilities that executed sales and purchase agreements with CP2 LNG, urging that the project is needed. Inpex Corporation and JERA, of Japan,[52] and EnBW Energie Baden-Wurttemberg AG, of Germany,[53] each filed comments stressing the importance of the CP2 LNG Project.  The entities note that the project will contribute to energy security in Japan, Germany, and globally.

26.    Section 3(a) of the NGA provides, in part, that "no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so."[54]  As noted above, in 1977 the Department of Energy Organization Act transferred

---

[47] Environmental Coalition January 6, 2022 Protest at 2-3; Institute for Energy Economics & Financial Analysis March 13, 2023 Comments at 2-4; NRDC March 13, 2023 Comments at 2-3.

[48] Institute for Energy Economics & Financial Analysis March 13, 2023 Comments at 2-4.

[49] Louisiana Bucket Brigade October 12, 2022 Letter at 1-2.

[50] RESTORE March 13, 2023 Comments at 6.

[51] NRDC March 13, 2023 Comments at 2-3.

[52] INPEX Corporation December 7, 2023 Comments; JERA Co., Inc. December 8, 2023 Comments.

[53] EnBW Energie Baden-Wurttemberg AG December 14, 2023 Comments.

[54] 15 U.S.C. § 717b(a).

the regulatory functions of section 3 of the NGA to the Secretary of Energy. Subsequently, the Secretary of Energy delegated to the Commission authority to "[a]pprove or disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports."[55]

27.     However, as we have previously explained,[56] the Secretary has not delegated to the Commission any authority to approve or disapprove the import or export of the commodity itself.[57]  Therefore, we decline to address commenters' and protestors' economic claims (e.g., those regarding market demand for LNG), which are relevant only to the exportation of the commodity of natural gas, a matter within DOE's exclusive jurisdiction, and not implicated by our limited action of reviewing proposed terminal sites and facilities.[58]  The Commission's authority under NGA section 3 applies "only to the siting and the operation of the facilities necessary to accomplish an export[,]"[59] while "export decisions [are] squarely and exclusively within the [DOE]'s wheelhouse."[60] Similarly, issues related to the impacts of natural gas development and production are related to DOE's authorization of the export and not the Commission's siting of the facilities,[61] notwithstanding DOE's interpretation of its own obligations under the National Environmental Policy Act (NEPA).  We have reviewed CP2 LNG's application

---

[55] DOE Delegation Order No. 00-004.00A.

[56] *See Alaska Gasline Dev. Corp.*, 171 FERC ¶ 61,134, at P 15, *order on reh'g*, 172 FERC ¶ 61,214 (2020).

[57] *See supra* note 41.  *See also Freeport LNG Dev., L.P.*, 148 FERC ¶ 61,076, *reh'g denied*, 149 FERC ¶ 61,119 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016) (finding that because DOE, not the Commission, has sole authority to license the export of any natural gas through LNG facilities, the Commission is not required to address the indirect effects of the anticipated export of natural gas in its NEPA analysis); *Sabine Pass Liquefaction, LLC*, 146 FERC ¶ 61,117, *reh'g denied*, 148 FERC ¶ 61,200 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 59 (D.C. Cir. 2016).

[58] *See Jordan Cove Energy Project L.P.*, 170 FERC ¶ 71,202, at P 32 (2020); *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143, at P 13 (2022).

[59] *Trunkline Gas Co., LLC*, 155 FERC ¶ 61,328, at P 18 (2016).

[60] *Sierra Club v. FERC*, 827 F.3d at 46.

[61] *Id.*

to determine if the siting, construction, and operation of its facilities as proposed would not be consistent with the public interest.[62]

28.    CP2 LNG states that it has contractually secured through agreements with landowners all land required for the construction and operation of the CP2 LNG Project.[63]

29.    Additionally, as discussed further below, Commission staff's EIS for the project finds that, although some impacts of the project would be permanent and significant, such as impacts on visual resources, including impacts to visual resources within environmental justice communities, most impacts would not be significant or would be reduced to less-than-significant levels with the implementation of avoidance, minimization, and mitigation measures recommended in the EIS[64] and adopted by this order.  We conclude that the various arguments raised regarding the CP2 LNG Project do not amount to the affirmative showing of inconsistency with the public interest that is necessary to overcome the presumption in section 3 of the NGA.

30.    In accordance with the Memorandum of Understanding signed on August 31, 2018, by the Commission and the Pipeline and Hazardous Materials Safety Administration (PHMSA) within the U.S. Department of Transportation (DOT),[65] PHMSA undertook a review of the proposed facility's ability to comply with the federal safety standards contained in Part 193, Subpart B, of Title 49 of the Code of Federal

---

[62] *See supra* P 41; *see also Nat'l Steel Corp.*, 45 FERC ¶ 61,100, at 61,332-33 (1988) (observing that DOE, "pursuant to its exclusive jurisdiction, has approved the importation with respect to every aspect of it except the point of importation" and that the "Commission's authority in this matter is limited to consideration of the place of importation, which necessarily includes the technical and environmental aspects of any related facilities").

[63] Application at 8.

[64] As part of its environmental review, Commission staff developed mitigation measures it determined would appropriately and reasonably reduce the environmental impacts resulting from project construction and operation.

[65] *Memorandum of Understanding Between the Department of Transportation and the Federal Energy Regulatory Commission Regarding Liquefied Natural Gas Transportation Facilities* (Aug. 31, 2018), https://www.ferc.gov/legal/mou/2018/FERC-PHMSA-MOU.pdf.

Regulations.[66]  On June 28, 2023,[67] PHMSA issued a Letter of Determination indicating CP2 LNG has demonstrated that the siting of the proposed CP2 LNG Project complies with these federal safety standards.  If the proposed project is subsequently modified so that it differs from the details provided in the documentation submitted to PHMSA, further review would be conducted by PHMSA.

31.  CP2 LNG will operate its LNG terminal under the terms and conditions mutually agreed to by its customers and will solely bear the responsibility for the recovery of any costs associated with construction and operation of the terminal and associated facilities.  Accordingly, CP2 LNG's proposal does not trigger NGA section 3(e)(4).[68]

32.  In view of the above, after careful consideration of the entire record of this proceeding, including the findings and recommendations of the final EIS, we find that, subject to the conditions imposed in this order, CP2 LNG's proposal is not inconsistent with the public interest.  Therefore, we will grant CP2 LNG's application.

## B.    CP Express Pipeline Project (Docket No. CP22-22-000)

33.  Because the proposed facilities will be used to transport natural gas in interstate commerce subject to the Commission's jurisdiction, the construction and operation of the facilities are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.[69]

### 1.  Certificate Policy Statement

34.  The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[70]  The Certificate Policy Statement establishes criteria for

---

[66] 49 C.F.R. pt. 193, subpt. B (2023).

[67] Commission staff July 6, 2023 memo, Docket No. CP22-21-000 (attaching PHMSA's Letter of Determination).

[68] 15 U.S.C. § 717b(e)(4) (governing orders for LNG terminals offering open access service).

[69] *Id.* §§ 717f(c) & (e).

[70] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).  On March 24, 2022, the Commission issued an order converting the policy statements issued in February 2022 to draft policy statements.  *Certification of New Interstate Nat. Gas Facilities*

determining whether there is a need for a proposed project and whether the proposed project will serve the public interest. The Certificate Policy Statement explains that, in deciding whether to authorize the construction of new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences. The Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

35.    Under this policy, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new pipeline facilities. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis, where other interests are considered.

### a.    No Subsidy Requirement and Project Need

36.    CP Express's proposal satisfies the threshold requirement that it financially support the project without relying on subsidization from existing customers. CP Express is a new company with no existing shippers. Thus, there is no potential for subsidization on CP Express's system.[71]

37.    CP Express asserts that the pipeline project is needed to transport domestically sourced natural gas to the CP2 LNG Project, where the gas will be liquefied and exported under CP2 LNG's DOE/FE export authorization.[72] CP Express entered a long-term

---

*Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,197 (2022) (Order on Draft Policy Statements).

[71] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 32 (2017), *order on reh'g*, 163 FERC ¶ 61,197 (2018); *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042, at P 28 (2017), *order denying reh'g*, 163 FERC ¶ 61,098 (2018); *Sierrita Gas Pipeline, LLC*, 147 FERC ¶ 61,192, at P 23 (2014).

[72] Application at 43.

precedent agreement with CP2 LNG for the full capacity of the pipeline system. Sierra
Club asserts that the Commission may not rely on this precedent agreement as evidence
of project need because CP2 LNG is an affiliate.[73]

38.     As the Commission has previously recognized, "it is not an uncommon model for
entities developing LNG terminals to construct and operate, through an affiliate, an
associated pipeline to provide transportation and ensure delivery of the natural gas which
will serve as feedstock for the liquefaction process."[74] Further, affiliated LNG terminals,
unlike affiliated local distribution companies, have no captive customers to whom they
can pass the costs associated with their transportation contracts.[75] We find CP Express's
precedent agreement with CP2 LNG for 100% of the pipeline's capacity to be significant
evidence of project need.

### b.     Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities

39.     As discussed above, CP Express does not have existing customers. In addition,
there is no evidence that the CP Express Pipeline Project will adversely affect other
pipelines or their captive customers. The project is designed to connect the existing
interstate grid to the proposed CP2 LNG Project. No pipeline currently provides
transportation service to the CP2 LNG Project, and the project is not intended to replace
service on other pipelines. No pipeline companies or their customers have protested CP
Express's application. We find that the CP Express Pipeline Project will not adversely
affect existing customers or existing pipelines and their customers.

40.     We are also satisfied that CP Express has taken appropriate steps to minimize
adverse economic impacts on landowners and surrounding communities. CP Express
states that the project's location and design were selected to minimize impacts to
landowners, and CP Express revised its pipeline route based on conversations with
landowners during the pre-filing process to reduce those impacts to the extent

---

[73] Sierra Club March 11, 2022 Comments at 6. *See also* Niskanen Center January
13, 2023 Comments at 5.

[74] *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at P 24 (2023) (citing *Corpus
Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135 (2019), *order on reh'g*,
181 FERC ¶ 61,033 (2022)); *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019), *order
on reh'g*, 170 FERC ¶ 61,046 (2020); *Plaquemines LNG*, 168 FERC ¶ 61,204; *Port
Arthur LNG, LLC*, 167 FERC ¶ 61,052 (2019); *Calcasieu Pass LNG*, 166 FERC
¶ 61,144).

[75] *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 24.

practicable.[76]  Approximately 43% of the project (39.2 miles) will be collocated with existing pipelines, power lines, roadways, and canals.  Construction of the project would affect 1,816.8 acres of land, 608.1 acres of which would be permanently retained for operation and maintenance of project facilities.[77]  Portions of the construction right-of-way that are not retained for operations and maintenance would be restored to preconstruction conditions.[78]

41.    Niskanen Center asserts that impacted landowners whose property is crossed by or next to CP Express's right-of-way would face the potential forced taking of their property via eminent domain, overall diminution in property value, and harms from construction activities and the permanent placement of a 48-inch gas pipeline on or near their land.[79] The EIS concludes that the CP Express pipeline is not expected to have more than negligible effects on property values, and the EIS includes protective conditions, adopted here, to mitigate construction impacts on landowner property.[80]  As of June 2022, CP Express had secured purchase/lease agreements for 94% of the project's aboveground facilities and anticipates that it will be able to secure agreements for the remaining aboveground tracts.[81]  Additionally, whether CP Express obtains land rights through agreement or eminent domain, landowners will be compensated for the use of their land.[82]

42.    In sum, we find that CP Express has demonstrated a need for the pipeline project and, further, that the project will not have adverse impacts on existing shippers or other pipelines and their existing customers and that the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.  Therefore, we

---

[76] *See* final EIS at 3-37.

[77] *Id.* at 1-4.

[78] *Id.*

[79] Niskanen Center March 13, 2023 Comments at 5.

[80] Final EIS at 4-298.

[81] *Id.* at 4-299.

[82] *See id.* at 4-247 (explaining that, in the event the company acquires land rights through eminent domain, a court would determine the appropriate level of compensation).

conclude that the project is consistent with the criteria set forth in the Certificate Policy Statement and analyze the environmental impacts of the project below.[83]

## 2. **Blanket Certificates**

43.     CP Express requests a Part 284, Subpart G blanket certificate in order to provide open-access transportation services.  Under a Part 284 blanket certificate, CP Express would not need individual authorizations to provide transportation services to particular customers.  CP Express filed a *pro forma* Part 284 tariff to provide open-access transportation services.  Because a Part 284 blanket certificate is required for CP Express to participate in the Commission's open-access regulatory regime, we will grant CP Express a Part 284 blanket certificate, subject to the conditions imposed herein.

44.     CP Express also requests a Part 157, Subpart F blanket certificate.  A Part 157 blanket certificate gives an interstate pipeline NGA section 7 authority to automatically, or after prior notice, perform a restricted number of routine activities related to the construction, acquisition, abandonment, and replacement and operation of existing pipeline facilities, provided that the activities comply with constraints on costs and environmental impacts.[84]  Because the Commission has previously determined through a rulemaking that these blanket-certificate eligible activities are in the public convenience and necessity,[85] it is the Commission's practice to grant new natural gas companies a Part 157 blanket certificate if requested.[86]  Accordingly, we will grant CP Express a Part 157 blanket certificate, subject to the conditions imposed herein.

---

[83] *See* Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

[84] *See* 18 C.F.R. § 157.203 (2023).

[85] *Revisions to the Blanket Certificate Reguls. & Clarification Regarding Rates,* Order No. 686, FERC Stats. & Regs. ¶ 31,231, at P 9 (2006) (cross-referenced at 117 FERC ¶ 61,074), *order on reh'g*, Order No. 686-A, 119 FERC ¶ 61,303, *order on reh'g*, Order No. 686-B, 120 FERC ¶ 61,249 (2007).

[86] *Cf. Rover Pipeline LLC*, 161 FERC ¶ 61,244, at P 13 (2017) (denying a request for a blanket certificate where the company's actions had eroded the Commission's confidence it would comply with all the requirements of the blanket certificate program, including the environmental requirements).

### 3. **Rates**

#### a. **Initial Rates**

45.     CP Express proposes separate initial recourse reservation rates for firm transportation service for Phase I service and for Phase II service of $7.637 per Dth and $4.203 per Dth, respectively, under Rate Schedule FTS.[87] CP Express states that once Phase II is placed in service, all facilities will be operated as a single, integrated system.[88] Accordingly, CP Express's proposed rates for Phase II service include the combined costs and design capacity of all project facilities constructed in both Phase I and Phase II and will apply to all service on the system after Phase II is placed into service. CP Express also proposes recourse rates for interruptible transportation service under Rate Schedule ITS that are equal to the 100% load factor equivalent of the applicable Rate Schedule FTS rate.

46.     CP Express states that it calculated the system rates using a straight-fixed-variable rate design. CP Express estimates a total cost of service of $203,732,195 for the first year of Phase I service and $223,817,850 for the first year of Phase II service.[89] CP Express states that its costs of service are based on a capital structure of 75% debt and 25% equity, with an estimated debt cost of 6.0%, a rate of return on equity (ROE) of 15.0%, and a depreciation rate of 5.0%.[90]

47.     Upon the completion and in-service of Phase I, CP Express proposes an initial cost-based reservation charge of $7.637 per Dth and a usage charge of $0.004 per Dth under Rate Schedule FTS, an interruptible rate of $0.255 per Dth under Rate Schedule ITS and an overrun charge of $0.255 per Dth.[91] CP Express calculated these rates based on its estimated first-year reservation cost of service of $200,642,025, variable costs of $3,090,170, and annual billing determinants of 2,189,272 Dth/day.

---

[87] Application at 33-34; October 17, 2022 Response to Data Request at Revised Ex. N (Revised Ex. N). CP Express revised Exhibits K, L, N, and O of its application in a response to a data request on October 17, 2022. *Id.*

[88] Construction during Phase II will consist entirely of the addition of 117,400 hp of gas-fired compression at the Moss Lake Compressor Station. *See supra* P 7.

[89] Revised Ex. N.

[90] *Id.* The 5% depreciation rate is derived from the 20-year term of CP Express's transportation service agreement with CP2 LNG.

[91] Revised Ex. N.

48.     Upon completion and in-service of Phase II, CP Express proposes an initial cost-based reservation charge of $4.203 per Dth and a usage charge of $0.002 per Dth under Rate Schedule FTS, an interruptible rate of $0.141 per Dth under Rate Schedule ITS and an overrun charge of $0.141 per Dth.[92]  CP Express calculated these rates based on its estimated first-year reservation cost of service of $220,442,714, variable costs of $3,375,136, and annual billing determinants of 4,370,422 Dth/day.

49.     We find that, once the Phase II facilities are placed in service, CP Express's system will function as an integrated system and that CP Express's proposed rate schedule appropriately establishes a single recourse rate for all Phase II service that reflects the costs and design capacities of both the Phase I and Phase II facilities.[93]  The transportation service on the capacity created by the Phase II facilities will be indistinguishable from the transportation service on the capacity created by Phase I facilities.  The Phase II facilities will create an additional 2,200,000 Dth/day of capacity at a lower cost than the 2,200,000 Dth/day of capacity created by the Phase I facilities, resulting in lower rates for Phase II service than for Phase I.

50.     We have reviewed CP Express's proposed cost of service and initial rates, as revised, and find that they are consistent with current Commission policy, subject to the modifications described below.

### i.     **Variable Costs**

51.     CP Express states that its operations and maintenance (O&M) expenses include $3,090,170 in variable costs for Phase I service and $3,375,136 in variable costs for Phase II service.[94]  From these variable costs, CP Express calculated a usage charge of $0.004 per Dth for Phase I service and $0.002 per Dth for Phase II service.

52.     The Commission's longstanding cost classification method assigns O&M costs to particular accounts, depending on the type of cost incurred, as defined in the Uniform System of Accounts.[95]  Costs assigned to each account are required to be itemized between two sub-accounts:  labor and non-labor.  Once the costs in each account have been itemized, these costs are then classified as fixed or variable.  Under the straight-

---

[92] *Id.*

[93] *See, e.g., Plaquemines LNG*, 168 FERC ¶ 61,204 at P 33; *Gulfstream Nat. Gas Sys., L.L.C.*, 105 FERC ¶ 61,052 (2003).

[94] Revised Ex. N.

[95] 18 C.F.R. pt. 201 (2023).

fixed-variable rate design, fixed costs should be collected through the reservation charge and variable costs should be collected through the usage charge.[96]

53.     In its Revised Exhibit N, CP Express classified costs from Account Nos. 853 (Compressor station labor and expenses), 857 (Measuring and regulating station expenses), 864 (Maintenance of compressor station equipment), and 865 (Maintenance of measuring and regulating station equipment) as variable and added them to its usage charge.  CP Express did not provide a breakdown of its accounts by labor and non-labor expenses.  Under the Commission's traditional cost classification method, non-labor costs in Account Nos. 853, 864, 857, and 865 are classified as variable, and labor costs are classified as fixed.[97]  We direct CP Express to calculate its usage charge in accordance with Commission regulations and policy and reflect only non-labor costs included in Account Nos. 853, 864, 857, and 865 in its usage charge.  Further, in its Revised Exhibit N, when CP Express calculated variable O&M expenses, CP Express did not remove the total variable O&M expenses from the fixed O&M expenses, thus double counting variable O&M expenses and increasing the total cost of service.  As stated above, fixed costs should be collected through the reservation charge and variable costs should be collected through the usage charge.  Therefore, we direct CP Express to recalculate its reservation charge in accordance with Commission policy.

54.     Furthermore, CP Express included Account No. 855 (Other fuel and power for compressor stations)[98] costs in the fixed O&M expenses used to calculate its reservation charge.  Because fuel use varies with throughput, these costs are properly classified as variable,[99] and we direct CP Express to include Account No. 855 costs in its usage charge.  When CP Express submits its tariff records before placing the project facilities into service, we direct CP Express to submit revised recourse rates consistent with the

---

[96] 18 C.F.R. § 284.7(e) (reservation charge) & § 284.10 (straight-fixed-variable rate design methodology) (2022); *Pipeline Serv. Obligations & Revisions to Reguls. Governing Self-Implementing Transp.; & Regul. Of Nat. Gas Pipelines after Partial Wellhead Decontrol,* Order No. 636, FERC Stats. & Regs. ¶ 30,939 (1992) (cross-referenced at 59 FERC ¶ 61,030); *Tenn. Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,157, at P 29 (2016).

[97] *Dominion Transmission Inc.*, 153 FERC ¶ 61,382, at P 33 (2015); *Columbia Gulf Transmission, LLC*, 152 FERC ¶ 61,214, at P 20 (2015).

[98] This account includes the cost of coal, oil, other fuel, or electricity used for the to operate compressor stations.  18 C.F.R. pt. 201 (2023), Account 855 Other fuel and power for compressor stations.

[99] *Tenn. Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,157 at P 25.

discussion herein, along with work papers in spreadsheet format, including formulas and a breakdown between labor and non-labor costs by account.[100]

### ii.     Design Capacity

55.     As revised, CP Express's proposed reservation rates for Phase I and Phase II service are based on a design capacity of 2,189,272 Dth/day and 4,370,422 Dth/day, respectively.[101]  Commission policy is to design initial rates based upon the full design capacity of the project.[102]  This approach ensures that the pipeline, not the rate payer, is placed at risk for underutilization of the facilities if it does not contract for its full capacity.[103]  Therefore, CP Express is directed to recalculate its initial rates based upon its design capacity of 2,200,000 Dth/day for Phase I service and 4,400,000 Dth/day for Phase II service.[104]

### iii.     Return on Equity

56.     CP Express contends its proposed 15% ROE is reasonable because its equity ratio is only 25%, and the Commission has regularly approved a 14% ROE for greenfield projects with equity ratios up to 50%, due to the increasing risks, in recent years, of developing and constructing new pipeline infrastructure.[105]

---

[100] When CP Express files its tariff records it should confirm that these Account No. 855 costs are not recoverable through its fuel reimbursement percentage.  *See Tenn. Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,157 at P 25 n.22.  *See infra* section III.B.3.c.

[101] Revised Ex. N.

[102] *See, e.g.*, *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042 at PP 106, 112; *Cameron Interstate Pipeline, LLC*, 147 FERC ¶ 61,230, at P 43 (2014).

[103] *See, e.g.*, *Dominion Transmission, Inc.*, 104 FERC ¶ 61,267, at P 57 (2003); *Pac. Gas Transmission Co.*, 70 FERC ¶ 61,016, at 61,045, *order on reh'g*, 71 FERC ¶ 61,268 (1995).

[104] *See* Application at 3, 8, & 23.  *See also* May 1, 2023 Response to Data Request at Attachment 2, reflecting revised fuel rates based upon a capacity of 2,200,000 Dth/day for Phase I service and 4,400,000 Dth/day for Phase II service.

[105] To support its claim that the risks of pipeline infrastructure development are increasing, CP Express cites recently proposed natural gas pipeline projects that have been abandoned as a result of opposition and regulatory challenges.  Application at 34 n.37.

57.     For greenfield pipelines with equity components equal to *or less than 50%*, the Commission has previously approved ROEs up to 14% for projects to reflect the higher risks faced by new market entrants relative to existing pipelines with an existing customer base.[106]  CP Express has not provided sufficient support for why the Commission should deviate from its policy of a 14% ROE for greenfield projects; therefore we reject its proposed 15% ROE.[107]  Because CP Express's equity component is less than 50%, consistent with Commission policy we authorize the use of a 14% ROE for this project.  Accordingly, we require CP Express to revise its proposed recourse rates using an adjusted overall rate of return reflecting a 14% ROE.

### b.     Negotiated Rates and Non-Conforming Provisions

58.     CP Express proposes to grant several contractual rights to CP2 LNG, the anchor shipper, that may materially deviate from the Rate Schedule FT Form of Service Agreement contained in CP Express's proposed *pro forma* tariff.  CP Express entered into a binding precedent agreement with CP Express for 100% of its firm transportation capacity for an initial term of 20 years subject to negotiated rates.  CP Express states that the open season made the negotiated rates and certain other contractual rights available to any qualifying anchor shippers.[108]

59.     CP Express states that CP2 LNG will have the following anchor shipper rights: (1) the one-time right to delay Phase II under certain conditions; (2) the right to extend the initial 20-year primary term of its Phase I or Phase II service by an additional term ranging from one to ten years, at its election, by providing notice to CP Express no later than two years prior to the end of the primary term of its service agreement; (3) at the time of that notice, if a term extension is elected, CP2 LNG may also choose to reduce its maximum transportation quantity for the extended term, provided, however, that the reduced quantity is no less than 225,000 Dth/day; (4) entitlements at primary points of receipt that, in aggregate, exceed its Maximum Daily Transportation Quantity (MDTQ),

---

[106] *Roaring Fork Interstate Gas Transmission, LLC*, 177 FERC ¶ 62,153, at P 30 (2021).  S*ee also, e.g.*, *Double E Pipeline*, 173 FERC ¶ 61,074, at P 42 (2020); *Nexus Gas Transmission, LLC*, 160 FERC ¶ 61,022, at P 81 (2017); *Fla. Se. Connection,* 154 FERC ¶ 61,080, at P 118 (2016); *Corpus Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135, at P 34 (2019).

[107] *See, e.g.*, *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 42 (rejecting request for a 14.5% ROE and approving a 14% ROE); *ETC Tiger Pipeline, LLC*, 131 FERC ¶ 61,010, at P 26 (2010) (denying a request for a 15% ROE and approving a 14% ROE); *Sonora Pipeline, LLC*, 120 FERC ¶ 61,032, at P 26 (2007) (rejecting a request for a 14.5% ROE and approving a 14% ROE).

[108] Application at 29.

provided that neither the primary firm entitlement at any single point of receipt nor its aggregate receipts on any day exceed its MDTQ, as well as the right to designate primary receipt point rights among available pipeline interconnections at any time prior to the execution of the service agreement; and (5) project-specific credit provisions to support the significant financial investment associated with development of the project that will remain in place for the duration of the firm service agreement.[109]

60.     As a threshold matter, for special terms and conditions of service to be permissible, they must be offered to all shippers who submit bids in an open season.[110] We are satisfied that CP Express met this requirement.  In its binding open season, CP Express stated that "Anchor Shippers will be eligible to receive certain incentives with respect to a negotiated rate, receipt point rights, and term extensions, consistent with regulatory requirements.  Shippers qualifying as Anchor Shippers for both phases of the project will also have certain rights regarding the timing of Phase II and related conditions precedent."[111]

61.     A material deviation in a service agreement is any provision that:  (1) goes beyond filling in the blank spaces with the appropriate information allowed by the tariff; and, (2) affects the substantive rights of the parties.[112]  The Commission prohibits negotiated terms and conditions of service that result in a shipper receiving a different quality of service than that offered to other shippers under the pipeline's generally applicable tariff or that affect the quality of service received by others.[113]  However, not all material deviations are impermissible.  Provisions that materially deviate from the corresponding *pro forma* agreement fall into two general categories:  (a) provisions the Commission must prohibit because they present a significant potential for undue discrimination among shippers, and (b) provisions the Commission can permit without a substantial risk of

---

[109] *Id.* at 30.  CP Express states that these contractual rights are similar to the anchor shipper rights provided to anchor shippers on two other Venture Global pipelines. *See Calcasieu Pass LNG*, 166 FERC ¶ 61,144 at PP 34-38 (TransCameron Pipeline Project); *Plaquemines LNG*, 168 FERC ¶ 61,204 at PP 62-65 (Gator Express Pipeline Project).

[110] *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042 at PP 116-118; *Columbia Gas Transmission, L.L.C.*, 153 FERC ¶ 61,008, at PP 7-21 (2015).

[111] October 17, 2022 Response to Data Request at 7.

[112] *Columbia Gas Transmission Corp.*, 97 FERC ¶ 61,221, at 62,002 (2001).

[113] *Monroe Gas Storage Co., LLC*, 130 FERC ¶ 61,113, at P 28 (2010).

undue discrimination.[114]  Further, the Commission has found that non-conforming provisions may be necessary to reflect the unique circumstances involved with the construction of new infrastructure and to provide the needed security to ensure the viability of a project.[115]

62.     We find that the non-conforming provisions in CP Express's precedent agreement with CP2 LNG constitute material deviations from CP Express's *pro forma* service agreement; however, we further find the non-conforming provisions are permissible because they do not present a risk of undue discrimination, do not adversely affect the operational conditions of providing service, and do not result in any customer receiving a different quality of service.[116]

63.     CP Express's *pro forma* tariff provides for CP Express to charge negotiated rates for its proposed services.  CP Express proposes to provide service under negotiated rate transportation service agreements.  CP Express must file either the negotiated rate agreements or tariff records setting forth the essential terms of the agreements in accordance with the Alternative Rate Policy Statement[117] and the Commission's negotiated rate policies.[118]  CP Express must file an executed copy of the non-conforming service agreement and identify and disclose all non-conforming provisions or agreements affecting the substantive rights of the parties under the tariff or service agreement.  This required disclosure includes any such transportation provision or agreement detailed in a

---

[114] *Columbia Gas Transmission Corp.*, 97 FERC at 62,003.  *See also Equitrans, L.P.*, 130 FERC ¶ 61,024, at P 5 (2010).

[115] *See, e.g.*, *Tenn. Gas Pipeline Co., L.L.C.*, 144 FERC ¶ 61,219 (2013); *Midcontinent Express Pipeline LLC*, 124 FERC ¶ 61,089 (2008).

[116] *See, e.g.*, *Gulf South Pipeline Co., L.P.*, 115 FERC ¶ 61,123 (2006); *Gulf South Pipeline Co., L.P.*, 98 FERC ¶ 61,318, at P 4 (2002).  *See also Calcasieu Pass LNG*, 166 FERC ¶ 61,144 at PP 34-38; *Plaquemines LNG*, 168 FERC ¶ 61,204 at PP 62-65.

[117] *Alt. to Traditional Cost-of-Service Ratemaking for Nat. Gas Pipelines; Regul. of Negotiated Transp. Servs. of Nat. Gas Pipelines*, 74 FERC ¶ 61,076, *clarification granted*, 74 FERC ¶ 61,194, *order on reh'g and clarification*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066, *reh'g dismissed*, 75 FERC ¶ 61,291 (1996), *petition denied sub nom. Burlington Res. Oil & Gas Co. v. FERC*, 172 F.3d 918 (D.C. Cir. 1998) (Alternative Rate Policy Statement).

[118] *Nat. Gas Pipelines Negotiated Rate Policies & Practices; Modification of Negotiated Rate Pol'y*, 104 FERC ¶ 61,134 (2003) (Negotiated Rate Policy Statement), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *reh'g dismissed and clarification denied*, 114 FERC ¶ 61,304 (2006).

precedent agreement that survives the execution of the service agreement. Consistent with section 154.112 of the Commission's regulations, CP Express must also file a tariff record identifying the agreements as non-conforming agreements.[119] In addition, the Commission emphasizes that the above determination relates only to those items described by CP Express in its application and not the entirety of the precedent agreement.[120]

### c.    **Fuel**

64.    CP Express proposes to recover the costs of fuel and lost and unaccounted for gas through in-kind reimbursement percentages of shipper receipts. CP Express states that the reimbursement percentages will be adjusted annually with a true-up mechanism set forth in section 13 of the General Terms and Conditions (GT&C) of its *pro forma* tariff.[121] CP Express proposes an initial fuel reimbursement percentage of 0.29% for Phase I service and 0.42% for Phase II service[122] and an initial lost and unaccounted for percentage of 0.25%.[123] CP Express states that the initial fuel reimbursement percentage reflects the required fuel to operate the Moss Lake Compressor Station on a design day with an assumed 100% load factor.

---

[119] 18 C.F.R. § 154.112 (2023).

[120] A Commission ruling on non-conforming provisions in a certificate proceeding does not waive any future review of such provisions when the executed copy of the non-conforming agreement(s) and a tariff record identifying the agreement(s) as non-conforming are filed with the Commission, consistent with section 154.112 of the Commission's regulations. *See, e.g.*, *Tenn. Gas Pipeline Co., L.L.C.*, 150 FERC ¶ 61,160, at P 44, n.33 (2015).

[121] Application at 35-36.

[122] May 1, 2023 Data Response at attach. 2. CP Express provided a revised fuel derivation to correct the fuel reimbursement percentages provided in the October 17, 2022 Data Response. The fuel consumption is projected to be 6,380 Dth/day for Phase I service and 18,707 Dth/day for Phase II service.

[123] *Id*.; October 17, 2022 Response to Data Request at 15. CP Express states that the 0.25% initial lost and unaccounted for percentage is consistent with the Commission's approval of the percentage for the similarly situated TransCameron Pipeline. *See Calcasieu Pass LNG*, 166 FERC ¶ 61,144 at PP 29, 31.

65.     We find that CP Express's proposed initial fuel and lost and unaccounted for gas reimbursement percentages are reasonable, and that the proposed true-up mechanism is consistent with Commission regulation and policy.[124]

### d.      Three-Year Filing Requirement

66.     Consistent with Commission precedent, CP Express is required to file a cost and revenue study no later than three months after its first three years of actual operation of the entire system (both Phase I and II) to justify its existing cost-based firm and interruptible recourse rates.[125]  In that filing, the projected units of service should be no lower than those upon which CP Express's approved initial rates are based.  The filing must include a cost and revenue study in the form specified in section 154.313 of the Commission's regulations to update cost of service data.[126]  CP Express's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580. In addition, CP Express is advised to include as part of the eFiling description a reference to Docket Nos. CP22-21-000 and CP22-22-000 in the cost and revenue study.[127]

67.     To the extent CP Express has not begun construction of the Phase II facilities within two years of the in-service date of Phase I, CP Express is directed to file a cost and revenue study three years after the in-service date of the Phase I facilities.  After reviewing the data, the Commission will determine whether to exercise its authority under NGA section 5 to investigate whether the rates remain just and reasonable.  In the alternative, in lieu of that filing, CP Express may make an NGA general section 4 rate filing to propose alternative rates to be effective no later than three years after the in-service date for its proposed facilities.

### e.      Pro Forma Tariff

68.     CP Express filed its *pro forma* tariff as part of its application in Exhibit P. CP Express states that the CP Express Pipeline System will provide transportation

---

[124] 18 C.F.R. § 154.403 (2023); *ANR Pipeline Co.*, 108 FERC ¶ 61,050 (2004).

[125] *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042 at P 105; *Fla. Southeast Connection*, 154 FERC ¶ 61,080 at P 139; *Bison Pipeline, LLC,* 131 FERC ¶ 61,013, at P 29 (2010); *Ruby Pipeline, L.L.C.*, 128 FERC ¶ 61,224, at P 57 (2009); *MarkWest Pioneer, L.L.C.*, 125 FERC ¶ 61,165, at P 34 (2008).

[126] 18 C.F.R. § 154.313 (2023).

[127] *Elec. Tariff Filings*, 130 FERC ¶ 61,047, at P 17 (2010).

Document Accession #: 20240627-3107    Filed Date: 06/27/2024

services on an unbundled, open access basis under nondiscriminatory terms and conditions.[128]

### i.    Negotiated Rate Authority

69.    Commission policy requires that if a pipeline files a tariff record reflecting the terms of a negotiated rate agreement, the tariff record summary must fully describe the essential elements of the transaction, including the name of the shipper, the negotiated rate, the type of service, the receipt and delivery points applicable to the service, and the volume of gas to be transported.  Also, where the price term of the negotiated rate agreement is a formula, the formula should be fully set forth in the tariff record.  CP Express is directed to modify its tariff, GT&C section 4.14(a)(v), to be consistent with the Commission's negotiated rate policy.[129]  In addition, CP Express must maintain separate and identifiable accounts for volumes transported, billing determinants, rate components, surcharges, and revenues associated with its negotiated rates in sufficient detail so that they can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case.  CP Express is ordered to add this record keeping requirement to section 4.14(c) of its tariff.[130]

### ii.    System Map

70.    CP Express's *pro forma* tariff does not include maps of its system and therefore does not comply with the Commission's regulations.  CP Express is required to revise its tariff to provide uniform resource locators (URL) designating a location on the internet for publication of its system maps.[131]

### iii.    Crediting of Operational Flow Order Penalties

71.    In section GT&C 14.2(a) of CP Express's *pro forma* tariff, CP Express proposes to credit penalties pursuant to Operational Flow Orders (OFO), net of transporter's costs, to non-offending firm transportation customers.  However, this section does not fully

---

[128] Application at 35.

[129] Negotiated Rate Policy Statement, 104 FERC ¶ 61,134, *order on reh'g and clarification*, 114 FERC ¶ 61,042, *reh'g dismissed and clarification denied*, 114 FERC ¶ 61,304.

[130] *See, e.g.*, *Gulf Crossing Pipeline Co., LLC*, 123 FERC ¶ 61,100 (2008).

[131] 18 C.F.R. § 154.106 (2023).

comply with Order No. 637.[132]  While CP Express's proposal states that it will credit OFO penalties only to non-offending firm shippers, we have generally held that a pipeline must credit revenues to all shippers.  Since all shippers, including interruptible shippers, may be subject to penalties, all shippers should therefore receive a proportional share of any net penalty revenues.[133]  We therefore direct CP Express to revise section 14.2(a) of its GT&C to provide crediting of OFO penalty revenues to all non-offending shippers, regardless of whether they are firm or interruptible.  Moreover, CP Express proposes to credit revenues "net of Transporter's costs."  CP Express will have the burden of supporting any such costs in a penalty revenue report.[134]  CP Express's customers may challenge the costs and the methods of identifying these amounts when the report has been filed.

#### iv.    Segmentation

72.    CP Express states that it does not propose to offer segmentation rights on its system as it is not operationally feasible and not desired by its shipper.  Therefore, CP Express requests exemption from section 284.7(d) of the Commission's regulations.[135]  According to CP Express, the pipeline will operate as a uni-directional line, receiving gas from receipt-only interconnects with upstream pipelines and transporting it to the single delivery point at the CP2 LNG Project with no intermediate delivery points allowing for segmentation of the capacity.[136]

73.    We find that because CP Express has uni-directional, receipt-only interconnections with upstream pipelines and one delivery point, segmentation is not operationally feasible

---

[132] *Regul. of Short-Term Nat. Gas Transp. Servs. & Regul. of Interstate Nat. Gas Transp. Servs.*, Order No. 637, FERC Stats. & Regs. ¶ 31,091 (cross-referenced at 90 FERC ¶ 61,109), *clarified*, Order No. 637-A, FERC Stats. & Regs. ¶ 31,099 (cross-referenced at 91 FERC ¶ 61,169), *reh'g denied*, Order No. 637-B, 92 FERC ¶ 61,062 (2000), *aff'd in part and remanded in part sub nom. Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18 (D.C. Cir.), *order on remand*, 101 FERC ¶ 61,127 (2002), *order on reh'g*, 106 FERC ¶ 61,088 (2004), *aff'd sub nom. Am. Gas Ass'n v. FERC*, 428 F.3d 255 (D.C. Cir. 2005).

[133] *Destin Pipeline Co., L.L.C.*, 99 FERC ¶ 61,060, at 61,284 (2002); *Nat. Gas Pipeline Co. of America*, 101 FERC ¶ 61,200, at P 99 (2002).

[134] *See* Order No. 637-A, FERC Stats. & Regs. ¶ 31,099 at 35,742.

[135] Application at 36.

[136] *Id.*

on the system as currently configured.[137]  Therefore, we will grant CP Express a limited waiver from implementing segmentation on its system.  The waiver is granted only until CP Express adds a point to its system making segmentation operationally feasible.  Before such additional point is placed in service, CP Express must file new or revised tariff records in accordance with the Commission's regulations to provide for segmentation.

## v.    NAESB

74.    The Commission has adopted in its regulations various standards for conducting business practices and electronic communication with interstate pipelines as promulgated by the North American Energy Standards Board (NAESB).[138]  The standards are intended to govern nominations, allocations, balancing measurement, invoicing, capacity release, and mechanisms for electronic communication between pipelines and those with whom they do business.  CP Express requests an extension of time to implement NAESB Wholesale Gas Quadrant (WGQ) Version 3.2 Standards relating to various Electronic Data Interchange (EDI),[139] Electronic Delivery Mechanism (EDM),[140] and Internet Electronic Transport (IET)[141] requirements until such time as CP Express is requested by a Part 284, open-access customer to provide such electronic data services.  CP Express states that the Commission generally has granted an extension of time to comply with

---

[137] *Calcasieu Pass LNG*, 166 FERC ¶ 61,144 at PP 39-40; *Plaquemines LNG*, 168 FERC ¶ 61,204 at PP 41-42; *Sierrita Gas Pipeline, LLC*, 147 FERC ¶ 61,192 at P 56.

[138] *See Standards for Bus. Practices for Interstate Nat. Gas Pipelines*, Order No. 698, FERC Stats. & Regs. ¶ 31,251 (2007) (cross-referenced at 119 FERC ¶ 61,317), *order granting clarification and denying reh'g*, Order No. 698-A, 121 FERC ¶ 61,264 (2007).  *Standards for Bus. Practices for Interstate Nat. Gas Pipelines*, Order No. 587-S, 111 FERC ¶ 61,203 (2005).  Pursuant to the June 14, 2005 errata notice in Docket No. RM96-1-026, the title of the May 9, 2005 final rule was changed from Order No. 654 to Order No. 587-S.

[139] EDI standards require computer-to-computer electronic data interchange of information in files as mapped from the NAESB WGQ datasets and communicated between trading partners over the Internet using the NAESB Internet Electronic Transport.

[140] EDM standards relate to the use of the Internet for pertinent business practice and electronic communications.

[141] IET refers to electronic transaction messaging standards which, in concert with Quadrant-specific EDM (QEDM), enable NAESB parties to securely and reliably exchange transactions over the Internet.

these standards.[142]  For good cause shown, we grant CP Express an extension of time to comply with EDI, EDM, and IET NAESB Standards, as requested.[143]  The extension of time is limited to the NAESB WGQ Version 3.2 Standards[144] promulgated by Order No. 587-Z,[145] and will be in effect until a Part 284 customer requests CP Express to offer the EDI, EDM, and IET transactions or data via its website.[146]  Further, CP Express must be fully compliant with the NAESB WGQ Version 3.2 Standards as it relates to proprietary location codes.[147]

### vi.  <u>Determination</u>

75.     CP Express proposes to offer firm and interruptible transportation services on an open-access basis under the terms and conditions set forth in the *pro forma* tariff attached as Exhibit P to the application.  We find that CP Express's proposed *pro forma* tariff generally complies with Part 284 of the Commission's regulations,[148] with the exceptions discussed above.  We will require CP Express to file actual tariff records consistent with

---

[142] Application at 37 (citing *TransCameron Pipeline, LLC*, 174 FERC ¶ 61,186 (2021)).

[143] NAESB WGQ Version 3.2 Standards 1.3.3, 1.3.9, 1.3.13, 1.3.20, 1.3.21, 1.3.23, 1.3.48, 1.3.53, 1.3.55, 1.3.56, 1.3.58, 1.3.62, 1.4.2, 1.4.7, 2.3.5, 2.3.6, 2.3.13, 2.3.32, 2.3.40, 2.4.2, 2.4.6, 2.4.7, 2.4.8, 3.3.23, 3.3.24, 3.4.1 through 3.4.4, 4.3.1 through 4.3.3, 4.3.42 through 4.3.47, 4.3.49, 4.3.50, 4.3.52 through 4.3.55, 4.3.57, 4.3.58, 4.3.60, 4.3.62, 4.3.66 through 4.3.69, 4.3.72, 4.3.75, 4.3.78 through 4.3.82, 4.3.84 through 4.3.87, 4.3.107 through 4.3.110, 5.3.10 through 5.3.12, 5.3.70 through 5.3.72, 5.4.14 through 5.4.17, 5.4.20 through 5.4.27, 10.3.1, 10.3.3 through 10.3.12, and 10.3.14 through 10.3.29.

[144] *See B-R Pipeline Co.*, 128 FERC ¶ 61,126, at P 6 (2009) (each time the Commission adopts new versions of the standards, a pipeline seeking to retain an existing waiver must request a waiver of the new standards).

[145] *Standards for Business Pracs. of Interstate Nat. Gas Pipelines*, Order No. 587-Z, 176 FERC ¶ 61,015 (2021).

[146] CP Express states that any changes to NAESB standards, as well as any other subsequent changes in the Commission's generally applicable requirements for tariffs, that take effect prior to the in-service date of the CP Express Pipeline Project will be incorporated into the tariff when CP Express files to make its tariff effective.

[147] *See Equitrans L.P.*, 153 FERC ¶ 61,320, at PP 9-13 (2015).

[148] 18 C.F.R. pt. 284 (2023).

Document Accession #: 20240627-3107    Filed Date: 06/27/2024

the directives in this order at least 30 days and no more than 60 days prior to the commencement of service. In addition, CP Express must file a redline-strikeout version of the revised tariff records to identify the changes made to comply with this order.

## C.    **Environmental Analysis**

76.    To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[149] Commission staff evaluated the potential environmental impacts of the proposed project in an EIS. The U.S. Army Corps of Engineers (Army Corps); U.S. Department of Energy; U.S. Coast Guard; Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA); and National Oceanic and Atmospheric Administration's National Marine Fisheries Service (NMFS) participated in development of the EIS as cooperating agencies, as defined by NEPA.[150]

77.    On February 17, 2021, Commission staff began its environmental review of the CP2 LNG and CP Express Projects by granting the applicants' request to use the pre-filing process, assigning Docket No. PF21-1-000.[151] The Commission's pre-filing process is designed to encourage early involvement by citizens, governmental entities, non-governmental organizations, and other interested parties in the development of proposed natural gas transmission projects, prior to the filing of a formal application. As part of the pre-filing review, staff participated in three virtual open house public meetings held by the applicants on April 6, 7, and 8, 2021, to explain the Commission's environmental review process to interested stakeholders.

78.    As part of the pre-filing process, on April 27, 2021, the Commission issued a Notice of Scoping Period Requesting Comments on Environmental Issues for the Planned CP2 LNG and CP Express Project and Notice of Public Scoping Sessions. The notice was published in the Federal Register on May 4, 2021, and opened a scoping period, with comments due on May 27, 2021.[152] The notice was mailed to about 2,700 entities, including federal, state, and local officials; agency representatives; conservation organizations; Native American Tribes; local libraries and newspapers; non-

---

[149] 42 U.S.C. §§ 4321 *et seq*. *See also* 18 C.F.R. pt. 380 (2023) (Commission's regulations implementing NEPA).

[150] 40 C.F.R. § 1501.8 (2023). Cooperating agencies have jurisdiction by law or special expertise with respect to resources potentially affected by a proposal and participate in the NEPA analysis.

[151] Approval of Pre-filing Request, Docket No. PF21-1-000 (issued Feb. 17, 2021); *see also* 18 C.F.R. § 157.21(b) (2023).

[152] 86 Fed. Reg. 23,711 (May 4, 2021).

governmental organizations; and property owners in the vicinity of the proposed project (Commission staff's environmental mailing list).  Commission staff held three virtual public scoping sessions via telephone on May 11, 12, and 13, 2021, to provide government agencies and the general public the opportunity to comment about issues to be addressed in the environmental analysis.  The pre-filing process ended on December 2, 2021, when CP2 LNG and CP Express filed their applications for the CP2 LNG and CP Express Projects.

79.     On February 9, 2022, the Commission issued a Notice of Intent to Prepare an Environmental Impact Statement for the Proposed CP2 LNG and CP Express Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review.  The notice was published in the Federal Register[153] and established a comment period that ended on March 11, 2022.  The notice was also mailed to project stakeholders on the Commission staff's environmental mailing list, including individuals who provided comments during the pre-filing process or asked to be on the mailing list.

80.     In response to the notices, the Commission received 56 comments and 1,719 individual form letters from landowners; federal, state, and local agencies; Native American Tribes; companies and non-governmental organizations; and other interested individuals.  Primary issues raised by the commenters related to potential project impacts on climate change, water quality and wetlands, wildlife, aquatic resources, threatened and endangered species, recreational activities, local infrastructure, environmental justice communities, and air quality.

81.     Pursuant to NEPA requirements, Commission staff prepared a draft EIS for the projects, which was issued on January 19, 2023, and addressed all substantive environmental comments received prior to its issuance.  Notice of the draft EIS was published in the *Federal Register* on January 26, 2023,[154] establishing a 45-day public comment period that ended on March 13, 2023.  Copies of the notice were mailed to Commission staff's environmental mailing list.

82.     In response to the draft EIS, the Commission received written comments from three federal agencies, two state agencies, eleven companies and non-governmental organizations, and nine individuals.  The Commission also received a copy of one form letter associated with an online petition which had 83 signatures at the time of filing. Commission staff held two public comment sessions in the project area on March 1 and 2, 2023, in Calcasieu and Cameron Parishes, Louisiana, respectively, to solicit and receive comments on the draft EIS.  A total of 36 individuals provided oral comments. Primary issues raised by the commenters relate to potential project impacts on wetlands,

---

[153] 87 Fed Reg. 8580 (Feb. 15, 2022).

[154] 88 Fed. Reg. 4995 (January 26, 2023).

wildlife, aquatic resources, threatened and endangered species, air quality, LNG terminal safety, flooding and tropical storm systems, and greenhouse gases and climate change.

83.     Commission staff issued the final EIS for the projects on July 28, 2023.  The *Notice of Availability* of the final EIS was published in the *Federal Register* on August 4, 2023,[155] and the notice was mailed to Commission staff's environmental mailing list.  The final EIS addresses:  geology; soils; water resources; wetlands; vegetation; wildlife; aquatic resources; threatened and endangered species; land use; recreation; visual resources; socioeconomics; environmental justice;[156] cultural resources; air quality; noise; safety; cumulative impacts; and alternatives.  It also addresses all substantive environmental comments received on the draft EIS.

84.     The final EIS concludes that construction and operation of the projects would result in some adverse environmental impacts, but that with the mitigation measures recommended in the final EIS, most of these impacts would be reduced to less than significant levels.[157]  The final EIS concludes that impacts on visual resources, including cumulative visual impacts and visual impacts affecting environmental justice communities in the region, would be significant.[158]  With regard to climate change impacts, the final EIS does not characterize the project's GHG emissions as significant or insignificant, but we provide information about these emissions below, based on the information on file in the proceeding and as disclosed in the final EIS.[159]

85.     The Commission received comments on the final EIS from the U.S. Environmental Protection Agency (EPA), NMFS, Louisiana Department of Wildlife and Fisheries (Louisiana DWF),[160] the Natural Resources Defense Council (NRDC), the

---

[155] 88 Fed. Reg. 51,802 (Aug. 4, 2023).

[156] Under NEPA, the Commission considers impacts to all potentially affected communities.  Consistent with Executive Order 12898 and Executive Order 14,008, the Commission separately identifies and addresses "disproportionately high and adverse human health or environmental effects" on environmental justice communities. Exec. Order No. 12898, 59 Fed. Reg. 7629 (Feb. 11, 1994); Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).  *See infra* section III.C.7.

[157] Final EIS at 5-1.

[158] *Id.*

[159] Final EIS at 4-549; *see infra* section III.C.8.

[160] We note that most of Louisiana DWF's comments on the final EIS were identical to its comments on the draft EIS, which were addressed in Appendix N of the

Environmental Integrity Project, Sierra Club, For a Better Bayou, Institute for Energy Economics and Financial Analysis, and landowners, stakeholders, and members of the public.[161]  Based on the comments received on the final EIS, the following issues are discussed further below:  essential fish habitat (EFH); wildlife (including special status species and nesting birds); water quality certification; vulnerability to hurricanes and high winds speeds, shoreline erosion, and sea level rise; environmental justice; commercial fisheries and shrimping; climate change; air quality; alternatives; and cumulative impacts.

## 1.  __Essential Fish Habitat__

86.    The final EIS evaluated the potential impacts of three alternative pipeline routes on EFH and concluded that the alternatives do not provide a significant environmental advantage over the preferred pipeline route, which avoids impacting existing oyster habitat, artificial finfish reefs, and oyster cultch plants[162] within Calcasieu Lake, as well as marsh restoration projects south of the lake.[163]  NMFS comments that it disagrees with this determination and notes that the alternative route through Calcasieu Lake would avoid a significant portion of estuarine emergent wetlands, resulting in fewer direct impacts to EFH.[164]  NMFS, however, concurs with the final EIS's conclusion that implementation of the applicants' preliminary compensatory mitigation plan and beneficial use of dredged materials plan would offset most of the EFH impacts.[165]  Therefore, NMFS states that the EFH consultation requirements of the Magnuson-

---

final EIS.  Only substantive comments not previously addressed in the final EIS are addressed in this order.

[161]  *See, e.g.*, Pam Elders October 17, 2023 Comments; Adley and Judy Dyson October 19, 2023 Comments; Karen Uhlenhuth October 19, 2023 Comments; Rebecca Liberman October 20, 2023 Comments; Jarrod Baniqued Comments; Kalama Reuter November 22, 2023 Comments; Donna Gaab November 22, 2023 Comments; Wendy Ring November 27, 2023 Comments; Thomas Kitson November 29, 2023 Comments; Alexis Dekle Comments; Betty Winkler November 30, 2023 Comments.

[162]  Oyster cultching involves the placement of various kinds of material into the water to provide points of attachment for oyster larvae.

[163]  Final EIS at 3-64.

[164]  NMFS September 29, 2023 Comments at 1.

[165]  *Id.*

Stevens Fishery Conservation and Management Act have been fulfilled for the projects.[166]

## 2. **Sensitive Species**

### a. **Endangered Species Act Consultation**

87.    On December 1, 2023, the U.S. Fish and Wildlife Service's Louisiana Ecological Services Office (FWS) issued a Biological Opinion for the portions of the projects in Louisiana.[167]  Thus, consultation under Section 7 of the Endangered Species Act is now complete and as such staff's environmental recommendation 19 that was included in the final EIS, is not included as an environmental condition of this order.[168]

### b. **Rice's Whale**

88.    Sierra Club comments that the final EIS does not fully analyze the potential direct, indirect, and cumulative impacts the project would have on the Rice's whale.[169]  Sierra Club further states that the final EIS inappropriately relied on CP2 LNG's commitment to provide vessel operators with materials outlining voluntary measures to reduce their impacts on marine mammals as its basis for finding the CP2 LNG Project is not likely to adversely affect the Rice's whale.[170]

89.    As discussed in the final EIS, the Rice's whale has been documented off the coast of Louisiana in the Gulf of Mexico.[171]  Barges and other vessels carrying construction equipment, as well as LNG carriers, would travel through this area to the CP2 LNG terminal during construction and operation, respectively, and could potentially strike a

---

[166] *Id.*

[167] FWS January 17, 2024 Biological Opinion.

[168] NMFS concurred with Commission staff's conclusions for federally designated threatened or endangered species under their jurisdiction.  NMFS May 12, 2023 Letter (filed in the docket in CP2 LNG and CP2 Express May 31, 2023 supplemental filing at 327).  This letter was inadvertently excluded from the final EIS.

[169] Sierra Club March 5, 2024 Comments at 1-2.

[170] *Id.*

[171] Final EIS at 4-224.

Rice's whale.[172]  The final EIS further discusses that the Rice's whale may be impacted by marine pollution related to project operation.[173]

90.     The final EIS states that the potential for collisions between project-related vessels and the Rice's whale is low because these vessels will use well-established shipping lanes, noting NMFS's determination that the potential for collisions between vessels associated with the neighboring Calcasieu Pass LNG terminal and sperm whales, the most abundant whale species in the Gulf of Mexico, is highly unlikely.[174]  The final EIS notes that the risk of collision is minimized because CP2 LNG would provide the Vessel Strike Avoidance Measures to LNG carrier captains and would advocate compliance with the measures identified in the document.[175]

91.     As noted in Sierra Club's comments, the estimated population of the Rice's whale in the Gulf of Mexico is less than 50 individuals.[176]  We add here that the likelihood of a project-related vessel colliding with a Rice's whale is low because operation of the CP2 LNG Project would only marginally increase ship traffic in the Calcasieu Ship Channel and would result in an even smaller relative increase in ship traffic in the Gulf of Mexico.[177]

92.     Further, the final EIS discusses the potential impact from marine pollution from marine traffic associated with the project.[178]  To address the potential marine pollution impacts associated with offshore spills of fuel, lubricants, or other hazardous materials, the Coast Guard requires LNG carriers to develop and implement a Shipboard Oil Pollution Emergency Plan, which includes measures to be taken if an oil pollution

---

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] Sierra Club March 5, 2024 Comments at 1.

[177] CP2 LNG estimates that between 200 and 400 LNG carriers would visit the terminal annually, which would represent only a minor increase in the level of ship traffic in the Calcasieu Ship Channel.  Final EIS at 4-185.

[178] Final EIS at 4-224.

incident occurs or if a ship is at risk of one.[179]  Implementation of these measures would minimize the risk of negative effects from marine pollution on the Rice's whale.[180]

93.     The final EIS concludes that the construction and operation of the project may affect but is not likely to adversely affect the Rice's whale.[181]  Based on its knowledge, expertise, and the information provided by Commission staff and related materials, NMFS concurred with the final EIS's conclusion that the project is not likely to adversely affect any listed species under its jurisdiction, including the Rice's whale.[182]

94.     Additionally, the final EIS discusses the potential cumulative impacts on the Rice's whale from the increased LNG carrier traffic from the CP2 LNG terminal, and marine traffic associated with other existing and proposed LNG projects and oil and gas development in the Gulf of Mexico.[183]  The final EIS concludes that although the project would contribute to a minor cumulative increase in vessel traffic which could incur a risk to whales in the Gulf of Mexico, the magnitude of the increase would not be significant.[184]  In addition, the cumulative impacts of the increased LNG carrier traffic associated with the CP2 LNG Project when considered with other projects would be permanent, but would not be significant.[185]  We agree.

95.     Finally, Sierra Club asserts that the Commission must initiate formal consultation with NMFS to consider NMFS's proposal to designate the Gulf's central and western-shelf break as critical habitat for the Rice's whale and the scientific evidence included in NMFS's proposal.[186]  We disagree.[187]  Should NMFS designate critical habitat for the

---

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] NMFS May 12, 2023 Letter (filed to the docket in CP2 LNG and CP2 Express May 31, 2023 Supplemental Filing at 327).

[183] Final EIS at 4-535.

[184] *Id.*

[185] *Id.* at 4-534.

[186] Sierra Club March 5, 2024 Comments at 7-8, 11-13.

[187] A proposal to designate critical habitat for a listed species does not trigger reinitiation of consultation under the ESA.  *See* 40 C.F.R. § 402.16 (2023).

Rice's whale, Commission staff will coordinate any necessary consultation with NMFS at that time.[188]

### c.     Mississippi Diamond-backed Terrapin

96.     Louisiana DWF comments that the Mississippi Diamond-backed Terrapin (*Malaclemys terrapin pileata*) may occur in the project area and is considered vulnerable in Louisiana.[189]  Louisiana DWF states that this species inhabits brackish water habitats, especially sandy coastal marshes and dunes, and that nest searches should be conducted if any project activities that involve mobilization or demobilization would occur in the sandy edges of marshes and dunes inhabited by the terrapin.[190]  In accordance with Louisiana's regulations,[191] the final EIS analyzes project impacts on state-designated threatened and endangered species.[192]  The Mississippi Diamond-backed Terrapin is listed as S3 (vulnerable; at moderate risk of extirpation in Louisiana), but not currently identified as a state-designated threatened or endangered species.

97.     The final EIS concludes that the construction and operation of the project facilities would not have a significant impact on wildlife resources.[193]  To minimize project impacts, CP2 LNG and CP Express would adhere to the project-specific *Upland Erosion Control, Revegetation, and Maintenance Plan* (Plan), *Wetland and Waterbody Construction and Mitigation Procedures* (Procedures), and Spill Prevention, Control, and Countermeasure Plan (SPCC Plan).  The applicants' proposed mitigation measures, such as the use of erosion control devices where feasible, limiting the amount and duration of open trenches during construction, and restoring temporary workspace areas to as near pre-construction conditions as practicable, would minimize potential impacts on habitat and wildlife species.  Further, CP Express would use a horizontal directional drill to cross beneath several rivers, which would eliminate impacts on the bed and banks of waterbodies potentially inhabited by the Mississippi Diamond-backed Terrapin.  CP Express would also limit the extent and duration of disturbance to the remaining

---

[188] NMFS has proposed, but not finalized, a critical habitat designation for the Rice's Whale.  88 Fed. Reg. 47,453 (July 24, 2023).

[189] Louisiana DWF August 29, 2023 Comments at 2.

[190] *Id.*

[191] Louisiana Administrative Code Title 76, section I-317.

[192] Final EIS at 4-229.

[193] *Id.* at 4-152 to 4-162.

waterbody crossings, which would minimize impact on any potential terrapins.  With these measures, we conclude that the project is not likely to adversely impact the species.

#### d.   Bird Nesting Colonies

98.     Louisiana DWF states that its Wildlife Diversity Program database "indicates the presence of bird nesting colonies within the project area," noting that entry into or disturbance of active breeding colonies and work within a certain radius of an active nesting colony is prohibited.[194]  Louisiana DWF further provides guidance on measures to be implemented during construction to mitigate potential impacts on bird nesting colonies.[195]

99.     The final EIS states that there is potentially suitable habitat for waterbird nesting rookeries within 1 mile of the CP Express Pipeline Project, but no nests or rookeries were observed during field surveys of the construction workspace and its vicinity.[196]  CP2 LNG and CP Express will conduct preconstruction nest surveys for both projects approximately four weeks prior to the migratory bird nesting window, which begins annually on March 1, and the nest surveys would be considered valid for 14 days.

100.   If nesting waterbirds are observed, Louisiana DWF guidelines state that all activities occurring within 1,000 feet of nesting wading birds (e.g., herons, egrets, ibis), should take place between September 1 and February 15, outside of the wading bird nesting season.  For colonies containing nesting gulls (*Laridae* spp.), terns, and/or black skimmers (*Rynchops niger*)*,* construction activities within 650 feet (or 2,000 feet for brown pelicans [*Pelecanus occidentalis*]) should take place between September 16 and April 1, outside of the nesting season for these species.  CP2 LNG and CP Express have committed to these spatial and time-of-year restrictions.  If construction within these spatial boundaries cannot be met, CP2 LNG and CP Express have committed to consult with the Louisiana DWF two weeks prior to the commencement of construction within those time-of-year restrictions.

### 3.   Water Quality Certification

101.   The final EIS's recommended condition 15 would require the applicants to file water quality certifications issued for the projects by the Railroad Commission of Texas (Railroad Commission) and the Louisiana Department of Environmental Quality (Louisiana DEQ) within 5 days of receipt.  On August 31, 2023, and September 5, 2023,

---

[194] Louisiana DWF August 29, 2023 Comments at 2-3.

[195] *Id.*

[196] Final EIS at 4-171.

Document Accession #: 20240627-3107    Filed Date: 06/27/2024

the applicants filed the receipts of water quality certifications from Louisiana DEQ[197] and the Railroad Commission, respectively.[198]  Further, as required by 40 CFR § 121.12, Commission staff notified EPA on November 21, 2023, that the water quality certifications for the projects were received.[199]  We have revised the final EIS's recommended condition 15, included as environmental condition 15 in the appendix to this order, accordingly.[200]

102.    Environmental Integrity Project filed comments alleging deficiencies in Louisiana's and Texas's water quality certification processes and regulations, including copies of letters raising the same concerns filed with Louisiana DEQ and the Railroad Commission.[201]  The Clean Water Act (CWA) establishes the states as the primary authority for water quality certifications, and the Commission must defer to the final decision of the state.[202]  The Commission's role is limited to confirming that the state has "facially satisfied the express requirements of section 401."[203]  Here, in accordance with the CWA, Texas and Louisiana issued public notice of the applicants' water quality certification requests.[204]  Nothing more is required.

---

[197] CP2 LNG and CP Express August 31, 2023 Comments at 1-3.

[198] CP2 LNG and CP Express September 5, 2023 Comments at 1-4.

[199] Commission Staff November 21, 2023 Memorandum in Docket Nos. CP22-21-000 and CP22-22-000) (providing email communication with EPA).

[200] We also revised environmental condition 15 to reflect EPA's final *Clean Water Act Section 401 Water Quality Certification Improvement Rule*, effective November 27, 2023, which limited the federal action agency's review of water quality certifications to verification of compliance with the requirements of Clean Water Act section 401. 88 Fed. Reg. 66,558 (Sept. 27, 2023).

[201] Environmental Integrity Project September 28, 2023 Comments.

[202] *City of Tacoma, Washington v. FERC*, 460 F.3d 53, 67 (D.C. Cir. 2006).

[203] *Id.* at 68.  Further, the Commission is not required to "inquire into every nuance of the state law proceeding, especially to the extent doing so would place FERC in the position of applying state law standards."  *Id.*

[204] Army Corps August 24, 2023 Public Notice, https://www.swg.usace.army.mil/Media/Public-Notices/Article/3504385/swg-2021-00499-venture-global-cp2-lng-llc-various-wetlands-and-waterbodies-in-l/.  The Galveston District of the Army Corps issues public notice regarding water quality

#### 4. **Hurricanes, Flooding, Relative Sea Level Rise, and Shoreline Erosion**

103.    Wendy Ring notes concerns that the CP2 LNG Project would be vulnerable to hurricanes and located in an area with rapid rates of shoreline erosion and sea level rise, further noting that flooding and high winds may increase the risk of damage and leaks from the LNG terminal.[205]

104.    The final EIS discusses the resilience of the LNG terminal facilities with respect to hurricane winds and hurricane-induced flooding.[206]  The terminal would be designed for sustained wind speeds of 150 miles per hour (mph).[207]  The final EIS concludes that the use of a 150-mph sustained wind speed is adequate for the LNG storage tanks and other LNG facilities where both the wind and tornado load design procedures are followed as recommended during final design and construction.[208]  We agree.

105.    In addition, as recommended by staff in the final EIS, this order requires CP2 LNG to design the floodwall to a 500-year mean recurrence interval with consideration of wind-driven wave effects, local subsidence, site settlement, shoreline recession, erosion and scour effect, and sea level rise based on National Oceanic and Atmospheric Administration projections, and, given the uncertainties, that the floodwall be periodically monitored and maintained to no less than a minimum elevation of 500-year mean recurrence interval flood event.[209]  The final EIS concludes that the storm surge floodwalls would provide adequate protection for the CP2 LNG terminal.  We agree.

106.    The final EIS also discusses the resilience of the LNG terminal to extreme weather due to climate change.[210]  Based on CP2 LNG's proposed design, which meets or exceeds both PHMSA's minimum requirements and Commission staff recommendations for LNG facilities, as well as codes and standards for other essential infrastructure, the final EIS

---

certifications under an agreement with the Railroad Commission and Louisiana DEQ.  *Id.* at 4.

[205] Wendy Ring November 27, 2023 Comments at 1.

[206] Final EIS at 4-447 to 4-453.

[207] *Id.* at 4-447.  *See also* Appendix, Environmental Condition 32.

[208] *Id.* at 4-448.  *See also* Appendix, Environmental Condition 32.

[209] Appendix, Environmental Conditions 39 & 40.

[210] Final EIS at 4-451 to 4-453.

Document Accession #: 20240627-3107     Filed Date: 06/27/2024

concludes that the project would be designed and maintained to withstand potential changes from climate change and any changes due to climate change would not present a significant impact to the safety of the LNG facilities.[211]  We agree.

## 5. Recreational and Commercial Fishing

107.    Adley and Judy Dyson and Fisherman Involved in Sustaining our Heritage (FISH) raise concerns regarding the potential impacts of the LNG terminal on the shrimping and fishing industries in and around the project area.[212]  The commenters state that the project threatens the viability of the fishing and shrimping industries as well as the historic culture that has arisen from those industries in the project area.[213]  Additionally, For a Better Bayou states that the LNG project threatens flora and fauna populations in the project area, that aquatic species such as shrimp would be killed or displaced, and that the project would limit the use of the few public fishing docks in the project area.[214]

108.    As discussed in the final EIS, construction of the LNG terminal could result in the mortality of less mobile species that are unable to escape the immediate construction area.[215]  Some wildlife would likely be permanently displaced as a result of habitat conversion to non-vegetated and/or impervious cover or maintained vegetation.[216]  Artificial lighting at the terminal could also affect aquatic species in the Calcasieu Ship Channel.[217]  In addition, construction-related noise could affect animal behavior, foraging, or breeding patterns, and cause wildlife and fishes to move away from the noise or relocate in order to avoid the disturbance.[218]

---

[211] *Id.* at 4-452 to 4-453.

[212] Adley and Judy Dyson October 19, 2023 Comments at 1-2; FISH April 18, 2024 Motion to Intervene.

[213] Adley and Judy Dyson October 19, 2023 Comments at 1-2; FISH April 18, 2024 Motion to Intervene at 1-2.

[214] For a Better Bayou October 16, 2023 Motion to Intervene at 2.

[215] Final EIS at 4-157.

[216] *Id.*

[217] *Id.*

[218] *Id.*

109.    As stated in the final EIS, CP2 LNG would adhere to the project-specific Plan and Procedures, which are specifically designed to avoid or minimize impacts on wildlife species and/or their habitats.[219]  Additionally, CP2 LNG would implement a training and awareness program for construction personnel to inform workers about resident wildlife and endangerment factors and to emphasize the responsibilities of the workers in preventing vehicular or vessel impacts (e.g., by adhering to speed limits and ensuring proper lighting).[220]  While these construction impacts would occur for an extended duration (e.g., 15 months for pile driving activities),[221] many of these impacts are already experienced within the project area (e.g., lighting, vehicle traffic, in-water noise, etc.), and common wildlife species that are not excluded by the fencing and are habituated to anthropogenic activities would likely return to the project area following construction.[222]  Additionally, while there would be permanent impacts associated with the removal of habitat and the area immediately surrounding the LNG terminal would be impacted by operational noise, lighting, and movement of operational personnel and vehicles, the final EIS concludes that construction and operation of the proposed LNG terminal would not have significant impacts on wildlife species due to the existence of similar habitats adjacent to the project area and CP2 LNG's proposed restoration and mitigation for project impacts on wetland habitat.[223]  We agree.

110.    Contrary to the dissent's assertion, the final EIS adequately analyzed the impacts from project construction and operation on the commercial fishing industry in the project area.  The final EIS explains that the primary commercial fisheries in the project area are shrimp and blue crab, and that Cameron and Calcasieu Parishes support a modest commercial fishing industry with approximately 55 vessels operating out of the town of Cameron.[224]  The final EIS analyzes the potential for increased disruptions to recreational and commercial fisherman at alternative site locations,[225] potential socioeconomic impacts on commercial fisheries and shrimping,[226] impacts to commercial fisheries and

---

[219] *Id.* at 4-158.

[220] *Id.*

[221] *Id.* at 4-316.

[222] *Id.* at 4-158.

[223] *Id.*

[224] *Id.* at 4-267.

[225] *Id.* at 3-56 to 3-59.

[226] *Id.* at 4-266 to 4-271.

fisherman in environmental justice communities,[227] and cumulative temporary and permanent impacts on commercial fishing.[228]

111.    As explained in the final EIS, recreational and commercial fishing could be impacted by construction activities associated with the LNG terminal.  Project construction is anticipated to occur during peak fishing and recreational seasons; however, due to the overall size of the waterway and access to and maneuverability within the Calcasieu Ship Channel, fishing and recreational activities would not be significantly affected by the proposed use of barges.[229]  Temporary impacts on recreational and commercial users in the Calcasieu Ship Channel, who would likely include individuals from environmental justice communities, may occur in construction areas.[230]  Permanent impacts on recreational and commercial fisheries in the ship channel may occur due to the loss of available fishing areas from operation of the LNG terminal's marine facilities and LNG carrier traffic.

112.    Potential impacts on commercial fisheries from project operation include: disturbances in vessel traffic corridors which fishing and shrimping vessels may need to traverse; difficulty accessing fishing locations as a result of large vessels associated with the project; and impacts to the number of fish, shrimp, or crab a commercial vessel may be able to catch.[231]   As described in the final EIS, based on consultations between Commission staff and Louisiana DWF, impacts on shrimping vessels would be greatest near the terminal south of the Firing Line where shrimping occurs year-round and vessel traffic and dredging associated with the LNG terminal would occur.[232]  Although the final EIS finds that fish, crab, and shrimp species common to the bay could be present in the project area, the area in which project activities would occur does not have any unique features or habitat characteristics that would draw recreational or commercial users to this particular location versus other locations within the Calcasieu Ship Channel.[233]

---

[227] *Id.* at 4-321 and 4-328.

[228] *Id.* at 4-541 and 4-544 to 4-545.

[229] *Id.* at 4-321.

[230] *Id.*

[231] *Id.*

[232] *Id.* at 4-321.

[233] *Id.*

113.     Additionally, CP2 LNG committed to continuing to develop its Engagement Plan for Local Commercial Shrimp Fishery, and Venture Global created the Calcasieu Pass Community Advisory Group to ensure residents of Cameron Parish can communicate issues and concerns directly to Venture Global.[234]  CP2 LNG will provide updates on its engagement effort and on the Calcasieu Pass Community Advisory Group meetings within CP2 LNG's monthly construction reports.[235]  The final EIS concludes that construction and operation impacts on recreational and commercial fishing would be localized and less than significant.[236]  We agree.

## 6.  Air Quality

114.     EPA suggests that Commission staff provide reports, such as emissions calculations, as appendices to their NEPA documents to increase transparency of the NEPA process.[237]  As stated in the final EIS, FERC docket accession numbers and appendices or attachment locations for the construction and operational emissions estimates are referenced throughout the final EIS and all referenced documents are available for public access.[238]

115.     EPA recommends that the Commission analyze the project's potential construction Hazardous Air Pollutants (HAP) emission impacts based on relevant inhalation health-based risk for the pollutants.[239]  EPA notes that exposure may potentially be higher during the four-year construction period of the LNG terminal than during project operations due to the high emission intensity from mobile source construction equipment.[240]  Additionally, to minimize the likelihood of an exceedance of the National Ambient Air Quality Standards (NAAQS), EPA recommends that the

---

[234] *Id.* at 1-13.

[235] *Id.*

[236] The final EIS describes impacts to commercial fishing as "moderate, but not significant," final EIS at 4-270, and that the project would "contribute negligibly to overall temporary and minor cumulative impacts on commercial fisheries," *id.* at 4-541. We clarify here that the CP2 LNG Project would have less than significant impacts on commercial fishing.

[237] EPA September 1, 2023 Comments at 2.

[238] See final EIS at 4-346 to 4-376, n.128.

[239] EPA September 1, 2023 Comments at 2.

[240] *Id.*

Commission require CP2 LNG to develop measures to implement when air monitoring data indicates that ambient pollutant concentrations are approaching an NAAQS threshold (e.g., 75% of a NAAQS threshold), and additional construction air quality mitigation measures, such as requiring higher tier construction equipment or zero exhaust emissions equipment.[241]

116.    As described in the final EIS, the location and magnitude of the projects' construction emissions' effect on air quality will vary across the four-year construction period.[242]  There are numerous assumptions that have to be made to develop a dispersion model for an active and dynamic construction site with varying equipment, levels of use, and construction phases.  Accordingly, it is unlikely that a dispersion model would yield results reliable enough to serve as a basis for a human health risk assessment.

117.    As stated in the final EIS, Commission staff determined that emissions during project construction would result in localized impacts on air quality.[243]  CP2 LNG and CP Express have committed to a number of measures to reduce the air quality impacts from construction, including using construction equipment and vehicles that comply with EPA mobile and non-road emission regulations, minimizing engine idling, and maintaining construction-related equipment in accordance with the manufacturer's recommendations.[244]  CP2 LNG and CP Express have also committed to take measures to mitigate fugitive dust, such as applying water to the roadways and reducing vehicle speeds.

118.    Further, in coordination with Louisiana DEQ, CP2 LNG will develop and submit for Commission staff approval an Ambient Air Quality Mitigation and Monitoring Plan (Air Monitoring Plan) to measure and monitor ambient concentrations of inhalable particulate matter and nitrogen oxides ($NO_x$), and CP2 LNG will include protocols to manage any potential NAAQS exceedances during construction and commissioning of the CP2 LNG terminal.[245]  Staff will consider EPA's suggested mitigation measures, as well as requiring CP2 LNG to take measures where pollutant concentrations are approaching a NAAQS exceedance, during its review of the plan.  Under the Air Monitoring Plan, CP2 LNG will report any periods of elevated concentrations, as well as:

---

[241] *Id.*

[242] Final EIS at 1-14.

[243] *Id.* at 4-346 to 4-354.

[244] *Id.* at 3-355 to 3-356.

[245] *Id.* at 1-14.  CP2 LNG must submit the Air Quality Plan as part of the Implementation Plan required by environmental condition 6 in the appendix to this order.

(1) a description of the specific activities occurring at the time of the exceedance and any other information, such as weather conditions, that may have contributed to the exceedance; (2) a description of what minimization or mitigation measures CP2 LNG implemented to reduce ambient air pollutant levels; and, (3) documentation of a reduction in ambient pollutant concentration levels to at or below the NAAQS. This information will be used to develop mitigation measures to minimize the potential for NAAQS exceedances. We conclude that such measures would minimize construction emissions and the likelihood for an exceedance of the NAAQS.

## 7. **Environmental Justice**

119.    In conducting NEPA reviews of proposed natural gas projects, the Commission follows the instruction of Executive Order 12898, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).[246]  Executive Order 14008 also directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[247]  Environmental justice is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[248]

---

[246] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994). While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance. *See* 18 C.F.R. § 380.12(g) (2023) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC, *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

[247] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021). The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution. *Id.* at 7629. The term also includes, but may not be limited to minority populations, low-income populations, or indigenous peoples. *See* EPA, *EJ 2020 Glossary* (Jul. 31, 2023), https://www.epa.gov/environmentaljustice/ej-2020-glossary.

[248] EPA, *Learn About Environmental Justice*, https://www.epa.gov/environmentaljustice/learn-about-environmental-justice (Aug. 16,

120.    Consistent with the Council on Environmental Quality (CEQ)[249] and EPA[250] guidance, the Commission's methodology for assessing environmental justice impacts considers:  (1) whether environmental justice communities (e.g., minority or low-income populations)[251] exist in the project area; (2) whether impacts on environmental justice communities are disproportionately high and adverse; and (3) possible mitigation measures.  As recommended in *Promising Practices*, the Commission uses the 50% and the meaningfully greater analysis methods to identify minority populations.[252] Specifically, a minority population is present where either:  (1) the aggregate minority population of the block groups in the affected area exceeds 50% or (2) the aggregate

---

2023).  Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies.  *Id.*  Meaningful involvement of potentially affected environmental justice community residents means:  (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of those potentially affected.  *Id.*

[249] CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act, at* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://www.energy.gov/sites/default/files/nepapub/nepa_documents/RedDont/G-CEQ-EJGuidance.pdf.  CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.  There were opportunities for public involvement during the Commission's prefiling and environmental review processes.  Final EIS at 1-5.

[250] *See generally* EPA, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (Promising Practices), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

[251] *See generally* Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994). Minority populations are those groups that include:  American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

[252] *See Promising Practices* at 21-25.

minority population in the block group affected is 10% higher than the aggregate minority population percentage in the county/parish.[253]

121.    CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau. Using *Promising Practices*' low-income threshold criteria method, low-income populations are identified as block groups where the percent of a low-income population in the identified block group is equal to or greater than that of the county/parish.

122.    To identify potential environmental justice communities, and as discussed in the final EIS, Commission staff used 2020 U.S. Census American Community Survey data[254] for the race, ethnicity, and poverty data at the state, county/parish, and block group level.[255]   Additionally, in accordance with *Promising Practices*, staff used EJScreen, EPA's environmental justice mapping and screening tool, as an initial step to gather information regarding minority and low-income populations; potential environmental quality issues; environmental and demographic indicators; and other important factors.[256]

123.    Once staff collected the block group level data, as discussed in further detail below, staff conducted an impacts analysis for the identified environmental justice communities and evaluated health or environmental hazards, the natural physical environment, and associated social, economic, and cultural factors to determine whether impacts were disproportionately high and adverse on environmental justice communities and also whether those impacts were significant.[257]   Commission staff assessed whether

---

[253] Here, Commission staff selected Calcasieu and Cameron Parishes in Louisiana and Jasper and Newton Counties in Texas as the comparable reference communities to ensure that affected environmental justice communities are properly identified.  A reference community may vary according to the characteristics of the particular project and the surrounding communities.  Final EIS at 4-304.

[254] U.S. Census Bureau, American Community Survey 2020 ACS 5-Year Estimates Detailed Tables, File# B17017, *Poverty Status in the Past 12 Months by Household Type by Age of Householder*, https://data.census.gov/cedsci/table?q=B17017; File #B03002 *Hispanic or Latino Origin By Race*, https://data.census.gov/cedsci/table?q=b03002.

[255] *See* final EIS at table 4.10.10-1; figs. 4.10.10-1, 4.10.10-2, 4.10.10-3, & 4.10.10-4.

[256] *See id.* at 4-300.

[257] *See Promising Practices* at 33 (stating that "an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning

impacts on an environmental justice communities were disproportionately high and adverse based on whether those impacts were predominantly borne by that community, consistent with EPA's recommendations in *Promising Practices*.[258]

124.     Commission staff identified 17 environmental justice community block groups[259] (out of 31 total block groups) that are within 15 miles[260] of the LNG terminal, within 1 mile of the pipeline project's aboveground facilities, and/or crossed by the CP Express Pipeline or Enable Gulf Run Lateral.[261]  For the LNG terminal, 6 block groups out of 8 within the geographic scope are considered environmental justice block groups.  For the CP Express Pipeline and Enable Gulf Run Lateral, 6 block groups out of 15 within the geographic scope are considered environmental justice block groups.  For the contractor yards, 6 block groups out of 11 within the geographic scope are considered environmental justice block groups.  The Moss Lake Compressor Station is within 1 mile of only 1 block group, which is not considered an environmental justice community.  For

---

of NEPA" and in other circumstances "an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA").

[258] *Id.* at 44-46 (explaining that there are various approaches to determining whether an action will cause a disproportionately high and adverse impact, and that one recommended approach is to consider whether an impact would be "predominantly borne by minority populations or low-income populations").  We recognize that EPA and CEQ are in the process of updating their guidance regarding environmental justice and we will review and incorporate that anticipated guidance in our future analysis, as appropriate.

[259] Several census block groups are crossed or within the radius of multiple project facility components.  This represents only unique census block groups affected by the projects.

[260] Final EIS at 4-324.  Based on the air quality impact analysis results for CP2 LNG, operation of the project would result at various locations in 1-hour nitrogen dioxide ($NO_2$) impacts that exceed the relevant significant impact level (SIL) out to about 15 miles from the Terminal Facilities.  A review of the modeling results filed on June 3, 2024, (Accession no. 20240603-5211) indicated that the updated annual $PM_{2.5}$ SIL would not result in impacts above the SIL extending beyond the distance already analyzed for $NO_2$.  Therefore, the Area of Impact for environmental justice review would not change.

[261] Final EIS at 4-304.  For these projects, we determined that a 15-mile radius around the proposed LNG terminal and a 1-mile radius around the pipeline's aboveground facilities were the appropriate units of geographic analysis for assessing project impacts on the environmental justice communities.  A 15-mile and 1-mile radius around the respective facilities represent the farthest extent of impacts on environmental justice communities.

the meter stations, 3 block groups out of 8 within the geographic scope are considered environmental justice block groups. For the 3 park-and-ride locations, all 4 of the block groups within the geographic scope are considered environmental justice block groups.

125.    The final EIS determined that potential impacts on the identified environmental justice communities may include flooding, impacts to surface water resources, wetlands impacts, visual impacts, socioeconomic impacts, recreational and commercial fishing impacts, traffic impacts, and air and noise impacts from construction and operation.[262] Environmental justice concerns are not present for other resource areas such as geology, soils, wildlife, land use, or cultural resources due to the minimal overall impact the projects would have on these resources and/or the absence of any suggested connection between such resources and environmental justice communities.[263]

### a.    CP2 LNG Project

### i.    Flooding

126.    The LNG terminal is not anticipated to induce flooding, as all aboveground facilities and roads would be constructed in accordance with federal, state, and local regulations, including parish floodplain requirements.[264]  Additionally, the project is not anticipated to significantly displace flood storage capacity.  As described in the final EIS, the terminal site and CPX Meter Station, the only two aboveground facilities within environmental justice block groups and within the floodplain, would be within the proposed floodwall.[265]  Interior drainage ditches and detention ponds would be installed within the floodwall to manage stormwater, and stormwater discharges from the terminal site would be conveyed to the west, avoiding the nearby residences situated to the northeast and east.[266]  The final EIS finds that potential flooding impacts from the project on environmental justice communities would be less than significant.[267]  We agree.

---

[262] *Id.* at 4-317 to 4-327.

[263] *Id.* at 4-318.

[264] *Id.*

[265] *Id.*

[266] *Id.* at 4-124.

[267] *Id.* at 4-318.

## ii.    **Surface Water**

127.    Regarding surface water, the final EIS finds that construction and operation of the LNG terminal would permanently impact two unnamed waterbodies (two drainage ditches) within the project area and would temporarily (during construction) and permanently (during operation) impact portions of the adjacent Calcasieu Ship Channel.[268]  As stated in the final EIS, these impacts would result from dredging activities, site construction, marine traffic, stormwater runoff, water use, and hydrostatic testing, and could occur from accidental spills or other releases of hazardous substances.[269]  Environmental justice communities in proximity to the project, particularly the community located in proximity to the LNG terminal (Census Tract 9702.02, Block Group 2 [CT 9702.02 - BG 2]), would be affected by dredging and resuspension of sediments.  CP2 LNG would adhere to all permit conditions and best management practices included in the project-specific Procedures to minimize waterbody impacts and promote the stability of the excavated shoreline during and after construction of the LNG berthing area.[270]  Further, CP2 LNG would minimize impacts on water quality by using a hydraulic suction dredge, where turbidity would be focused close to the river bottom and would equate to a storm event within a short distance of the cutterhead.[271]  The final EIS concludes impacts on environmental justice communities related to surface water impacts would not be significant.[272]  The final EIS further concludes environmental justice communities in the study area would experience cumulative impacts on surface water but that these impacts would be less than significant.[273]  We agree.

128.    As stated in the final EIS, construction and operation of the LNG terminal, as well as marine traffic to and from the LNG terminal, have the potential to adversely impact water quality in the event of an accidental release of hazardous substances such as fuel, lubricants, coolants, or other material.[274]  CP2 LNG would implement the measures outlined in the project-specific Plan and Procedures to minimize the likelihood of a spill

---

[268] *Id.*

[269] *Id.*

[270] *Id.*

[271] *Id.*

[272] *Id.*

[273] *Id.* at 4-544.

[274] *Id.* at 4-318.

and would implement its SPCC Plan in the event of a spill. If an accidental release were to occur, environmental justice communities along the ship channel, particularly the community in CT 9702.02 - BG 2, as well as individuals from these communities that use the channel, would be affected.[275] LNG carriers are required by the U.S. Coast Guard to develop and implement a Shipboard Oil Pollution Emergency Plan, which includes measures to be taken when an oil pollution incident occurs, or a ship is at risk of one.[276] With these mitigation measures, the final EIS concludes that environmental justice communities would not be significantly impacted by an accidental release.[277] We agree.

### iii.    Wetlands

129.    The final EIS finds that project impacts associated with the LNG terminal on wetlands would be short-term and temporary during construction, and permanent during operation.[278] Wetland impacts would occur within several identified environmental justice communities; therefore, the loss of wetland habitat and the subsequent decrease in wetland benefits could affect those environmental justice communities within and near the project. Potential wetland benefits include flood storage capacity, water filtration, and habitat for fish and wildlife. CP2 LNG will be required to obtain the applicable Army Corps and Louisiana Department of Natural Resources (Louisiana DNR)/Office of Coastal Management (OCM) permits for permanent loss of wetland habitat and implement any mitigation measures required by the Army Corps and Louisiana DNR/OCM for that loss. CP2 LNG will implement project-specific plans, as applicable, including its project-specific Procedures and SPCC Plan to minimize and/or avoid impacts on wetlands during project construction. The final EIS concludes that through implementation of the mitigation measures, impacts from the project on wetlands would not have a significant impact on environmental justice communities.[279] The final EIS also concludes that environmental justice communities in the study area would experience cumulative impacts on wetlands but that these impacts would not be significant.[280] We agree.

---

[275] *Id.* at 4-319.

[276] *Id.* at 4-318 to 4-319.

[277] *Id.* at 4-319.

[278] *Id.*

[279] *Id.*

[280] *Id.* at 4-544.

#### iv.    **Visual Resources**

130.    The final EIS concludes that the completed LNG terminal, which is within environmental justice community CT 9702.02 - BG 2, would result in permanent visual impacts associated with the existence and operation of the facilities.[281]  The tops of the LNG storage tanks and flare stack will create a vertical visual contrast across a relatively flat existing landscape for the nearby residences 330 feet north and 360 feet east of the project fence line.[282]  These same structures and the proposed floodwall surrounding the LNG terminal would be visible to users of the Calcasieu Ship Channel, visitors to nearby beaches, employees and operators of industrial facilities along Davis Road, motorists along the Creole Nature Trail (State Highway 27), and other areas surrounding the project site.[283]  While the perimeter berm and floodwall would help partially obscure the industrial facilities on the LNG terminal site from offsite views, including partial obstruction of the proposed tanks and flare stack, the nearby residences (and associated environmental justice populations) have a direct view of the LNG terminal.[284]  In response to Commission staff's recommendation in the draft EIS, CP2 LNG committed to install vegetative screening by planting native live oak trees and native groundsel bushes on the northeastern and eastern sides of the terminal site.[285]  While the vegetative screening would minimize the impact to the extent practicable, the final EIS concludes, and we agree, that the LNG terminal will permanently change the viewshed and have a significant adverse effect on residents and passerby of the environmental justice communities near the project.[286]

131.    The final EIS also analyzed the cumulative visual impacts along the Calcasieu Ship Channel (including impacts from the Commonwealth LNG Terminal, Calcasieu Pass LNG Terminal, and the CP2 LNG Terminal) and determined that the project would adversely contribute to visual impacts on users of the Calcasieu Ship Channel; users of the Jetty Pier Facility, Lighthouse Bend Park, and nearby beaches; residents in the town of Cameron; and motorists along the Creole Nature Trail.[287]  Visual impacts from

---

[281] *Id.* at 4-319.

[282] *See id.* at app. J.

[283] *Id.* at 4-319.

[284] *Id.*

[285] *See id.* at 4-319, 4-252 to 4-253, and app. J.

[286] *See id.* at 4-319.

[287] *Id.* at 4-546.

construction would include clearing of vegetation, grading, the presence of large construction equipment, lighting, and increased vehicle and vessel traffic. While the extent of impacts would vary depending on the proximity to the sites, environmental justice communities may experience significant visual changes from the construction and operation of additional sites, flares, lighting, and storage tanks for several miles. The final EIS concludes, and we agree, that the CP2 LNG terminal and other nearby LNG terminals will contribute to significant cumulative visual impacts on environmental justice communities in the project area.[288]

### v.    Socioeconomics

132.    Regarding socioeconomics, as stated in the final EIS, the temporary influx of workers/contractors into the area during construction and operation of the LNG terminal could increase the demand for community services, such as traffic, housing, police enforcement, and medical care.[289] The final EIS concludes, however, that sufficient housing units would be available and impacts on community services would not be significant.[290] Based on the foregoing, the final EIS concludes that the project's socioeconomic impacts on environmental justice communities would be less than significant.[291] As stated in the final EIS, several other projects have been proposed or approved that could have overlapping construction schedules with the proposed project, including the Driftwood LNG Project, Line 200 and Line 300 Project, Hackberry Storage Project, Cameron LNG Expansion Project, Lake Charles Liquefaction Project, Magnolia LNG, Delfin LNG, and Commonwealth LNG Project.[292] Combined, these additional projects could require a peak of more than 20,000 workers, a 10% increase in the current population.[293] The temporary flux of workers/contractors into the area from all of these projects would increase the demand for housing. Should other major industrial projects listed in table 4.14.1-1 of the final EIS be constructed at the same time as the LNG terminal, sufficient housing would still be available.[294] This cumulative increased demand for housing could drive costs up, increase property taxes, and adversely impact

---

[288] *See id.*

[289] *Id.* at 4-320.

[290] *Id.* at 4-266, 4-276 to 4-280.

[291] *Id.* at 4-320.

[292] *Id.* at 4-546.

[293] *Id.*

[294] *Id.* at 4-546 to 4-547.

low-income individuals.[295]  An increase in costs of material goods may also occur due to increased demand for these goods.  The final EIS concludes that environmental justice communities in the study area would experience cumulative impacts on socioeconomic resources but that these impacts would be less than significant.[296]  We agree with staff's conclusions.

### vi.  Recreational and Commercial Fishing

133.    Recreational and commercial fishing could be impacted by construction of the CP2 LNG terminal.  As stated in the final EIS, construction activities are anticipated to occur during peak fishing and recreational seasons; however, due to the overall size of the waterway and access to and maneuverability within the Calcasieu Ship Channel, fishing and recreational activities would not be significantly affected by the proposed use of barges.[297]  Temporary impacts on recreational and commercial users in the Calcasieu Ship Channel, who would likely include individuals from environmental justice communities, may occur in construction areas.[298]

134.    Permanent impacts on recreational and commercial fisheries in the ship channel, as well as on individuals from environmental justice communities, may occur due to the loss of available fishing areas from operation of the terminal's marine facilities and LNG carrier traffic.[299]  Based on consultations between Commission staff and Louisiana DWF, impacts on shrimping vessels would be greatest near the terminal south of the Firing Line where shrimping occurs year-round and vessel traffic and dredging associated with the CP2 LNG terminal would occur.[300]  Although the final EIS finds that fish, crab, and shrimp species common to the bay could be present, the area in which project activities will occur does not have any unique features or habitat characteristics that will draw recreational or commercial users to this particular location versus other locations within the Calcasieu Ship Channel.[301]

---

[295] *Id.* at 4-547.

[296] *Id.*

[297] *Id.* at 4-321.

[298] *Id.*

[299] *Id.*

[300] *Id.*

[301] Final EIS at 4-321.

135.    Venture Global created the Calcasieu Pass Community Advisory Group to ensure that residents from all parts of Cameron Parish are represented and can communicate promptly and directly with Venture Global to express any concerns they have or to communicate adverse impacts that they or their neighbors have seen related to Calcasieu Pass.[302]    Additionally, CP2 LNG has committed to continuing the development of its *Engagement Plan for Local Commercial Shrimp Fishery* and would provide updates on its engagement effort and on the Calcasieu Pass Community Advisory Group meetings within CP2 LNG's monthly construction reports.[303]    The final EIS concludes that environmental justice communities in the study area would experience cumulative impacts on recreational and commercial fishing resources; however, these impacts would be less than significant.[304]    We agree.

### vii.    Road and Marine Traffic

136.    The final EIS finds that area residents, including environmental justice communities near the LNG terminal, may be affected by traffic delays during construction of the LNG terminal.[305]    Construction of the CP2 LNG terminal would temporarily increase use of area roads by heavy construction equipment and associated trucks and vehicles.    CP2 LNG would implement its Terminal Facilities Traffic Management Plan, which includes mitigation measures such as the use of park and ride locations, busing, staggered shift start and stop times during expected times of peak site personnel, and utilization of flagger police vehicles or traffic signals.[306]    Once construction is complete, CP2 LNG estimates that impacts on road traffic would be primarily limited to the 250 permanent LNG terminal employees, and periodic deliveries to the site.    CP2 LNG predicts the level of service (LOS)[307] of the roadways within the

---

[302] *Id.* at 1-13.

[303] *Id.*

[304] Final EIS at 4-545.

[305] *Id.* at 4-321.

[306] *Id.* at 4-322.

[307] The term level of service (LOS) is used to describe the operating conditions of a roadway based on factors such as speed, travel time, delay, and safety.    LOS A denotes the best conditions (i.e., free flow), while LOS F denotes the worst conditions (i.e., forced or breakdown flow with frequent slowing required and more demand than capacity).    CP2 used the LOS concept outlined in the Transportation Research Board's Highway Capacity Manual, 6th Edition.    *See* CP2 LNG March 7, 2023 Supplemental Information on Workforce and Traffic.

project area would remain at an LOS D[308] or better throughout construction and would remain at an LOS C or better during operation.[309]  With the proposed traffic mitigation measures as described above and in the final EIS, the final EIS concludes that traffic impacts from the project on environmental justice communities would be less than significant.[310]  The final EIS further concludes that environmental justice communities in the study area would experience cumulative impacts associated with traffic but that these impacts would also be less than significant.[311]  We agree.

137.    As stated in the final EIS, barge deliveries would occur at the LNG terminal site throughout the project's construction period, with an estimated 32 barges a week at the peak of Phase I construction.[312]  During operations, up to 8 LNG carriers would call at the terminal's marine facilities per week.[313]  Because of the existing traffic patterns and capacity of the Calcasieu Ship Channel, the final EIS concludes that the LNG carrier calls and barge deliveries associated with the project would not result in significant impacts on marine traffic.[314]  In addition, the final EIS concludes that recreational boaters and fishers, which likely include individuals from environmental justice communities, would not experience significant changes in marine traffic.[315]  We agree.

### viii.    Air Quality

138.    We received a comment on the final EIS expressing concern with project air quality impacts on environmental justice communities.[316]  As explained in the final EIS,

---

[308] LOS D denotes the approach of unstable flow, with speeds decreased and traffic volume slightly increased.

[309] Final EIS at 4-321 to 4-322.

[310] *Id.* at 4-322.

[311] *Id.* at 4-321 to 4-323.

[312] *Id.* at 4-323.

[313] *Id.* at 4-294.

[314] *Id.* at 4-323.

[315] *Id.*

[316] Kalama Reuter November 22, 2023 Comments at 1.

construction and operation of the LNG terminal would result in impacts on air quality.[317]
CP2 LNG would implement measures to mitigate exhaust emissions during construction
by using construction equipment and vehicles that comply with EPA's mobile and non-
road emission regulations, and using commercial gasoline and diesel fuel products that
meet specifications of applicable federal and state air pollution control regulations.
Further, CP2 LNG would mitigate fugitive dust by applying water to the roadways and
reducing vehicle speeds.  The final EIS concludes that construction-related impacts of the
LNG terminal on local air quality would not be significant.[318]

139.    The final EIS states that CP2 LNG conducted detailed air quality impact
assessments for emissions of criteria pollutants (subject to Prevention of Significant
Deterioration [PSD] review) from the operation of the LNG terminal to show compliance
with the relevant National Ambient Air Quality Standards (NAAQS).[319]  Based on the air
quality impact analysis results for CP2 LNG, operation of the project would result in
1-hour nitrogen dioxide ($NO_2$) impacts at various locations out to about 15 miles from the
LNG terminal that exceed the relevant Significant Impact Level (SIL).[320]  However, a
further refined assessment of the cumulative analysis results showed that predicted CP2
LNG impacts would not cause or contribute to an  exceedance of the NAAQS for 1-hour
$NO_2$.[321]

140.    Although the LNG terminal would be in compliance with the NAAQS and the
NAAQS are designated to protect sensitive populations, the final EIS acknowledges that
NAAQS attainment alone may not ensure there is no localized harm to such populations
due to project emissions of volatile organic compounds, hazardous air pollutants (HAP),
as well as the presence of non-project related pollution sources, local health risk factors,
disease prevalence, and access (or lack thereof) to adequate health care.[322]  According to
EJScreen, the environmental justice community in which the LNG terminal is located

---

[317] Final EIS at 4-323.

[318] *Id.* 4-323 to 4-324.

[319] *Id.* at 4-324.

[320] For major source permitting under the Clean Air Act, the SIL is the point below
which the impact of increased emissions from a new or modified major source on
ambient air quality does not cause or contribute to a violation of the NAAQS.

[321] *Id.* at 4-324, app. K.

[322] *Id.* at 4-324.

(CT 9702.02 - BG 2) is within the 64th percentile for cancer prevalence among adults.[323]
Thus, Commission staff followed EPA's *Human Health Risk Assessment Protocol*[324] in
overseeing a  Human Health Risk Assessment[325] (Risk Assessment) for maximum HAP
emissions from the LNG terminal (stationary and mobile marine sources) based on the
highest model-predicted 1-hour and annual average ground-level concentrations of a total
of 16 HAPs.[326]  The Risk Assessment estimated chronic (long-term) cancer risk and non-
cancer hazard, as well as acute (short-term) non-cancer hazard via inhalation of HAP
compounds primarily emitted from stationary and mobile marine sources at the LNG
terminal.[327]  The Risk Assessment evaluated inhalation exposure of hypothetical adult
and child residents for which Reasonable Maximum Exposure was assumed.[328]

141.    The results of the Risk Assessment showed that the estimated adult and child
resident cancer risk for each HAP is at least an order of magnitude (i.e., 10-fold) below
EPA's risk management objective of 1-in-1 million for individual HAPs.  Moreover, the
total cancer risks summed across all HAPs are well below (by almost 100-fold) EPA's
target of 1-in-100,000 for a single facility.  In other words, the CP2 LNG Terminal would
represent up to a 0.0000002% (or 1.75E-07) increase in cancer risk as a conservative
estimate for communities that live near to the terminal.[329]  The EPA's risk management
objective of 1-in-100,000 for a single facility is ten times more stringent than the highest
cancer risk that EPA deems acceptable, to account for potential exposure to background

---

[323] *Id.*

[324] EPA, *Human Health Risk Assessment Protocol for Hazardous Waste
Combustion Facilities*, EPA530-D-05-006 (2005).  The Human Health Risk Assessment
Protocol incorporates risk assessment guidance and methods from the EPA, as well as the
experience EPA has gained through conducting and reviewing combustion risk
assessments, to provide a comprehensive method of assessing human health risk from
combustion emissions.  It provides a standardized methodology for conducting
combustion risk assessments and, therefore, was chosen as the most appropriate guidance
to follow.

[325] Lucy Fraiser Toxicology Consulting LLC, *CP2 LNG Terminal and Mobile
Sources Human Health Risk Assessment*. June 30, 2023. See Appendix O of the Final
EIS.

[326] Final EIS at 4-324, 4-374 to 4-376. See also Appendix O of the Final EIS.

[327] *Id.*

[328] *Id.* at 4-324.

[329] See Table 6 of Appendix O in the Final EIS.

Document Accession #: 20240627-3107     Filed Date: 06/27/2024

levels of air contaminants.  Therefore, this facility risk management objective addresses the potential for cumulative risk (i.e., risk associated with multiple HAPs and other sources in the area).

142.    The Hazard Quotient analysis from the Human Health Risk Assessment indicated that no chronic Hazard Quotient for any HAP is greater than the non-cancer risk management objective of 1 for individual HAPs.  In addition, all aggregated chronic Hazard Index values (derived by summing Hazard Quotient values for all HAPs with similar chronic effects) are well below 1 (by almost 100-fold).  Similarly, all acute Hazard Quotient and aggregated acute Hazard Index values are well below the acute risk management objective of 1 (by almost 100-fold).[330] The results of the HHRA indicated the estimated cancer and non-cancer risks for the environmental justice community located within the same block group as  the CP2 LNG terminal (CT 9702.02 - BG 2) would be below EPA's risk management objectives during operation of the CP2 LNG terminal.[331]

143.    Commission staff concluded in the final EIS that the construction and operational emissions from the LNG terminal would not have significant adverse air quality impacts on environmental justice communities in the project area.[332]  We agree.

### ix.    Noise

144.    As stated in the final EIS, noise levels above ambient conditions, attributable to construction activities at the LNG terminal, would vary over time and would depend upon the nature of the construction activity, the number and type of equipment operating, and the distance between sources and receptors.[333]  The closest noise sensitive area (NSA) within an environmental justice community (CT 9702.02 - BG 2) is about 330 feet northeast of the LNG terminal site (from the floodwall, where pile driving would occur during construction) and consists of a recreational vehicle park and residence.[334]  Peak construction noise (due to pile driving and civil works) would occur during the first 18 months of construction and would increase noise levels over ambient conditions by 9 to 10 decibels at the closest NSAs.  Project construction would last up to 4 years, however, construction of the floodwall near the affected NSAs would occur as early as

---

[330] Final EIS at 4-325.

[331] *Id.* at 4-325.

[332] *Id.* at 4-323 to 4-325.

[333] *Id.* at 4-325.

[334] *Id.*

possible during project construction and would be expected to reduce the noise levels at the NSAs by 5 to 10 dBA, depending on the location of construction activities.[335] Although project construction could occur 24 hours per day, pile driving would be limited to daytime hours (i.e., 7 a.m. to 7 p.m.). As recommended in the final EIS,[336] environmental condition 25 in the appendix to this order requires that CP2 LNG monitor noise levels during construction of the LNG terminal between 7 p.m. to 7 a.m. to ensure noise levels during these hours are less than our criterion of 48.6 decibels on the A-weighted scale (dBA) at any nearby NSA.

145.    Operational noise associated with the LNG terminal would be persistent and would increase noise levels over ambient by about 5.7 decibels at the closest NSA.[337] As recommended in the final EIS,[338] environmental conditions 26 and 27 in the appendix to this order require CP2 LNG to meet sound level requirements of 55 dBA day-night sound level ($L_{dn}$) at any nearby NSAs. With implementation of these measures, the final EIS concludes that the project would not result in significant noise impacts on local residents and the surrounding communities, including environmental justice populations.[339] The final EIS further concludes that environmental justice communities in the study area would experience cumulative impacts related to noise but that these impacts would be less than significant.[340] We agree.

### x.    **Safety**

146.    Commission staff evaluated the potential impacts which could result from potential incidents identified for analysis, such as equipment failures or natural disasters, along the LNG marine vessel transit route and at the LNG terminal, including potential impacts to people with access and functional needs as defined in National Fire Protection Association (NFPA) 1600, Standard on Continuity, Emergency, and Crisis Management[341] and NFPA 1616, Standard on Mass Evacuation, Sheltering, and Re-Entry

---

[335] *Id.* at 4-326.

[336] *Id.* at 4-388.

[337] *Id.* at 4-326.

[338] *Id.* at 4-388 to 4-389.

[339] *Id.* at 4-327.

[340] *Id.* at 4-554 to 4-556.

[341] Freely and publicly accessible to view in English and Spanish at NFPA, https://www.nfpa.org/codes-and-standards/allcodes-and-standards/list-of-codes-andstandards/detail?code=1600, accessed January 2024.

Programs.[342]  The worst-case distances from these potential incidents would potentially impact three block groups, two of which are considered environmental justice communities.  The block groups located with environmental justice communities that exceed the thresholds for minority and low income would include CT 9702.02 - BG 2 (based on the low-income threshold); and CT 9701.02 - BG 1 (based on the minority threshold).[343]

147.    Commission staff determined that potential impacts on environmental justice communities may include safety concerns, however, staff determined that the risk of accidental or intentional events would be less than significant with implementation of the proposed safety and security measures recommended in the EIS.  The proposed measures rise above minimum federal requirements and will enhance the safety and security of the project.  We agree and adopt all of staff's safety recommendations herein as environmental conditions.  We encourage CP2 LNG to engage with the two potentially impacted environmental justice communities as it develops an Emergency Response Plan (ERP) in accordance with environmental condition 45.

### b.    CP Express Pipeline Project

### i.    Flooding

148.    The CP Express Pipeline Project is not anticipated to induce flooding.  As described in the final EIS, CP Express calculated that 52.5 acre-feet of floodplain storage capacity will be lost due to construction and operation of aboveground facilities associated with the CP Express Pipeline.[344]  Based on an estimated total floodplain storage volume of 136,000 acre-feet, this would represent an approximate 0.04 percent loss of total floodplain storage volume, which would be a minor loss.  Additionally, the only aboveground facility within an environmental justice block group that is also within a floodplain is the CPX Meter Station, which would be within the proposed floodwall of

---

[342] Freely and publicly accessible to view in English only at NFPA, https://www.nfpa.org/codes-and-standards/all-codesand-standards/list-of-codes-andstandards/detail?code=1616, accessed January2024.

[343] Final EIS at 4-474.

[344] *Id.* at 4-98.  Acre-feet of floodplain storage capacity lost for the Terminal Site Gas Gate Station (i.e., CPX Meter Station), Pig Receiver, and MLV 7 is not included in this calculation as these facilities would be constructed entirely within the CP2 LNG Terminal Site.

Document Accession #: 20240627-3107          Filed Date: 06/27/2024

the LNG terminal.[345]  Therefore, because project facilities would be elevated above base flood elevation ranges identified by the Federal Emergency Management Agency, and given CP Express's implementation of other measures detailed in its Floodplain Mitigation Plan, the final EIS finds that potential flooding impacts from the CP Express Pipeline Project on environmental justice communities would be less than significant.[346] We agree.

## ii.  **Surface Water**

149.  Construction of the CP Express Pipeline may result in potential impacts to surface waters due to clearing and grading activities; construction-related discharges (e.g., stormwater and hydrostatic test water); the use of horizontal directional drilling (HDD), open-cut, and push method for pipeline installation; dredging and dredge material placement; and potential spills or leaks of hazardous liquids from the refueling of construction vehicles or storage of fuel, oil, and other fluids.  In order to minimize the risk of a release impacting sensitive resources, CP Express would implement the project-specific plans, as applicable, including its project-specific Procedures, its HDD Monitoring and Contingency Plan, and its SPCC Plan to minimize and/or avoid impacts on water resources during construction.  These plans would minimize the risk of impacts on surface waterbodies.  With the mitigation measures, the final EIS concludes that environmental justice communities would not be significantly impacted by construction of the pipeline.[347]  We agree.

## iii.  **Wetlands**

150.  The final EIS finds that the impacts on wetlands from the CP Express Pipeline would primarily be short-term and temporary during construction.[348]  Permanent impacts to wetlands would consist of the permanent conversion of some forested wetlands for permanent pipeline easements and the loss of some wetlands for the aboveground facilities.[349]  Wetland impacts would occur within several identified environmental justice communities; therefore, the loss of wetland habitat and the subsequent decrease in

---

[345] *Id.* at 4-318.

[346] *Id.*

[347] *Id.* at 4-318 to 4-319.

[348] *Id.* at 4-319.

[349] *Id.* at 4-139 to 4-140.

wetland benefits, could affect those environmental justice communities within and near the pipeline.[350]

151.    The majority of wetlands impacted by construction would be restored to pre-construction conditions, resulting in only short-term impacts.  CP Express is coordinating with the Louisiana DNR/OCM and the Army Corps to develop a Compensatory Mitigation Plan in accordance with the Mitigation Rule and CWA Section 404(b)(1) Guidelines to replace the loss of aquatic resource functions for permanent conversion and loss of wetlands.[351]  Further, CP Express would implement project-specific plans, as applicable, including its project-specific Procedures, its HDD Monitoring and Contingency Plan, and its SPCC Plan to minimize and/or avoid impacts on wetlands during pipeline construction.  The final EIS concludes that through implementation of the mitigation measures, impacts from the project on wetlands would not have a significant impact on environmental justice communities.[352]  The final EIS also concludes that environmental justice communities in the study area would experience cumulative impacts on wetlands but that these impacts would be less than significant.[353]  We agree.

### iv.    <u>Visual Resources</u>

152.    Temporary visual impacts would occur during construction of the pipeline and aboveground facilities.  These impacts would consist of vehicle and equipment movement, vegetation clearing and grading, trench and foundation excavation, pipe storage, and spoil piles.[354]  Permanent visual impacts may occur along the pipeline route from removal of forested vegetation and periodic vegetation clearing within the permanent right-of-way to allow for visual pipeline inspection.[355]  After construction, CP Express would restore disturbed areas associated with the pipeline rights-of-way to near pre-construction conditions to the extent practicable, with the exception of the permanent

---

[350] *Id.* at 4-319.

[351] *Id.* at 4-137.

[352] *Id.* at 4-319.

[353] *Id.* at 4-544.

[354] *Id.* at 4-319.

[355] *Id.*

right-of-way that would be kept in a low, maintained herbaceous state through regular mowing and woody vegetation removal.[356]

153.    The proposed Florida Gas Transmission Meter Station is 0.6 mile northeast of an identified environmental justice block group (CT 35 - BG 1).[357]  The nearest sensitive receptor within CT 35 - BG 1 is a residence approximately 1 mile southwest of the meter station.  The Florida Gas Transmission Meter Station would not be visible from the residence due to the presence of a wooded parcel of land west of the meter station.[358] The proposed Enable Interconnect Meter Station is within an identified environmental justice block group (CT 36.02 - BG 1).[359]  The nearest residence is approximately 0.6 mile east of the meter station.  The Enable Interconnect Meter Station would be constructed west of existing industrial facilities and a wooded lot; therefore, the meter station would not be visible to the nearest residence.[360]  The proposed CPX Meter Station is also within an identified environmental justice block group (CT 9702.02 - BG 2); however, it would be within the proposed floodwall associated with the LNG terminal and, therefore, would not be visible.[361]  The remaining meter stations and the Moss Lake Compressor Station are not in or within one mile of an environmental justice community. The final EIS concludes, and we agree, that visual impacts from construction and operation of the CP Express Pipeline are anticipated to have a permanent and minor effect on environmental justice communities.[362]

### v.    Socioeconomics

154.    Regarding socioeconomics, as stated in the final EIS, the temporary influx of workers/contractors into the area along the pipeline route could increase the demand for community services, such as traffic, housing, police enforcement, and medical care.[363] The final EIS concludes, however, that sufficient housing units would be available and

---

[356] *Id.* at 4-319 to 4-320.

[357] *Id.* at 4-320.

[358] *Id.*

[359] *Id.*

[360] *Id.*

[361] *Id.*

[362] *See id.*

[363] *Id.*

impacts on community services would not be significant.[364]  Based on the foregoing, the final EIS concludes that socioeconomic impacts on environmental justice communities would be less than significant.[365]

155.    As stated in the final EIS, several other projects have been proposed or approved that could have overlapping construction schedules with CP Express Pipeline Project, including Driftwood LNG Project, Line 200 and Line 300 Project, Hackberry Storage Project, Cameron LNG Expansion Project, Lake Charles Liquefaction Project, Magnolia LNG, Delfin LNG, and Commonwealth LNG Project.[366]  Combined, these projects could require a peak of more than 20,000 workers, a 10% increase in the current population.[367]  The temporary flux of workers/contractors into the area from all of these projects would increase the demand for housing.  Should other major industrial projects listed in table 4.14.1-1 of the final EIS be constructed at the same time as the CP Express Pipeline, sufficient housing would still be available.[368]  This cumulative increased demand for housing could drive costs up, increase property taxes, and adversely impact low-income individuals.[369]  An increase in costs of material goods may also occur due to increased demand for these goods.  The final EIS concludes that environmental justice communities in the study area would experience cumulative impacts on socioeconomic resources, but these impacts would be less than significant.[370]  We agree with staff's conclusions.

### vi.    Road Traffic

156.    The final EIS finds that area residents may be affected by traffic delays during construction of the CP Express Pipeline Project.[371]  Construction of the pipeline project would temporarily increase use of area roads by heavy construction equipment and associated trucks and vehicles.  Increased use of these roads would result in a higher

---

[364] *Id.* at 4-266, 4-276 to 4-280.

[365] *Id.* at 4-320.

[366] *Id.* at 4-546.

[367] *Id.*

[368] *Id.* at 4-546 to 4-547.

[369] *Id.* at 4-547.

[370] *Id.*

[371] *Id.* at 4-322.

volume of traffic, increased commute times, and greater risk of vehicle accidents.[372] During construction, public roads utilized in the immediate vicinity of the pipeline would be monitored by CP Express and maintained as necessary. CP Express would implement its Traffic, Noxious Weed, and Fugitive Dust Control Plan to minimize impacts from pipeline construction on local traffic and transportation systems.[373] During operation of the pipeline, impacts on road traffic would be primarily limited to the ten employees based at the proposed Moss Lake Compressor Station (which is not within an environmental justice block group), and periodic deliveries to aboveground facilities. Therefore, the final EIS concludes that the road traffic impacts from the CP Express Pipeline on environmental justice communities are expected to be less than significant.[374] We agree.

### vii.  Air Quality

157.  Emissions during construction of the CP Express Pipeline Project would generally be associated with the use of on-road and off-road mobile equipment. CP Express's construction equipment exhaust emissions would be minimized by using construction equipment and vehicles that are maintained in accordance with manufacturers' maintenance schedules; comply with EPA vehicle and non-road engine emissions regulations; and use commercial fuels (e.g., diesel) that meet specifications of applicable federal and state air pollution control regulations.[375] Fugitive dust generation would be minimized, in part, by applying water in active construction areas (e.g., unpaved roads, material storage piles) and imposing speed limits for on-site vehicles in accordance with CP2 LNG and CP Express's Traffic, Noxious Weed, and Fugitive Dust Control Plan.[376] The final EIS concludes that impacts from pipeline construction on local air quality would not be significant.[377]

158.  The operation of the proposed Moss Lake Compressor Station would not cause or contribute to any cumulative significant impact level (SIL) exceedances for NAAQS, and

---

[372] *Id.*

[373] *Id.*

[374] *Id.*

[375] *Id.* at 4-323.

[376] *Id.*

[377] *Id.* at 4-323 to 4-324.

it is not within 1 mile of an environmental justice community.[378]  Therefore, Commission staff concluded in the final EIS that the operational emissions from the pipeline would not have significant adverse air quality impacts on environmental justice communities.[379] We agree.

### viii.  Noise

159.    As stated in the final EIS, noise levels above ambient conditions, attributable to pipeline construction activities, would vary over time and would depend upon the nature of the construction activity, the number and type of equipment operating, and the distance between sources and receptors.[380]  Construction noise at any given location, including locations within environmental justice block groups, would be temporary due to the assembly-line method of pipeline installation.[381]  However, noise associated with unmitigated HDD activities for pipeline construction would increase noise levels above ambient conditions at sensitive receptor sites in proximity to two HDD entry/exit locations (Marshall Street HDD Entry/Exit and Terminal Site Entry/Exit) in an identified environmental justice block group (CT 9702.02 - BG 2).[382]  The closest NSAs to the Marshall Street HDD are residences 990 feet southeast and 380 feet southeast of its entry/exit locations, respectively, and the closest NSAs to the Terminal Site HDD are residences 890 feet northeast and 430 feet southeast of its entry/exit location, respectively.[383]  CP Express will restrict HDD activities to daytime hours (i.e., 7 a.m. to 7 p.m.) with the exception of pipe pullback and hydrostatic testing, which would occur continuously during daytime and nighttime hours until the activity is complete; however, depending on site conditions, pullback and testing activities are generally completed within a day or two.[384]  Except for HDD locations, construction activities associated with the CP Express Pipeline Project would generally be limited to daytime hours; therefore, most construction noise would have no nighttime impacts on residents or other sensitive

---

[378] *Id.* at n. 101, 4-324.

[379] *Id.* at 4-323 to 4-325.

[380] *Id.* at 4-325.

[381] *Id.* at 4-326.

[382] *Id.*

[383] *Id.*

[384] *Id.*

receptors near the pipeline. Due to the temporary nature of construction, including HDD, no associated long-term impacts are anticipated for environmental justice populations.[385]

160.    Operation of the CP Express Pipeline would include an increase in noise levels at the proposed Florida Gas Transmission Meter Station, Enable Interconnect Meter Station, and CPX Meter Station; however, there are no NSAs within identified environmental justice block groups within 0.5 mile of the meter stations. The final EIS concludes the pipeline project would not result in significant noise impacts on local residents and the surrounding communities, including environmental justice communities.[386] We agree.

### c.    Environmental Justice Conclusion

161.    In conclusion, 17 block groups out of 31 block groups within the geographic scope of the projects are considered environmental justice communities.[387]

162.    Temporary and permanent adverse impacts on environmental justice communities from construction and operation of the CP2 LNG Project include impacts associated with water resources, wetlands, socioeconomics, traffic, air quality, noise, and visual resources. The construction and operation of the LNG terminal would have a disproportionately high and adverse impact on environmental justice communities because the impacts would be predominantly borne by those communities. Visual impacts on environmental justice communities near the terminal would be significant. In addition, the project would contribute to significant cumulative visual impacts on environmental justice communities.[388] The remainder of the temporary and permanent adverse impacts on water resources, wetlands, socioeconomics, traffic, air quality, and noise in environmental justice communities from construction and operation of the LNG terminal would be less than significant.[389]

163.    Temporary adverse impacts on environmental justice communities from construction of the CP Express Pipeline Project include impacts associated with water resources, wetlands, socioeconomics, traffic, air quality, and construction noise. Permanent adverse impacts on visual resources in environmental justice communities would occur as a result of pipeline operation, including removal of forested vegetation

---

[385] *Id.*

[386] *Id.* at 4-326 to 4-327.

[387] *Id.* at table 4.10.10-1.

[388] *Id.* at 4-328 to 4-329, 4-546, app. J.

[389] *Id.* at 4-329.

and periodic vegetation clearing within the permanent right-of-way. The construction and operation of the pipeline (including meter stations, contractor yards, and park and ride locations) would have a disproportionately high and adverse impact on environmental justice communities because the impacts would be predominantly borne by those communities, but the impacts would be less than significant.[390]

## 8.  Greenhouse Gas Emissions and Climate Change

164.    NEPA requires agencies to include in NEPA documents reasonably foreseeable environmental effects of the proposed agency action.[391]  CEQ defines effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," which include those effects that "occur at the same time and place" and those that "are later in time or farther removed in distance, but are still reasonably foreseeable."[392]  An impact is reasonably foreseeable if it is "sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision."[393]

165.    For the CP2 LNG and CP Express Pipeline Projects, we find that the construction emissions, including commissioning, and direct operational emissions are reasonably foreseeable.  The final EIS estimates that construction of the projects would result in 3,034,891 tons of carbon dioxide equivalent ($CO_2$e) emissions (equivalent to 2,753,207 metric tons of $CO_2$e) over the duration of construction and commissioning.[394]  GHG emissions from the operation of the projects would result in an annual increase of

---

[390] *Id.* at 4-328.

[391] See FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10, at § 321 (June 3, 2023).

[392] 40 C.F.R. § 1508.1(g) (2023).

[393] *Id.* § 1508.1(aa).  *See generally Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (explaining that "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause" and that "[t]he Court analogized this requirement to the 'familiar doctrine of proximate cause from tort law'") (citation omitted); *Food & Water Watch v. FERC*, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question.'") (citation omitted); *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (*Sabal Trail*) ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.").

[394] *See* final EIS at 4-353, 4-358, 4-365, and tbls. 4.12.1-9, 4.12.1-10, & 4.12.1-17.

CO2e emissions of about 9,380,776 tons per year (tpy) (equivalent to 8,510,099 metric tpy).[395]

166.    EPA argues that the Commission should disclose and evaluate the GHG emissions associated with upstream production and downstream use of the gas exported by the CP2 LNG Project due to the Commission's authorization role under NGA section 3 and to the reasonably close causal relationship between the projects and upstream and downstream emissions.[396]  EPA states that it is irrelevant whether downstream GHG emissions occur within or outside of the United States to assess their climate impacts given that GHG emissions have impacts that are global in scale, and that whether the project gas is used nationally or internationally does not impact the location of upstream GHG emissions.[397]

167.    As we have repeatedly held,[398] under D.C. Circuit precedent, the Commission need not consider the effects of upstream production or downstream transportation, consumption, or combustion of exported gas because the DOE's "independent decision to allow exports . . . breaks the NEPA causal chain and absolves the Commission of responsibility to include [these considerations] in its NEPA analysis."[399]

168.    The final EIS estimates that the social cost of GHGs from the projects is either $2,171,634,661 (assuming a discount rate of 5%), $8,163,209,390 (assuming a discount rate of 3%), $12,317,496,889 (assuming a discount rate of 2.5%) or $24,759,892,905 (using the 95th percentile of the social cost of GHGs with a discount rate of 3%).[400]  The final EIS states that "construction and operation of the Project[s] would increase the

---

[395] *See id.* at 4-368 and tbl. 4.12.1-19.

[396] EPA September 1, 2023 Comments at 3; *see also* final EIS at 4-559.

[397] EPA September 1, 2023 Comments at 3.

[398] *See Commonwealth LNG*, 181 FERC ¶ 61,143 at P 77; *Columbia Gulf Transmission, LLC*, 178 FERC ¶ 61,198, at P 46, *order on reh'g*, 180 FERC ¶ 61,206, at P 78 (2022).

[399] 827 F.3d 36 (D.C. Cir. 2016) (*Freeport*); *see also Sierra Club v. FERC*, 827 F.3d 59, 68-69 (D.C. Cir. 2016); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir 2016) (same); *Sierra Club v. FERC*, 867 F.3d 1357, 1372 (D.C. Cir. 2017) (explaining *Freeport*).

[400] The Interagency Working Group draft guidance identifies costs in 2020 dollars.  Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990*, at 5 (Table ES-1) (Feb. 2021).

atmospheric concentration of GHGs, in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts."[401]  We clarify that, assuming that the transported gas is not displacing equal-or higher-emitting sources, we recognize that the projects' contributions to GHG emissions globally contribute incrementally to future climate change impacts,[402] including impacts in the region.[403]

169.    EPA recommends that the Commission detail the discount rates and methodology behind the social cost of GHG estimates in the Commission's order or other NEPA documents.[404]  For the calculations, the final EIS assumed discount rates of 5%, 3%, and 2.5%, and assumed that the project will begin service in 2026 and that the operational emissions would be at a constant rate throughout the life of a 20-year contract.[405]

170.    Additionally, EPA asserts that the social cost of GHG estimates in the final EIS underrepresent global impacts from GHG emissions because they do not include damages related to upstream or downstream emissions.[406]  As explained above, the upstream and downstream emissions are appropriately excluded from our NEPA analysis.[407]

171.    As we have done in prior orders, we place the project's GHG emissions in context by comparing them to the total GHG emissions of the United States as a whole and at the state level.  At a national level, 5,586.0 million metric tons (MMT) of $CO_2$e were emitted in 2021 (inclusive of $CO_2$e sources and sinks).[408]  The construction and commissioning emissions from the CP Express Pipeline Project and the CP2 LNG Project could

---

[401] Final EIS at 4-559.

[402] *Id.*

[403] *Id.* at 4-457 to 4-558 (discussing observations from the Fourth Assessment Report).

[404] EPA September 1, 2023 Comment at 3.

[405] Final EIS at 4-560 to 4-561.

[406] EPA September 1, 2023 Comment at 3.

[407] *See supra* P 167.

[408] Final EIS at 4-559; EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2021 at tbl. 2-1 (April 2022), https://www.epa.gov/system/files/documents/2023-04/US-GHG-Inventory-2023-Main-Text.pdf.

Document Accession #: 20240627-3107          Filed Date: 06/27/2024

potentially increase $CO_2e$ emissions based on the national 2021 levels by 0.002 to 0.02% in any one year;[409] in subsequent years, operation of the projects could potentially increase emissions nationally by 0.17%.[410]

172.     At the state level, we compare the project's GHG emissions to the total $CO_2$ emissions for the State of Louisiana alone.[411]  For Louisiana, 183.3 MMT of $CO_2$ were emitted in 2020.[412]  The total construction and commissioning emissions from the projects would temporarily increase $CO_2e$ emissions in Louisiana, based on the state 2020 level, by 0.05 to 0.57% in any one year of construction/commissioning; in subsequent years, the operation of both projects could potentially increase annual GHG emissions in Louisiana by 5.13%.[413]

173.     When states have GHG emissions reduction targets, a project's GHG emissions are compared to those state goals to provide additional context.[414]  The state of Louisiana established executive targets in 2020 to reduce net GHG emissions 26% to 28% by 2025 and 40% to 50% by 2030, compared to 2005 levels.  The targets also aim for net-zero GHG emissions by 2050.  Statewide GHG emissions were 215 MMT $CO_2e$ in 2005; therefore, the goals are to have emission levels in Louisiana at about 157 MMT $CO_2e$ in 2025 (based on a 27% reduction) and between 108 and 129 MMT $CO_2e$ in 2030.  Based

---

[409] Construction and commissioning are estimated to take a total of 48 months, but may occur over 5 calendar years.  Final EIS at 2-18, 4-349, and 4-358.

[410] This estimate was incorrectly stated in the Final EIS and has been corrected here.  Final EIS at 4-559.

[411] In Texas, the pipeline and two meter stations would have only minor construction-related emissions and operational fugitive emissions.  Given that the vast majority of project-related emissions would occur in Louisiana, we compare both projects' GHG emissions to State of Louisiana emissions.

[412] Final EIS at 4-560.

[413] Mathematical *Id.* at 4-560.

[414] *See, e.g.*, *Tex. E. Transmission, LP*, 180 FERC ¶ 61,186, at P 28 (2022); *Golden Pass Pipeline, LLC*, 180 FERC ¶ 61,058, at P 21 (2022).

on operational emissions (9.38 MMT $CO_2e$)[415], the projects would contribute approximately 7.98% of the $CO_2e$ emissions level goal (midpoint of range) in 2030.[416]

174.    EPA recommends that the Commission avoid expressing project-level emissions as a percentage of national or state emissions or reduction targets as it "trivializes substantial project-scale GHG emissions and is also misleading given the nature of the climate policy challenge to reduce GHG emissions from a multitude of sources."[417]  We disagree.  The D.C. Circuit has repeatedly upheld the Commission's analysis of a project's estimated GHG emissions by comparison to national and state inventories.[418]

175.    EPA recommends that the Commission provide updated estimates of global warming potentials (GWP) for GHGs using the latest scientific information from the Intergovernmental Panel on Climate Change 6th Assessment Report.[419]  As stated in the final EIS, Commission staff chose to use GWPs that EPA itself established for reporting of GHG emissions and air permitting requirements, allowing for a consistent comparison with these regulatory requirements.[420]

176.    EPA also recommends that the Commission condition its approval of the projects on CP2 LNG and CP Express's commitment to adopt all practicable GHG mitigation measures.[421]  EPA further recommends that any mitigation or best management practices be included as conditions of the authorization order, in a Memorandum of Understanding

---

[415] Final EIS at 4-368.

[416] Because the projects are not projected to begin operations until 2026, we only compare to Louisiana's 2030 goal.

[417] EPA September 1, 2023 Comment at 3.

[418] *Ala. Mun. Distributors Grp. v. FERC*, 100 F.4th 207, 214 (D.C. Cir. 2024) (*Evangeline Pass*); *Alaska LNG*, 67 F.4th at 1183-84.

[419] EPA September 1, 2023 Comments at 2.

[420] Commission staff chose EPA-developed GWPs outlined in 40 C.F.R. pt. 98, subpt. A, tbl.A-1 (2023), rather than other published GWPs.  Final EIS at 4-335; *see also Gas Transmission Northwest LLC*, 181 FERC ¶ 61,234, at P 39 (2022)  (finding staff appropriately selected EPA's GWP for methane in its environmental analysis).

[421] EPA September 1, 2023 Comments at 2-3.

with CP2 LNG and CP Express, or in a state or local permit to ensure the measures are real and verifiable.[422]

177.   As described in the final EIS, CP2 LNG and CP Express have committed to various methods, measures, and best management practices, which Commission staff determined would help to reduce GHG emissions.[423]   Additionally, CP2 LNG plans to capture, compress, and sequester approximately 500,000 tons of $CO_2$ from feed gas entering the CP2 LNG Project through its CCS facilities.[424]   We are satisfied that these measures sufficiently address EPA's recommendation.

178.   Some commenters oppose the projects, citing concern regarding the projects' contribution to climate change and the importance of domestic and global GHG emissions reductions targets.[425]   The Commission has disclosed the GHG emissions associated with construction and operation of the projects.[426]   Additionally, as stated above, we recognize that the projects' contributions to GHG emissions globally contribute incrementally to future climate change impacts, assuming that the transported gas is not displacing equal-or higher-emitting sources.[427]

179.   We clarify that, for informational purposes, Commission staff disclosed an estimate of the social cost of GHGs.[428]   While we have recognized in some past orders that the social cost of GHGs may have utility in certain contexts such as rulemakings,[429] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions

---

[422] *Id.* at 3.

[423] Final EIS at 4-365 to 4-367.

[424] *See supra* P 9.

[425] *See, e.g.*, Pam Elders October 17, 2023 Comments; Karen Uhlenhuth October 19, 2023 Comments; Rebecca Liberman October 20, 2023 Comments.

[426] *See supra* P 165; *see also* final EIS at 4-353, 4-358, 4-365, 4-368, and tbls. 4.12.1-9, 4.12.1-10, 4.12.1-17, and 4.12.1-19.

[427] *See supra* P 168.

[428] Final EIS at 4-560 to 4-561.   "Commission staff have not identified a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Project's incremental contribution to GHGs."   *Id.* at 4-559.

[429] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 35-37 (2018).

associated with a project are significant or not significant in terms of their impact on global climate change.[430]  Currently, however, there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.[431]  Nor are we aware of any other currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.[432]  The D.C. Circuit has repeatedly upheld the Commission's decisions not to use the social cost of carbon, including to assess significance.[433]  In fact, the D.C. Circuit recently affirmed the

---

[430] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, (2017), *aff'd sub nom.*, *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019); *Del. Riverkeeper Network v. FERC*, 45 F.th 104, 111 (D.C. Cir. 2022).  The social cost of GHGs tool merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

[431] *Tenn. Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051, at P 37 (2022); *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 296, *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297 (2018), *aff'd*, *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *2) ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes."); *EarthReports v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at P 75 (2022); *see, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 91 (2022).

[432] *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 ("there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.").

[433] *See, e.g.*, *Food & Water Watch v. FERC*, Nos. 22-1214, 22-1315, 2024 WL 2983833, at *6-7 (D.C. Cir. June 14, 2024) (*Tenn. East 300*) (noting that "NEPA regulations [do not] require an agency to clarify every environmental impact as significant or insignificant," and upholding the Commission's decision not to assess "significance" despite having done so in the past); *Alaska LNG*, 67 F.4th at 1184 (explaining that "the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions," "declined to apply the social cost of carbon for the same reasons it had given in a previous order"; describing those reasons as (1) "the lack of consensus about how to apply the social cost of carbon on a long time horizon," (2)

Commission's decision to not analyze the social cost of carbon in its NEPA analysis,[434] rejected the suggestion that it was required to do so, found that the petitioner's arguments "fare no better when framed as NGA challenges," and then, in the very same paragraph, sustained the Commission's public interest determination as "reasonable and lawful."[435]

180.   We note that there currently are no accepted tools or methods for the Commission to use to determine significance; therefore, the Commission is not herein characterizing these emissions as significant or insignificant.[436]   Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

---

that "the social cost of carbon places a dollar value on carbon emissions but does not measure environmental impacts as such," and (3) "FERC has no established criteria for translating these dollar values into an assessment of environmental impacts"; and recognizing that the Commission's "approach was reasonable and mirrors analysis . . . previously upheld" and that the Commission "had no obligation in this case to consider the social cost of carbon") (citations omitted); *EarthReports v. FERC*, 848 F.3d 949, 956 (D.C. Cir. 2016) (upholding the Commission's decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things); *Del. Riverkeeper Network v. FERC*, 45 F.4th 104 (D.C. Cir. 2022) (also upholding the Commission's decision not to use the social cost of carbon); *Appalachian Voices v. FERC*, 2019 WL 847199 (same).

[434] *Tenn East 300*, 2024 WL 2983833, at *6 ("FERC need not attempt to monetize those emissions through a Social Cost of Carbon model which FERC views as unreliable for analyzing individual projects."); *Evangeline Pass*, 100 F.4th 207, 214-15 (D.C. Cir. 2024) (upholding the Commission's decision not to rely on the social cost of carbon tool where, as in the instant proceeding, Commission staff estimated the social cost of carbon, publicly disclosed those estimates, and shared them in the NEPA document); *Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions. It declined to apply the social cost of carbon for the same reasons it had given in a previous order. . . FERC's approach was reasonable and mirrors analysis we have previously upheld.").

[435] *Alaska LNG*, 67 F.4th at 1184.

[436] The February 18, 2022 Interim GHG Policy Statement, *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022), which proposed to establish a NEPA significance threshold of 100,000 tons per year of $CO_2e$ as a matter of policy, has been suspended, and opened to further public comment.  Order on Draft Policy Statements, 178 FERC ¶ 61,197 at P 2.

## 9. Alternatives

181. In the final EIS, Commission staff determined that electric-driven turbines at the LNG terminal and electric motor-driven compression at the Moss Lake Compressor Station would not provide a significant environmental advantage over or equivalent reliability to the proposed gas-powered turbines and compression, in part due to the unpredictable reliability of electric power transmission during severe weather events, including hurricanes.[437] EPA acknowledges these reliability issues, but recommends the Commission consider these alternative energy sources over the life of the projects, during which the availability of renewable energy may increase.[438]

182. As stated in the final EIS, electric power transmission can be unreliable in the project area due to the susceptibility of overhead electric transmission lines to damage, and power outages lasting days or weeks are not uncommon in southern Louisiana after major weather events.[439] Renewable energy provided through the electrical grid would be subject to the same reliability concerns. We agree.

## 10. Cumulative Impacts

### a. Mobile Source Emissions

183. Sierra Club comments that the final EIS fails to consider cumulative air quality impacts from mobile source emissions, particularly from marine vessels.[440] It notes that the final EIS for the CP2 LNG and CP Express Projects, as well as EISs for other Commission-jurisdictional projects considered in the cumulative impacts analysis,[441] estimates large volumes of mobile source emissions during both project construction and operation.[442] Sierra Club asserts that including mobile source emissions in the

---

[437] *Id.* at 3-85 to 3-86.

[438] EPA September 1, 2023 Comments at 1-2.

[439] Final EIS at 3-86.

[440] Sierra Club October 16, 2023 Comments at 1.

[441] Commission-jurisdictional LNG projects considered in the cumulative effects analysis are: the Calcasieu Pass LNG Project; Driftwood LNG Project; Lake Charles Liquefaction Project; Cameron LNG Project; Cameron LNG Expansion Project; Commonwealth LNG Project; Delfin LNG Project; and, Magnolia LNG Project. Final EIS at 4-518 to 4-520.

[442] Sierra Club October 16, 2023 Comments at 2-3.

cumulative impacts analysis may result in a predicted NAAQS exceedance, thereby undermining the final EIS's conclusion that there would be no significant individual or cumulative air quality impacts from the projects because, even where project emissions would exceed the Significant Impact Level (SIL) for a given pollutant, the ambient pollution levels would remain below the relevant NAAQS threshold.[443]  It further states that given the magnitude of cumulative mobile source emissions, this possibility cannot be dismissed as speculative.[444]

184.    The Commission's analysis of cumulative air quality impacts satisfied our responsibility under NEPA.  The cumulative air dispersion modeling in the final EIS was conducted in accordance with EPA's 40 CFR Part 51, Appendix W.[445]  CP2 LNG conducted a cumulative impact analysis for the terminal facilities for each pollutant that exceeded the SIL.  The terminal facilities sources, including marine vessels (LNG carriers and tugboats), were modeled along with additional offsite sources obtained from the Louisiana DEQ Emissions Reporting and Inventory Center.  The Area of Impact (AOI) for each pollutant and averaging period was established as the distance from the terminal facilities to the farthest receptor that showed a model-predicted impact greater than the SIL in the Significance Analysis.  The offsite source inventory for the cumulative analysis included all sources within the AOI plus 15 kilometers and all major sources within the AOI plus 20 kilometers.[446]

185.    The cumulative air dispersion modeling for the CP2 LNG and CP Express Projects included both stationary sources and mobile sources (LNG vessels and tugs) associated with the operation of the CP2 LNG terminal,[447] as well as the stationary and mobile sources associated with the Calcasieu Pass LNG terminal.[448]  The emissions inventory provided by the Louisiana DEQ does not include mobile emissions associated with the other LNG terminals, and thus, those emissions were not included in the cumulative

---

[443] *Id.* at 4-5.

[444] *Id.* at 5.

[445] Final EIS at 4-369 to 4-373.

[446] *Id.* at 4-299.

[447] *Id.* at 4-296 to 4-301.

[448]  See Appendix E of CP2 LNG's August 1, 2022 *Supplemental Response to Environmental Information Request No 3*, which lists the Louisiana DEQ offsite sources.

impacts modeling.[449]  Per 40 CFR part 51, Appendix W – Guideline on Air Quality Models, this is consistent with the Prevention of Significant Deterioration requirements of the Clean Air Act.[450]

186.    Further, the final EIS describes a cause-and-contribute analysis that determined that the projects would not cause or contribute to the anticipated exceedances of the 1-hour NAAQS for nitrogen dioxide ($NO_2$) or the 24-hour NAAQS for particulate matter ($PM_{2.5}$) predicted by the modeling.[451]  This analysis indicates that existing, permitted off-site sources, such as existing marine vessels operating in the nearby Calcasieu Ship Channel, are the primary drivers of NAAQS exceedances in the project area because, where the modeling predicted an exceedance of a NAAQS threshold, that exceedance would occur even in the absence of the projects' emissions.[452]  Based on this modeling, the final EIS concludes that the CP2 LNG terminal would not cause or contribute to a potential NAAQS exceedance.[453]  We agree.

187.    The addition of nearby mobile source emissions, including those from the nearest facilities, such as Commonwealth LNG terminal, would not change the conclusion that the CP2 LNG and CP Express Projects do not cause or contribute to potential NAAQS exceedances.[454]  As detailed in Appendix K of the final EIS, the highest project contribution to any potential NAAQS exceedance location for the 1-hour $NO_2$ standard is

---

[449]  *See id.*; *see also* Louisiana DEQ, Air Emissions Inventory, https://deq.louisiana.gov/index.cfm?md=pagebuilder&tmp=home&pid=EmissionsInventory (last updated Mar. 2, 2023).

[450]  Where there is no simultaneous exceedance of the NAAQS and the significant impact level by the project sources, the modeling analysis is deemed to demonstrate that the proposed source would not cause or contribute to the potential NAAQS exceedance. 40 C.F.R. part 51, app. W (Guideline on Air Quality Models), § 8.1.2 a (2023) states: "For a NAAQS or [Prevention of Significant Deterioration] increments assessment, the modeling domain or project's impact area shall include all locations where the emissions of a pollutant from the new or modifying source(s) may cause a significant ambient impact."  Further, per Section 9.2.3 c.: "The receptors that indicate the location of significant ambient impacts should be used to define the modeling domain for use in the cumulative impact analysis."

[451]  Final EIS at 4-553.

[452]  *Id.*

[453]  *Id.* at 4-552 to 4-553.

[454]  *Id.* at 4-552 to 4-553.

3.7 micrograms per cubic meter, which is about half of the SIL for the 1-hour $NO_2$ standard.[455]

188.    Based on the cumulative air quality dispersion modeling and cause-and-contribute analysis summarized in the final EIS, as well as the extent of the project's contribution to the potential exceedances of the NAAQS analyzed in the final EIS, our conclusion remains the same—the CP2 LNG terminal does not cause or contribute to potential NAAQS exceedances.[456]

189.    In addition, Sierra Club states that the information used to support the air quality modeling, as well as Louisiana DEQ's emission inventory data, were not provided in the final EIS.  Sierra Club questions why this information is not available to the public.[457] We note that the dispersion modeling assumptions are stated generally throughout the body text of the EIS, and footnotes in the EIS refer to CP2 LNG and CP Express's detailed modeling reports (including the modeling files and Louisiana DEQ offsite emissions inventory) in CP2 LNG's application as well.[458]

### b.    **Particulate Matter**

190.    On March 6, 2024, EPA revised the National Ambient Air Quality Standards (NAAQS) for particulate matter with an aerodynamic diameter less than 2.5 micrometers ($PM_{2.5}$), lowering the primary annual standard from 12.0 micrograms per cubic meter ($\mu g/m^3$) to 9.0 $\mu g/m^3$.[459]  The revised NAAQS became effective on May 6, 2024.

191.    As described in the final EIS, CP2 LNG's modeling estimated that the maximum impacts from the LNG terminal would be 9.4 $\mu g/m^3$ for the annual $PM_{2.5}$ NAAQS.[460]  To confirm that the operations of the LNG terminal would not result in $PM_{2.5}$ air quality impacts greater than the revised annual $PM_{2.5}$ NAAQS in the surrounding communities,

---

[455] *Id.* at app. K.

[456] *See id.* at 4-552 to 4-553.

[457] Sierra Club October 16, 2023 Comments at 5.

[458] Final EIS at 4-296 to 4-303 and n. 138.  *See also* Appendix E of CP2 LNG's August 1, 2022 *Supplemental Response to Environmental Information Request No 3.*

[459] 89 Fed. Reg. 16,202 (Mar. 6, 2024).

[460] Final EIS at tbl. 4.12.1-22.

Commission staff issued Environmental Information Requests (EIRs) to the applicant on March 26, 2024, and May 29, 2024, requesting revised air quality analysis.[461]

192.    On April 4 and June 3, 2024, CP2 LNG submitted revised air quality impacts analysis to demonstrate compliance with the revised annual $PM_{2.5}$ NAAQS in the project area.  Specifically, CP2 LNG updated its air dispersion modeling to use the PM2.5 design value derived from ambient air data collected at an air quality monitoring station in Vinton, Louisiana.[462]  CP2 LNG states that the ambient air conditions at the Vinton, Louisiana station are more representative of the project area than the ambient air conditions at the West Orange, Texas monitoring station used in its initial modeling.  CP2 LNG states that it originally used the design value from the West Orange station because, at that time, the data from the Vinton station was considered incomplete due to a 2021 hurricane; however, in early 2024, CP2 LNG states that EPA concluded that the Vinton station's data from 2020 to 2022 is valid and acceptable for use.[463]  With the Vinton station $PM_{2.5}$ value, air dispersion modeling estimates that the total cumulative concentration of annual $PM_{2.5}$ will be 8.2 ug/m³ once the LNG facilities are in operation, in compliance with the EPA's revised standard.[464]

193.    We disagree with the dissent's assertion that the revised $PM_{2.5}$ annual NAAQS triggered the Commission's duty to prepare a supplemental EIS.[465]  An agency need not supplement an EIS every time new information comes to light after an EIS is finalized, for to do so "would render agency decision making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."[466]  Rather, a supplemental EIS is required where "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its

---

[461] CP2 LNG submitted revised air quality analysis in response to Commission staff's March 26, 2024 EIR on April 4, 2024.

[462] CP2 LNG April 4, 2024 Response to Environmental Information Request.

[463] *Id.*

[464] *Id.*

[465] Dissent at PP 12-16 (stating that a supplemental EIS is required "where 'might' be 'any' significant environmental impacts").

[466] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373-74 (1989); *see also Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017).

impacts."[467]  The D.C. Circuit has explained that a supplemental EIS "must only be prepared where new information provides a *seriously* different picture of the environmental landscape."[468]

194.    Commission staff requested additional air quality analysis from the applicant to determine whether the LNG terminal would have a significant impact on air quality. Staff reviewed and replicated the cumulative air quality model filed on June 3, 2024, and determined that the increase in emissions from the CP1 LNG facility as well as the change in the annual $PM_{2.5}$ SIL did not result in additional locations where cumulative impacts would exceed the NAAQS.  Furthermore, staff confirmed that, consistent with the determination in the final EIS, the impacts attributable to the CP2 facility would not cause or contribute to an exceedance of any the NAAQS.  The cumulative area of impact is not affected by the change in the annual $PM_{2.5}$ SIL as the cumulative air quality AOI is based upon the much larger area where the 1-hour $NO_2$ SIL is exceeded.  Thus, the increase in area where the annual $PM_{2.5}$ SIL is exceeded is much smaller than the 1-hour $NO_2$ AOI.  For the reasons explained herein, we are satisfied that the applicant's revised modeling demonstrates compliance with the revised annual $PM_{2.5}$ NAAQS in the project area and that the project will not significantly impact air quality.[469]

195.    The dissent further states that the analysis "inexplicably excluded mobile emissions from the Driftwood LNG, Lake Charles Liquefaction, Commonwealth LNG, and Magnolia LNG projects."[470]  We note that EPA's modeling guidance under Appendix W[471] does not require modeling of mobile sources under clean air permitting PSD or Title V requirements.[472]  CP1 LNG and CP2 LNG are owned/controlled by the same company, so to ensure we took a "hard look" at the totality of the emission impacts under NEPA,

---

[467] 40 C.F.R. § 1502.9(d)(1)(ii) (emphasis added); *see also Tenn. Gas Pipeline Co., L.L.C.*, 187 FERC ¶ 61,136, at P 50 (2004) ("…the decision to prepare a supplemental EIS is left to agency discretion under a 'rule of reason.'").

[468] *Stand Up for Cal.! v. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (emphasis in original) (quoting *Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (internal quotation marks omitted)).

[469] *See supra* P 192; *see infra* PP 196-197.

[470] Dissent at P 15.

[471] *See supra* P 184.

[472] *See supra* P 185.

we conservatively included the mobile emissions from both CP1 LNG and CP2 LNG in the cumulative air quality model.

### c.  CP1 LNG Terminal Emissions

196.  In comments filed April 24, 2024, Sierra Club argued that CP2 LNG's cumulative air impact modeling was flawed because it did not include anticipated increases in operational emissions from the neighboring CP1 LNG terminal as described in CP1 LNG's application to modify its Title V/PSD Permit filed with LDEQ on March 17, 2023.  CP2 LNG responded on May 15, 2024, that its modeling did include CP1 LNG's increased emissions and provided its application materials for the CP1 LNG permit modification.  After reviewing the revised analysis, Commission staff determined that the modeling reflected the increase in CP1 LNG's operational emissions, but did not include the associated LNG ship and support vessel emissions.  Commission staff issued an EIR on May 29, 2024, requiring that CP2 LNG include CP1 LNG's marine emissions in its air quality analysis.

197.  CP2 LNG filed an updated air quality analysis that included the marine emissions associated with the CP1 LNG terminal on June 3, 2024.  The updated air quality modeling indicates that the increase in CP1 LNG emissions results in increases in overall cumulative impacts from $NO_2$ and $PM_{2.5}$.  However, the updated air quality analysis demonstrates that operation of the CP2 LNG terminal would not result in air quality impacts that would cause or contribute to an exceedance of any NAAQS in the surrounding communities.

### 11.  Environmental Impacts Conclusion

198.  We have reviewed the information and analysis contained in the final EIS, as well as other information in the record, regarding the potential environmental effects of the projects.  We accept the environmental recommendations in the final EIS, as modified herein, and we are including them as conditions in the appendix to this order.  Based on our consideration of this information, as supplemented or clarified herein,[473] we agree with the conclusions presented in the final EIS and find that the projects, if implemented as described in the applications and in compliance with the environmental conditions to this order, are environmentally acceptable actions.

---

[473] Although the analysis in the EIS provides substantial evidence for our conclusions in this order, it is the order itself that serves as our record of decision.  The order supersedes any inconsistent discussion in the EIS.

## IV.    Conclusion

199.    For the reasons discussed above, we find that the CP2 LNG Project is not inconsistent with the public interest, and we will grant CP2 LNG's application for authorization under section 3 of the NGA to site, construct, and operate the project.

200.    The CP Express Pipeline Project will enable CP Express to transport domestically sourced natural gas to the CP2 LNG terminal for export.  We find that CP Express has demonstrated a need for the project, that the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers, and that the project will have minimal impacts on the interests of landowners and surrounding communities.  Additionally, as noted above, the project is an environmentally acceptable action.  Based on the discussion above, we conclude under section 7 of the NGA that the public convenience and necessity requires approval of the CP Express Pipeline Project, subject to the conditions in this order.

201.    Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Only when satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of life, health, property, and environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

202.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[474]

---

[474] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal

203.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, and exhibits thereto, and all comments.

<u>The Commission orders:</u>

(A)    In Docket No. CP22-21-000, CP2 LNG is authorized under section 3 of the NGA to site, construct, and operate the CP2 LNG Project, as described and conditioned herein, and as more fully described in CP2 LNG's application and subsequent filings by the applicant, including any commitments made therein.

(B)    The authorizations in Ordering Paragraph (A) are conditioned on:

(1)    CP2 LNG's facilities being fully constructed and made available for service within seven years of the date of this order; and

(2)    CP2 LNG's compliance with the environmental conditions contained in the appendix to this order.

(C)    In Docket No. CP22-22-000, a certificate of public convenience and necessity under section 7(c) of the NGA is issued to CP Express authorizing it to construct and operate the CP Express Pipeline Project, as described and conditioned herein, and as more fully described in CP Express's application and subsequent filings by the applicant, including any commitments made therein.

(D)    The certificate authorized in Ordering Paragraph (C) is conditioned on:

(1)    CP Express's facilities being constructed and made available for service within seven years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

(2)    CP Express's compliance with all applicable Commission regulations under the NGA, particularly the general terms and conditions set forth in Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations; and

(3)    CP Express's compliance with the environmental conditions contain in the appendix of this order.

---

regulation, or would delay the construction and operation of facilities approved by the Commission).

(E)     A blanket transportation certificate is issued to CP Express under Subpart G of Part 284 of the Commission's regulations.

(F)     A blanket construction certificate is issued to CP Express under Subpart F of Part 157 of the Commission's regulations.

(G)     CP Express shall file a written statement affirming that it has executed firm contracts for the capacity levels and terms of service represented in the signed precedent agreements, prior to commencing construction.

(H)     CP2 LNG and CP Express shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies CP2 LNG or CP Express.  CP2 LNG and CP Express shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

(I)     CP Express's initial recourse rates, fuel and lost and unaccounted for gas reimbursement percentages, and *pro forma* tariff are approved, as conditioned and modified above.

(J)     CP Express is required to file actual tariff records reflecting revised initial rates and tariff language that comply with the requirements contained in the body of this order prior to the commencement of interstate service consistent with Part 154 of the Commission's regulations.  CP Express may file the revised initial rates for Phase II service in this filing or in a separate filing prior to the commencement of Phase II service.

(K)     The untimely motion to intervene filed by Fisherman Involved in Sustaining our Heritage on April 18, 2024, is denied.

(L)     Within three months after its first three years of actual operation of its entire system including Phase II service, as discussed herein, CP Express must make a filing to justify its existing cost-based firm and interruptible recourse rates.  CP Express's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580.  In addition, CP Express is advised to include as part of the eFiling description, a reference to Docket Nos. CP22-21-000 and CP22-22-000 in the cost and revenue study.  To the extent CP Express has not begun construction of the Phase II facilities within two years of the in-service date of Phase I, CP Express is directed to file a cost and revenue study three years after the in-service date of the Phase I facilities.

Document Accession #: 20240627-3107     Filed Date: 06/27/2024

By the Commission.   Commissioner Clements is dissenting with a separate statement
                     attached.
                     Commissioner Rosner is not participating.

( S E A L )


                              Debbie-Anne Reese,
                              Acting Secretary.

## Appendix

## Environmental Conditions

As recommended in the final environmental impact statement (EIS) and otherwise amended herein, this authorization includes the following conditions.

1.  Venture Global CP2 LNG, LLC (CP2 LNG) and Venture Global CP Express, LLC (CP Express) shall follow the construction procedures and mitigation measures described in its application and supplements, including responses to staff data requests and as identified in the EIS, unless modified by the Order.  CP2 LNG and CP Express must:

    a.  request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

    b.  justify each modification relative to site-specific conditions;

    c.  explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d.  receive approval in writing from the Director of the Office of Energy Projects (OEP), or the Director's designee, **before using that modification**.

2.  The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of life, health, property, and the environment during construction and operation of the CP2 LNG and CP Express Project (project).  This authority shall allow:

    a.  the modification of conditions of the Order;

    b.  stop-work authority and authority to cease operation; and

    c.  the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

3.  **Prior to any construction,** CP2 LNG and CP Express shall file an affirmative statement with the Secretary, certified by senior company officials, that all

company personnel, environmental inspectors (EI), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4.     The authorized facility locations shall be as shown in the EIS, as supplemented by filed plot plans, alignment sheets, and facility diagrams. **As soon as they are available, and before the start of construction,** CP2 LNG and CP Express shall file with the Secretary any revised detailed plans, diagrams, and alignment sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order. All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must specify locations designated on these plans, diagrams, and alignment sheets.

CP Express' exercise of eminent domain authority granted under Natural Gas Act (NGA) section 7(h) in any condemnation proceedings related to the Order must be consistent with the authorized Pipeline System facilities and locations. CP Express' right of eminent domain granted under NGA section 7(h) does not authorize it to increase the size of its natural gas pipeline to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.     CP2 LNG and CP Express shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed that have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use or cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps, or aerial photographs. Use of each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area.**

This requirement does not apply to extra workspace allowed by the Federal Energy Regulatory Commission's (FERC or Commission) *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route alignments and facility location changes resulting from:

    a.      implementation of cultural resources mitigation measures;

    b.      implementation of endangered, threatened, or special concern mitigation measures;

    c.      recommendations by state regulatory authorities; and

    d.      agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.      **At least 60 days before construction begins,** CP2 LNG and CP Express shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee.  CP2 LNG and CP Express must file revisions to the plan as schedules change.  The plan shall identify:

    a.      how CP2 LNG and CP Express will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the Order;

    b.      how CP2 LNG and CP Express will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

    c.      the number of EIs assigned, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

    d.      company personnel, including EIs and contractors, who will receive copies of the appropriate material;

    e.      the location and dates of the environmental compliance training and instructions CP2 LNG and CP Express will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change); (with the opportunity for OEP staff to participate in the training sessions(s));

    f.      the company personnel (if known) and specific portion of CP2 LNG and CP Express' organization having responsibility for compliance;

    g.      the procedures (including use of contract penalties) CP2 LNG and CP Express will follow if noncompliance occurs; and

    h.    for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

        i.    the completion of all required surveys and reports;

        ii.    the environmental compliance training of onsite personnel;

        iii.    the start of construction; and

        iv.    the start and completion of restoration.

7.    CP2 LNG shall employ at least one EI and CP Express shall employ at least one EI per construction spread.  The EI(s) shall be:

    a.    responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

    b.    responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

    c.    empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

    d.    a full-time position, separate from all other activity inspectors;

    e.    responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

    f.    responsible for maintaining status reports.

8.    Beginning with the filing of its Implementation Plan, CP2 LNG shall file updated status reports with the Secretary on a **monthly** basis and CP Express shall file updated status reports with the Secretary on a **biweekly** basis until all construction and restoration activities are complete.  Problems of a significant magnitude shall be reported to the FERC **within 24 hours**.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities.  Status reports shall include:

    a.    an update on CP2 LNG and CP Express' efforts to obtain the necessary federal authorizations;

    b.    project schedule, including current construction status of the project and work planned for the following reporting period;

    c.     a listing of all problems encountered, contractor nonconformance/deficiency logs, and each instance of noncompliance observed by the EI during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

    d.     a description of the corrective and remedial actions implemented in response to all instances of noncompliance, nonconformance, or deficiency;

    e.     the effectiveness of all corrective and remedial actions implemented;

    f.     a description of any landowner/resident complaints which may relate to compliance with the requirements of the order, and the measures taken to satisfy their concerns; and

    g.     copies of any correspondence received by CP2 LNG and CP Express from other federal, state, or local permitting agencies concerning instances of noncompliance, and CP2 LNG and CP Express response.

9.    CP2 LNG and CP Express shall develop and implement an environmental complaint resolution procedure, and file such procedure with the Secretary, for review and approval by the Director of OEP, or the Director's designee.  The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the project and restoration of the right-of-way.  **Prior to construction**, CP2 LNG and CP Express shall mail the complaint procedures to each landowner whose property will be crossed by the project.

    a.     In its letter to affected landowners, CP2 LNG and CP Express shall:

        (1)    provide a local contact that the landowners should call first with their concerns; the letter should indicate how soon a landowner should expect a response;

        (2)    instruct the landowners that if they are not satisfied with the response, they should call CP2 LNG and CP Express Hotline; the letter should indicate how soon to expect a response; and

        (3)    instruct the landowners that if they are still not satisfied with the response from CP2 LNG and CP Express Hotline, they should contact the Commission's Landowner Helpline at 877-337-2237 or at LandownerHelp@ferc.gov.

    b.     In addition, CP2 LNG and CP Express shall include in its status report a copy of a table that contains the following information for each

problem/concern:

(1)    the identity of the caller and date of the call;

(2)    the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

(3)    a description of the problem/concern; and

(4)    an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

10.    CP2 LNG and CP Express must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction** of any project facilities.  To obtain such authorization, CP2 LNG and CP Express must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

11.    CP2 LNG must receive written authorization from the Director of OEP, or the Director's designee, **prior to introducing hazardous fluids into the Terminal Facilities**.  Instrumentation and controls, hazard detection, hazard control, and security components/systems necessary for the safe introduction of such fluids shall be installed and functional.

12.    CP2 LNG must receive written authorization from the Director of OEP, or the Director's designee, **before placing into service the Terminal Facilities.**  Such authorization will only be granted following a determination that the facilities have been constructed in accordance with FERC approval, can be expected to operate safely as designed, and the rehabilitation and restoration of areas affected by the project are proceeding satisfactorily.

13.    CP Express must receive written authorization from the Director of OEP, or the Director's designee, **before placing the Pipeline System into service**.  Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily.

14.    **Within 30 days of placing the authorized facilities in service**, CP2 LNG and CP Express shall file an affirmative statement with the Secretary, certified by a senior company official:

a.    that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

    b.    identifying which of the conditions in the Order CP2 LNG and CP Express has complied with or will comply with.  This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

15.    All conditions attached to the water quality certification issued by the Railroad Commission of Texas and/or the Louisiana Department of Environmental Quality constitute mandatory conditions of the Order.  **Prior to construction activities**, CP2 LNG and CP Express shall file, for review and written approval of the Director of OEP, or the Director's designee, any revisions to its project design necessary to comply with the water quality certification conditions.

16.    **Prior to construction,** CP Express shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee:

    a.    the Interstate 10, Energy Corridor, and Houston River horizontal directional drills (HDD) alignment plan and profile that incorporates site-specific geotechnical information; and

    b.    for each proposed HDD, a description of any subsurface conditions that were identified during geotechnical investigations that may increase the risk of HDD complications (e.g., loss of drilling fluids; drill transition between overburden/bedrock, drill hole collapse, existing groundwater and/or soil contamination) as well as the measures that CP Express would implement to minimize these risks.

17.    **Prior to construction**, CP2 LNG shall file with the Secretary, for review and written approval by the Director of the OEP, or the Director's designee, for the six proposed Calcasieu Pass HDDs:

    a.    an HDD monitoring, inadvertent return response, and contingency plan which describes drilling fluid composition and management, monitoring procedures during drilling operations, and response procedures for an inadvertent return of drilling fluid to the ground surface;

    b.    an alignment plan and profile that incorporates site-specific geotechnical information; and

    c.    a description of any subsurface conditions that were identified during geotechnical investigations that may increase the risk of HDD complications (e.g., loss of drilling fluids; drill transition between overburden/bedrock, drill hole collapse, existing groundwater and/or soil contamination) as well as the measures that CP2 LNG would implement to

minimize these risks.

18. **Prior to construction**, CP2 LNG shall provide a plan for review and written approval by the Director of the OEP, or the Director's designee, to maintain an intake velocity of less than 0.5 feet per second at the hydrostatic test water intake structure screen.

19. **Prior to construction**, CP2 LNG shall consult with the National Marine Fisheries Service Marine Mammal Branch to confirm that an Incidental Take Authorization is not required for the project. CP2 LNG shall file the documentation of the consultation with the Secretary.

20. CP2 LNG and CP Express shall **not begin** construction of the project **until** they file with the Secretary a copy of the determination of consistency with the Coastal Zone Management Plan issued by the Louisiana Department of Natural Resource/Office of Coastal Management.

21. CP Express shall **not begin** construction of the facilities and/or use of staging, storage, or temporary workspace areas and new or to-be improved access roads **until**:

    a.    CP Express files with the Secretary:

        i.    any remaining cultural resources survey report(s);

        ii.    site evaluation report(s) and avoidance/treatment plan(s), as required; and

        iii.    comments on the cultural resources reports and plans from the Texas and Louisiana State Historic Preservation Officers and/or any interested Indian tribes.

    b.    the Advisory Council on Historic Preservation is afforded the opportunity to comment if historic properties would be adversely affected; and

    c.    the FERC staff reviews and the Director of OEP, or the Director's designee, approves the cultural resources reports and plans, and notifies CP Express in writing that treatment plans/mitigation measures (including archaeological data recovery) may be implemented and/or construction may proceed.

    All material filed with the Commission containing **location, character, and ownership** information about cultural resources much as the cover and any relevant pages therein clearly labeled in bold lettering: **"CUI/PRIV – DO NOT RELEASE."**

23. **Prior to construction**, CP2 LNG shall file a nighttime noise mitigation plan with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, that includes the measures it will implement to reduce the projected nighttime (7:00 p.m. to 7:00 a.m.) construction noise levels to at or below 48.6 A-weighted decibel (dBA) equivalent sound level ($L_{eq}$) at noise sensitive areas (NSA)/noise evaluation locations (NEL), and how it will monitor the noise levels during construction activities.

24. **Prior to construction**, CP2 LNG shall file a pile driving noise mitigation plan with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, that includes the measures it will implement to reduce the projected maximum sound level ($L_{max}$) pile driving noise levels to at or below 70 dBA $L_{max}$ at NSAs/NELs, and how it will monitor the noise levels during pile driving activities. The mitigation plan shall include mitigation measures, such as temporary barriers or shrouds.

25. **During construction activities at the Terminal Facilities between 7:00 p.m. and 7:00 a.m.**, CP2 LNG shall monitor noise levels, document the noise levels in the construction status reports, and restrict the noise attributable to construction activities to no more than 55 dBA day-night sound level ($L_{dn}$) (48.6 dBA $L_{eq}$) at any nearby NSAs.

26. CP2 LNG shall file with the Secretary, a full power load noise survey for the Terminal **no later than 60 days** after each phase of liquefaction blocks are placed into service. If the noise attributable to operation of the equipment at the Terminal exceeds an $L_{dn}$ of 55 dBA at any nearby NSA, **within 60 days** CP2 LNG shall modify operation of the liquefaction facilities or install additional noise controls until a noise level below an $L_{dn}$ of 55 dBA at the NSA is achieved. CP2 LNG shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

27. CP2 LNG shall file a noise survey with the Secretary, **no later than 60 days** after placing the entire Terminal into service. If a full load condition noise survey is not possible, CP2 LNG shall provide an interim survey at the maximum possible horsepower load **within 60 days** of placing the Terminal into service and provide the full load survey **within 6 months**. If the noise attributable to operation of the equipment at the Terminal exceeds an $L_{dn}$ of 55 dBA at any nearby NSA under interim or full horsepower load conditions, CP2 LNG shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date. CP2 LNG shall confirm compliance with the above requirement by filing an additional noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

28.    CP Express shall file a noise survey for the Moss Lake Compressor Station with the Secretary **no later than 60 days** after placing the station into service.  If a full power load conditions are not possible, CP Express shall file an interim survey at the maximum possible horsepower load **within 60 days** of placing the station into service and file the full load survey **within 6 months**.  If the noise attributable to operation of the equipment at the Moss Lake Compressor Station exceeds an $L_{dn}$ of 55 dBA at any nearby NSA under interim or full horsepower load conditions, CP Express shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date.  CP Express shall confirm compliance with the above requirement by filing an additional noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

29.    CP Express shall file a noise survey for the TETCO & Boardwalk Interconnect and Florida Gas Meter Stations with the Secretary **no later than 60 days** after placing the stations into service.  If full power load conditions are not possible, CP Express shall file an interim survey at the maximum possible horsepower load **within 60 days** of placing the station into service and file the full load survey **within 6 months**.  If the noise attributable to operation of the equipment at the meter stations exceeds an $L_{dn}$ of 55 dBA at any nearby NSAs under interim or full horsepower load conditions, CP Express shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date.  CP Express shall confirm compliance with the above requirement by filing an additional noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

30.    **Prior to initial site preparation**, CP2 LNG shall file with the Secretary the following information, stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana:

   a.    the erosion control and prevention plan for the dock area; and

   b.    the finalized foundation design criteria for the project; and the associated quality assurance and quality control procedures.

31.    **Prior to initial site preparation,** CP2 LNG shall file with the Secretary the finalized pile load test program (e.g., pile load test procedure, locations, configuration, quality assurance, and quality control, etc.), which shall comply with American Society for Testing and Materials (ASTM) D1143, ASTM 3689, ASTM 3966, or approved equivalent.  The filing shall be stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana.

32.    **Prior to initial site preparation**, CP2 LNG shall file with the Secretary the finalized wind design basis for the project facility, which shall include the tornado

loads determination and consideration for the design loads combination cases as required by American Society of Civil Engineers (ASCE)/Structural Engineering Institute (SEI) (2022).

33. **Prior to construction of final design**, CP2 LNG shall file with the Secretary the following information, stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana:

    a.    the corrosion control and prevention plan for any underground piping, structure, foundations, equipment, and components;

    b.    the finalized site settlement analysis for the project site, which shall include total settlement, differential settlement, subsidence, sea level rise, potential soil liquefaction;

    c.    the total and differential settlement of final designed structures, systems, and components foundations for the project site;

    d.    the finalized settlement monitoring program and procedures for the project site; and

    e.    the total and differential settlement monitoring system of liquified natural gas (LNG) storage tank foundation design shall comply with applicable LNG industrial code/standards, including but not limited to American Petroleum Institute (API) 620 (12th edition), API 625 (1st edition), API 650 (13th edition), API 653 (5th edition), and American Concrete Institute (ACI) 376 (2011 edition) or approved equivalents.

34. **Prior to construction of final design**, CP2 LNG shall file with the Secretary the following information, stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana:

    a.    site preparation drawings and specifications;

    b.    finalized civil and structural design basis, criteria, specifications;

    c.    LNG terminal structures, LNG storage tank, and foundation design drawings and calculations (including prefabricated and field constructed structures);

    d.    seismic design specifications for procured Seismic Category I equipment;

    e.    quality control procedures to be used for civil/structural design and construction; and

    f.    a determination of whether soil improvement is necessary to counteract soil liquefaction.

In addition, CP2 LNG shall file, in its Implementation Plan, the schedule for producing this information.

35.    **Prior to construction of the final design**, CP2 LNG shall file with the Secretary the finalized projectile/missile impact analysis to demonstrate that the outer concrete container wall of the full containment LNG storage tank could withstand projectile/missile impact. The analysis shall detail the projectile/missile speeds and characteristics and methods used to determine penetration resistance and perforation depths. The finalized projectile/missile impact analysis shall be stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana.

36.    **Prior to construction of final design**, CP2 LNG shall file with the Secretary a final design basis of the structure, system, and components in consideration of flood loads, erosion and scour and hydrostatic loads; and final maintenance program of inspection of hydrographic survey of the submerged slope conducted with enough frequency to detect any erosion in the areas vulnerable to bow thrusters and propellers. The filing shall be stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana.

**Information pertaining to the following specific conditions, shall be filed with the Secretary for review and written approval by the Director of OEP, or the Director's designee, within the timeframe indicated by each condition. Specific engineering, vulnerability, or detailed design information meeting the criteria specified in Order No. 833 (Docket No. RM16-15-000), including security information, shall be submitted as critical energy infrastructure information pursuant to 18 CFR §388.113. See Critical Electric Infrastructure Security and Amending Critical Energy Infrastructure Information, Order No. 833, 81 Fed. Reg. 93,732 (December 21, 2016), FERC Stats. & Regs. 31,389 (2016). Information pertaining to items such as offsite emergency response, procedures for public notification and evacuation, and construction and operating reporting requirements will be subject to public disclosure. All information shall be filed <u>a minimum of 30 days</u> before approval to proceed is requested.**

37.    **Prior to initial site preparation**, CP2 LNG shall file the finalized geotechnical investigation report that includes the performance of boreholes and cone penetration test (CPT) soundings on the route from LNG storage tank area to dock area; the performance of the boreholes and CPT soundings for each LNG storage tank foundation area in accordance with the provisions of ACI 376 (2011 edition) or approved equivalent; and details on the number, location, and depth of

boreholes and CPT soundings.  The finalized geotechnical investigation report shall be stamped and sealed by the professional engineer-of-record, registered in the State of Louisiana.

38.     **Prior to initial site preparation,** CP2 LNG shall file the finalized civil plot plan with slopes and elevation contour lines for the project site.  The finalized civil plot plan shall demonstrate that the CP2 LNG site would not be flooded during mean higher high water (MHHW) after accounting for sea level rise and subsidence using intermediate values over 30 years.  The MHHW shall be based upon tidal datum from station 8768094 recorded by National Oceanic and Atmospheric Administration or approved equivalent.  The sea level rise and vertical land movement shall be in accordance with a minimum intermediate curve corresponding to the design life of the facility in Global and Regional Sea Level Rise Scenarios for the United States, U.S. Department of Commerce, National Ocean and Atmospheric Administration, National Ocean Service Center for Operational Oceanographic Products and Services, February 2022 or approved equivalent.

39.     **Prior to initial site preparation**, CP2 LNG shall file the final design of floodwalls (storm surge protection barriers) to comply with applicable code/standards requirements including but not limited to National Fire Protection Association (NFPA) 59A (2019 edition) as incorporated by 33 CFR 127, and NFPA 59A (2001 edition) in 49 CFR 193. In addition, the floodwalls shall be designed and maintained in accordance with ASCE/SEI 7 (2022 edition) or approved equivalent and ASCE/SEI 24 (2014 edition) or approved equivalent to withstand a minimum of a 500-year mean occurrence interval in consideration of relative sea level rise, local subsidence, site settlement, shoreline recession, erosion and scour effect, and wind-driven wave effects. The sea level rise and vertical land movement shall be in accordance with a minimum intermediate curve corresponding to the design life of the facility in Global and Regional Sea Level Rise Scenarios for the United States, U.S. Department of Commerce, National Ocean and Atmospheric Administration, National Ocean Service Center for Operational Oceanographic Products and Services, February 2022 or approved equivalent.

40.     **Prior to construction of final design**, CP2 LNG shall file the settlement monitoring and maintenance plan, which ensures the storm surge floodwalls to be no less than a minimum elevation of 500-year mean recurrence interval flood event; and facilities are protected for the life of the LNG terminal considering settlement, subsidence, and sea level rise.

41.     **Prior to initial site preparation**, CP2 LNG shall file an overall project schedule, which includes the proposed stages of initial site preparation, construction, commissioning, and in-service plan relative to notice to proceed requests and

related conditions.

42. **Prior to initial site preparation**, CP2 LNG shall file procedures for controlling access during construction.

43. **Prior to initial site preparation**, CP2 LNG shall file quality assurance and quality control procedures for construction activities, including initial equipment laydown receipt and preservation.

44. **Prior to initial site preparation**, CP2 LNG shall file its design wind speed criteria for all other facilities not covered by Pipeline and Hazardous Materials Safety Administration's Letter of Determination to be designed to withstand wind speeds commensurate with the risk and reliability associated with the facilities in accordance with ASCE/SEI 7 (2022) or approved equivalent.

45. **Prior to initial site preparation**, CP2 LNG shall develop an Emergency Response Plan (including evacuation and any sheltering and re-entry) and coordinate procedures with the U.S. Coast Guard; state, county, and local emergency planning groups; fire departments; state and local law enforcement; and other appropriate federal agencies. This plan shall be consistent with recommended and good engineering practices, as defined in NFPA 1600, NFPA 1616, NPFA 1620, NFPA 470, NFPA 475, or approved equivalents and based on potential impacts and onsets of hazards from accidental and intentional events along the LNG marine vessel route and potential impacts and onset of hazards from accidental and intentional events at the LNG terminal, including but not limited to a catastrophic failure of the largest LNG tank. This plan shall address any special considerations and pre-incident planning for infrastructure and public with access and functional needs and shall include at a minimum:

   a. materials and plans for periodic dissemination of public education and training materials for evacuation and/or shelter in place of the public within any transient hazard areas along the LNG marine vessel route and within LNG terminal hazard areas;

   b. plans to competently train emergency responders required to effectively and safely respond to hazardous material incidents including, but not limited to, LNG fires and dispersion;

   c. plans to competently train emergency responders to effectively and safely evacuate or shelter public within transient hazard areas along the LNG marine vessel route and within hazard areas from LNG terminal;

   d. designated contacts with federal, state and local emergency response agencies responsible for emergency management and response within any

transient hazard areas along the LNG marine vessel route and within hazard areas from the LNG terminal;

e.  scalable procedures for the prompt notification of appropriate local officials and emergency response agencies based on the level and severity of potential incidents;

f.  scalable procedures for mobilizing response and establishing a unified command, including identification, location, and design of any emergency operations centers and emergency response equipment required to effectively and safely respond to hazardous material incidents and evacuate or shelter public within transient hazard areas along the LNG marine vessel route and within LNG terminal hazard areas;

g.  scalable procedures for notifying public, including identification, location, design, and use of any permanent sirens or other warning devices required to effectively communicate and warn the public prior to onset of debilitating hazards within any transient hazard areas along the LNG marine vessel route and within hazard areas from the LNG terminal;

h.  scalable procedures for evacuating the public, including identification, location, design, and use of evacuation routes/methods and any mustering locations required to effectively and safely evacuate the public within any transient hazard areas along the LNG marine transit route and within hazard areas from the LNG terminal; and

i.  scalable procedures for sheltering the public, including identification, location, design, and use of any shelters demonstrated to be needed and demonstrated to effectively and safely shelter the public prior to onset of debilitating hazards within transient hazard areas that may better benefit from sheltering in place (i.e., those within Zones of Concern 1 and 2), along the route of the LNG marine vessel and within hazard areas of the LNG terminal that may benefit from sheltering in place (i.e., those within areas of 1,600 British thermal units per square foot per hour [BTU/ft$^2$-hr] and 10,000 BTU/ft$^2$-hr radiant heats from fires with the farthest impacts, including from a catastrophic failure of the largest LNG tank).

CP2 LNG shall notify the FERC staff of all planning meetings in advance and shall report progress on the development of its ERP **at 3-month intervals**. CP2 LNG shall file public versions of offsite emergency response procedures for public notification, evacuation, and shelter in place.

46.  **Prior to initial site preparation**, CP2 LNG shall file a Cost-Sharing Plan identifying the mechanisms for funding all project-specific security/emergency

management costs that would be imposed on state and local agencies. This comprehensive plan shall include funding mechanisms for the capital costs associated with any necessary security/emergency management equipment and personnel base. This plan shall include sustained funding of any requirement or resource gap analysis identified to effectively and safely evacuate and shelter the public and to effectively and safely respond to hazardous material incidents consistent with recommended and good engineering practices. CP2 LNG shall notify FERC staff of all planning meetings in advance and shall report progress on the development of its Cost Sharing Plan **at 3-month intervals**.

47.    **Prior to initial site preparation**, CP2 LNG shall file calculations demonstrating the loads on buried pipelines and utilities at temporary road crossings would be adequately distributed. The analysis shall be based on API Recommended Practices (RP) 1102 or other approved methodology.

48.    **Prior to initial site preparation**, CP2 LNG shall file pipeline and utility damage prevention procedures for personnel and contractors. The procedures shall include provisions to mark buried pipelines and utilities prior to any site work and subsurface activities.

49.    **Prior to construction of final design**, CP2 LNG shall file change logs that list and explain any changes made from the front-end-engineering-design (FEED) provided in CP2 LNG's application and filings. A list of all changes with an explanation for the design alteration shall be provided, and all changes shall be clearly indicated on all diagrams and drawings.

50.    **Prior to construction of final design**, CP2 LNG shall file information/revisions pertaining to CP2 LNG's response numbers 37, 50, 60, 75b, 175, 176 of its June 10, 2022 filing; numbers 35, 86, 195, 197 of its July 7, 2022 filing; numbers 55, 59, 184, 191, 206 of its July 19, 2022 filing; number 15 of its August 2, 2022 filing; numbers 196, 205 of its August 4, 2022 filing; number 87 of its September 14, 2022 filing; numbers 13, 18 and 24 of its October 28, 2022 filing; number 22 of its November 3, 2022 filing; number 6 of its November 28, 2022 filing; number 11 of its May 19, 2023 filing; and numbers 1, 6, 7, 8, 9, 10 of its May 26, 2023 filing, which indicated features to be included or considered in the final design.

51.    **Prior to construction of final design**, CP2 LNG shall file drawings and specifications for crash rated vehicle barriers in accordance with ASTM F2656 (2015) or approved equivalent at each facility entrance for access control. The crash rating vehicle type shall be supported by a security vulnerability assessment that takes into account the potential target attractiveness, threats, vulnerabilities, consequences, and mitigation effectiveness consistent with American Institute of Chemical Engineers, *Guidelines for Analyzing and Managing the Security Vulnerabilities of Fixed Chemical Sites*, or equivalent. The crash rating speed

shall be supported by an analysis of the maximum attainable vehicle velocity based on vehicle type acceleration and road characteristics (e.g., straight length, radius of curvature, sloped/banked, coefficient of friction, etc.).

52.     **Prior to construction of final design**, CP2 LNG shall file drawings of vehicle protections internal to the plant, such as guard rails, barriers, and bollards to protect transfer piping, pumps, compressors, hydrants, and monitors to ensure that the facilities would be protected from inadvertent damage from vehicles, unless the facilities are located sufficiently away from in-plant roadways and areas accessed by vehicle.

53.     **Prior to construction of final design**, CP2 LNG shall file drawings of the security fence. The fencing drawings shall provide details of fencing that demonstrate it is in accordance with National Fire Protection Association (NFPA) 59A (2019 edition) and would restrict and deter access around the entire facility and have a setback from exterior features (e.g., power lines, trees, etc.) and from interior features (e.g., piping, equipment, buildings, etc.) by at least 10 feet and that would not allow the fence to be overcome.

54.     **Prior to construction of final design,** CP2 LNG shall file security camera and intrusion detection drawings. The security camera drawings shall show the locations, mounting elevation, areas covered, and features of each camera (e.g., fixed, tilt/pan/zoom, motion detection alerts, low light, etc.) and shall provide camera coverage at access points and along the entire perimeter of the terminal with redundancies and camera coverage of the interior of the terminal to enable rapid monitoring of the terminal, including a camera at the top of each LNG storage tank, and coverage within pretreatment areas, within liquefaction areas, within truck transfer areas, within marine transfer areas, and within buildings. Drawings shall also show or note the location and type of the intrusion detection and shall cover the entire perimeter of the facility.

55.     **Prior to construction of final design**, CP2 LNG shall file photometric analyses or equivalent and associated lighting drawings. The lighting drawings shall show the location, elevation, type of light fixture, and lux levels of the lighting system and shall depict illumination coverage along the perimeter of the terminal, process equipment, mooring points, and along paths/roads of access and egress to facilitate security monitoring and emergency response operations in accordance with federal regulations (e.g., 49 CFR 193, 29 CFR 1910, and 29 CFR 1926) and API 540 or approved equivalent.

56.     **Prior to construction of final design**, CP2 LNG shall file a plan to implement the security risk analysis countermeasure recommendations and provide justification for any that would not be implemented as recommended.

57.     **Prior to construction of final design**, CP2 LNG shall file a plot plan of the final design showing all major equipment, structures, buildings, and impoundment systems.

58.     **Prior to construction of the final design**, CP2 LNG shall file an evaluation of the final design that quantitatively confirms the congestion levels used in overpressure modeling, considering the volume blockage ratios with all of the equipment, structural components, and piping included.  In addition, CP2 LNG shall file details for mitigation of overpressures onto the emergency diesel generators and any other significant components, unless final overpressure calculations demonstrate this is not necessary.

59.     **Prior to construction of final design**, CP2 LNG shall file three-dimensional plant drawings to confirm plant layout for maintenance, access, egress, and the extent and density of congested areas used in overpressure modeling.

60.     **Prior to construction of final design**, CP2 LNG shall file up-to-date process flow diagrams (PFDs), heat and material balances (HMBs), and piping and instrument diagrams (P&IDs) including vendor P&IDs.  The HMBs shall demonstrate a peak export rate of 28 million metric tonnes per annum.  The P&IDs shall include the following information:

   a.     equipment tag number, name, size, duty, capacity, and design conditions;

   b.     equipment insulation type and thickness;

   c.     storage tank pipe penetration size and nozzle schedule;

   d.     valve high pressure side and internal and external vent locations;

   e.     piping with line number, piping class specification, size, and insulation type and thickness;

   f.     piping specification breaks and insulation limits;

   g.     all control and manual valves numbered;

   h.     relief valves with size and set points; and

   i.     drawing revision number and date.

61.     **Prior to construction of final design**, CP2 LNG shall file P&IDs, specifications, and procedures that clearly show and specify the tie-in details required to safely connect subsequently constructed facilities with the operational facilities.

62.     **Prior to construction of final design**, CP2 LNG shall file a car seal and lock

philosophy and car seal and lock program, including a list of all car-sealed and locked valves consistent with the P&IDs. The car seal and lock program shall include monitoring and periodically reviewing correct car seal and lock placement and valve position.

63. **Prior to construction of final design**, CP2 LNG shall file information to verify how the EPC contractor has addressed all FEED hazard identification (HAZID) study recommendations.

64. **Prior to construction of final design**, CP2 LNG shall file a hazard and operability review of the final design P&IDs, a list of the resulting recommendations, and actions taken on the recommendations. The issued for construction P&IDs shall incorporate the hazard and operability review recommendations and justification shall be provided for any recommendations that are not implemented.

65. **Prior to construction of final design**, CP2 LNG shall file information to demonstrate adherence to NFPA 59A (2019) Chapter 10 or approved equivalent, and, or including, the following information for the final design of the LNG transfer pipe-in-pipe systems:

    a.    the detailed design, materials of construction, and a plot plan layout of the pipe-in-pipe system, including identification of all conventional process lines extending from or attached to the pipe-in-pipe, as well as the locations of any reliefs, instrumentation or other connections along the inner or outer pipes;

    b.    an assessment of the vapor production and vapor handling capacities within the annular space during a full inner pipe rupture or smaller release into the outer pipe;

    c.    stress analysis (thermal, mechanical, seismic, etc.) for the pipe-in-pipe systems, including the differential stresses between the inner pipe and outer pipe for a full inner pipe rupture, or any smaller release, at any location along the system;

    d.    an evaluation demonstrating that pressure surge events will not exceed the design pressures;

    e.    leak testing details, including pressures, for the outer pipe, consistent with American Society of Mechanical Engineers (ASME) B31.3;

    f.    details of the maintenance procedures that will be followed over the life of the facility to determine that the outer pipe will be continuing to adequately serve as spill containment;

g.    procedures for purging or draining LNG from the outer pipe;

h.    details of loading and any external features that will protect against external common cause failures of the inner and outer pipes, including resulting stresses during horizontal directional drilling and fabrication processes;

i.    drawings and calculations for the sizing and configuration of any pressure relief for the annular space of the pipe-in-pipe and for the inner pipe in case of isolation while containing LNG; and

j.    plans to detect and monitor the LNG transfer line for leak monitoring.

66.    **Prior to construction of final design**, CP2 LNG shall provide a check valve upstream of the acid gas removal column to prevent backflow or provide a dynamic simulation that shows that upon plant shutdown, the vertical piping segment would be sufficient for this purpose.

67.    **Prior to construction of final design**, CP2 LNG shall include LNG tank fill flow measurement with high flow alarm.

68.    **Prior to construction of final design**, CP2 LNG shall specify the discretionary vent valve be operable through the Distributed Control System (DCS).  In addition, car sealed open manual block valves shall be provided upstream and downstream of the discretionary vent valve.  CP2 LNG shall also specify a discretionary vent valve on each LNG storage tank to safely vent pressure when the tank is isolated from the common boil-off gas (BOG) system.

69.    **Prior to construction of final design**, CP2 LNG shall file the safe operating limits (upper and lower), alarm and shutdown set points for all instrumentation (e.g., temperatures, pressures, flows, and compositions).

70.    **Prior to construction of final design**, CP2 LNG shall file cause-and-effect matrices for the process instrumentation, fire and gas detection system, and emergency shutdown system.  The cause-and-effect matrices shall include alarms and shutdown functions, details of the voting and shutdown logic, and set points.

71.    **Prior to construction of final design**, CP2 LNG shall specify that all emergency shutdown (ESD) valves are to be equipped with open and closed position switches connected to the DCS/safety instrument system (SIS).

72.    **Prior to construction of final design**, CP2 LNG shall file an up-to-date equipment list, process and mechanical data sheets, and specifications.  The specifications shall include:

a.    building specifications (e.g., control buildings, electrical buildings,

compressor buildings, storage buildings, pressurized buildings, ventilated buildings, blast resistant buildings);

b.    mechanical specifications (e.g., piping, valve, insulation, rotating equipment, heat exchanger, storage tank and vessel, other specialized equipment);

c.    electrical and instrumentation specifications (e.g., power system, control system, SIS, cable, other electrical and instrumentation); and

d.    security and fire safety specifications (e.g., security, passive protection, hazard detection, hazard control, firewater).

73.    **Prior to construction of final design**, CP2 LNG shall file a list of all codes and standards and the final specification document number where they are referenced.

74.    **Prior to construction of final design**, CP2 LNG shall file complete specifications and drawings of the proposed LNG tank design and installation.

75.    **Prior to construction of final design**, CP2 LNG shall file an evaluation of emergency shutdown valve closure times.  The evaluation shall account for the time to detect an upset or hazardous condition, notify plant personnel, and close the emergency shutdown valve(s).

76.    **Prior to construction of final design**, CP2 LNG shall file an evaluation of dynamic pressure surge effects from valve opening and closure times and pump operations that demonstrate that the surge effects do not exceed the design pressures.

77.    **Prior to construction of final design**, CP2 LNG shall file a pipe stress analysis for critical or potential higher consequence lines that evaluates all loads in ASME B31.3 (2016 edition and after), including but not limited to consideration of hazardous fluid lines that are cryogenic, high temperature, subject to slug flow, and that include 2-phase flow.  CP2 LNG shall also demonstrate, for hazardous fluids, piping and piping nipples 2 inches or less in diameter are designed to withstand external loads, including vibrational loads in the vicinity of rotating equipment and operator live loads in areas accessible by operators.

78.    **Prior to construction of final design**, CP2 LNG shall clearly specify the responsibilities of the LNG tank contractor and the Engineering Procurement and Construction (EPC) contractor for the piping associated with the LNG storage tank.

79.    **Prior to construction of final design**, CP2 LNG shall file the sizing basis and capacity for the final design of the flares and/or vent stacks as well as the pressure

and vacuum relief valves for major process equipment, vessels, and storage tanks.

80.    **Prior to construction of final design**, CP2 LNG shall specify that the common, non-spared process vessels are installed with spare pressure relief valves to ensure overpressure protection during relief valve testing or maintenance.

81.    **Prior to construction of final design**, CP2 LNG shall file an updated fire protection evaluation of the proposed facilities.  A copy of the evaluation, a list of recommendations and supporting justifications, and actions taken on the recommendations shall be filed.  The evaluation shall justify the type, quantity, and location of hazard detection and hazard control, passive fire protection, emergency shutdown and depressurizing systems, firewater, and emergency response equipment, training, and qualifications in accordance with NFPA 59A (2001).  The justification for the flammable and combustible gas detection and flame and heat detection systems shall be in accordance with International Society of Automation (ISA) 84.00.07 or approved equivalent methodologies and would need to demonstrate 90 % or more of releases (unignited and ignited) that could result in an off-site or cascading impact would be detected by two or more detectors and result in isolation and de-inventory within 10 minutes.  The analysis shall take into account the set points, voting logic, wind speeds, and wind directions.  The justification for firewater shall provide calculations for all firewater demands based on design densities, surface area, and throw distance as well as specifications for the corresponding hydrant and monitors needed to reach and cool equipment.

82.    **Prior to construction of final design**, CP2 LNG shall file spill containment system drawings with dimensions and slopes of curbing, trenches, impoundments, tertiary containment and capacity calculations considering any foundations and equipment within impoundments, as well as the sizing and design of the down-comers.  The spill containment drawings shall show containment for all hazardous fluids including all liquids handled above their flashpoint, from the largest flow from a single line for 10 minutes, including de-inventory, or the maximum liquid from the largest vessel (or total of impounded vessels) or otherwise demonstrate that providing spill containment would not significantly reduce the flammable vapor dispersion or radiant heat consequences of a spill.  Any elevated stainless steel that would convey spills of cold liquefied gases shall be demonstrated suitable to handle the thermal shock combined with any applicable jetting forces of a pressurized release.

83.    **Prior to construction of final design**, CP2 LNG shall file an analysis that demonstrates the flammable vapor dispersion from design spills will be prevented from dispersing underneath the elevated jetty control room, or the control room will be able to withstand an overpressure due to ignition of the flammable vapor that disperses underneath the elevated jetty control room.

84.    **Prior to construction of final design**, CP2 LNG shall file electrical area classification drawings, including cross sectional drawings. The drawings shall demonstrate compliance with NFPA 59A, NFPA 70, NFPA 497, and API RP 500, or approved equivalents. In addition, the drawings shall include revisions to the electrical area classification design or provide technical justification that supports the electrical area classification using most applicable API RP 500 figures (i.e., figures 20 and 21) or hazard modeling of various release rates from equivalent hole sizes and wind speeds (see NFPA 497 release rate of 1 lb-mole/minute).

85.    **Prior to construction of final design**, CP2 LNG shall file analysis of the buildings containing hazardous fluids and the ventilation calculations that limit concentrations below the lower flammable limits (LFL) (e.g., 25% LFL), including an analysis of off gassing of hydrogen in battery rooms, and shall also provide hydrogen detectors that alarm (e.g., 20 to 25% LFL) and initiate mitigative actions (e.g., 40 to 50% LFL) or alarms in the event the ventilation is not functioning as designed, in accordance with NFPA 59A and NFPA 70, or approved equivalents.

86.    **Prior to construction of final design**, CP2 LNG shall file drawings and details of how process seals or isolations installed at the interface between a flammable fluid system and an electrical conduit or wiring system meet the requirements of NFPA 59A (2001) and NFPA 70 (1999 or 2020, as applicable).

87.    **Prior to construction of final design**, CP2 LNG shall file details of an air gap or vent installed downstream of process seals or isolations installed at the interface between a flammable fluid system and an electrical conduit or wiring system. Each air gap shall vent to a safe location and be equipped with a leak detection device that shall continuously monitor for the presence of a flammable fluid, alarm the hazardous condition, and shut down the appropriate systems. Alternatively, CP2 LNG shall file details on a system providing an approved equivalent protection, in accordance with NFPA 59A (2023 edition), from the migration of flammable fluid through the electrical conduit or wiring.

88.    **Prior to construction of final design**, CP2 LNG shall file complete drawings and a list of the hazard detection equipment. The drawings shall clearly show the location and elevation of all detection equipment as well as their coverage area. The list shall include the instrument tag number, type, manufacturer, model, location, alarm indication locations, and shutdown functions of the hazard detection equipment.

89.    **Prior to construction of final design**, CP2 LNG shall file a technical review of facility design that:

        a.     identifies all combustion/ventilation air intake equipment; and

b.   demonstrates that these areas are adequately covered by flammable gas detection devices and applicable toxic gas detection devices, and indicates how these devices would isolate or shutdown any combustion or ventilation air intake equipment whose continued operation could add to or sustain an emergency.

90.   **Prior to construction of final design**, CP2 LNG shall file a design that includes hazard detection suitable to detect high temperatures and smoldering combustion products in electrical buildings and control room buildings.

91.   **Prior to construction of final design**, CP2 LNG shall file an evaluation of the voting logic and voting degradation for hazard detectors.

92.   **Prior to construction of final design**, CP2 LNG shall file a list of alarm and shutdown set points for all hazard detectors that account for the calibration gas of the hazard detectors when determining the lower flammable limit set points for methane, ethylene, propane, isopentane, and condensate.

93.   **Prior to construction of final design**, CP2 LNG shall file a list of alarm and shutdown set points for all hazard detectors that account for the calibration gas of hazard detectors when determining the set points for toxic components such as condensate and hydrogen sulfide.

94.   **Prior to construction of final design**, CP2 LNG shall file a drawing showing the location of the emergency shutdown buttons, including but not limited to the refrigerant storage, LNG storage areas and area/unit emergency isolation and equipment shutdown.  Emergency shutdown buttons shall be easily accessible, conspicuously labeled, and located in an area which would be accessible during an emergency.

95.   **Prior to construction of final design**, CP2 LNG shall file facility plan drawings and a list of the fixed and wheeled dry-chemical, hand-held fire extinguishers, and other hazard control equipment.  Plan drawings shall clearly show the location by tag number of all fixed, wheeled, and hand-held extinguishers and shall demonstrate the spacing of extinguishers meet prescribed NFPA 10 travel distances.  The list shall include the equipment tag number, type, manufacturer and model, capacity, equipment covered, discharge rate, and automatic and manual remote signals initiating discharge of the units and shall demonstrate they meet NFPA 59A.

96.   **Prior to construction of final design**, CP2 LNG shall file drawings and specifications for the structural passive protection systems to protect equipment and supports from low temperature releases below minimum design metal temperatures.

97. **Prior to construction of final design**, CP2 LNG shall file calculations or test results for the structural passive protection systems to protect equipment and supports from low temperature releases below minimum design metal temperatures.

98. **Prior to construction of final design**, CP2 LNG shall file drawings and specifications for the structural passive protection systems to protect equipment and supports from pool fires and from jet fires of design spills that may exacerbate the initial hazard, as well as for electrical and control equipment that activate emergency systems to protect this equipment from a minimum 20-minute Underwrites Laboratories Inc. (UL) 1709 fire exposure.

99. **Prior to construction of final design**, CP2 LNG shall file a detailed quantitative analysis to demonstrate that adequate mitigation would be provided for each pressure vessel that could fail within the 4,000 BTU/ft$^2$-hr zone from pool or jet fires; each critical structural component (including the LNG marine vessel) and emergency equipment item that could fail within the 4,900 BTU/ft$^2$-hr zone from a pool or jet fire; and each occupied building that could expose unprotected personnel within the 1,600 BTU/ft$^2$-hr zone from a pool or jet fire. Trucks at truck transfer stations shall be included in the analysis of potential pressure vessel failures, as well as measures needed to prevent cascading impact due to the 10-minute sizing spill at the marine area. A combination of passive and active protection for pool fires and passive and/or active protection for jet fires shall be provided and demonstrate the effectiveness and reliability. Effectiveness of passive mitigation shall be supported by calculations or test results for the thickness limiting temperature rise over the fire duration, and active mitigation shall be supported by reliability information by calculations or test results, such as demonstrating flow rates and durations of any cooling water would mitigate the heat absorbed by the component. The total firewater demand shall account for all components that could fail due to a pool or jet fire.

100. **Prior to construction of final design**, CP2 LNG shall file an evaluation and associated specifications, drawings, and datasheets for transformers and transformer fluid demonstrating prevention of cascading damage of transformers (e.g., fire walls or spacing) in accordance with NFPA 850 or approved equivalent.

101. **Prior to construction of final design**, CP2 LNG shall provide additional information on final design for any blast walls, hardened structures, and blast resistant design, including supporting hazard analysis and building risk assessment studies, in order to prevent cascading damage.

102. **Prior to construction of final design**, CP2 LNG shall file facility plan drawings showing the proposed location of the firewater systems. Plan drawings shall clearly show the location of firewater piping, post indicator and sectional valves,

and the location and area covered by each monitor, hydrant, hose, water curtain, deluge system, water-mist system, and sprinkler. The drawings shall demonstrate that each process area, fire zone, or other sections of piping with several users can be isolated with post indicator or sectional valves in accordance with NFPA 24 (2013 or thereafter) or approved equivalent, and that firewater coverage is provided by at least two monitors or hydrants with sufficient firewater flow to cool exposed surfaces subjected to a fire. The drawings shall also include piping and instrumentation diagrams of the firewater systems. Drawings of the sprinkler system design shall show coverage in applicable buildings per NFPA 850 and in applicable closed roofed buildings around the site, per NFPA 13.

103. **Prior to construction of final design**, CP2 LNG shall specify that the firewater pump shelter is designed to remove the largest firewater pump or other component for maintenance with an overhead or external crane.

104. **Prior to construction of final design**, CP2 LNG shall demonstrate that the firewater storage tank is in compliance with NFPA 22 or approved equivalent.

105. **Prior to construction of final design**, CP2 LNG shall specify that the firewater flow test meter is equipped with a transmitter and that a pressure transmitter is installed upstream of the flow transmitter. The flow transmitter and pressure transmitter shall be connected to the DCS and recorded.

106. **Prior to construction of the final design**, CP2 shall file the finalized seismic monitoring program for the project site. The seismic monitoring program shall comply with NFPA 59A (2019 edition) sections 8.4.14.10, 8.4.14.12, 8.4.14.12.1, 8.4.14.12.2, and 8.4.14.13; ACI 376 (2011 edition) sections 10.7.5 and 10.8.4; U.S. Nuclear Regulatory Commission Regulatory Guide Regulatory Guide (RG) 1.12 (Revision 3) sections 1 and 3 through 9 and all subsections, or approved equivalents. A free-field seismic monitoring device shall be included in the seismic monitoring program for the project site. The seismic monitoring program information must include installation location plot plan; description of the triaxial strong motion recorders or other seismic instrumentation; the proposed alarm set points and operating procedures (including emergency operating procedures) for control room operators in response to such alarms/data obtained from seismic instrumentation; and testing and maintenance procedures.

107. **Prior to construction of final design**, CP2 LNG shall file drawings of the storage tank piping support structure and support of horizontal piping at grade including pump columns, relief valves, pipe penetrations, instrumentation, and appurtenances.

108. **Prior to construction of final design**, CP2 LNG shall file the structural analysis of the LNG storage tank and outer containment demonstrating they are designed to

withstand all loads and combinations.

109. **Prior to construction of final design**, CP2 LNG shall file an analysis of the structural integrity of the outer containment of the full containment LNG storage tank demonstrating it can withstand the radiant heat from an adjacent external pipeline fire or from an adjacent tank roof fire modeled using LNGFIRE3 or a similarly approved and validated pool fire model with application of uncertainty factors commensurate with its validation results including consideration of extrapolation. If the LNG storage tank walls will not be designed to withstand the predicted radiant heat for the maximum duration, CP2 LNG shall demonstrate firewater coverage, or other mitigation that can be remotely or automatically activated or manually activated from a safe accessible distance based on appropriate Personal Protective Equipment ratings, for the LNG storage tank walls in addition to any other firewater coverage needs.

110. **Prior to construction of final design**, CP2 LNG shall file an analysis of the structural integrity of the outer containment of the full containment LNG storage tank demonstrating it can withstand the thermal shock caused by a failure of the inner tank, including specification of the leakage rate.

111. **Prior to construction of final design**, CP2 LNG shall file the final wheel load evaluations for underground hazardous fluid lines, including feed gas lines within the plant, in accordance with API RP 1102 or approved equivalent, and address any recommendations.

112. **Prior to commissioning**, CP2 LNG shall file a detailed schedule for commissioning through equipment startup. The schedule shall include milestones for all procedures and tests to be completed: prior to introduction of hazardous fluids and during commissioning and startup. CP2 LNG shall file documentation certifying that each of these milestones has been completed before authorization to commence the next phase of commissioning and startup will be issued.

113. **Prior to commissioning**, CP2 LNG shall file detailed plans and procedures for: testing the integrity of onsite mechanical installation; functional tests; introduction of hazardous fluids; operational tests; and placing the equipment into service.

114. **Prior to commissioning**, CP2 LNG shall file settlement results during the hydrostatic tests of the LNG storage containers and shall file a plan to periodically thereafter to verify settlement is as expected and does not exceed the applicable criteria set forth in API 620 (12th edition), API 625 (1st edition), API 650 (13th edition), API 653 (5th edition), and ACI 376 (2011 edition) or approved equivalents. The program shall also specify what actions would be taken after various levels of seismic events.

115. **Prior to commissioning**, CP2 LNG shall file the operation and maintenance procedures and manuals, as well as safety procedures, hot work procedures and permits, abnormal operating conditions procedures, simultaneous operations procedures, and management of change procedures and forms. The operational maintenance and testing procedures for fire protection components shall be in accordance with the current versions of the applicable standards listed in NPFA 59A (2019) or equivalent.

116. **Prior to commissioning**, CP2 LNG shall file a plan for clean-out, dry-out, purging, and tightness testing. This plan shall address the requirements of the American Gas Association's Purging Principles and Practice, and shall provide justification if not using an inert or non-flammable gas for clean-out, dry-out, purging, and tightness testing.

117. **Prior to commissioning**, CP2 LNG shall tag all equipment, instrumentation, and valves in the field, including drain valves, vent valves, main valves, and car-sealed or locked valves.

118. **Prior to commissioning**, CP2 LNG shall file a plan to maintain a detailed training log to demonstrate that operating, maintenance, and emergency response staff have completed the required training. In addition, CP2 LNG shall file signed documentation that demonstrates training has been conducted, including ESD and response procedures, prior to the respective operation.

119. **Prior to commissioning**, CP2 LNG shall file the procedures for pressure/leak tests which address the requirements of ASME Boiler and Pressure Vessel Code (BPVC) Section VIII and ASME B31.3. In addition, CP2 LNG shall file a line list of pneumatic and hydrostatic test pressures.

120. **Prior to introduction of hazardous fluids**, CP2 LNG shall complete and document a pre-startup safety review to ensure that installed equipment meets the design and operating intent of the facility. The pre-startup safety review shall include any changes since the last hazard review, operating procedures, and operator training. A copy of the review with a list of recommendations, and actions taken on each recommendation, shall be filed.

121. **Prior to introduction of hazardous fluids**, CP2 LNG shall complete and document all pertinent tests (Factory Acceptance Tests, Site Acceptance Tests, Site Integration Tests) associated with the DCS and SIS that demonstrates full functionality and operability of the system.

122. **Prior to introduction of hazardous fluids**, CP2 LNG shall develop and implement an alarm management program consistent with ISA 18.2 (2016 edition) or approved equivalent to reduce alarm complacency and maximize the

effectiveness of operator response to alarms.

123. **Prior to introduction of hazardous fluids**, CP2 LNG shall complete and document clean agent acceptance tests.

124. **Prior to introduction of hazardous fluids**, CP2 LNG shall complete and document a firewater pump acceptance test and firewater monitor and hydrant coverage test. The actual coverage area from each monitor and hydrant shall be shown on facility plot plan(s).

125. **Prior to introduction of hazardous fluids**, CP2 LNG shall complete and document sprinkler system acceptance tests.

126. CP2 LNG shall file a request for written authorization from the Director of OEP **prior to unloading or loading the first LNG commissioning cargo**. After production of first LNG, CP2 LNG shall file weekly reports on the commissioning of the proposed systems that detail the progress toward demonstrating the facilities can safely and reliably operate at or near the design production rate. The reports shall include a summary of activities, problems encountered, and remedial actions taken. The weekly reports shall also include the latest commissioning schedule, including projected and actual LNG production by each liquefaction train, LNG storage inventories in each storage tank, and the number of anticipated and actual LNG commissioning cargoes, along with the associated volumes loaded or unloaded. Further, the weekly reports shall include a status and list of all planned and completed safety and reliability tests, work authorizations, and punch list items. Problems of significant magnitude shall be reported to the FERC within 24 hours.

127. **Prior to commencement of service**, CP2 LNG shall file a request for written authorization from the Director of OEP. Such authorization would only be granted following a determination by the U.S. Coast Guard, under its authorities under the Ports and Waterways Safety Act, the Magnuson Act, the MTSA of 2002, and the Security and Accountability For Every Port Act, that appropriate measures to ensure the safety and security of the facility and the waterway have been put into place by CP2 LNG or other appropriate parties.

128. **Prior to commencement of service**, CP2 LNG shall notify the FERC staff of any proposed revisions to the security plan and physical security of the plant.

129. **Prior to commencement of service**, CP2 LNG shall label piping with fluid service and direction of flow in the field consistent with ASME A13.1 (2020 edition) or approved equivalent, in addition to the pipe labeling requirements of NFPA 59A (2001).

130. **Prior to commencement of service**, CP2 LNG shall provide plans for any preventative and predictive maintenance program that performs periodic or continuous equipment condition monitoring.

131. **Prior to commencement of service**, CP2 LNG shall develop procedures for offsite contractors' responsibilities, restrictions, monitoring, training, and limitations and for supervision of these contractors and their tasks by CP2 LNG staff.  Specifically, the procedures shall address:

   a. selecting a contractor, including obtaining and evaluating information regarding the contract employer's safety performance and programs;

   b. informing contractors of the known potential hazards, including flammable and toxic release, explosion, and fire, related to the contractor's work and systems they are working on;

   c. developing and implementing provisions to control and monitor the entrance, presence, and exit of contract employers and contract employees from process areas, buildings, and the plant;

   d. developing and implementing safe work practices for control of personnel safety hazards, including lockout/tagout, confined space entry, work permits, hot work, and opening process equipment or piping;

   e. developing and implementing safe work practices for control of process safety hazards, including identification of layers of protection in systems being worked on, recognizing abnormal conditions on systems they are working on, and re-instatement of layers of protection, including ensuring bypass, isolation valve, and car-seal programs and procedures are being followed;

   f. developing and implementing provisions to ensure contractors are trained on the emergency action plans and that they are accounted for in the event of an emergency; and

   g. monitoring and periodically evaluating the performance of contract employers in fulfilling their obligations above, including successful and safe completion of work and re-instatement of all layers of protection.

**In addition, we recommend that the following measures shall apply <u>throughout the life</u> of the CP2 LNG project.**

132. The facility shall be subject to regular FERC staff technical reviews and site inspections on at least an **annual** basis or more frequently as circumstances indicate.  Prior to each FERC staff technical review and site inspection, CP2 LNG

shall respond to a specific data request including information relating to possible design and operating conditions that may have been imposed by other agencies or organizations. Up-to-date detailed P&IDs reflecting facility modifications and provision of other pertinent information not included in the semi-annual reports described below, including facility events that have taken place since the previously submitted semi-annual report, shall be submitted.

133. **Semi-annual** operational reports shall be filed with the Secretary to identify changes in facility design and operating conditions; abnormal operating experiences; activities (e.g., ship arrivals, quantity and composition of imported and exported LNG, liquefied and vaporized quantities, boil off/flash gas); and plant modifications, including future plans and progress thereof. Abnormalities shall include, but not be limited to, unloading/loading/shipping problems, potential hazardous conditions from offsite vessels, storage tank stratification or rollover, geysering, storage tank pressure excursions, cold spots on the storage tank, storage tank vibrations and/or vibrations in associated cryogenic piping, storage tank settlement, significant equipment or instrumentation malfunctions or failures, non-scheduled maintenance or repair (and reasons therefore), relative movement of storage tank inner vessels, hazardous fluids releases, fires involving hazardous fluids and/or from other sources, negative pressure (vacuum) within a storage tank, and higher than predicted boil off rates. Adverse weather conditions and the effect on the facility also shall be reported. Reports shall be submitted **within 45 days after each period ending June 30 and December 31**. In addition to the above items, a section entitled "Significant Plant Modifications Proposed for the Next 12 Months (dates)" shall be included in the semi-annual operational reports. Such information would provide the FERC staff with early notice of anticipated future construction/maintenance at the LNG facilities.

134. In the event the temperature of any region of the LNG storage container, including any secondary containment and imbedded pipe supports, becomes less than the minimum specified operating temperature for the material, the Commission shall be notified **within 24 hours** and procedures for corrective action shall be specified.

135. Significant non-scheduled events, including safety-related incidents (e.g., LNG, condensate, refrigerant, or natural gas releases; fires; explosions; mechanical failures; unusual over pressurization; and major injuries) and security-related incidents (e.g., attempts to enter site, suspicious activities) shall be reported to the FERC staff. In the event that an abnormality is of significant magnitude to threaten public or employee safety, cause significant property damage, or interrupt service, notification shall be made **immediately**, without unduly interfering with any necessary or appropriate emergency repair, alarm, or other emergency procedure. In all instances, notification shall be made to the FERC staff **within 24**

**hours**. This notification practice shall be incorporated into the liquefaction facility's emergency plan. Examples of reportable hazardous fluids-related incidents include:

a.     fire;

b.     explosion;

c.     estimated property damage of $50,000 or more;

d.     death or personal injury necessitating in-patient hospitalization;

e.     release of hazardous fluids for 5 minutes or more;

f.     unintended movement or abnormal loading by environmental causes, such as an earthquake, landslide, or flood, that impairs the serviceability, structural integrity, or reliability of an LNG facility that contains, controls, or processes hazardous fluids;

g.     any crack or other material defect that impairs the structural integrity or reliability of an LNG facility that contains, controls, or processes hazardous fluids;

h.     any malfunction or operating error that causes the pressure of a pipeline or LNG facility that contains or processes hazardous fluids to rise above its maximum allowable operating pressure (or working pressure for LNG facilities) plus the build-up allowed for operation of pressure-limiting or control devices;

i.     a leak in an LNG facility that contains or processes hazardous fluids that constitutes an emergency;

j.     inner tank leakage, ineffective insulation, or frost heave that impairs the structural integrity of an LNG storage tank;

k.     any safety-related condition that could lead to an imminent hazard and cause (either directly or indirectly by remedial action of the operator), for purposes other than abandonment, a 20 % reduction in operating pressure or shutdown of operation of a pipeline or an LNG facility that contains or processes hazardous fluids;

l.     safety-related incidents from hazardous fluids transportation occurring at or en route to and from the LNG facility; or

m.     an event that is significant in the judgment of the operator and/or

Document Accession #: 20240627-3107          Filed Date: 06/27/2024

management even though it did not meet the above criteria or the guidelines set forth in an LNG facility's incident management plan.

In the event of an incident, the Director of OEP has delegated authority to take whatever steps are necessary to ensure operational reliability and to protect human life, health, property, or the environment, including authority to direct the LNG facility to cease operations. Following the initial company notification, the FERC staff would determine the need for a separate follow-up report or follow up in the upcoming semi-annual operational report. All company follow-up reports shall include investigation results and recommendations to minimize a reoccurrence of the incident.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Venture Global CP2 LNG, LLC                    Docket Nos.  CP22-21-000
Venture Global CP Express, LLC                              CP22-22-000

(Issued June 27, 2024)

CLEMENTS, Commissioner, *dissenting*:

1.      I dissent from today's Order[1] because it contravenes sections 3 and 7 of the
Natural Gas Act (NGA),[2] the National Environmental Policy Act (NEPA),[3] and the
Administrative Procedure Act (APA).[4]  The Order's conclusions that the CP2 LNG
Project is not inconsistent with the public interest[5] and that the CP Express Pipeline
Project is required by the public convenience and necessity[6] cannot be sustained for
several reasons.[7]  First, the Order fails to meaningfully assess these Projects' enormous

---

[1] *Venture Global CP2 LNG, LLC*, 187 FERC ¶ 61,199 (2024) (Order).

[2] 15 U.S.C. §§ 717b, 717f.

[3] 42 U.S.C. § 4321 *et seq.*

[4] 5 U.S.C. § 551 *et seq.*

[5] Order, 187 FERC ¶ 61,199 at PP 32, 199.  I agree with commenters that the
bifurcation of authority between the Commission and the Department of Energy (DOE)
with respect to authorizations under section 3 of the Natural Gas Act leaves us no clear
standard for making our public interest determination.  *See, e.g.*, Better Bayou et al.
March 13, 2023 Comments on Draft Environmental Impact Statement (DEIS) at 1-3;
NRDC March 13, 2023 Comments on DEIS at 2-3; Niskanen Center March 13, 2023
Comments on DEIS at 7-9.  We have no record on the economic or other benefits from
LNG exports and therefore cannot weigh them against the adverse impacts from
construction and operation of the CP2 LNG Project.  I reiterate my call for Congressional
clarification of how the Commission is to make its public interest determination.  *See
Commonwealth LNG, LLC*, 181 FERC ¶ 61,143 (2022) (Clements, Comm'r, concurring
at P 5).  However, in this case, the CP2 LNG Project's adverse environmental and
socioeconomic impacts are so great that I am compelled to find that approving the project
is inconsistent with the public interest.

[6] Order, 187 FERC ¶ 61,199 at P 200.

[7] The CP2 LNG Project and CP Express Pipeline Project are collectively referred

greenhouse gas (GHG) emissions and does not explain whether or how the Commission factored them into its public interest determinations.[8]  Second, the Commission's analysis of cumulative air pollutant emissions is deficient, both procedurally and substantively. The public has had no access to critical new air impacts modeling information, which should have been addressed in a supplemental environmental impact statement (SEIS) with full opportunity for public review and comment.  Third, the Order improperly discounts impacts to commercial fishing businesses, which will likely be significant. Finally, the Commission failed to adequately consider how the full range of adverse project impacts will affect Environmental Justice (EJ) communities.

<u>Failure to Assess and Consider GHG Impacts</u>

2.      At the outset, it is helpful to summarize the Commission's legal obligations under the NGA, NEPA, and the APA with respect to the consideration of a proposed project's GHG emissions.  A number of cases have recognized that the Commission must consider the impacts of GHG emissions in its public interest determinations under the NGA.[9] Those cases are consistent with the many precedents holding that environmental impacts are relevant to the Commission's public interest determinations under the statute.[10]

_____

to below as the Projects.

[8] Order, 187 FERC ¶ 61,199 at PP 178-80.

[9] *See Vecinos Para el Bienstar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329, 1331 (D.C. Cir. 2021) (*Vecinos*) (finding the Commission's analysis of climate change impacts deficient under *both* the NGA and NEPA and directing the Commission to revisit its public interest determination after correcting deficiencies); *see also Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 109, 115 (D.C. Cir. 2022) (finding "the Commission's NGA section 7 balancing of public benefits and adverse consequences reasonably accounted for potential environmental impacts" and noting that in some circumstances "[g]reenhouse gas emissions are a reasonably foreseeable effect of a pipeline project" that must be studied under NEPA); *Food & Water Watch v. FERC*, 28 F.4th 277, 282 (D.C. Cir. 2022) (recognizing the NGA section 7 certificate process incorporates environmental review under NEPA, which includes analysis of downstream GHG emissions); *Birckhead v. FERC*, 925 F.3d 510, 518-19 (D.C. Cir. 2019) (affirming previous holdings that the Commission is the "legally relevant cause of the direct and indirect environmental effects of pipelines it approves," including reasonably foreseeable GHG emissions (cleaned up)); *Sierra Club v. FERC*, 867 F.3d 1357, 1373 (D.C. Cir. 2017) (addressing Commission's treatment of GHG emissions and explaining that the Commission's public convenience and necessity determination must weigh a project's environmental effects).

[10] *See, e.g.*, *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023) (holding that the Commission makes an appropriate NGA public interest

Indeed, more than sixty years ago, the Supreme Court held that our predecessor, the Federal Power Commission, properly factored air pollution impacts into its public interest determination under section 7.[11]  In *NAACP*, the Supreme Court held that environmental protection is one purpose of the NGA.[12]

3.      NEPA also requires the Commission to consider climate and other environmental impacts in deciding whether to approve a project application.  As the Supreme Court has explained, NEPA's EIS requirement "ensures that the agency, *in reaching its decision*, will have available, and will carefully *consider*, detailed information concerning significant environmental impacts . . ."[13]  The Commission's obligations under the NGA and NEPA are intertwined.  NEPA directs federal agencies "to the fullest extent possible" to interpret and administer their organic statutes in accordance with the environmental protection objectives set forth in NEPA.[14]  In requiring the Commission to consider environmental impacts in its substantive decision-making, NEPA gives content to the NGA's broad "public interest" standard.[15]

---

determination when it finds that a project has "substantial economic and commercial benefits" that are "not outweighed by the projected environmental impacts"); *Sierra Club v. FERC*, 827 F.3d 36, 42 (D.C. Cir. 2016) ("As required by the Natural Gas Act and NEPA, the Commission undertook an extensive review of the Freeport Projects."); *City of Oberlin v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019) (holding that *"[a]s part of the Section 7 certificating process* . . . the Commission must complete an environmental review of the proposed project under the National Environmental Policy Act" (emphasis added)); *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 106–11 (D.C. Cir. 2014) (stating that FERC is obligated to consider alternatives to a proposed project that might better serve the public interest, including on the basis of their environmental impact, when issuing a certificate under section 7).

[11] *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 5 (1961).

[12] *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 n.6 (1976).

[13] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (*Methow Valley*) (emphasis added).

[14] 42 U.S.C. § 4332; *see also* 42 U.S.C. § 4331 (setting forth NEPA's environmental protection objectives).

[15] *Cf. Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 665-66 (D.C. Cir. 2011) (upholding agency's interpretation of "public interest" in its organic statute to include environmental considerations given NEPA's language and goals).

4.    Of course, the Commission must do more than consider GHG impacts in its decision-making.  The APA requires the Commission to provide a reasoned *explanation* of how it factored the GHG impacts into its substantive decision.[16]

5.    Today's order meets none of these statutory obligations.  The Order does not and cannot meaningfully explain how the Commission factored the Projects' GHG emissions into its decision, as the APA required it to do, because the Commission failed its duties under NEPA and the NGA to assess and weigh the impacts of those emissions.[17]

6.    The Commission's legal errors begin with its deficient NEPA analysis.  NEPA regulations and case law require the Commission to assess GHG-related environmental impacts.  The Council on Environmental Quality's (CEQ) regulations state that an EIS must discuss "[t]he environmental impacts of the proposed action and reasonable alternatives to the proposed action and the *significance* of those impacts."[18]  The D.C. Circuit Court of Appeals recently held that the regulation does not require the Commission to label GHG emissions as significant or insignificant.[19]  However, NEPA nevertheless requires more than a mere recitation of general facts about climate change and quantification of emissions; the statute requires *evaluation* and *analysis* of

---

[16] *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."); *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) ("[A]n agency action will be set aside as arbitrary and capricious if it is not the product of 'reasoned decisionmaking.'" (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (*State Farm*))).

[17] In *Vecinos*, the D.C. Circuit Court of Appeals found the Commission must reconsider its NGA public interest determinations because they rested on a deficient EIS. *See Vecinos*, 6 F.4th at 1331.

[18] 40 C.F.R. § 1502.16(a)(1) (2024); *see also Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017) (*Sabal Trail*) (recognizing CEQ regulations requires an EIS to discuss the significance of environmental impacts).  The Commission's regulations implementing NEPA provide that the Commission will comply with CEQ's regulations under the statute.  18 C.F.R. § 380.1 (2024).

[19] *See Food and Water Watch v. FERC*, No. 22-1214, 2024 WL 2983833, at *6 (D.C. Cir. 2024) (*East 300*).

environmental impacts.[20]  Both the EIS for the Projects[21] and today's Order[22] violate
NEPA and CEQ's regulations by failing to assess the nature and severity of
environmental impacts that project-related GHG emissions will cause.

7.      Beyond failing its duties under NEPA, the Commission has not met its APA
obligations because it nowhere explains whether or how the information on GHG
emissions factored into its decision.  For example, the Order compares project emissions
to national and state emissions inventories and emission reduction goals but says nothing
about how, if at all, the Commission assessed this information in deciding to authorize
the Projects.[23]  The public—and a reviewing court—are left to guess what connection
there might be between the information the EIS and Order provide on GHG emissions
and the Commission's public interest determinations under the NGA.  In failing to
articulate that connection, the Commission violated fundamental APA requirements.[24]

8.      The Commission cannot excuse its non-compliance by claiming, as it does here,
that there are no "accepted tools or methods for the Commission to use to determine
significance" of the impacts of GHG emissions.[25]  That statement contradicts the

---

[20] *See, e.g.*, 40 C.F.R. § 1502.1 (2024) ("Statements shall be concise, clear, and to
the point, and shall be supported by evidence that the agency has made the necessary
environmental *analyses*.") (emphasis added); *Reed v. Salazar*, 744 F. Supp. 2d 98, 100
(D.D.C. 2009) ("NEPA 'requires that agencies *assess* the environmental consequences of
federal projects by following certain procedures during the decision-making process.'")
(emphasis added) (quoting *City of Alexandria v. Slater*, 198 F.3d 862, 866 (D.C. Cir.
1999))); 40 C.F.R. § 1502.15 (2024) ("The environmental impact statement may combine
the *description* with *evaluation* of the environmental consequences.") (emphasis added).
The court in *East 300* did not consider these requirements.

[21] Final EIS at 4-557 to 4-561.

[22] Order, 187 FERC ¶ 61,199 at PP 178-80.

[23] *See id.* at PP 171-73.

[24] *See State Farm*, 463 U.S. at 43 ("[T]he agency must examine *the relevant data*
and articulate a satisfactory explanation for its action including a 'rational connection
between the facts found and the choice made.'" (emphasis added) (quoting *Burlington
Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962))).

[25] Order, 187 FERC ¶ 61,199 at P 180.  In addition to the reasons explained in the
text of my dissent, I dissent from paragraphs 179-80 of the Order because they (1) reflect
a final Commission decision that it cannot determine the significance of GHG emissions,
despite the fact the Commission has never responded to comments in the GHG Policy
Statement docket (Docket No. PL21-3) addressing methods for doing so; and (2) depart

from previous Commission precedent without reasoned explanation, thereby violating the APA. In my concurrence in *Transcon. Gas Pipe Line Co.*, 184 FERC ¶ 61,066 (2023) (Clements, Comm'r, concurring, at PP 2-3), I explained the history of the language, which the majority suddenly adopted in *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (*Driftwood*). I dissented from this language in *Driftwood* and every subsequent order in which it has appeared. *See Driftwood*, 183 FERC ¶ 61,049 (Clements, Comm'r, dissenting in part at PP 2-3 & n.5); *see also Gas Transmission Nw. LLC*, 187 FERC ¶ 61,177 (2024) (Clements, Comm'r, dissenting at P 3); *Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136 (2004) (Clements, Comm'r, dissenting in part at P 2) *Port Arthur LNG, LLC*, 187 FERC ¶ 61,058 (2024) (Clements, Comm'r, dissenting in part at P 1); *Great Basin Gas Transmission Co.*, 187 FERC ¶ 61,043 (2024) (Clements, Comm'r, dissenting in part at P 1); *Fla. Gas Transmission Co.*, 187 FERC ¶ 61,042 (2024) (Clements, Comm'r, dissenting in part at P 1); *El Paso Nat. Gas Co.*, 187 FERC ¶ 61,041 (2024) (Clements, Comm'r, dissenting in part at P 1); *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024 (2024) (Clements, Comm'r, dissenting at P 1) (*Transco*); *Gas Transmission Nw., LLC,* 187 FERC ¶ 61,023 (2024) (Clements, Comm'r, dissenting at P 28); *E. Tenn. Nat. Gas, LLC*, 186 FERC ¶ 61,210 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,209 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *N. Nat. Gas Co.*, 186 FERC ¶ 61,064 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Saguaro Connector Pipeline, LLC*, 186 FERC ¶ 61,114 (2024) (Clements, Comm'r, dissenting in part at PP 2-4); *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,113 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,063 (2024) (Clements, Comm'r, dissenting in part at PP 2-3); *Columbia Gas Transmission, LLC*, 186 FERC ¶ 61,048 (2024) (Clements, Comm'r, dissenting in part at PP 2-4); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,047 (2024) (Clements, Comm'r, dissenting at PP 8-9); *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,046 (2024) (Clements, Comm'r, dissenting in part at PP 1-2); *ANR Pipeline Co.*, 185 FERC ¶ 61,191 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,130 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. LNG Brownsville LLC*, 185 FERC ¶ 61,079 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (2023) (Clements, Comm'r, dissenting at PP 9-10); *Gas Transmission Nw., LLC,* 185 FERC ¶ 61,035 (2023) (Clements, Comm'r, concurring in part and dissenting in part at PP 7-8); *WBI Energy Transmission, Inc.*, 185 FERC ¶ 61,036 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Glob. Plaquemines LNG, LLC*, 185 FERC ¶ 61,037 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. E. Transmission, LP*, 185 FERC ¶ 61,038 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Trailblazer Pipeline Co.*, 185 FERC ¶ 61,039 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.*, 185 FERC ¶ 61,040 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Port Arthur LNG Phase II, LLC*, 184 FERC ¶ 61,184 (2023) (Clements, Comm'r, dissenting in part at PP 2-3);

Commission's own precedent.  In *Northern Natural,* the Commission found that it *can* determine the significance of GHG-related impacts by applying its "experience, judgment, and expertise," just as it does for other types of environmental impacts.[26] Citing Supreme Court precedent, the Commission explained that the significance determination furthers NEPA's purposes by "disclosing to the public and the relevant decisionmakers the extent of a project's adverse environmental impacts."[27]

9.    I agree with parties in this docket who have stated that the Commission should have used the SC-GHG Protocol to assess the severity of the environmental impacts caused by the Projects' GHG emissions.[28]  In another recent dissent, I explained in detail that the Commission's continued refusal to use the SC-GHG Protocol in its substantive decision-making (rather than simply for general "informational purposes") rests on outmoded reasoning that ignores important recent policy and scientific developments.[29] All of the points I made in that dissent apply here and I incorporate them by reference.

10.    The Order's treatment of GHG impacts is especially objectionable because of the sheer scale of the Projects' GHG emissions.  The Projects' annual emissions equate to

---

*Venture Glob. Calcasieu Pass, LLC*, 184 FERC ¶ 61,185 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *N. Nat. Gas Co.*, 184 FERC ¶ 61,186 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Tex. E. Transmission, LP*, 184 FERC ¶ 61,187 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans*, *LP*, 183 FERC ¶ 61,200 (2023) (Clements, Comm'r dissenting at PP 2-3); *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 (2023) (Clements, Comm'r, dissenting at PP 5-8); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023) (Clements, Comm'r, dissenting at PP 14-15); *Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Clements, Comm'r, dissenting at PP 14-15).

[26] *N. Nat. Gas Co.*, 174 FERC ¶ 61,189, at P 32 (2021) (*Northern Natural*).

[27] *Id.* at P 31 & n.47 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004)).

[28] For a Better Bayou March 13, 2023 Comments on DEIS at 18-19; Niskanen Center March 13, 2023 Comments on DEIS at 39-42; NRDC March 13, 2023 Comments on DEIS at 10-12.

[29] *Transco*, 187 FERC ¶ 61,024 (Clements, Comm'r, dissenting at PP 9-17). While some courts have found that the Commission is not required to use the SC-GHG Protocol, the parties in those cases did not raise, nor did the courts consider, the points made in my dissent regarding recent policy and scientific developments supporting the protocol's use.

putting more than 1,850,000 additional gas-fueled automobiles on the road each year.[30]
Under any common sense understanding of the word, the Projects' GHG emissions
would have to be considered far more than "significant." Yet the EIS and the Order fail
to provide any analysis of the Projects' incremental or cumulative climate impacts.[31] As
explained above, NEPA requires real analysis, not rote recitation of general facts about
climate change. Moreover, the depth of the analysis must be commensurate with the
magnitude of the impact.[32] Here, both the EIS and the Order are silent as to the degree or
severity of the expected climate impacts[33] and bereft of *any analysis* of climate impacts
the Projects will cause. Consequently, the Commission simply has failed to take the
"hard look" at climate impacts that NEPA requires.[34]

11.    In summary, without assessing the Projects' climate impacts, the Commission
cannot credibly claim to have considered them in its substantive decision-making, as both
NEPA and the NGA required it to do. And it is beyond dispute that the Commission
nowhere explains whether or how it factored the Projects' climate impacts into its public
interest determinations, in violation of the APA. These fundamental legal errors render
the Order unsustainable.

    Deficiencies in the Cumulative Air Pollution Impacts Analysis Undermine the Order

---

[30] The Projects are estimated to emit approximately 8,510,099 metric tons per year
of $CO_2e$. Order, 187 FERC ¶ 61,199 at P 165. That is equivalent to putting more than
1,850,000 additional gas-fueled automobiles on the road. EPA, *Greenhouse Gas
Emissions from a Typical Passenger Vehicle* (Aug. 28, 2023),
https://www.epa.gov/greenvehicles/greenhouse-gas-emissions-typical-passenger-vehicle
("A typical passenger vehicle emits about 4.6 metric tons of $CO_2$ per year.").

[31] *See supra* P 6 & n.20 (discussing agency obligations under NEPA to engage in
substantive analysis of environmental impacts).

[32] *See* 40 C.F.R. § 1502.2(b) (2024) (stating EISs "shall discuss impacts in
proportion to their significance"); 40 C.F.R. § 1502.15 (2024) ("Data and analyses in a
statement shall be commensurate with the importance of the impact . . .").

[33] *See Methow Valley*, 490 U.S. at 352 (stating that an EIS must allow "the agency
[or] other interested groups and individuals [to] properly evaluate the severity of the
adverse effects [of an agency action]").

[34] *Id.* at 350 ("The sweeping policy goals announced in § 101 of NEPA are thus
realized through a set of action-forcing procedures that require that agencies take a hard
look at environmental consequences.") (cleaned up).

12.    The Commission's analysis of cumulative air quality impacts associated with the CP2 LNG Project was deficient, both procedurally and substantively, thereby undermining the Order's conclusion that the project is "environmentally acceptable."[35] CEQ regulations require that an agency publish an SEIS if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[36]  After the EIS for the Projects was published, critically important new information became available:  EPA updated the National Ambient Air Quality Standard (NAAQS) for annual PM2.5 emissions.  Based on the air emissions analysis in the EIS, cumulative PM2.5 emissions would exceed the new NAAQS.[37]  The Commission treats NAAQS exceedances as significant environmental impacts because the standards are designed to protect human health.[38]  Consequently, with publication of the new NAAQS, the EIS's conclusions that PM 2.5 emissions would be insignificant could not be sustained.  Staff therefore required Venture Global to conduct new air modeling.  Venture Global submitted the results of additional modeling purporting to show the new PM2.5 NAAQS would not be exceeded.  But, as Sierra Club informed the Commission, the modeling did not account for planned increased PM2.5 emissions[39] at the company's existing Calcasieu Pass LNG terminal (CP1).[40]  These increased emissions are reflected in an air permit application that Venture Global filed with the state regulator but failed to share with the Commission.  Commission staff then requested that Venture Global update the modeling to reflect these increased emissions.[41]  This time, Venture Global's response did not include mobile emissions associated with CP1, and staff

---

[35] Order, 187 FERC ¶ 61,199 at P 198.

[36] 40 C.F.R. § 1502.9(d)(1)(ii) (2024).

[37] See EIS at 4-372, table 4.12.1-22 (showing expected annual PM2.5 concentrations at 9.4 $\mu g/m^3$, exceeding the new NAAQS of 9.0 $\mu g/m^3$).

[38] See 42 U.S.C. § 7409(b)(1) ("National primary ambient air quality standards . . . shall be ambient air quality standards the attainment and maintenance of which . . . are requisite to protect the public health."); EIS at 4-376 ("[W]e find that the Project would not cause or contribute to an exceedance of the NAAQS, which are established to be protective of human health, including sensitive populations such as children, the elderly, and those with compromised respiratory function, i.e. asthmatics.").

[39] Sierra Club April 22, 2024 Comments at 2.

[40] On February 21, 2019, the Commission granted Venture Global authorization to site, construct, and operate its Calcasieu Pass LNG export terminal.  *Venture Global Calcasieu Pass, LLC*, 166 FERC ¶ 61,144 (2019).

[41] May 15, 2024 Environmental Information Request (EIR) No. 15 at 1.

requested a third round of modeling, which it received June 14, 2024. The data underlying that modeling has not been made public, so the basis for the Order's conclusions on PM2.5 air pollutant impacts cannot be reviewed or verified by Sierra Club or other members of the public.

13.     The Commission should have published an SEIS presenting and analyzing the new PM2.5 modeling data. NEPA requires that an agency prepare an EIS where there "might" be "any" significant environmental impacts,[42] and "the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance."[43] Since the EIS indicated that there would be significant PM2.5 air pollution impacts associated with the CP2 terminal, the Commission was required to prepare an SEIS to account for the new data.

14.     While the Order includes a truncated discussion of the updated modeling,[44] that is insufficient. Failure to prepare an SEIS is more than a technical error. CEQ's regulations provide that an agency "shall prepare, publish, and file a supplement to a[n EIS] . . . as a draft and final statement."[45] Although the regulation does not say so explicitly, the only purpose for publishing a draft would be for the public to comment on it. Consistent with the regulation, the Commission regularly provides for public comment on draft supplemental EISs.[46] Public input ensures the Commission has a solid foundation for its environmental analysis and substantive decision-making. By failing to publish an SEIS regarding the new modeling, the Commission not only violated CEQ regulations but also compromised the Order itself.

---

[42] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1039 (D.C. Cir. 2021) (quoting *Grand Canyon Tr. V. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002)); *see also Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).

[43] *Stand Up for Cal.! v. DOI*, 994 F.3d 616, 628 (D.C. Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989)) (internal quotation marks omitted).

[44] Order, 187 FERC ¶ 61,199 at PP 192, 194, 197.

[45] 40 C.F.R. § 1502.9(d)(3) (2024).

[46] Consistent with the regulation, the Commission regularly provides for public comment on draft supplemental EIS's. *See, e.g., Magnolia LNC, LLC; Notice of Availability of the Draft Environmental Impact Statement for the Proposed Magnolia Production Capacity Amendment*, 84 Fed. Reg. 52,881 (Oct. 3, 2019); *Fla. Se. Connection, LLC; Transcon. Gas Pipe Line Co., LLC; Sabal Trail Transmission, LLC; Notice of Availability of the Draft Supplemental Environmental Impact Statement for the Se. Mkt. Pipelines Project*, 82 Fed. Reg. 46,233 (Oct. 4, 2017).

15.     There is a second reason for the Commission to prepare an SEIS addressing air pollution impacts.  As Sierra Club repeatedly argued, the EIS improperly failed to consider mobile emissions from other LNG projects in the analysis of cumulative air pollution impacts.[47]  The Order suggests, with no explanation or citation to legal authority, that the Commission need not analyze the emissions from other LNG terminals if they are not included in the Louisiana Department of Environmental Quality Emissions Reporting Inventory (LDEQ Inventory).  But nowhere does the Order address why the Commission chose to consider only the mobile emissions from the CP2 LNG Project and CP1, but not emissions from other Commission-authorized projects.  Specifically, the analysis inexplicably excluded mobile emissions from the Driftwood LNG, Lake Charles Liquefaction, Commonwealth LNG, and Magnolia LNG projects.[48]  The LDEQ Inventory does not include the mobile emissions associated with the CP1 or CP2 LNG projects, yet the Commission included these emissions in its cumulative impacts modeling.[49]  As Sierra Club notes, the mobile emissions associated with all Commission-jurisdictional LNG facilities are clearly foreseeable as they have already been quantified in prior Commission EISs.[50]  NEPA requires that the Commission assess all reasonably foreseeable effects of the Projects.[51]  Contrary to the Order's assertions,[52] it is this foreseeability standard under NEPA, not the requirements for Clean Air Act permitting,

---

[47] Sierra Club October 16, 2023 Comments on FEIS at 3-4; Sierra Club May 30, 2024 Comments at 2.

[48] Sierra Club October 16, 2023 Comments on FEIS at 3-4.  Driftwood LNG, Lake Charles Liquefaction, Commonwealth LNG, and Magnolia LNG operations all contribute or will contribute to cumulative air quality impacts in the project area.  EIS at 4-511 to 4-512.

[49] In fact, the Commission rejected Venture Global's air modeling as insufficient because it only included LDEQ Inventory sources and not CP1 mobile emissions.  May 29 EIR No. 16 at 3 (rejecting the May 15 modeling which was derived from modeling submitted to LDEQ because "it does not include the LNG ship and support vessel emissions from CP1").

[50] Sierra Club October 16, 2023 Comments on FEIS at 3.

[51] *See* 40 C.F.R. § 1508.1(g)(3) (2024) (describing cumulative effects as "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions"); *Sabal Trail*, 867 F.3d at 1371 ("Effects are reasonably foreseeable if they are 'sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision.'") (quoting *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016)).

[52] Order, 187 FERC ¶ 61,199 at P 195.

that determines the required scope of the Commission's review. The Commission's inconsistent treatment of mobile emissions, along with its failure to explain that inconsistency, violates both NEPA and the APA.[53] The Commission should rectify these deficiencies by publishing an SEIS that includes a cumulative impacts analysis incorporating all relevant mobile source emissions.

16.    The Order's claim that modeling additional mobile sources would not change the "cause and contribute" analysis is simply unsupported.[54] Factoring in additional emissions would likely identify new locations where the NAAQS will be exceeded, with the Projects deemed to cause or contribute to the exceedances.[55] Without properly modeling all foreseeable mobile source emissions, the Commission risks failing to account for how the Projects might contribute to NAAQS violations and the consequent significant health risks. That risk is especially high in the case of these Projects, which are located in areas where NAAQS violations are already predicted.[56]

17.    The improper modeling of mobile source emissions highlights why the Commission should have made public all the modeling inputs upon which it relied. NEPA plays an information forcing role by requiring agencies both to assess the environmental impacts of their actions and to inform the public of its analysis.[57] By

---

[53] *State Farm*, 463 U.S. at 43 ("[T]he agency must examine *the relevant data* and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (emphasis added) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. at 168)).

[54] *See* Order, 187 FERC ¶ 61,199 at PP 186-88.

[55] The record confirms that including additional emissions sources will likely change the cause and contribute analysis. In Appendix K of the EIS, the highest project contribution to any potential NAAQS exceedance location for the 1-hour $NO_2$ standard is 3.7 $\mu g/m^3$. EIS at Appendix K. But in updated modeling reflecting greater $NO_2$ emissions from CP1, new NAAQS exceedances were found, including a location where CP2 contributed 6.36 $\mu g/m^3$ to the $NO_2$ exceedance. *See* CP2 LNG June 3, 2024 Response to EIR No. 16 at 3. Thus, the Order relies on outdated information in stating that "the highest project contribution to any potential NAAQS exceedance location for the 1-hour $NO_2$ standard is 3.7 micrograms per cubic meter." Order, 187 FERC ¶ 61,199 at P 187.

[56] Order, 187 FERC ¶ 61,199 at P 186.

[57] *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) ("NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its

explaining its reasoning and the data on which it relies, the agency enables the public to identify informational gaps or errors for the agency to correct.[58]  Sierra Club did just that in this case, identifying the EIS's failure to account for sources of mobile emissions in the EIS's cumulative impacts analysis, as well as the increased PM2.5 emissions reflected in Venture Global's state permit application.  Shielding this information from the public limited the public's ability to identify additional errors in the cumulative air impacts modeling and how they should be corrected.[59]  By limiting the information made available to the public, the Commission limited its ability to satisfy its own legal obligations.[60]

---

decisionmaking process.") (internal citations omitted).

[58] *See Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 143 (1981) ("Through the disclosure of an EIS, the public is made aware that the agency has taken environmental considerations into account."); *see also Methow Valley*, 490 U.S. at 349 ("Publication of an EIS . . . provides a springboard for public comment.").

[59] *See* Sierra Club October 16, 2023 Comments on FEIS at 5-6 (explaining Sierra Club's inability to provide a complete analysis of air modeling without modeling inputs). The majority's claims that modeling information was provided is incorrect.  *See* Order, 187 FERC ¶ 61,199 at P 189.  Venture Global did not make public *any* of the modeling data supporting the results submitted on June 3, 2024.  This is the modeling supporting the ultimate conclusions in the Order with respect to air impacts.  As to the earlier modeling, the Order mischaracterizes what information Venture Global made public. The "modeling files" are not included in Venture Global's EIR, as the page referencing them is blank and has no link or embedded files.  *See* Appendix E of CP2 LNG August 1, 2022 Supplemental Response to EIR No. 3 at 951.  While the public might be able to request the modeling files from the Commission, the Commission's failure to affirmatively notify participants in the docket that they may request the modeling files means that the public *functionally* had no access.  Of course, even if the data had been made public, there would have been too little time before issuance of this Order for any real evaluation of such highly technical information.

[60] *See, e.g.*, *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072-74 (1st Cir. 1980) (failure to present data and analysis supporting agency's decision in EIS improperly hampers public comment, "mut[ing] those most likely to identify problems and criticize decisions"); *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974) ("An EIS is in compliance with NEPA when its form, content, and preparation substantially . . .  make available to the public, information of the proposed project's environmental impact and *encourage public participation in the development of that information*.") (emphasis added).

<u>Inadequate Review of Impacts to Commercial Fishing</u>

18.     NEPA requires that when "economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment."[61]  Here, the Commission recognized that it must assess impacts on commercial fishing interests. Ultimately however, the EIS did not fully consider impacts on commercial fishing and the people who rely on it for their livelihoods.[62]  The EIS found that dredging associated with construction of the CP2 LNG Project "would likely result in the direct mortality of benthic organisms, including less mobile life stages of managed species such as shrimp and benthic invertebrates, which are an important food source for many species of fish."[63] The EIS found that these impacts would not be significant because the "losses would be short term and the benthic community is expected to rebound within a few seasons."[64] While the EIS concludes that shrimp populations will eventually recover, it fails to consider how this would impact commercial fishing.  Comments from FISH,[65] For a Better Bayou, and affected individuals indicate that a single season of decreased shrimp catch threatens to irrevocably end shrimping business ventures in the area.[66]  Yet, despite these comments, the EIS ignores the risk that temporary impacts on fisheries might permanently adversely affect commercial fishing businesses.  Consequently, the

---

[61] 40 C.F.R. § 1502.16(b).

[62] I distinguish between the fisheries, the fish population and ecosystem in a given area, and businesses and individuals engaged in commercial fishing businesses, who make their livelihood catching fish in the fishery.

[63] EIS at 4-206.

[64] *Id*.

[65] Fishermen Involved in Sustaining our Heritage (FISH) is a coalition of commercial fishermen in Southwestern Louisiana.  *See* FISH April 18, 2024 Motion to Intervene at 1.

[66] Comments of Mr. Eustis at the March 1, 2023 Public Comment Meeting, pg. 24 at lines 19-23 (noting that with regards to shrimping impacts "discontinuity of one season can be the difference between -- can bankrupt the family."); FISH June 14, 2024 Comments at 6 ("Mr. Theriot is unsure whether his commercial fishing business will survive through 2024 and he is worried that he may not be able to continue to make payments on his home.");  *Id.* at Exhibit 4, Theriot Declaration (describing how Mr. Theriot has experienced decreased catch volume since 2022, and declaring that "[i]f my shrimp catch does not recover this year, I am concerned that I will be forced out of business.").

Commission failed to take the legally required "hard look" at commercial fishing impacts.

19.     The Commission's analysis of fishing impacts is flawed in other ways as well. The EIS recognizes that project construction would cause impacts to nearby fisheries due to marine traffic from LNG carriers.[67]  But the EIS is inconsistent in predicting the extent of the marine traffic impact commercial fishing businesses,[68] likely because the Commission has not fully considered marine traffic impacts.  The EIS suggests that impacts on shrimping boats are minimal because "[t]ypically, shrimp are most active at night when few vessels are using the Calcasieu Ship Channel."[69]  But the assertion that few ships use the channel at night conflicts with the 2019 Port of Lake Charles Calcasieu Ship Channel Traffic Study (Marine Traffic Study), which the EIS relied on to assess expected traffic impacts.[70]  The Marine Traffic Study assumed that "[a]ll vessels were able to transit the channel at night, with no further restrictions and no preference given to either day or night transits."[71]  Either the EIS is incorrect in its assertion that few vessels use the Calcasieu Ship Channel at night, and thus the impact on shrimpers is larger than the EIS contemplated, or the Marine Traffic Study does not paint a representative picture of traffic by assuming no preferences for channel transit time, in which case daytime fishers will face greater impacts than the EIS considered.  Either way, the Commission's analysis of marine traffic impacts on commercial fishing is flawed.

20.     In addition, the EIS ignores the features of the areas of the channel near the project terminal that make it a popular shrimping spot. The Order finds that there would be less than significant impacts on fishers who are members of EJ communities because the area near the terminal facilities "does not have any unique features or habitat characteristics that would draw recreational or commercial users to this particular location versus other

---

[67] EIS at 4-270 (finding that an "increase in delays associated with LNG carrier transit would have a moderate, but not significant impact on commercial fishing").

[68] Contrast the EIS finding that the CP2 terminal in isolation would have a "moderate, but not significant impact on commercial fishing," *id.*, with later findings that "the Project would contribute negligibly to overall temporary and minor cumulative impacts on commercial fisheries in the Calcasieu Ship Channel." *Id.* at 4-541.  It is clearly inconsistent to find that the cumulative impacts of all ship traffic in the channel would be minor when the impacts of ship traffic from the ships servicing CP2 alone would be moderate.

[69] EIS at 4-270.

[70] EIS at 4-295; EIS at 4-543 to 4-544.

[71] Marine Traffic Study at 20.

locations within the Calcasieu Ship Channel."[72]  But the ship channel, particularly the narrow area of the channel at the firing line,[73] *is* a special habitat.  The ship channel at the firing line represents an especially popular shrimping location in part because it acts as a unique geographic bottleneck where shrimp migrate.[74]  While the proposed LNG terminal is south of the firing line and so will not directly impact traffic in this unique location, the EIS fails to consider how "[t]he moving security zone around LNG carriers [which] has the potential to close the channel to traffic" would impact access to the area around the firing line.[75]

21.     In short, there are significant contradictions and omissions in the Commission's analysis of project impacts on commercial fishing businesses.  These errors in the Commission's environmental analysis join the others in rendering the Order unsustainable.

<u>Inadequate Consideration of Totality of Impacts on EJ Communities</u>

22.     Although the EIS and Order purport to consider the Projects' cumulative impacts on EJ communities, neither fully considered the interrelationship of the multiple adverse impacts the Projects would have on these communities.  The EIS found that "the addition of the Terminal Facilities at this location would represent a significant impact on the viewshed of boaters, beachgoers, tourists, and local residents, as it would detract from the overall quality of the scenic views of this portion of the region."[76]  These impacts would

---

[72] Order, 187 FERC ¶ 61,199 at P 112.

[73] The firing line represents the boundary between waters open for commercial fishing year round and those only open for seasonal commercial fishing.  *See* EIS at 4-267 to 4-268.

[74] *See* EIS at 4-541. The EIS states that the migration occurs for "approximately two weeks," although the length of migration is characterized as "generally… much longer than two weeks" by LDWF.  Memo of May 23, 2023 Telephone Conversation with NMFW and LDWF at 1.  It is not clear why the Commission disagreed with the LDWF assessment, or if a longer migration period would have changed the Commission's assessment of the significance of impacts on shrimpers.

[75] EIS at 4-538.  The Terminal facilities are approximately 1.5 miles from the firing line, and thus the shrimping location at the firing line would be impacted by any moving security zone, which extends for 2 miles ahead of applicable ships. 33 C.F.R. § 165.805(a)(2) (2024) ("The following areas are moving security zones: . . . 2 miles ahead and 1 mile astern of certain designated vessels while in transit.").

[76] EIS at 4-546.  Notably, although the EIS recognizes that the terminal represents a significant impact on the viewshed of tourists, it does not examine how such an impact

not be felt equally, however. Rather, "permanent changes in the viewshed would have a significant adverse effect on residents and passersby of those environmental justice communities near the Project,"[77] resulting in "disproportionately high and adverse impact[s]"[78] on EJ communities.

23. Members of EJ communities would also suffer from the LNG terminal's adverse impacts on commercial fishing businesses. As discussed above, the EIS and Order provide a deficient analysis of the project's impacts on commercial fishing businesses.[79] The EIS acknowledges that "commercial users in the Calcasieu Ship Channel . . . would likely include individuals from environmental justice communities."[80] Thus, the deficiencies in the analysis of adverse impacts on fishing blind the Commission to the adverse impacts on members of EJ communities. EJ communities are especially vulnerable to those impacts since one bad season can significantly disrupt fishing businesses,[81] and low-income fishers without significant savings likely would be among those least likely to recover from that disruption.

24. The Commission has also failed to fully consider climate change impacts on EJ communities. The EIS found that "the impacts of compounded extreme events . . . *may* exacerbate preexisting community vulnerabilities and have a cumulative adverse impact on environmental justice communities."[82] But we *know* that climate change will have adverse impacts on EJ communities. Commission Staff found "local mean sea level rise . . . [would be] 2.1 feet . . . between 2050 and 2060 (relative to year 2000) at the proposed project site area."[83] These rising sea levels can "accelerate coastal erosion and wetland loss, exacerbate flooding, and increase storm impacts."[84] Indeed, with the 2.1 feet of sea level rise some homes in identified impacted EJ communities will be permanently

---

would affect tourism in the region.

[77] *Id.* at 4-319.

[78] *Id.* at 4-328.

[79] *See supra* PP 18-21.

[80] EIS at 4-545.

[81] *See supra* P 18.

[82] EIS at 4-549 (emphasis added).

[83] *Id.* at 4-453.

[84] *Id.* at 4-90.

underwater.[85]  Surely this is an adverse impact on EJ communities, but it is one the Commission completely failed to consider.  Marginalized communities face additional barriers to moving when climate change makes their homes unlivable,[86] highlighting why it is important for the Commission to fully consider impacts to EJ communities in its NEPA reviews.

25.     Finally, the Order fails to adequately assess the impact of cumulative air pollutant emissions on EJ communities.  As discussed above, the Commission failed to properly assess cumulative emissions impacts by omitting foreseeable mobile sources that might well lead to NAAQS violations.[87]  This is especially disturbing given that "[p]eople in low socioeconomic neighborhoods and communities may be more vulnerable to air pollution,"[88] making the health impacts even more severe.

26.     The Order's failure to fully assess the totality of impacts on EJ communities, like its deficient analysis of GHG impacts, falls short of the Commission's legal obligations under NEPA, the NGA, and the APA.  It is also difficult to square with the Commission's commitment to "better integrate environmental justice and equity considerations in its decision-making processes,"[89] and to address barriers to "adequate and consistent review of all potential project impacts to environmental justice communities, including cumulative impacts and impacts to health and safety."[90]  Today's approval of the Projects will compound the cumulative impacts of existing LNG projects on nearby EJ communities, and is a key reason the Projects will not serve the public interest.

---

[85] For example, some of the homes on Mildred street are at an elevation of just 1.72 feet above current sea levels, leaving them underwater with 2.1 feet of additional sea level rise.  *See* U.S. Geological Surv., *The National Map*, https://apps.nationalmap.gov/viewer/ (showing a 1.72 ft elevation at lat. 29.78469, long. 93.29007 using the spot elevation tool).

[86] *See, e.g.,* Bergan et al., *Creating Moves to Opportunity: Experimental Evidence on Barriers to Neighborhood Choice*, 114 Am. Econ. Rev. 2181 (2024).

[87] *See supra* P 15.

[88] EPA, *Research on Health Effects from Air Pollution* (May 28, 2024), https://www.epa.gov/air-research/research-health-effects-air-pollution.

[89] FERC, *2023 Equity Action Plan* at 2 (Apr. 15, 2022), https://www.ferc.gov/equity.

[90] FERC, *2024 Equity Action Plan* at 14 (June 6, 2024), https://www.ferc.gov/equity.

For these reasons, I respectfully dissent.


_____
Allison Clements
Commissioner

Document Content(s)

CP22-21-000.docx...............................................................1

# EXHIBIT B

188 FERC ¶ 62,109
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Venture Global CP2 LNG, LLC                        Docket Nos. CP22-21-001
Venture Global CP Express, LLC                                      CP22-22-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(August 29, 2024)

 Rehearing has been timely requested of the Commission's order issued on
June 27, 2024, in this proceeding. *Venture Glob. CP2 LNG*, *LLC*, 187 FERC ¶ 61,199
(2024). In the absence of Commission action on a request for rehearing within 30 days
from the date it is filed, the request for rehearing may be deemed to have been denied.
15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2023); *Allegheny Def. Project v. FERC*,
964 F.3d 1 (D.C. Cir. 2020) (en banc).

 As provided in 15 U.S.C. § 717r(a), the request for rehearing of the above-cited
order filed in this proceeding will be addressed in a future order to be issued consistent
with the requirements of such section. As also provided in 15 U.S.C. § 717r(a), the
Commission may modify or set aside its above-cited order, in whole or in part, in such
manner as it shall deem proper.

Debbie-Anne A. Reese,
Acting Secretary.

Document Content(s)

CP22-21-001.docx.......................................................1

# EXHIBIT C

Service List for CP22-21-000 Venture Global CP2 LNG, LLC

Contacts marked ** must be postal served

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| Anthony Theriot | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>mgibson@selcdc.org |
| Anthony Theriot | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>UNITED STATES<br>ddlugoleski@selcva.org | |
| Branstetter, Stranch & Jennings, PLLC | Clement Tsao<br>Branstetter, Stranch & Jennings, PLLC<br>425 WALNUT ST STE 2315<br>CINCINNATI, OHIO 45202<br>UNITED STATES<br>clementt@bsjfirm.com | |
| Cheniere Creole Trail Pipeline, L.P. | Akayla Broussard<br>Cheniere Energy, Inc.<br>Cheniere Energy, Inc.<br>845 Texas Avenue<br>Suite 1250<br>Houston, TEXAS 77002<br>UNITED STATES<br>akayla.broussard@cheniere.com | Karri Mahmoud<br>Director, Environmental and Re<br>Cheniere Energy, Inc.<br>845 Texas Avenue, Ste. 1250<br>HOUSTON, TEXAS 77002<br>karri.mahmoud@cheniere.com |
| Cheniere Creole Trail Pipeline, L.P. | Taylor Johnson<br>Deputy General Counsel<br>Cheniere Energy, Inc.<br>PO Box Null<br>Houston,TEXAS 77002<br>UNITED STATES<br>taylor.johnson@cheniere.com | |

| | | |
|---|---|---|
| Commonwealth LNG, LLC | David Wochner<br>K&L Gates LLP<br>1601 K Street, NW<br>Suite 400<br>Washington, DISTRICT OF COLUMBIA 20006-1600<br>UNITED STATES<br>david.wochner@klgates.com | |
| Commonwealth LNG, LLC | Timothy Furdyna<br>Partner<br>K&L Gates LLP<br>1601 K Street, NW<br>Suite 400<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>tim.furdyna@klgates.com | |
| Driftwood LNG LLC | Lisa Tonery<br>Attorney<br>ORRICK, HERRINGTON & SUTCLIFFE, LLP<br>51 West 52nd Street<br>New York, NEW YORK 10019<br>UNITED STATES<br>ltonery@orrick.com | Mariah T Johnston<br>Orrick, Herrington & Sutcliffe LLP<br>51 West 52nd St<br>22nd Floor<br>New York, NEW YORK 10019<br>mjohnston@orrick.com |
| Driftwood LNG LLC | | Catherine Rourke<br>VP, Health, Safety, and Enviro<br>Tellurian Inc.<br>1201 LOUISIANA ST STE 3100<br>DRIFTWOOD LNG<br>HOUSTON, TEXAS 77002<br>cathy.rourke@driftwoodlng.com |
| Driftwood Pipeline LLC | Lisa Tonery<br>Attorney<br>ORRICK, HERRINGTON & SUTCLIFFE, LLP<br>51 West 52nd Street<br>New York, NEW YORK 10019<br>UNITED STATES<br>ltonery@orrick.com | Mariah T Johnston<br>Orrick, Herrington & Sutcliffe LLP<br>51 West 52nd St<br>22nd Floor<br>New York, NEW YORK 10019<br>mjohnston@orrick.com |
| Fisherman Involved in Sustaining Our Heritage | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400 | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325 |

| | | |
|---|---|---|
| | Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | WASHINGTON, DISTRICT OF<br>COLUMBIA 20001<br>mgibson@selcdc.org |
| Fishermen Involved in Sustaining Our Heritage | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>UNITED STATES<br>ddlugoleski@selcva.org | |
| For a Better Bayou | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF<br>COLUMBIA 20001<br>mgibson@selcdc.org |
| For a Better Bayou | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>ddlugoleski@selcva.org |
| Golden Pass LNG Terminal LLC | Kevin Sweeney<br>Law Office of Kevin M. Sweeney<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>ksweeney@kmsenergylaw.com | S Diane Neal<br>Assoc. General Counsel<br>Golden Pass LNG Project<br>811 Louisiana St<br>Houston, TEXAS 77002<br>dneal@goldenpasslng.com |
| Golden Pass Pipeline LLC | Kevin Sweeney<br>Law Office of Kevin M. Sweeney<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>ksweeney@kmsenergylaw.com | S Diane Neal<br>Assoc. General Counsel<br>Golden Pass LNG Project<br>811 Louisiana St<br>Houston, TEXAS 77002<br>dneal@goldenpasslng.com |
| Healthy Gulf | naomi yoder<br>5912 KANSAS ST UNIT A<br>HOUSTON, TEXAS 77007 | |

| | UNITED STATES<br>n yoder@yahoo.com | |
|---|---|---|
| Jerryd Tassin | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF<br>COLUMBIA 20001<br>mgibson@selcdc.org |
| Jerryd Tassin | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA<br>22902<br>ddlugoleski@selcva.org |
| Kent Duhon | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF<br>COLUMBIA 20001<br>mgibson@selcdc.org |
| Kent Duhon | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA<br>22902<br>ddlugoleski@selcva.org |
| Louisiana Bucket Brigade | James Hiatt<br>3416B Canal Street<br>New Orleans, LOUISIANA 70119<br>UNITED STATES<br>james@labucketbrigade.org | |
| Louisiana Environmental Action Network | Tom Gosselin<br>Sierra Club<br>PO BOX 4998<br>AUSTIN, TEXAS 78765<br>UNITED STATES<br>tom.gosselin@sierraclub.org | |
| Mary Alice Nash | Megan Gibson<br>Southern Environmental Law Center | Zoe Klass-Warch<br>Niskanen Center |

| | | |
|---|---|---|
| | 122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>mgibson@selcdc.org | 820 First Street, NE, Suite 675<br>Washington DC, DISTRICT OF<br>COLUMBIA 20002<br>zklasswarch@niskanencenter.org |
| Mary Alice Nash | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>UNITED STATES<br>ddlugoleski@selcva.org | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>sgall@selcva.org |
| Natural Resources Defense Council | Morgan Johnson<br>Staff Attorney<br>Natural Resources Defense Council<br>1152 15TH STREET NW<br>SUITE 300<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>majohnson@nrdc.org | Gillian R Giannetti<br>Staff Attorney<br>Natural Resources Defense Council<br>1152 15th Street, NW<br>Suite 300<br>Washington, DISTRICT OF COLUMBIA 20005<br>ggiannetti@nrdc.org |
| Nicole Dardar | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>mgibson@selcdc.org |
| Nicole Dardar | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>ddlugoleski@selcva.org |
| Niskanen Center | Zoe Klass-Warch<br>Niskanen Center<br>820 First Street, NE, Suite 675<br>Washington DC, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>zklasswarch@niskanencenter.org | |

| | | |
|---|---|---|
| Port Arthur Community Action Network | John Beard<br>Mr.<br>501 W. 15th St. Port Arthur, TX<br>Port Arthur, TEXAS 77640<br>UNITED STATES<br>john.beard901456@outlook.com | |
| PUBLIC CITIZEN, INC | Tyson Slocum<br>Energy Program Director<br>Public Citizen's Energy Program<br>215 PENNSYLVANIA AVE SE<br>PUBLIC CITIZEN, INC.<br>WASHINGTON, DISTRICT OF<br>COLUMBIA 20003<br>UNITED STATES<br>tslocum@citizen.org | |
| RESTORE | RESTORE RESTORE<br>RESTORE<br>RESTORE<br>PO Box 233<br>Longville,LOUISIANA 70652-0233<br>UNITED STATES<br>michaeltritico@yahoo.com | |
| RESTORE | RESTORE RESTORE<br>RESTORE<br>RESTORE<br>PO Box 233<br>Longville,LOUISIANA 70652-0233<br>UNITED STATES<br>michaeltritico@yahoo.com | |
| Sierra Club | Tom Gosselin<br>Sierra Club<br>PO BOX 4998<br>AUSTIN, TEXAS 78765<br>UNITED STATES<br>tom.gosselin@sierraclub.org | |
| Southeast Laborers District Council | Clement Tsao<br>Branstetter, Stranch & Jennings, PLLC<br>425 WALNUT ST STE 2315<br>CINCINNATI, OHIO 45202<br>UNITED STATES<br>clementt@bsjfirm.com | |
| State of Louisiana | Joseph St. John<br>Deputy Solicitor General | |

| | | |
|---|---|---|
| | 909 POYDRAS ST STE 1850<br>LOUISIANA DEPARTMENT OF JUSTICE<br>NEW ORLEANS, LOUISIANA 70112<br>UNITED STATES<br>stjohnj@ag.louisiana.gov | |
| Texas Campaign For The Environment | Tom Gosselin<br>Sierra Club<br>PO BOX 4998<br>AUSTIN, TEXAS 78765<br>UNITED STATES<br>tom.gosselin@sierraclub.org | |
| Travis Dardar | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>mgibson@selcdc.org |
| Travis Dardar | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>ddlugoleski@selcva.org |
| Turtle Island Restoration Network | Joanie Steinhaus<br>Program Director<br>1214 Bowie Drive<br>Galveston, TEXAS 77551<br>UNITED STATES<br>joanie@tirn.net | |
| Venture Global CP Express LLC | Patrick Nevins<br>Latham & Watkins LLP<br>Latham & Watkins LLP<br>555 Eleventh Street NW<br>Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>patrick.nevins@lw.com | Sandra Snyder, ESQ<br>Assistant General Counsel<br>Venture Global LNG Inc.<br>1001 19TH ST N STE 1500<br>ARLINGTON, VIRGINIA 22209<br>ssnyder@ventureglobalng.com |

| | | |
|---|---|---|
| Venture Global CP2 LNG, LLC | Patrick Nevins<br>Latham & Watkins LLP<br>Latham & Watkins LLP<br>555 Eleventh Street NW<br>Suite 1000<br>Washington, DISTRICT OF<br>COLUMBIA 20004<br>UNITED STATES<br>patrick.nevins@lw.com | Sandra Snyder, ESQ<br>Assistant General Counsel<br>Venture Global LNG Inc.<br>1001 19TH ST N STE 1500<br>ARLINGTON, VIRGINIA 22209<br>ssnyder@venturegloballng.com |

Service List for CP22-22-000 Venture Global CP Express, LLC

Contacts marked ** must be postal served

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| Anthony Theriot | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>mgibson@selcdc.org |
| Anthony Theriot | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>UNITED STATES<br>ddlugoleski@selcva.org | |
| Driftwood LNG LLC | Lisa Tonery<br>Attorney<br>ORRICK, HERRINGTON & SUTCLIFFE, LLP<br>51 West 52nd Street<br>New York, NEW YORK 10019<br>UNITED STATES<br>ltonery@orrick.com | Mariah T Johnston<br>Orrick, Herrington & Sutcliffe LLP<br>51 West 52nd St<br>22nd Floor<br>New York, NEW YORK 10019<br>mjohnston@orrick.com |
| Driftwood LNG LLC | | Catherine Rourke<br>VP, Health, Safety, and Enviro<br>Tellurian Inc.<br>1201 LOUISIANA ST STE 3100<br>DRIFTWOOD LNG<br>HOUSTON, TEXAS 77002<br>cathy.rourke@driftwoodlng.com |
| Driftwood Pipeline LLC | Lisa Tonery<br>Attorney<br>ORRICK, HERRINGTON & SUTCLIFFE, LLP<br>51 West 52nd Street<br>New York, NEW YORK 10019 | Mariah T Johnston<br>Orrick, Herrington & Sutcliffe LLP<br>51 West 52nd St<br>22nd Floor<br>New York, NEW YORK 10019<br>mjohnston@orrick.com |

| | UNITED STATES<br>ltonery@orrick.com | |
|---|---|---|
| Fishermen Involved in Sustaining Our Heritage | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>mgibson@selcdc.org |
| Fishermen Involved in Sustaining Our Heritage | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>ddlugoleski@selcva.org |
| For a Better Bayou | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>mgibson@selcdc.org |
| For a Better Bayou | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>ddlugoleski@selcva.org |
| Golden Pass LNG Terminal LLC | Kevin Sweeney<br>Law Office of Kevin M. Sweeney<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>ksweeney@kmsenergylaw.com | S Diane Neal<br>Assoc. General Counsel<br>Golden Pass LNG Project<br>811 Louisiana St<br>Houston, TEXAS 77002<br>dneal@goldenpasslng.com |
| Golden Pass Pipeline LLC | Kevin Sweeney<br>Law Office of Kevin M. Sweeney<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006 | S Diane Neal<br>Assoc. General Counsel<br>Golden Pass LNG Project<br>811 Louisiana St<br>Houston, TEXAS 77002<br>dneal@goldenpasslng.com |

| | | |
|---|---|---|
| | UNITED STATES<br>ksweeney@kmsenergylaw.com | |
| Healthy Gulf | naomi yoder<br>5912 KANSAS ST UNIT A<br>HOUSTON, TEXAS 77007<br>UNITED STATES<br>n yoder@yahoo.com | |
| Jerryd Tassin | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF<br>COLUMBIA 20001<br>mgibson@selcdc.org |
| Jerryd Tassin | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA<br>22902<br>ddlugoleski@selcva.org |
| Kent Duhon | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF<br>COLUMBIA 20001<br>mgibson@selcdc.org |
| Kent Duhon | | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA<br>22902<br>ddlugoleski@selcva.org |
| Louisiana<br>Bucket<br>Brigade | James Hiatt<br>3416B Canal Street<br>New Orleans, LOUISIANA 70119<br>UNITED STATES<br>james@labucketbrigade.org | |
| Louisiana<br>Environmental | Tom Gosselin<br>Sierra Club<br>PO BOX 4998 | |

| | | |
|---|---|---|
| Action Network | AUSTIN, TEXAS 78765 UNITED STATES tom.gosselin@sierraclub.org | |
| Mary Alice Nash | Zoe Klass-Warch Niskanen Center 820 First Street, NE, Suite 675 Washington DC, DISTRICT OF COLUMBIA 20002 UNITED STATES zklasswarch@niskanencenter.org | Megan Gibson Southern Environmental Law Center 122 C St. NW Suite 325 WASHINGTON, DISTRICT OF COLUMBIA 20001 mgibson@selcdc.org |
| Mary Alice Nash | Deirdre Dlugoleski Southern Environmental Law Center 120 Garrett St Suite 400 CHARLOTTESVILLE, VIRGINIA 22902 UNITED STATES ddlugoleski@selcva.org | Spencer Gall Southern Environmental Law Center 120 Garrett St Suite 400 Charlottesville, VIRGINIA 22902 sgall@selcva.org |
| Natural Resources Defense Council | Morgan Johnson Staff Attorney Natural Resources Defense Council 1152 15TH STREET NW SUITE 300 Washington, DISTRICT OF COLUMBIA 20005 UNITED STATES majohnson@nrdc.org | Gillian R Giannetti Staff Attorney Natural Resources Defense Council 1152 15th Street, NW Suite 300 Washington, DISTRICT OF COLUMBIA 20005 ggiannetti@nrdc.org |
| Nicole Dardar | Spencer Gall Southern Environmental Law Center 120 Garrett St Suite 400 Charlottesville, VIRGINIA 22902 UNITED STATES sgall@selcva.org | Megan Gibson Southern Environmental Law Center 122 C St. NW Suite 325 WASHINGTON, DISTRICT OF COLUMBIA 20001 mgibson@selcdc.org |
| Nicole Dardar | | Deirdre Dlugoleski Southern Environmental Law Center 120 Garrett St Suite 400 CHARLOTTESVILLE, VIRGINIA 22902 ddlugoleski@selcva.org |
| Niskanen Center | Zoe Klass-Warch Niskanen Center 820 First Street, NE, Suite 675 | |

| | | |
|---|---|---|
| | Washington DC, DISTRICT OF COLUMBIA 20002 UNITED STATES zklasswarch@niskanencenter.org | |
| Port Arthur Community Action Network | John Beard Mr. 501 W. 15th St. Port Arthur, TX Port Arthur, TEXAS 77640 UNITED STATES john.beard901456@outlook.com | |
| PUBLIC CITIZEN, INC | Tyson Slocum Energy Program Director Public Citizen's Energy Program 215 PENNSYLVANIA AVE SE PUBLIC CITIZEN, INC. WASHINGTON, DISTRICT OF COLUMBIA 20003 UNITED STATES tslocum@citizen.org | |
| RESTORE | RESTORE RESTORE RESTORE RESTORE PO Box 233 Longville,LOUISIANA 70652-0233 UNITED STATES michaeltritico@yahoo.com | |
| Sierra Club | Tom Gosselin Sierra Club PO BOX 4998 AUSTIN, TEXAS 78765 UNITED STATES tom.gosselin@sierraclub.org | |
| Southeast Laborers District Council | Clement Tsao Branstetter, Stranch & Jennings, PLLC 425 WALNUT ST STE 2315 CINCINNATI, OHIO 45202 UNITED STATES clementt@bsjfirm.com | |
| State of Louisiana | Joseph St. John Deputy Solicitor General 909 POYDRAS ST STE 1850 LOUISIANA DEPARTMENT OF JUSTICE NEW ORLEANS, LOUISIANA 70112 | |

|  |  |  |
|---|---|---|
|  | UNITED STATES<br>stjohnj@ag.louisiana.gov |  |
| Texas Campaign For The Environment | Tom Gosselin<br>Sierra Club<br>PO BOX 4998<br>AUSTIN, TEXAS 78765<br>UNITED STATES<br>tom.gosselin@sierraclub.org |  |
| Travis Dardar | Spencer Gall<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>Charlottesville, VIRGINIA 22902<br>UNITED STATES<br>sgall@selcva.org | Megan Gibson<br>Southern Environmental Law Center<br>122 C St. NW<br>Suite 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>mgibson@selcdc.org |
| Travis Dardar |  | Deirdre Dlugoleski<br>Southern Environmental Law Center<br>120 Garrett St<br>Suite 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>ddlugoleski@selcva.org |
| Turtle Island Restoration Network | Joanie Steinhaus<br>Program Director<br>1214 Bowie Drive<br>Galveston, TEXAS 77551<br>UNITED STATES<br>joanie@tirn.net |  |
| Venture Global CP Express LLC | Patrick Nevins<br>Latham & Watkins LLP<br>Latham & Watkins LLP<br>555 Eleventh Street NW<br>Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>patrick.nevins@lw.com | Sandra Snyder, ESQ<br>Assistant General Counsel<br>Venture Global LNG Inc.<br>1001 19TH ST N STE 1500<br>ARLINGTON, VIRGINIA 22209<br>ssnyder@venturegloballng.com |
| Venture Global CP2 LNG, LLC | Patrick Nevins<br>Latham & Watkins LLP<br>555 Eleventh Street NW, Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>patrick.nevins@lw.com | Sandra Snyder, ESQ<br>Assistant General Counsel<br>Venture Global LNG Inc.<br>1001 19TH ST N STE 1500<br>ARLINGTON, VIRGINIA 22209<br>ssnyder@venturegloballng.com |