# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Travis Dardar, *et al.,*<br>    *Petitioners,*<br><br>    v.<br><br>Federal Energy Regulatory<br>Commission,<br>    *Respondent.* | ) <br> ) <br> ) <br> ) <br> )    Nos. 24-1291(L), 24-1292 <br> )        (consolidated) <br> ) <br> ) <br> ) <br> ) |

## PETITIONERS' JOINT MOTION
## FOR CLARIFICATION OR, IN THE ALTERNATIVE,
## AMENDMENT

Pursuant to Federal Rule of Appellate Procedure 27, Petitioners request confirmation that this Court will have jurisdiction to review, and that the record will include, the Federal Energy Regulatory Commission's ("FERC" or "the Commission") November 27, 2024 Order Addressing Arguments Raised on Rehearing and Setting Aside Prior Order, In Part in *Venture Global CP2 LNG, LLC,* 189 FERC ¶ 61,148 (Nov. 27, 2024) ("Rehearing Order"), without further action required by Petitioners—for example, by moving to amend their petitions or filing additional petitions. In the alternative, and out of an abundance of

caution, Petitioners request to amend their petitions to identify the Rehearing Order. Petitioners discussed this motion with Respondent FERC, and the Commission has stated that the certified index to the record in this case, when filed, will include the Rehearing Order, but does not oppose the motion for clarification regarding Petitioners' filing requirements or the motion to amend. Respondent-Intervenor Venture Global did not respond to Petitioners' request for its position.

## I.    Background

Prior to seeking judicial review, Petitioners filed a timely request for rehearing of the Commission's June 27, 2024, Order Granting Authorizations Under Sections 3 and 7 of the Natural Gas Act, *Venture Global CP2 LNG, LLC*, 187 FERC ¶ 61,199 (June 27, 2024) ("Operative Order"). On August 29, 2024, rehearing was denied by operation of law pursuant to 15 U.S.C. § 717r(a). *Venture Global CP2 LNG, LLC*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 188 FERC ¶ 62,109 (Aug. 29, 2024) ("Notice"). In the Notice, the Commission expressed interest in issuing a future order to address the rehearing request. Pursuant to 15 U.S.C. § 717r and *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en

banc), on September 9, 2024, Petitioners filed timely petitions for review of the Operative Order and the Notice, which this Court consolidated here.

After the petitions for review were filed and consolidated, on November 27, 2024, the Commission issued its Rehearing Order. The Rehearing Order "as permitted by section 19(a) of the Natural Gas Act, . . . modif[ied] the discussion in the [Operative] Order" and "set aside the [Operative] Order, in part, solely regarding the Commission's analysis of $NO_2$ and $PM_{2.5}$." Rehearing Order PP 2, 185. For all issues raised in Petitioners' rehearing request other than the $NO_2$, $PM_{2.5}$, and related air quality arguments, the Rehearing Order rejected the arguments and left the outcome in the Operative Order unchanged.

## II.    Motion to Clarify

Petitioners seek clarification from the Court regarding which orders are fairly encompassed by the existing petitions for review and whether Petitioners are required to amend their petitions or file new petitions specifically to identify the Rehearing Order.

This Court held in *Allegheny* that parties have the right to petition for judicial review if the Commission has not acted on a party's

request for rehearing in 30 days. *Allegheny*, 964 F.3d at 3-5, 18-19; 15 U.S.C. § 717r(a). When a petition for review is filed with the Court, the Commission may still "modify or set aside, in whole or in part, any finding or order made" until the record is filed in the Court. 15 U.S.C. § 717r(a). As a practical matter, this has become the typical procedure: a party seeks rehearing of a Commission order, 30 days pass with at most a notice by the Commission that the rehearing request has been denied by operation of law, the party files a petition for review of the Commission order in Court, and then the Commission issues an order on rehearing before filing the record. *See e.g.*, *Healthy Gulf v. FERC*, 107 F.4th 1033, 1039 (D.C. Cir. 2024) (party sought rehearing December 19, 2022; party petitioned for review March 15, 2023; Commission issued order on rehearing June 9, 2023); *Advanced Energy United v. FERC*, D.C. Cir. No. 23-1282 (filed Oct. 6, 2023) (parties sought rehearing August 28, 2023 (Request for Rehearing and Clarification of the Clean Energy Associations, FERC Dkt. No. RM22-14-001, Doc. Accession No. 20230828-5428); parties petitioned for review October 6, 2023; Commission issued order on rehearing March 21, 2024 (Order on Rehearing and Clarification, Improvements to

Generator Interconnection Procedures and Agreements, No. RM22-14-001, 186 FERC ¶ 61,199)); *Appalachian Voices v. FERC*, D.C. Cir. No. 22-1330 (filed Dec. 23, 2022) (party sought rehearing September 22, 2022 (Appalachian Mountain Advocates' Request for Rehearing on behalf of Appalachian Voices et al., Dkt. No. CP16-10-010, Doc. Accession No. 20220922-5186); party petitioned for review December 23, 2022; Commission issued order on rehearing February 17, 2023 (Order Addressing Arguments Raised on Rehearing, *Mountain Valley Pipeline LLC*, Docket Nos. CP16-10-010, CP19-477-002, CP21-57-002, 182 FERC ¶ 61,046)).

What has not become typical is the process by which petitioners ensure the Court has jurisdiction to review not just the order petitioners initially sought judicial review of but also the rehearing order issued after the petition for review was filed. For example, in some instances, FERC included the rehearing order in the certified record index without petitioners amending their petition. *See e.g.* Certified Index to the R. at 102, *Healthy Gulf v. FERC*, Dkt. No. 23-1069, Doc. No. 2003055 (D.C. Cir. June 9, 2023) (Record Item No. 549). In others, petitioners sought to amend their petitions to add the new

rehearing order. *See e.g.* Mot. for Leave to Amend Pet., *Advanced Energy United v. FERC*, Dkt. No. 23-1282, Doc. No. 2047993 (D.C. Cir. Apr. 2, 2024). In yet other circumstances, petitioners filed new petitions for review of the rehearing order, later consolidating the new petition for review with the petition for review of the original order. *See e.g.* Pet. for Review, *Appalachian Voices v. FERC*, Dkt. No. 23-1117, Doc. No. 1995708 (D.C. Cir. Apr. 18, 2023) (new petition filed seeking review of rehearing order and consolidated with original case, *Appalachian Voices v. FERC*, Dkt. No. 22-1330, Doc. No. 1995716 (D.C. Cir. Apr. 20, 2023)).

Rule 15(a)(2) of the Federal Rules of Appellate Procedure requires that a petition for review "specify the order or part thereof to be reviewed." Fed. R. App. P. 15(a)(2)(C); *see also Entravision Holdings, LLC v. FCC*, 202 F.3d 311, 312 (D.C. Cir. 2000). The requirements of Rule 15(a) are jurisdictional; "mistaken or inexact specification of the order to be reviewed will not be fatal to the petition, however, if the petitioner's intent to seek review of a specific order can be fairly inferred from the petition for review or from other contemporaneous filings, and the respondent is not misled by the mistake." *Entravision Holdings,* 202 F.3d at 313.

This Court recently explained that, where "FERC's second order in [the] case merely *modified* its initial order . . . . FERC's initial order – as modified – is still the operative order." *Evergy Kan. Cent., Inc. v. FERC*, 77 F.4th 1050, 1054-55 (D.C. Cir. 2023). Thus, "'[p]etitioners [are] under no obligation to file a new petition for review' after FERC issued 'an amendment to' its original order, because 'their petitions adequately specif[ied] the orders to be reviewed.'" *Id.* (quoting *Sierra Club v. FERC*, 68 F.4th 630, 646 (D.C. Cir. 2023), *petition dismissed as moot and opinion vacated*, No. 20-1512, 2023 WL 5537562 (D.C. Cir. Aug. 25, 2023)). Further, in light of this Court's liberal construction of Rule 15(a)'s requirements, the Court has explained in a parallel context that "[w]e can fairly infer from the petitions for review that petitioners intended to seek review not only of the [there-operative] Order but also of any amendment to it." *Sierra Club*, 68 F.4th at 646. Thus, in *Sierra Club*, the Court found that it had jurisdiction to review the orders as modified by rehearing orders even though petitioners had not amended their petitions for review to explicitly include the rehearing orders. *Id.*

*Evergy Kansas* and *Sierra Club* clarified that when FERC's second order merely modifies the first order, this Court will have jurisdiction to

review both orders even when petitioners list only the first order in their petition for review. However, *Evergy Kansas* reserved the question of whether a rehearing order that is "separate from and supersede[s] the agency's original order" requires a new or amended petition. 77 F.4th at 1054-55.

Here, the Rehearing Order modified the Operative Order and "set aside the [Operative] Order, in part, solely regarding the Commission's analysis of $NO_2$ and $PM_{2.5}$." Rehearing Order P 185. Therefore, under the reasoning in *Evergy Kansas* and *Sierra Club*, the part of the Rehearing Order that only modified but did not set aside the Operative Order is not a stand-alone administrative action but rather the Rehearing Order is more appropriately considered a supplemental part of the record pertaining to the petitions already before the Court. As such, no further action with regard to the Rehearing Order would be required, and this Court would have jurisdiction to review Respondent's rationale reaffirming the modified but not set aside portions of the Operative Order. However, because the Rehearing Order did set aside a portion of the Operative Order, Petitioners respectfully request that this Court clarify whether, in these circumstances, the setting aside of

*part of* the Operative Order requires Petitioners to amend their petition, or to file a new petition, to enable review of the Operative Order and Rehearing Order. Because this question is likely to arise in other cases in which the Commission issues a rehearing order after a petition for review has been filed, clarification regarding Rule 15's requirements would be beneficial to future litigants.

## III. Motion to Amend

In the alternative, and out of an abundance of caution, pursuant to Rule 27 of the Federal Rules of Appellate Procedure, and Circuit Rule 27 of this Court, Petitioners move to amend their September 9, 2024 petitions for review (Nos. 24-1291(L), 24-1292) to identify FERC's Rehearing Order, which is attached as Exhibit A.

There is good cause to grant this motion. As demonstrated, this Court has permitted motions to amend in cases where a rehearing order is issued after appeals have been submitted and docketed by the Court. *See e.g. Evergy Kan.*, 77 F.4th at 1054-55. Amendment of Petitioners' petitions would neither unduly burden the Court nor expand the issues raised in the initial appeal. Further, filing new petitions would burden

the parties and the Court with the need to file and process additional petitions for review, motions to intervene, and motions to consolidate.

## IV. Conclusion

Petitioners respectfully request that their motion be granted, and that the Court clarify that the Commission's Rehearing Order may be incorporated in the record without further action by Petitioners. In the alternative, Petitioners respectfully request their petitions be amended to identify the Rehearing Order.

Respectfully submitted,

*/s/ Caroline Reiser*
Caroline Reiser
Morgan Johnson
Thomas Zimpleman
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

*Counsel for Natural Resources Defense Council*

*/s/ Nathan Matthews*
Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612

415-977-5695
nathan.matthews@sierraclub.org

Rebecca McCreary
Sierra Club
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595 ext. 103
rebecca.mccreary@sierraclub.org

*Counsel for Louisiana Bucket Brigade,
Healthy Gulf, Sierra Club, Texas
Campaign for the Environment, and
Turtle Island Restoration Network*

/s/ Megan C. Gibson
Megan C. Gibson
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
(202) 849-5953
mgibson@selcdc.org

Spencer Gall
Deirdre Dlugoleski
Southern Environmental Law Center
120 Garrett Street, Suite 400
Charlottesville, Virginia 22902
(434) 977-4090
sgall@selcva.org

*Counsel for Travis Dardar, Nicole
Dardar, Kent Duhon, Mary Alice
Nash, Jerryd Tassin, Anthony Theriot,
For a Better Bayou, and Fishermen
Involved in Sustaining Our Heritage*

Exhibit A

189 FERC ¶ 61,148
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
                        Mark C. Christie, David Rosner and
                        Lindsay S. See

| | |
|---|---|
| Venture Global CP2 LNG, LLC | Docket Nos.  CP22-21-001 |
| Venture Global CP Express, LLC | CP22-22-001 |

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING AND SETTING
ASIDE PRIOR ORDER, IN PART

(Issued November 27, 2024)

1.     On June 27, 2024, the Commission issued an order (1) authorizing Venture Global
CP2 LNG, LLC (CP2 LNG) to site, construct, and operate a new liquefied natural gas
(LNG) export terminal and associated facilities on the east side of the Calcasieu Ship
Channel in Cameron Parish, Louisiana (CP2 LNG Project); and (2) issuing Venture
Global CP Express, LLC (CP Express) a certificate of public convenience and necessity
to construct and operate a new interstate natural gas pipeline system to connect the CP2
LNG to the existing natural gas pipeline grid in east Texas and southwest Louisiana (CP
Express Pipeline Project).[1]  On July 29, 2024, a coalition of petitioners (Petitioners)[2] filed
a timely request for rehearing and motion for stay[3] of the Authorization Order.

---

[1] *Venture Glob. CP2 LNG, LLC*, 187 FERC ¶ 61,199 (2024) (Authorization
Order).  CP2 LNG and CP Express will be referred to jointly herein as Venture Global.
The CP2 LNG Project and CP Express Pipeline Project will be referred to jointly herein
as Projects.

[2] Petitioners include: A Better Bayou, Fishermen Involved in Sustaining our
Heritage (FISH), Nicole Dardar, Travis Dardar, Kent Duhon, Mary Alice Nash, Jerryd
Tassin, Anthony Theriot, Healthy Gulf, Louisiana Bucket Brigade, Natural Resources
Defense Council, Port Arthur Community Action Network, Public Citizen, Sierra Club,
Texas Campaign for the Environment, and Turtle Island Restoration Network.  We note
that, in the Authorization Order, the Commission denied FISH's late motion to intervene,
*see id.* P 17, which is further discussed in section II.A., *infra*.

[3] On October 1, 2024, the Commission issued a separate order denying Petitioners'
motion for stay.  *See Venture Glob. CP2 LNG, LLC*, 189 FERC ¶ 61,005 (2024) (Order

2.       Pursuant to *Allegheny Defense Project v. FERC*,[4] the rehearing request filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 19(a) of the Natural Gas Act (NGA),[5] we are modifying the discussion in the Authorization Order, and setting aside the prior order, in part, as discussed below.[6]

## I.       **Background**

### A.       **CP2 LNG Project**

3.       On December 2, 2021, CP2 LNG filed an application, in Docket No. CP22-21-000, under NGA section 3[7] and Part 153 of the Commission's regulations[8] for authorization to site, construct, and operate the CP2 LNG Project, with 20 million metric tons per annum (MTPA) of nameplate liquefaction capacity and a peak achievable capacity of 28 MTPA under optimal operating conditions.[9]  The project would be constructed in two phases[10] and include a liquefaction plant consisting of eighteen liquefaction blocks, four aboveground full containment LNG storage tanks, and two

---

Denying Stay).

[4] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[5] 15 U.S.C. § 717r(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[6] *Allegheny Def. Project*, 964 F.3d at 16-17.

[7] 15 U.S.C. § 717b.

[8] 18 C.F.R. pt. 153 (2024).

[9] Authorization Order, 187 FERC ¶ 61,199 at PP 1, 5.

[10] Each phase is designed with a nameplate liquefaction and export capacity of 10 MTPA, and a peak achievable capacity of 14 MTPA.  *Id.* P 6.

marine LNG loading docks.[11]  The CP2 LNG Project will receive natural gas via the CP Express Pipeline Project.[12]

4.      CP2 LNG received authorization from the Department of Energy (DOE), Office of Fossil Energy (DOE/FE) to export annually up to approximately 28 MTPA of natural gas in the form of LNG to countries with which the United States has a Free Trade Agreement (FTA).[13]  In addition, CP2 LNG currently has pending before DOE/FE an application to export LNG to nations with which the U.S. permits such trade, but has not entered into an FTA (non-FTA).[14]

5.      CP2 LNG also stated that it intends to construct and operate carbon capture and sequestration (CCS) facilities that will capture, compress, and sequester approximately 500,000 tons of carbon dioxide ($CO_2$) from feed gas entering the CP2 LNG Project.[15]

### B.      CP Express Pipeline Project

6.      In the same application, CP Express filed a request, in Docket No. CP22-22-000, under NGA section 7(c)[16] and Parts 157 and 284 of the Commission's regulations,[17] for a certificate of public convenience and necessity to construct and operate the CP Express Pipeline Project.[18]  The CP Express Pipeline Project would originate at interconnections with Transcontinental Gas Pipe Line's interstate system and Midcoast Energy's CJ Express pipeline in Jasper County, Texas, extend through Newton County, Texas, and

---

[11] *Id.* P 1.  For more specific information regarding the CP2 LNG Project, *see id.* PP 5-9.

[12] *Id.* P 2.

[13] *Id.* P 8 (citing *Venture Glob. CP2 LNG, LLC*, FE Docket No. 21-131-LNG, Order No. 4812 (Apr. 22, 2022)).

[14] *Id.* (citing Venture Global CP2 LNG, LLC, December 2, 2021 Application, FE Docket No. 21-131-LNG).

[15] *Id.* P 9.

[16] 15 U.S.C. § 717f(c).

[17] 18 C.F.R. pts. 157, 284 (2024).

[18] Authorization Order, 187 FERC ¶ 61,199 at P 1.  For more specific information regarding the CP Express Pipeline Project, *see id.* PP 10-14.

Calcasieu and Cameron Parishes, Louisiana, and terminate at the CP2 LNG Project.[19] The CP Express Pipeline would provide up to 4,400,000 dekatherms per day (Dth/day) of firm natural gas transportation service.[20]

7.    As with the CP2 LNG Project, CP Express Pipeline would be constructed and operated in two phases.[21] Facilities constructed during Phase I would provide 2,200,000 Dth/day of firm transportation service, transporting enough feed gas for the nine liquefaction blocks to be constructed in Phase I of the CP2 LNG Project.[22] Phase II would provide an additional 2,200,000 Dth/day of firm transportation service, transporting feed gas for the nine additional liquefaction blocks constructed in Phase II of the CP2 LNG Project.[23]

8.    CP Express held a binding open season and, as a result, it executed a binding precedent agreement with CP2 LNG for 100% of the firm transportation service provided by Phases I and II of the CP Express Pipeline for a term of twenty years at negotiated rates.[24] CP Express received no other bids or expressions of interest during the open season.[25]

9.    In the Authorization Order, the Commission found that the CP2 LNG Project was not inconsistent with the public interest,[26] and that the CP Express Pipeline was required by the public convenience and necessity.[27] After considering the environmental effects of the Projects, the Commission agreed with the conclusions presented in the final Environmental Impact Statement (EIS) and found that the Projects, if implemented as

---

[19] *Id.*

[20] *Id.* P 10.

[21] *Id.* P 11.

[22] *Id.* (discussing, in detail, the nature of the proposed facilities in Phase I).

[23] *Id.* P 12 (discussing, in detail, the nature of the proposed facilities in Phase II).

[24] *Id.* P 14.

[25] *Id.*

[26] *Id.* P 199.

[27] *Id.* P 200.

described in the applications and in compliance with the environmental conditions in the Authorization Order, were environmentally acceptable actions.[28]

## II.      **Procedural Issues**

### A.      **Party Status**

10.     FISH argues that the Commission erred by denying its late motion to intervene because FISH demonstrated good cause for late intervention.[29]  FISH further argues that the Commission departed from prior practice of granting late motions to intervene prior to issuance of the Commission's order without adequate explanation, particularly because FISH's motion was unopposed and it will be directly impacted by the proposed action.[30]

11.     We disagree.  Under the Commission's regulations, a movant seeking late intervention must establish that there is good cause for its late filing.[31]  The Commission may also consider whether granting late intervention will delay the proceeding or prejudice the other participants and whether the movant is adequately represented by existing parties,[32] but in the absence of a showing of good cause the Commission need not consider these additional factors.[33]

12.     In 2018, the Commission expressed concern "with the increasing degree to which participants in natural gas certificate proceedings have come to file late motions to intervene without adequately addressing the factors set forth in our regulations."[34]  Noting that "going forward [the Commission] will be less lenient in the grant of late interventions," the Commission reiterated that a movant seeking out-of-time intervention would be "required to 'show good cause why the time limitation should be waived,'" in

---

[28] *Id.* P 198.

[29] Rehearing Request 92, 108.

[30] *Id.* at 92-93.

[31] 18 C.F.R. § 385.214(b)(3) (2024); *see also id.* § 385.214(d)(1)(i) (identifying "good cause" as one of the criteria for the Commission to consider when determining whether to grant a late motion to intervene).

[32] 18 C.F.R. § 385.214(d)(1)(ii)-(iv).

[33] *See Broadview Solar LLC*, 174 FERC ¶ 61,199, at P 16 (2021).

[34] *Tenn. Gas Pipeline Co.*, 162 FERC ¶ 61,167, at P 49 (2018) (*Tennessee Gas*).

addition to satisfying the other late intervention criteria under Rule 214(d).[35] Importantly, the decision of whether to grant a late motion to intervene is committed to the Commission's discretion; "Rule 214 affords movants no right to late intervention."[36]

13.     Against that backdrop, we continue to deny FISH's late motion to intervene because we find that it failed to show good cause under Rule 214(d).[37] FISH's only attempt to demonstrate good cause comes from its explanation that it was not formed until November 2023.[38] This argument is undermined, however, by the fact that it did not seek to intervene until April 2024 despite being able to file joint comments on the Projects with other parties in January 2024. In other words, FISH's argument is predicated on the claim that it needed until April 2024 to recruit community representatives,[39] but it nonetheless was able to substantively participate in the proceeding in January 2024. Moreover, FISH's cooperation with other parties on joint comments supports the conclusion that its interests are adequately represented by other parties to the proceeding.[40] We thus continue to find that FISH has failed to establish that good cause exists for its late intervention and that denying its motion is consistent with Commission regulations and policy.

14.     FISH suggests that the Commission follow the approach taken in *Mountain Valley Pipeline, LLC*[41] which allowed late-filed intervention nearly two years after the deadline for intervention because the movant "demonstrated a sufficient interest in the proceeding."[42] While, as FISH notes, this order was never overturned, the *Tennessee Gas* decision was issued a short time later and represents current Commission policy.

---

[35] *Id.* P 50.

[36] *Panhandle E. Pipe Line Co.*, 170 FERC ¶ 63,011, at P 2 (2020) (citing *Alaska Power & Tel. Co.*, 98 FERC ¶ 61,092, at 61,278 (2002) ("In short, there is no right to late intervention in Commission proceedings under Rule 214. Rather, the rule affords the Commission the discretion to grant late intervention based on a showing of good cause, as well as consideration of other relevant factors.")).

[37] *See* Authorization Order, 187 FERC ¶ 61,199 at P 17.

[38] Rehearing Request at 100.

[39] *See id.*

[40] *See* Authorization Order, 187 FERC ¶ 61,199 at P 17.

[41] 161 FERC ¶ 61,043, at P 22 (2017).

[42] Rehearing Request at 95.

Moreover, even in *Mountain Valley Pipeline, LLC,* the Commission noted that the lateness of the motion "push[ed the] practice" of granting intervention requests filed prior to the issuance of the certificate.[43]  Further, FISH maintains that the Commission has not consistently applied the standard set forth in *Tennessee Gas*.[44]  In support, it cites a number of Commission decisions in matters where the initial intervention deadline passed prior to issuance of the decision in *Tennessee Gas*.[45]  FISH's assertion, however, ignores that the 2018 *Tennessee Gas* decision applies only to "any new Natural Gas Act section 3 or section 7 proceeding and any pending section 3 or section 7 proceeding in which the deadline for filing timely interventions has not yet passed," and so the *Tennessee Gas* holding would not have been applied to these proceedings.[46]

15.     We also disagree that by failing to grant its motion for late intervention, the Commission singled out FISH for inconsistent treatment.[47]  On the contrary, the Commission's consideration of FISH's late intervention is consistent with its post-*Tennessee Gas* practice.  While the Commission has on occasion granted such motions— including those raising non-environmental concerns—filed prior to or immediately following the second deadline to intervene based on the comment period for an EIS,[48] for motions for late intervention filed at later dates in proceedings, the Commission has

---

[43] *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 22.

[44] Rehearing Request at 94-97.

[45] *Id.* n.476 (citing *Tex. Brownsville LLC*, 169 FERC ¶ 61,130 (2019); *Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202 (2020); *Alaska Gasline Dev. Corp.*, 171 FERC ¶ 61,134 (2020); *Venture Glob. Calcasieu Pass, LLC*, 166 FERC ¶ 61,144 (2019); *Driftwood LNG LLC,* 167 FERC ¶ 61,054 (2019); *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019); *Spire STL Pipeline LLC,* 164 FERC ¶ 61,085 (2018); *High Point Gas Transmission, LLC*, 163 FERC ¶ 61,135, at P 9 (2018)).

[46] *Tenn. Gas Pipeline Co.*, 162 FERC ¶ 61,167 at P 51.  We note that for the same reasons, *Tennessee Gas* similarly would not have been applied to *Mountain Valley, LLC.*, 161 FERC ¶ 61,043 at P 22 (explaining that the intervention deadline was November 17, 2015).

[47] Rehearing Request at 94-97.

[48] 18 C.F.R. §§ 157.10(a)(2), 380.10(a)(1)(i) (2024) (motions to intervene based on environmental grounds are deemed timely if they are filed within the comment period on a draft EIS); *see, e.g.*, *Saguaro Connector Pipeline, LLC*, 186 FERC ¶ 61,114, at P 5 (2024) (motions for late intervention received shortly after deadline and prior to issuance of environmental documents granted).

weighed the requirements of Rule 214, focusing on whether good cause has been shown for the late filing.[49]

16.     Although the Commission granted other late-filed intervention motions in these proceedings, those motions differ from FISH's motion.[50]  The Commission granted intervention requests from one group of parties that filed their intervention requests prior to the availability of the draft EIS, which opened a new intervention period, and from

---

[49] *Double E Pipeline, LLC*, 173 FERC ¶ 61,074, at PP 17-23 (2020) (finding that good cause not demonstrated due to new additional data on ambient air quality and the effects of the COVID-19 pandemic); *Transcon. Gas Pipe Line Co.*, 172 FERC ¶ 61,281, at P 6 (2020) (claim of "administrative error" insufficient to show good cause); *Nat. Gas Pipeline Co. of Am., LLC*, 171 FERC ¶ 61,157, at P 8 (2020) (finding good cause for late intervention when Commission staff provided incorrect guidance).  FISH also relied on the Commission's decision in *N. Nat. Gas Co.*, 175 FERC ¶ 61,052 (2021) where the Commission granted late intervention without addressing good cause or the other factors in Rule 214.  Because the Commission's voted order does not address the basis for allowing late intervention, while *Tennessee Gas* and other subsequent decisions reflect consistent application of the good cause standard and Rule 214, we are unable to rely on *Northern Natural Gas Company* and decline to give it controlling weight.  Moreover, a prior motion for late intervention in the same proceeding had been rejected for failure to show good cause.  *N. Nat. Gas Co.*, Notice, Docket No. CP20-487-000 (Aug. 31, 2020).  In addition, the present circumstances are more analogous to *Broadview Solar, LLC*, where the Commission distinguished *Northern Natural Gas Company* and noted that, unlike the late intervenors in *Northern Natural Gas Company* who were responding to a potential shift in Commission-wide policy that was not apparent at the opening of the proceeding, the movants in *Broadview Solar, LLC* had clear notice that their interests might be affected at an early stage in the proceeding.  175 FERC ¶ 61,228, at P 10 (2021).

[50] *See* Secretary's Notices dated November 13, 2023 (granting the unopposed motions for late intervention filed by Golden Pass LNG Terminal LLC and Golden Pass Pipeline LLC, Commonwealth LNG, LLC, Niskanen Center, and Bernard and Georgia Webb and Jerryd Tassin, and Mary Alice Nash because "allowing interventions filed before the Commission issued the draft Environmental Impact Statement, which opened a new intervention period, will not disrupt the proceedings or cause any prejudice to or additional burdens upon the existing parties" and granting the opposed motions for late intervention filed by For a Better Bayou and Adley and Judy Dyson because the movants "have a direct interest in the proceeding that may not be adequately represented by other parties, and allowing the interventions will not disrupt the proceedings or cause any prejudice to or additional burdens upon the existing parties.")

another group of parties that, unlike FISH, the Commission found had a direct interest in the proceeding that might not be adequately represented by other parties.

17.     Under NGA section 19(a) and Rule 713(b) of the Commission's Rules of Practice and Procedure, only a party to a proceeding is eligible to request rehearing of a final Commission decision.[51]  Because FISH is not a party to this proceeding it is not eligible to seek rehearing of the Authorization Order.[52]  We note, in any event, that FISH's concerns are generally addressed in response to arguments properly raised by Petitioners on rehearing.

### B.     Answers

18.     On August 13, 2024, Venture Global filed a motion for leave to answer and answer to Petitioners' request for rehearing and motion for stay.  The Commission's Rules of Practice and Procedure prohibit answers to a request for rehearing.[53]  Accordingly, we deny Venture Global's motion to answer and reject its answer.

### C.     Comments

19.     Between March 27, 2024, and May 1, 2024, various commenters filed form letters containing identical content and arguments in favor of authorization of the Projects.  On June 14, 2024, Petitioners[54] filed a response to the letters.[55]  In their request for rehearing, Petitioners assert that the Commission failed to acknowledge or reference this filing yet made "passing reference to 'comments in support of the project, citing an increase in job opportunities and local economic investment.'"[56]  The Commission, however, did not cite the letters referenced by Petitioners.  We note that these filings were made after the time

---

[51] 15 U.S.C. § 717f(a); 18 C.F.R. § 385.713(b) (2024).

[52] *See Pac. Gas and Elec. Co.*, 187 FERC ¶ 61,167, at P 13 (2024).

[53] 18 C.F.R. § 385.713(d)(1); 18 C.F.R. § 385.213(a)(2) (2024).

[54] We note that, as discussed above, *see supra* section II.A., FISH is not a party to this proceeding.

[55] Petitioners June 14, 2024 Comments in Response to Form Letters (Response to Form Letters).

[56] Rehearing Request at 69, n.354 (citing Authorization Order, 187 FERC ¶ 61,199 at P 19).

for comments had closed and were thus untimely.[57]  "Generally an agency is not under an obligation to consider comments submitted after the close of the comment period."[58] Moreover, the Commission has not relied on these filings to support its decisions in these proceedings.  Nevertheless, Petitioners' rehearing arguments that rely on their June 14, 2024 filing are addressed below.

## III.  __Discussion__

20.     Petitioners allege that the Commission, through its Authorization Order: (1) violated the NGA and Administrative Procedure Act (APA) by authorizing the Projects (including arguments related to jurisdiction,[59] public interest,[60] need,[61] and project benefits[62]); (2) violated the National Environmental Policy Act (NEPA) and related APA responsibilities (including arguments related to alternatives,[63] greenhouse gases (GHG),[64] impacts to commercial and recreational fishing and local communities,[65] safety,[66] the CCS system,[67] socioeconomics,[68] impacts to the Rice's whale,[69] wetlands

---

[57] *See, e.g.*, *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042, at P 76 & n.111 (2017) (rejecting comment as untimely).

[58] *Montrose Chem. Corp. of Cal. v. E.P.A.*, 172 F.3d 920 (D.C. Cir. 1999) (citations omitted).

[59] Rehearing Request at 34-46.

[60] *Id.* at 87-92.

[61] *Id.* at 47-62.

[62] *Id.* at 62-75.

[63] *Id.* at 109-16, 165-66.

[64] *Id.* at 116-25.

[65] *Id.* at 75-85, 125-28.

[66] *Id.* at 128-35.

[67] *Id.* at 162-66.

[68] *Id.* at 64-69.

[69] *Id.* at 166-87.

impacts,[70] environmental justice,[71] and air impacts[72]), and (3) failed to properly balance the benefits and adverse impacts of the Projects.[73]  Except for air impacts, we conclude that each of these arguments lacks merit, as discussed below.

## A.     NGA Jurisdiction

21.     Petitioners argue that because the CP Express Pipeline Project will only transport natural gas destined for export it is not engaged in interstate commerce and cannot be approved under NGA section 7.[74]  Petitioners maintain that interstate commerce does not include foreign commerce and that the Commission failed to explain its finding that the CP Express Pipeline Project would transport gas in interstate commerce or that CP Express will become a natural gas company upon commencing operation of the CP Express Pipeline Project.[75]  Petitioners assert that Congress's grant of eminent domain authority to projects authorized under NGA section 7 and not under NGA section 3 represents a deliberate choice to grant eminent domain to interstate gas pipelines and not export projects, and that the Commission must honor the NGA's two distinct regimes.[76]

22.     We disagree with these assertions.  NGA section 7 confers jurisdiction to the Commission over the transportation and the sale for resale of natural gas in interstate commerce, and the construction and operation of facilities for that purpose.[77]  NGA section 2(7) defines interstate commerce as "commerce between any point in a State and any point outside thereof, or between points within the same State but through any place

---

[70] *Id.* at 188-91.

[71] *Id.* at 85-87.

[72] *Id.* at 135-62.

[73] *Id.* at 75-92.

[74] *Id.* at 34-36 (citing *City of Oberlin, Ohio v. FERC*, 937 F.3d 599 (D.C. Cir. 2019) (*Oberlin I*)); *see also id.* at 41 (citing *Border Pipe Line Co. v. FPC*, 171 F.2d 149, 150 (D.C. Cir. 1948) (*Border Pipe Line*) (arguing that the natural gas is destined for ultimate sale and consumption in foreign commerce and thus, ineligible for NGA section 7).

[75] *Id.* at 34 (citing *Ala. Mun. Distrib. Grp. v. FERC*, 100 F.4th 207, 213 (D.C. Cir. 2024) (*Evangeline Pass*)); *id.* at 35-39.

[76] *Id.* at 36-37.

[77] 15 U.S.C. § 717(b); *Yukon Pac. Corp.*, 39 FERC ¶ 61,216, at 61,757 (1987).

outside thereof, but only insofar as such commerce takes place within the United States."[78]  While it is true that "interstate commerce" does not include foreign commerce,[79] gas crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey.[80]  In circumstances such as the instant case, where natural gas is being transported in both interstate commerce (i.e., by transporting it across state lines) and foreign commerce (i.e., through exportation), "the Commission has [NGA] section 3 jurisdiction over the point of export/importation and [NGA] section 7 jurisdiction over the facilities up to or from the point of export/importation."[81]  Accordingly, a pipeline transporting natural gas destined for export into foreign commerce that crosses state lines or otherwise engages in interstate transactions is engaged in interstate commerce subject to the Commission's NGA section 7 jurisdiction.[82]

23.    Here, the CP Express Pipeline Project would, in part, comprise an approximately 85.4-mile-long mainline pipeline from Jasper County, Texas, for delivery to the CP2 LNG Project in Cameron Parish, Louisiana.[83]  The CP Express Pipeline Project is designed to connect the CP2 LNG Project to the existing natural gas pipeline grid in east Texas and southwest Louisiana.[84]  Accordingly, because at least some natural gas transported by the pipeline will cross the Texas/Louisiana state line and, therefore, travel in interstate commerce, the CP Express Pipeline will be an interstate pipeline subject to

---

[78] 15 U.S.C. § 717a(7); *Yukon Pac. Corp.*, 39 FERC at 61,757.

[79] *Comanche Trail Pipeline, LLC,* 155 FERC ¶ 61,182, at P 18 (2016) (citing *Border Pipe Line*, 171 F.2d at 150-51).

[80] *Md. v. La.*, 451 U.S. 725, 728 (1981).

[81] *W. Gas Interstate Co.*, 59 FERC ¶ 61,022, at 61,048-49 (1992); *accord Valley Crossing Pipeline, LLC*, 161 FERC ¶ 61,084, at n.26 (2017).

[82] *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205, at P 11 (2022) (sustaining authorization of a pipeline under NGA section 7 that transports natural gas across state lines for delivery to LNG facility for ultimate consumption in foreign commerce); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at P 11 (2022); *see Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202 at PP 47-48, *vacated on other grounds*, 177 FERC ¶ 61,198 (2021) (finding transportation service by pipeline within a single state of gas that otherwise crosses state lines for delivery to LNG facility subject to NGA section 7 jurisdiction).

[83] Authorization Order, 187 FERC ¶ 61,199 at P 2.

[84] *Id.*

our jurisdiction under NGA section 7.  Despite Petitioners' contentions, the Commission has previously explained that "[w]hether some, or even all, of the gas carried by the [] pipeline is consumed in [foreign commerce] is immaterial to its status as an interstate— i.e., an NGA section 7—pipeline, since '[g]as crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey.'"[85]  Thus, the question whether all of the gas transported by the CP Express Pipeline Project will be consumed in foreign commerce has no bearing on its status as an interstate pipeline.[86]  Based on the foregoing, because CP Express will be engaged in the transportation of natural gas in interstate commerce, it will be a "natural-gas company" under the NGA.[87]

---

[85] *NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199, at P 16 & n.39 (2020) (quoting *Md. v. La.*, 451 U.S. at 728); *Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202 at PP 48-51; *see also W. Gas Interstate Co.*, 59 FERC at 61,050 ("It is clear that Western will be receiving gas that comes from the domestic sources outside the State of Texas.  Therefore, that gas already will have been transported in interstate commerce. Western's continued transportation of that gas through the Del Norte pipeline laterals from its point of receipt with El Paso to the point of exportation at the Mexico border is also transportation in interstate commerce.  Consequently, Western's transportation is subject to our jurisdiction under section 7 of the NGA.  It is immaterial that Western individually will receive the gas in Texas solely to transport it across the border.").

[86] In any event, we note that if the CP2 LNG Project uses a small percentage of gas from the CP Express Pipeline Project for on-site liquefaction and other purposes as Petitioners suggest, *see* Rehearing Request at 41-42, we find that such consumption, even if *de minimis*, supports the Commission's exercise of its NGA section 7 authority over the CP Express Pipeline Project.  Application at 12 ("[t]he [CP2 LNG Project] will be powered by two combined cycle gas turbine power generating plants with up to 1,440 megawatts (MW) of collective generating capacity"); *see id.* Resource Report 13, Volume I, sections 13.19.1.3 and 13.19.1.4. (describing the quantities of fuel gas needed to supply the combined cycle gas turbine generators); *Ga. Strait Crossing Pipeline LP*, 100 FERC ¶ 61,280, at 62,197 (2002) ("Because NGA section 7 does not grant the Commission jurisdiction by degree, no matter how small this interstate aspect of [the pipeline's] business is when compared to the pipeline's foreign commerce transactions, this movement of gas between states subjects the entire project to our regulatory oversight under NGA section 7").

[87] 15 U.S.C. § 717a(6) (defining "natural-gas company" as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale").

24.     Next, Petitioners argue that the mere fact that the natural gas crosses state lines, by itself, does not render it subject to NGA section 7 jurisdiction.[88]  Petitioners cite to the NGA's exemption for Hinshaw pipelines as an example and assert that because Congress excluded foreign commerce from interstate commerce, only commerce taking place in the United States may be regulated under NGA section 7.[89]  That there are exemptions to the Commission's NGA jurisdiction in certain situations has no bearing on the instant proceeding.  We note that CP Express has not claimed and does not qualify for a Hinshaw exemption.[90]  Moreover, the transportation of natural gas in interstate commerce is separate and distinct from the subsequent liquefaction and sale of LNG in foreign commerce.  CP Express will transport natural gas in interstate commerce for delivery to and use by CP2 LNG pursuant to a precedent agreement.  Any gas transported by CP Express that ultimately enters foreign commerce will only do so after having been delivered by CP Express to CP2 LNG.  The CP2 LNG Project and any exports therefrom are authorized under NGA section 3.[91]  The CP Express Pipeline Project will only transport natural gas in interstate commerce—CP2 LNG, not CP Express is authorized to export LNG.  Accordingly, the CP Express Pipeline Project is properly under our NGA section 7 jurisdiction.

25.     Petitioners next argue that, according to *Maryland v. Louisiana*,[92] the Commission must consider the entire flow of gas, from production to consumption, when determining what type of commerce is at issue (and not solely whether the natural gas crosses state lines).[93]  They assert that the ultimate consumer under the NGA is the final end-user of the natural gas.[94]  But that case stands for the proposition that "gas crossing a state line at

---

[88] Rehearing Request at 42.

[89] *Id.*

[90] NGA section 1(c), 15 U.S.C. § 717(c), known as the Hinshaw Amendment, "exempted from [Commission] regulation intrastate pipelines that receive natural gas at their state boundary that is consumed within the state and subject to state commission regulation."  *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 898 & n.2 (D.C. Cir. 1995).  In contrast, the CP Express Pipeline Project will traverse state lines and thus would not qualify for a Hinshaw exemption.

[91] *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 11.

[92] 451 U.S. at 755.

[93] Rehearing Request at 37-39, 41.

[94] *Id.* at 38 (citing 15 U.S.C. § 3301 ("'local distribution company' means any person, other than any interstate pipeline or any intrastate pipeline, engaged in the transportation, or local distribution, of natural gas and the sale of natural gas for ultimate

any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey."[95]  It does not address foreign commerce and thus is inapposite here.

26.     Petitioners also rely on *Oberlin I*[96] and *Oberlin II*[97] to argue that the CP Express Pipeline does not fall within the Commission's NGA section 7 authority because the pipeline will be engaged in foreign, not interstate, commerce.  Specifically, Petitioners argue that, although in *Oberlin II* the court found that the pipeline at issue there was "indisputably" transporting gas in interstate commerce[98] and that the Commission could rely on precedent agreements with foreign shippers, it nevertheless reserved judgment on whether the Commission could grant an NGA section 7 certificate for a pipeline that crosses state lines but exclusively transports gas ultimately bound for export.[99]  Here, in contrast, Petitioners maintain that the CP Express Pipeline Project will not transport gas across state lines for sale within the United States.[100]  We disagree.  The Commission has explained in proceedings involving natural gas destined for export that once the natural gas leaves a pipeline company's system, it is immaterial where that gas is ultimately consumed because any gas that ultimately enters foreign commerce will only do so after delivery to the LNG facility and solely at the direction of the owner of the LNG facility pursuant to DOE's NGA section 3 authority.[101]  In other words, "[a]ny actual export does

_____

consumption.") and 15 U.S.C. § 3202(2) (defining a "local distribution company" as an entity engaged in the "the local distribution of natural gas, and the sale of natural gas to any ultimate consumer of natural gas.")).

[95] *Md. v. La.*, 451 U.S. at 755.

[96] 937 F.3d 599.

[97] *City of Oberlin, Ohio v. FERC*, 39 F.4th 719 (D.C. Cir. 2022) (*Oberlin II*).

[98] The court in *Oberlin II* found that the pipeline was transporting interstate gas primarily because the natural gas would cross state lines and approximately 17% of gas bound for export was commingled with gas bound for domestic, interstate use.  *Oberlin II*, 39 F.4th at 726.

[99] Rehearing Request at 36, 40 (citing *Oberlin II*, 39 F.4th at 726 & n.3) (stating that whether a pipeline like the CP Express Pipeline which crosses state lines but exclusively transports gas for export engages in interstate commerce is an open question of statutory construction).

[100] *Id.* at 40-41.

[101] *Columbia Gulf Transmission, LLC*, 178 FERC ¶ 61,198, at P 17-18 (2022), *order on reh'g*, 180 FERC ¶ 61,206 at PP 11-12.

not occur until the gas leaves interstate commerce and enters export facilities subject to NGA section 3."[102]  We note that since the U.S. Court of Appeals for the District of Columbia Circuit's (D.C. Circuit) opinion in *Oberlin II*, the Commission has approved pipelines under NGA section 7 carrying interstate gas for export.[103]

27.     Petitioners next argue that the CP Express Pipeline should be regulated under NGA section 3 rather than section 7, similar to the Commission's approach in *Alaska Gasline Development Corporation*[104] where the Commission asserted NGA section 3 jurisdiction over pipeline feeding natural gas to an export LNG terminal.[105]

28.     In *Alaska Gasline Development Corporation*, the Commission acknowledged that the physical footprint of the Alaska LNG project diverged significantly from that of any LNG facility previously considered by the Commission.[106]  The project included a gas treatment plant and liquefaction facilities that were connected by an approximately 806.9-mile-long pipeline.[107]  Although the Commission recognized that it had previously authorized remotely-located gas treatment facilities and shorter pipeline segments as part of an LNG terminal,[108] it also recognized that it had never asserted NGA section 3

---

[102] *Tenn. Gas Pipeline Co.*, 163 FERC ¶ 61,190, at P 9 (2018); *see also Comanche Trail Pipeline, LLC*, 155 FERC ¶ 61,182 at P 19 ("When a company constructs a pipeline to import or export volumes of natural gas, only a small segment of the pipeline close to the border is deemed to be the import or export facility for which section 3 authorization is necessary; the rest of the pipeline may be jurisdictional under section 7, if it will be used to transport gas in interstate commerce, or it may be NGA-exempt, if it will be used to gather gas or for intrastate transportation service.").  *Cameron LNG, LLC*, 147 FERC ¶ 61,230, at P 2 (2014) (approving 21 miles of 42-inch-diameter pipeline under NGA section 7 that will "enable [the pipeline] to transport domestically-sourced gas . . . to the LNG terminal where the gas will be liquefied for export").

[103] *Tenn. Gas Pipeline Co.*, 178 FERC ¶ 61,199, at PP 31-33 (2022), *order on reh'g*, 180 FERC ¶ 61,205 at PP 15-16.

[104] 171 FERC ¶ 61,134.

[105] Rehearing Request at 42-43.

[106] *Alaska Gasline Dev. Corp.*, 171 FERC ¶ 61,134 at P 9.

[107] *Id.*

[108] *Id.* (citing *Freeport LNG Dev., L.P.*, 107 FERC ¶ 61,278 (2004), *order granting reh'g and clarification*, 108 FERC ¶ 61,253 (2004) (authorizing a 9.6-mile-long pipeline under section 3 of the NGA)).

jurisdiction over a project of that size.[109]  The Commission determined that there were no existing interstate pipelines in Alaska, that the project would involve no interstate transportation subject to NGA section 7 jurisdiction, and that there is no intrastate transmission system linking in-state production areas to in-state markets or to the LNG terminal; thus, the statutory definition of "LNG terminal" in NGA section 2(11)[110] encompassed the 806.9-mile-long pipeline in that particular situation.[111]  In contrast to *Alaska Gasline Development Corporation*, the CP Express Pipeline will be engaged in interstate transportation and will not connect gas treatment facilities to the CP2 LNG Project as was the case in *Alaska Gasline Development Corporation*.  Accordingly, we find *Alaska Gasline Development Corporation* inapplicable to the facts here.[112]

29.    We also disagree with Petitioners' assertion that the Commission never explained why it is lawful to credit demand for export capacity in issuing NGA section 7 certificates and that doing so should not be authorized under NGA section 7 because the primary purpose of exporting is to serve foreign demand in foreign markets.[113]  As the D.C. Circuit has held, "nothing in Section 7 prohibits considering export precedent agreements in the public convenience and necessity analysis."[114]  The Commission may "lawfully consider the export precedent agreements" because a public convenience and necessity determination requires consideration of "all the factors that might bear on the public interest."[115]  The court in *Oberlin II* affirmed the Commission's decision to credit contracts for firm transportation of gas bound for Canada as evidence of need in the Commission's section 7 analysis, given Congress's "clear statutory directive" that natural gas exports to countries with which the United States has a free trade agreement for natural gas "shall be deemed to be consistent with the public interest."[116]  Here, CP2

---

[109] *Id.*

[110] 15 U.S.C. § 717a(11).

[111] *Alaska Gasline Dev. Corp.*, 171 FERC ¶ 61,134 at PP 9-10.

[112] *See also Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202 at P 50 (finding neither reasonable nor appropriate to consider the entire 229-mile-long pipeline part of the NGA section 3 export facility given the limited authority delegated by DOE).

[113] Rehearing Request at 43.

[114] *Oberlin II*, 39 F.4th at 725-26.

[115] *Id.*; *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at P 29 (2023).

[116] *Oberlin II*, 39 F.4th at 726-27; *see Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 15.

LNG is authorized to export to countries with which the United States has a free trade agreement.[117] Accordingly, the Commission properly credited the precedent agreement with CP2 LNG as evidence of need under NGA section 7 even though the natural gas is destined for ultimate consumption in foreign commerce. We note that exports, whether to FTA or non-FTA nations, can only occur once DOE has determined that they are in the public interest.[118]

**B.     Takings Clause**

30.     Petitioners argue that the CP Express Pipeline Project cannot be approved under the NGA because it satisfies neither the types of benefits contemplated under the NGA (i.e., that the pipeline transport natural gas "for ultimate distribution to the public") nor the public use requirement of the United States Constitution's Fifth Amendment (i.e., Takings Clause).[119]

31.     We disagree. Although Petitioners argue that delivering gas for export falls outside Congress's declaration in NGA section 1 that "transporting and selling natural gas for ultimate distribution to the public is affected with a public interest," that sentence goes on to say that "Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest."[120] Moreover, the Fifth Amendment to the Constitution provides that private property may not be taken for public use without just compensation.[121] As Petitioners recognize, the Supreme Court has a longstanding policy of deference to legislative judgments as to what public needs justify the use of the takings power.[122] The

---

[117] Authorization Order, 187 FERC ¶ 61,199 at P 8; *Venture Glob. CP2 LNG, LLC*, FE Docket No. 21-131-LNG, Order No. 4812 (Apr. 22, 2022).

[118] *Sierra Club v. United States Dep't of Energy*, 107 F.4th 1012, 1014 (D.C. Cir. 2024) (citing 15 U.S.C. §§ 717b(c)-(a)).

[119] Rehearing Request at 35, 43-44 (citing 15 U.S.C. § 717(a) and U.S. Const. Amend. V).

[120] 15 U.S.C. § 717(a); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 12.

[121] U.S. Const. amend. V.

[122] *See Kelo v. City of New London*, 545 U.S. 469, 480 (2005) (*Kelo*); *see also Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 244 (1984) ("Thus, if a legislature, state or federal, determines there are substantial reasons for an exercise of the taking power, courts must defer to its determination that the taking will serve a public use.").

Commission having appropriately determined that the CP Express Pipeline Project serves the public convenience and necessity, it is not required to make a separate finding that the project serves a "public use" in order for a certificate holder to pursue condemnation proceedings in a U.S. District Court or state court pursuant to NGA section 7(h).[123] Congress articulated in the NGA that the transportation of natural gas and the sale thereof in interstate and foreign commerce is in the public interest.[124]  Congress did not suggest that there was a further test beyond the Commission's determination under NGA section 7(e) that a proposed pipeline is required by the public convenience and necessity and is thus entitled to use eminent domain.[125]  So long as the Commission's determination that a project is required by the public convenience and necessity complies with the NGA, a certificate-holder's exercise of Congressionally-delegated eminent domain authority satisfies the Fifth Amendment's public-use requirement.[126]

---

[123] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136, at P 55 (2020); *PennEast Pipeline Co.*, 164 FERC ¶ 61,098, at P 29 (2018); *see, e.g.*, *N. Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469, 470-71 (7th Cir. 1998) (under the NGA, "issuance of the certificate [of public convenience and necessity] to [pipeline] carries with it the power of eminent domain to acquire the necessary land when other attempts at acquisition prove unavailing"); *Maritimes & Ne. Pipeline, L.L.C. v. Decoulos*, 146 F. App'x 495, 498 (1st Cir. 2005) (noting that once a section 7 certificate authorization is issued, and the pipeline is unable to acquire the needed land by contract or agreement with the owner, the only issue before the district court in the ensuing eminent domain proceeding is just compensation for the taking); *Rockies Express Pipeline LLC v. 4.895 Acres of Land, More or Less*, 734 F.3d 424, 431 (6th Cir. 2013) (rejecting landowner's claim for damages from eminent domain taking by pipeline as it was an impermissible collateral attack on the essential fact findings made by the Commission in issuing the certificate order authorizing the pipeline); *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 823 (4th Cir. 2004) (affirming district court's determination that Commission's issuance of a certificate of public convenience and necessity gave the pipeline the right to exercise eminent domain and thus an interest in the landowners' property).

[124] 15 U.S.C. § 717(a); *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 55.

[125] *PennEast Pipeline Co.*, 164 FERC ¶ 61,098 at P 29.

[126] *See Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 973 (D.C. Cir. 2000) (holding the Commission's determination that pipeline "serve[d] the public convenience and necessity" demonstrated that it served a "public purpose" for Fifth Amendment purposes).

32.     Petitioners also assert that there must be more than mere economic benefits for a pipeline project to be considered as providing a public benefit under the Takings Clause.[127]  Petitioners cite *Kelo*[128] and *Puntenney v. Iowa Utilities Board* (*Puntenney*)[129] to support their argument that CP Express plans to take private property in order to build a project that only benefits CP Express.[130]  They claim that the public purpose of the CP Express Pipeline Project is a "mere pretext" for conferring a private benefit on a private party, as discussed in *Kelo*,[131] and that the CP Express Pipeline Project fails to meet the public use requirement under the Takings Clause.[132]

33.     We disagree with this characterization of those cases and of the Commission's analysis in the Authorization Order.  Neither the Takings Clause nor governing precedent preclude the conferral of eminent domain authority where, in addition to the requisite public benefit, there may also be a private benefit.[133]  And, "[n]either Congress nor a court has stated that in order to constitute a public use, the taking may only provide a domestic benefit."[134]  The Commission's ultimate conclusion under NGA section 7(e) that the public interest (i.e., public convenience and necessity) is served by the construction of a proposed project reflects its findings that the benefits of a project will outweigh its adverse effects.[135]  Under NGA section 7(h), once a natural gas company obtains a certificate of public convenience and necessity it may exercise the right of

---

[127] Rehearing Request at 45-46.

[128] 545 U.S. at 477, 483-84.

[129] 928 N.W.2d 829, 848 & n.4 (Iowa 2019).

[130] Rehearing Request at 45-46.

[131] 545 U.S. at 477.

[132] Rehearing Request at 46.

[133] *Kelo*, 545 U.S. at 485 ("[T]he government's pursuit of a public purpose will often benefit individual private parties.").

[134] *NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199 at P 23; *Transcon. Gas Pipe Line Co.*, 161 FERC ¶ 61,250, at P 32 (2017); *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, at 61,747-49, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

[135] *PennEast Pipeline Co.*, 164 FERC ¶ 61,098 at P 30.

eminent domain in a U.S. District Court or a state court.[136]  As we explain above, in enacting the NGA, Congress clearly articulated that the transportation and sale of natural gas in interstate commerce for ultimate distribution to the public is in the public interest.[137]  Congress also clearly articulated that import and export to FTA nations shall be deemed to be consistent with the public interest.[138]  The congressional recognition that interstate transportation as well as import and export further the public interest is consistent with the Supreme Court's emphasis on legislative declarations of public purpose in upholding the power of eminent domain.[139]  For these reasons, and because neither of the cases cited by Petitioners had occasion to consider the legislative declarations in the NGA, we find Petitioners reliance on *Kelo*[140] and *Puntenney*[141] misplaced.

### C.    Public Interest

#### 1.    CP2 LNG Project

34.    Petitioners aver that the Commission's authority under NGA section 3 is undefined and lacks a clear legal standard, rendering the Authorization Order arbitrary.[142]

---

[136] 15 U.S.C. § 717f(h).

[137] *Id.* § 717(a) (declaring that the "business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest").  *See also Thatcher v. Tenn. Gas Transmission Co.*, 180 F.2d 644, 647 (5th Cir. 1950), *cert. denied*, 340 U.S. 829 (1950) (explaining that Congress, in enacting the NGA, recognized that "vast reserves of natural gas are located in States of our nation distant from other States which have no similar supply, but do have a vital need of the product; and that the only way this natural gas can be feasibly transported from one State to another is by means of a pipe line.").

[138] 15 U.S.C. § 717b(c).

[139] *Transcon. Gas Pipe Line Co.*, 161 FERC ¶ 61,250 at P 33 (citing *Kelo*, 545 U.S. at 479-80).

[140] 545 U.S. at 477, 483-84.

[141] 928 N.W.2d at 848 & n.4.

[142] Rehearing Request at 87-88 (citing 15 U.S.C. 717b(e)); *see also id.* (stating that NGA section 3 contains no legal standard governing the exercise of that power); *id.* at 89 (citing Authorization Order, 187 FERC ¶ 61,199 at P 23) (stating that the

They maintain that the Commission failed to articulate a clear standard for making its NGA section 3 finding that the project was not inconsistent with the public interest despite record evidence of harms and impacts emanating from the CP2 LNG Project.[143] Thus, Petitioners argue that the Commission's failure to engage in or state a policy for its decision-making and balancing under NGA section 3 is a violation of the NGA and APA.[144]

35.     NGA section 3(a) provides, in part, that "no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so."[145]  The Department of Energy Organization Act transferred the regulatory functions of NGA section 3 to the Secretary of Energy.[146]  The Secretary subsequently delegated to the Commission the authority to approve or disapprove the construction and operation of natural gas import and export facilities and the site at which such facilities shall be located.  The Commission does not authorize importation or exportation of the commodity itself.[147]  Rather, applications for authorization to import or export natural gas

---

Commission merely asserts that it has a coherent standard and failed to articulate or identify one).

[143] *Id.* at 91-92 (listing impacts as including harm to fishermen, resources, and landowners).

[144] *Id.* at 92.

[145] 15 U.S.C. § 717b(a).

[146] In 1977, Congress transferred the regulatory functions of NGA section 3 to the Secretary of DOE in 1977 pursuant to section 301(b) of the Department of Energy Organization Act, Pub. L. No. 95-91, 42 U.S.C. § 7101 *et seq.*  The Secretary subsequently delegated to the Commission the authority to approve or disapprove the construction and operation of natural gas import and export facilities and the site at which such facilities shall be located.  The most recent delegation is in DOE Delegation Order No. S1-DEL-FERC-2006, effective May 16, 2006.

[147] *Freeport LNG Dev., L.P.*, 148 FERC ¶ 61,076, *reh'g denied*, 149 FERC ¶ 61,119 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 36, 49 (D.C. Cir. 2016) (*Freeport*) (finding that because DOE, not the Commission, has sole authority to license the export of any natural gas through LNG facilities, the Commission is not required to address the indirect effects of the anticipated export of natural gas in its NEPA analysis); *Sabine Pass Liquefaction, LLC*, 146 FERC ¶ 61,117 (2014), *reh'g denied*, 148 FERC ¶ 61,200 (2014), *aff'd sub nom. Sierra Club v. FERC*, 827 F.3d 59, 69 (D.C. Cir. 2016) (*Sabine Pass*).

must be submitted to DOE.[148]   Thus, the Commission's authority under NGA section 3 applies "only to the siting and the operation of the facilities necessary to accomplish an export[,]"[149] while "export decisions [are] squarely and exclusively within the [DOE]'s wheelhouse."[150]

36.     As the D.C. Circuit has explained, the NGA section 3 standard that a proposal "shall" be authorized unless it "will not be consistent with the public interest[,]"[151] "sets out a general presumption favoring such authorizations."[152]   To overcome this favorable presumption and support denial of an NGA section 3 application, there must be an

---

[148] *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016) (*EarthReports*) (detailing how regulatory oversight for the export of LNG and supporting facilities is divided between the Commission and DOE).

[149] *Trunkline Gas Co.*, 155 FERC ¶ 61,328, at P 18 (2016).  With respect to border-crossing projects, the Commission has consistently interpreted its section 3 authority to extend only to the "small segment of . . . pipeline close to the border . . . deemed to be the import or export facility . . . ."  *E.g.*, *Trans-Pecos Pipeline, LLC*, 155 FERC ¶ 61,140, at P 31 & n.33 (2016) (citing *S. LNG, Inc.*, 131 FERC ¶ 61,155, at P 15 & n.17 (2010)), *order on reh'g*, 157 FERC ¶ 61,081 (2016), *aff'd sub nom. Big Bend Conservation All. v. FERC*, 896 F.3d 418 (D.C. Cir. 2018) (*Big Bend*).

[150] *Freeport*, 827 F.3d at 46; *see Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1185 (D.C. Cir. 2023) (*Alaska LNG*) (". . .[T]he Department of Energy has exclusive jurisdiction over whether to approve natural gas exports . . . .").

[151] 15 U.S.C. § 717b(a).

[152] *Alaska LNG*, 67 F.4th at 1188 (quoting *W. Va. Pub. Serv. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982) (*W. Va. Pub. Serv. Comm'n*)); *see also Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 203 (D.C. Cir. 2017) (*Freeport II*).

"affirmative showing of inconsistency with the public interest."[153]  This same standard applies to the Commission's consideration of the siting and operation of facilities.[154]

37.     Accordingly, we disagree that the Commission has failed to articulate a standard. As the Commission has done in prior NGA section 3 proceedings, it noted the overall benefits, evaluated the environmental impacts, and concluded that construction and operation of the CP2 LNG Project is not inconsistent with the public interest.[155]  Those objecting to such a project bear the burden of producing credible, contrary evidence that the project is inconsistent with the public interest, and the record in this proceeding does not contain such contrary evidence sufficient to overcome the presumption.[156]

38.     Petitioners also maintain that the Commission conflates its role under NGA section 3 with the DOE's jurisdiction under NGA section 3 for exports as a commodity.[157]  They assert that the Commission's reliance on the designation of FTA exports being deemed to be in the public interest has replaced any meaningful inquiry or development of the record that could rebut the presumption.[158]  Petitioners maintain that the Commission then disclaims the authority to evaluate evidence of adverse economic impacts and, instead, relies on the fact that the land has been acquired through easements

---

[153] *See, e.g.*, *Jordan Cove Energy Project, L.P.*, 157 FERC ¶ 61,194, at P 30 (2016) (explaining that "the issue of whether the export of LNG will cause economic harm or benefit is beyond the Commission's purview and the [authorization order] was not required to consider these factors"); *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 48 ("While the Commission acknowledged the economic benefits of the proposal, the Commission's determination examined other factors, including the prior use of the site, the mitigation of environmental impacts, as well as [the Pipeline and Hazardous Materials Safety Administration's (PHMSA)] Letter of Determination that the siting of the LNG terminal would comply with federal safety standards.").

[154] *Alaska LNG*, 67 F.4th at 1188 (upholding the Commission's application of NGA section 3).

[155] Authorization Order, 187 FERC ¶ 61,199 at PP 22-32, 199; *see also Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029, at P 16 (2024).

[156] Authorization Order, 187 FERC ¶ 61,199 at P 13 ("Those objecting to a project thus bear the burden of showing inconsistency with the public interest.").

[157] Rehearing Request at 88 (citing 15 U.S.C. 717b(a)).

[158] *Id.* at 89.

with landowners and there would be no significant environmental effects to conclude that the CP2 LNG Project is not inconsistent with the public interest.[159]

39.    NGA section 3 explicitly provides that the "exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such . . . exportation shall be granted without modification or delay."[160]  Thus, any disagreement with the NGA's treatment of natural gas trade with FTA nations is better addressed to Congress.  To the extent the Commission addressed the limited impacts to landowners and the environment, such considerations do not change this clear statutory directive.  As discussed above, the Commission does not examine economic claims relating to the exportation of natural gas as a commodity; that task is within the purview of DOE.  Instead, the Commission examines the siting and the operation of the facilities.  Thus, despite Petitioners' assertions, the Commission's consideration of landowner and environmental impacts from LNG facilities are precisely the type of issues relevant to the Commission's jurisdiction under NGA section 3.

40.    Petitioners next assert that, even if the Commission could use the NGA's "not inconsistent with the public interest" standard, the Commission has failed to articulate a policy explaining what it considers in its public interest balancing or how such a policy is implemented.[161]

41.    Petitioners appear to conflate the Commission's obligations under NGA section 7 and section 3.  "Section 7 requires that an affirmative finding of public necessity be made before authorization may be granted, while section 3 requires a finding of detriment to the public interest be made before authorization may be denied."[162]  As explained above, NGA section 3 "'sets out a general presumption favoring' authorizations . . . ; accordingly, section 3 of the NGA does not charge the Commission with demonstrating that the benefits of a proposal outweigh its potential harms."[163]  Petitioners

---

[159] *Id.* at 89-90 (citing Authorization Order, 187 FERC ¶ 61,199 at PP 24, 27).

[160] 15 U.S.C. § 717b(c).

[161] Rehearing Request at 90.

[162] *Atl. Richfield Co.*, 50 FERC ¶ 61,210, at 61,667 (1990).

[163] *Alaska Gasline Dev. Corp.*, 172 FERC ¶ 61,214, at P 16 (2020) (noting that section 3 is a "decidedly different standard than exists under section 7 of the NGA") (quoting *EarthReports*, 828 F.3d at 953).

characterization of the Commission's obligation under NGA section 3 as a "balancing" is misplaced.

42.     Petitioners argue that in *KeySpan LNG, L.P.*[164] the Commission asserted its NGA section 3 authority to deny an application for an import terminal due to safety concerns and the terminal not being in the public interest.[165]  We find this case inapposite.  There, KeySpan LNG, L.P. (KeySpan) proposed to convert an existing LNG storage facility into an import terminal.[166]  KeySpan argued that it was not required to make modifications to the facilities, which did not meet Department of Transportation (DOT) safety standards for new LNG import facilities, because it was "grandfathered" in under the Natural Gas Pipeline Safety Act (NGPSA).[167]  The Commission determined that it was not in the public interest under NGA section 3 to authorize the construction of a new import terminal, where the components do not meet the current federal safety standards required of all other new LNG import facilities.[168]  Contrary to *KeySpan LNG, L.P.*, here, there are no similar safety concerns.  Indeed, the CP2 LNG Project will be designed, constructed, operated, and maintained in accordance with numerous cooperating agencies' regulations, including PHMSA.[169]

43.     Petitioners also assert that the argument that increased LNG exports are needed to bolster U.S. national security by supplying LNG to strategic allies because of the ongoing war in Ukraine is neither substantiated by the market data or geopolitical realities.[170]  Petitioners aver that European energy needs are a pretext to expand U.S. LNG exports and that LNG contracts are contrary to Germany's climate targets which has a sufficient

---

[164] 114 FERC ¶ 61,054 (2006).

[165] Rehearing Request at 90 (noting that the Commission denied the application under its NGA authority and not under safety statutes or regulations).

[166] *KeySpan LNG, L.P.*, 114 FERC ¶ 61,054 at P 4.

[167] *Id.*

[168] *Id.* P 20.

[169] Final EIS at 1-4 to 1-8; Authorization Order, 187 FERC ¶ 61,199 at env't. condition 10.

[170] Rehearing Request at 69-70 (citing Response to Form Letter at 16-19).

supply of natural gas.[171]  In Asia, Petitioners argue that there is no increased need for LNG exports[172] and that Japan and South Korea have seen gas demand reductions and are either over-contracted[173] or will see further natural gas demand reductions due to increased renewables.[174]  Thus, Petitioners assert that there may not be any unmet demand and that there could be an oversupply within two years.[175]  Based on the foregoing, Petitioners argue that the Commission failed to discuss foreign market conditions in its evaluation of project benefits and should reevaluate the public interest.[176]

44.     As we explained above, "the [DOE] has exclusive jurisdiction over whether to approve natural gas exports."[177]  DOE has not delegated to the Commission any authority to approve or disapprove the import or export of the commodity itself.[178]  The Commission's authority under NGA section 3 applies "only to the siting and the operation of the facilities necessary to accomplish an export."[179]  The Commission "does not examine economic claims relating to the exportation of the commodity of natural gas,

---

[171] *Id.* at 70 (citing Response to Form Letters at Ex. 19; Kathrin Henneberger, German Member of Parliament, January 15, 2024 Comment at 1; German Civil Society January 16, 2024 Comment at 2).

[172] *Id.* at 70-74.  Petitioners note that the manufacturing sectors in Asian emerging markets compete with American manufacturing and that providing U.S. LNG to improve those nations may cause harm to the U.S. economy.  *Id.* at 72.

[173] *Id.* at 70-71 (citing Response to Form Letters at Ex. 26).

[174] *Id.* at 71-72 (citing Response to Form Letters at Ex. 27 & 28); *see also id.* at 72-73 (asserting that gas demand projections in emerging economies may be overblown and that the International Energy Administration (IEA) has revised Asia demand growth downward every year since 2018).

[175] *Id.* at 73-74 (citing Response to Form Letters at Ex. 27, 29); *see also id.* at 74 & Ex. 29 (stating that the Institute for Energy Economics and Financial Analysis (IEEFA) estimates global capacity to reach 666.5 MTPA by 2028 while the International Energy Agency (IEA) projects total LNG demand in 2050 to reach a maximum of 482 MTPA).

[176] *Id.* at 75.

[177] *Alaska LNG*, 67 F.4th at 1185.

[178] Authorization Order, 187 FERC ¶ 61,199 at P 27 & n.57.

[179] *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143, at P 13 (2022) (citing *Trunkline Gas Co.*, 155 FERC ¶ 61,328 at P 18).

which are within DOE's exclusive jurisdiction, nor [does] the Commission rely on these claims in determining that the siting, construction, and operation of the [export facility] [is] not inconsistent with the public interest."[180]  Accordingly, as discussed in the Authorization Order, we continue to decline to address claims regarding market demand for LNG, which are relevant only to the exportation of the commodity of natural gas, a matter within DOE's exclusive jurisdiction, and not implicated by our separate role reviewing proposed terminal sites and facilities.[181]

45.     Petitioners next assert that global gas markets are saturated and are unlikely to become more favorable in the future.[182]  They assert that approximately 73% of the LNG terminals authorized by the Commission have yet to be constructed and become operational, representing an additional 35.93 billion cubic feet per day (Bcf/d) of export capacity and that, even prior to DOE's temporary pause on LNG export approvals to non-FTA countries, DOE had already authorized 48 Bcf/d of U.S. natural gas, representing over 45% of current domestic production.[183]  Petitioners also argue that Venture Global's parent corporation and/or affiliates currently have two other facilities that are operating at less than nameplate capacity, including one next to the proposed CP2 LNG Project site, and that they have not been a reliable or trustworthy market actor due to their failure to perform under long-term contracts.[184]  Petitioners maintain that Venture Global's parent corporation and/or affiliates could increase market share and bolster fossil fuel export markets by constructing or reconfiguring existing facilities, including their own facilities.[185]

46.     We find Petitioners' arguments regarding excess capacity outside the scope of the Commission's jurisdiction.  Issues related to the impacts of natural gas development and production are related to DOE's authorization of the export and not the Commission's

---

[180] *Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 20; *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 48.

[181] Authorization Order, 187 FERC ¶ 61,199 at P 27; *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143 at P 13; *Jordan Cove Energy Project L.P.*, 170 FERC ¶ 61,202 at P 32.

[182] Rehearing Request at 59.

[183] *Id.* at 60.

[184] *Id.* at 60-61.

[185] *Id.* at 61.

siting of the facilities.[186]  Each of the proposed and approved projects identified by
Petitioners is either authorized, or has applied to DOE, to export to FTA countries.[187]
Because the NGA has deemed FTA exports to be in the public interest, we will not
consider speculative assertions that excess capacity is available from these projects to
substitute for the CP2 LNG Project.  In any event, the willingness of companies to build
facilities, and customers to sign contracts for capacity are appropriate indicators for
forecasting future demand for increased service 188 and, as we discussed above, although
it is outside of the Commission's NGA section 3 authority to assess market demand for
LNG exports, we view DOE's approval of applications to export LNG to FTA nations as
sufficient evidence of market demand.[189]

## 2.    CP Express Pipeline Project

### a.    Project Need

#### i.    Precedent Agreement

47.     Petitioners argue that the Commission's reliance on a single affiliate precedent
agreement, the lack of market need, and the fact that all of the capacity is destined for
export are insufficient to demonstrate market need for the CP Express Pipeline Project
under NGA section 7.[190]  Petitioners assert that a pipeline that the public cannot use or
benefit from cannot be required by the public convenience and necessity and that
landowners should not be subject to eminent domain.[191]  Petitioners maintain that the
Commission ignored contrary evidence in the record that more than half of the CP2 LNG

---

[186] Authorization Order, 187 FERC ¶ 61,199 at P 27; *Commonwealth LNG, LLC*,
181 FERC ¶ 61,143 at P 13 (citing *Freeport*, 827 F.3d at 46).

[187] *See* final EIS at 3-39 to3-40, tbl. 3.3.1-1 (detailing planned, proposed, or
approved LNG export terminals and expansions projects within the CP2 LNG Project
area and their capacity).

[188] *See generally Twp. of Bordentown, New Jersey v. FERC*, 903 F.3d 234, 262 (3d
Cir. 2018) ("If there were no objective market demand for the additional gas, no rational
company would spend money to secure the excess capacity."); *Trunkline Gas Co.*, 147
FERC ¶ 61,041, at P 20 (2014).

[189] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 47.

[190] Rehearing Request at 47-50, 52.

[191] *Id.* at 49.

Project may never be built, and that CP2 LNG has less than fifty percent of its offtake contracted for on a conditional basis.[192]

48.     Precedent agreements are significant evidence of demand for a project.[193]  A shipper's affiliation with a project sponsor does not lessen the shipper's need for capacity or its contractual obligation to pay for its subscribed service, absent plausible evidence of self-dealing or of exploitation of captive end use customers.[194]  When considering applications for new certificates, the Commission's primary concern regarding affiliates of the pipeline as shippers is whether there may have been undue discrimination against a non-affiliate shipper.[195]  Here, there is no evidence of impropriety or self-dealing to

---

[192] *Id.* at 50.  As explained below, LNG terminals have no captive customers to whom they can pass the costs associated with their transportation contract and, therefore, we find this argument unavailing.

[193] *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 110 n.10 (D.C. Cir. 2014) (*Minisink*); *Sierra Club v. FERC*, 867 F.3d 1357, 1379 (D.C. Cir. 2017) (*Sabal Trail*) (affirming Commission reliance on preconstruction contracts for 93% of project capacity to demonstrate market need)); Certificate Policy Statement, 88 FERC at 61,748 (precedent agreements, though no longer required, "constitute significant evidence of demand for the project")); *Twp. of Bordentown v. FERC*, 903 F.3d at 263 ("As numerous courts have reiterated, FERC need not 'look[] beyond the market need reflected by the applicant's existing contracts with shippers.'") (quoting *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 183 F.3d 1291, 1301, 1311 (D.C. Cir. 2015) (*Myersville*)); *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199 at *1 (D.C. Cir. Feb. 19, 2019) (*Appalachian Voices*) (unpublished) (precedent agreements are substantial evidence of market need); *see also Midship Pipeline Co.*, 164 FERC ¶ 61,103, at P 22 (2018) (long-term precedent agreements for 64% of the system's capacity is substantial demonstration of market demand); *PennEast Pipeline Co.*, 164 FERC ¶ 61,098 at P 16 (affirming that the Commission is not required to look behind precedent agreements to evaluate project need); *NEXUS Gas Transmission, LLC*, 160 FERC ¶ 61,022, at P 41 (2017), *order on reh'g*, 164 FERC ¶ 61,054 (2018), *aff'd in relevant part, Oberlin I*, 937 F.3d at 605 (finding need for a new pipeline system that was 59% subscribed).

[194] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 at P 45, *order on reh'g*, 163 FERC ¶ 61,197, at P 90 (2018), *aff'd, Appalachian Voices*, 2019 WL 847199 at *3; *see also, e.g.*, *Greenbrier Pipeline Co.*, 101 FERC ¶ 61,122, at P 59 (2002), *reh'g denied*, 103 FERC ¶ 61,024 (2003).

[195] *See* 18 C.F.R. § 284.7(b) (2024) (requiring transportation service to be provided on a non-discriminatory basis).

indicate anti-competitive behavior or affiliate abuse.  Accordingly, it is appropriate for the Commission to give credit to the precedent agreement in this case for transportation of gas that the shipper intends to liquefy for export.[196]

49.     Petitioners argue that this proceeding is analogous to *Environmental Defense Fund v. FERC*[197] because there is no evidence that the CP2 LNG Project will serve new load demand since all of the LNG is destined for overseas markets, there is evidence that global demand for LNG is decreasing, the CP2 LNG Project will not decrease costs paid by consumers and may actually increase costs, and there is only one affiliate precedent agreement.[198]

50.     Petitioners' reliance on *EDF* is misplaced.  The Commission frequently approves NGA section 7 applications in circumstances substantially similar to the instant proceeding, and "it is not an uncommon model for entities developing LNG terminals to construct and operate, through an affiliate, an associated pipeline to provide transportation and ensure delivery of the natural gas which will serve as feedstock for the liquefaction process."[199]  Unlike affiliated local distribution companies (such as those at issue in *EDF*), LNG terminals have no captive customers to whom they can pass the costs associated with their transportation contracts.[200]  Thus here, absent evidence of self-dealing or other anti-competitive behavior, the Commission views precedent agreements with affiliates like those with any other shipper for purposes of assessing the demand for capacity[201]—an affiliated shipper's need for new capacity and its obligation to pay for

---

[196] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 38.

[197] 2 F.4th 953 (D.C. Cir. 2021) (*EDF*).

[198] Rehearing Request at 50-51.

[199] *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 24 & n.39 (citing *Corpus Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135 (2019), *order on reh'g*, 181 FERC ¶ 61,033 (2022); *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131, *order on reh'g*, 170 FERC ¶ 61,046 (2020); *Venture Glob. Plaquemines LNG, LLC*, 168 FERC ¶ 61,204 (2019); *Port Arthur LNG, LLC*, 167 FERC ¶ 61,052 (2019); *Venture Glob. Calcasieu Pass, LLC*, 166 FERC ¶ 61,144).

[200] *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 24.

[201] *See EDF*, 2 F.4th at 975 (acknowledging that the Commission can "put precedent agreements with affiliates on the same footing as non-affiliate precedent agreements" so long as the Commission finds no evidence of self-dealing); *NEXUS Gas Transmission, LLC*, 160 FERC ¶ 61,022 at P 47; *see also E. Shore Nat. Gas Co.*, 181 FERC ¶ 61,233, at PP 15-16 (2022) (finding no evidence of self-dealing where

such service under a binding contract are not lessened simply because it is affiliated with the project sponsor.[202] Petitioners have presented no evidence of self-dealing or other anti-competitive behavior and, in the absence of such evidence, we find no occasion to look behind the precedent agreements.[203]

51.     Petitioners also attempt to distinguish the D.C. Circuit's recent holding in *Food & Water Watch v. FERC*[204] by explaining that there the Commission relied on more than a precedent agreement to support its finding of need, the precedent agreement was with a non-affiliate, and the Commission relied on well-documented gas shortages.[205]

---

affiliate local distribution company contracted for 100% of the firm transportation service created by construction of new compressor station).

[202] *Oberlin I*, 937 F.3d at 606 (citing *Appalachian Voices*, 2019 WL 847199 at *1); Certificate Policy Statement, 88 FERC at 61,748-49 ("[a]s long as the project is built without subsidies from existing ratepayers, the fact that it would be used by affiliated shippers is unlikely to create a rate impact on existing ratepayers"); *see id.* (stating that the focus will be on the impact of the project on the relevant interests balanced against the benefits to be gained from the project); *see also Millennium Pipeline Co.*, 100 FERC ¶ 61,277, at P 57 (2002) ("as long as the precedent agreements are long term and binding, we do not distinguish between pipelines' precedent agreements with affiliates or independent marketers in establishing market need for a proposed project.") (citing *Tex. E. Transmission Corp.*, 84 FERC ¶ 61,044 (1998)).

[203] *See EDF*, 2 F.4th at 975 ("FERC can put precedent agreements with affiliates on the same footing as non-affiliate precedent agreements (*i.e.*, it may 'fully credit[ ]' them), but only so long as FERC finds 'no evidence of self-dealing' or affiliate abuse and the pipeline operator 'bears the risk for any unsubscribed capacity.'") (citing *Oberlin I*, 937 F.3d at 605); *Nw. Alaskan Pipeline Co.*, 7 FERC ¶ 61,071, at 61,111 (1979) ("the applicants have the burden of demonstrating that their applications, as filed, meet the requirements of the [NGA] and the Alaska Natural Gas Transportation Act.  As a corollary, any party in opposition to the applications, as filed, has the burden of filing evidence to the contrary if such opposition depends upon facts to be established of record"); Certificate Policy Statement, 88 FERC ¶ at 61,744 ("the Commission gives equal weight to contracts between an applicant and its affiliates and an applicant and unrelated third parties and does not look behind the contracts to determine whether the customer commitments represent genuine growth in market demand").

[204] 104 F.4th 336 (D.C. Cir. 2024) (*East 300*).

[205] Rehearing Request at 51-52.

Petitioners also distinguish *Delaware Riverkeeper Network v. FERC*[206] and assert that there the applicant held an open season that resulted in precedent agreements with four shippers for most of the capacity, and most of the project consisted of the existing pipeline changing ownership.[207]  As discussed above, Petitioners' reliance on these cases ignores the Certificate Policy Statement and court precedent that absent plausible evidence of self-dealing, precedent agreements with affiliates will be considered on equal footing as precedent agreements with non-affiliates.[208]  Consistent with the Certificate Policy Statement, pipeline companies rely on a variety of indicators to demonstrate need, including precedent agreements with affiliates, precedent agreements with non-affiliates, and market studies to name a few.[209]  Accordingly, Petitioners' reference to past decisions involving a demonstration of need using any one or a combination of these factors that are different than those presented here is inapposite and ignores other past decisions to the contrary.[210]

## ii.     Export Considerations

52.     Next, Petitioners assert that the Commission conflates the standards under NGA sections 3 and 7 by crediting export agreements associated with the CP2 LNG Project toward a finding that the CP Express Pipeline Project is required by the public convenience and necessity and that the Commission fails to present any public use or

---

[206] 45 F.4th 104 (D.C. Cir. 2022) (*Adelphia*).

[207] Rehearing Request at 52.  We note that CP Express held an open season that resulted in CP2 LNG executing a binding precedent agreement with CP2 LNG for 100% of the firm transportation service provided by Phases I and II of the CP Express Pipeline Project.  Authorization Order, 187 FERC ¶ 61,199 at P 14.

[208] Certificate Policy Statement, 88 FERC at 61,748 (stating that the Commission, when it ended its policy of requiring pipelines to demonstrate a specific subscription rate, was reducing the significance of whether the precedent agreements are with affiliated or unaffiliated shippers); *Oberlin I*, 937 F.3d at 605-6 (upholding the Commission's treatment of affiliate precedent agreements as on par with non-affiliate agreements); *EDF*, 2 F.4th at 975 (requiring the Commission to look behind precedent agreements when presented with "plausible evidence of self-dealing").

[209] Certificate Policy Statement, 88 FERC at 61,747.

[210] *See, e.g.*, *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 24 (citing *Corpus Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135, *order on reh'g*, 181 FERC ¶ 61,033; *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131, *order on reh'g*, 170 FERC ¶ 61,046; *Venture Glob. Plaquemines LNG, LLC*, 168 FERC ¶ 61,204; *Port Arthur LNG, LLC*, 167 FERC ¶ 61,052; and *Venture Glob. Calcasieu Pass, LLC*, 166 FERC ¶ 61,144).

benefits that suggest that the CP Express Pipeline meets the Takings Clause's public use requirement.[211]  Additionally, Petitioners maintain that, unlike *Oberlin II*,  there are not myriad domestic benefits from the CP Express Pipeline and there is no increased likelihood that the natural gas will be re-imported to the United States.[212]  Petitioners argue that the Commission's obligation to consider market need under NGA section 7 is independent of DOE's NGA section 3 authority over exports and that the Commission failed to engage with arguments and evidence challenging the probative value of the precedent agreement.[213]  Petitioners assert that nothing in NGA section 3 divests the Commission of its obligation to determine market need when it considers an NGA section 7 pipeline and that the power of eminent domain conveyed by section 7 requires a more thorough analysis.[214]  Petitioners disagree with the Commission's assessment that it lacks authority to consider import and export market demand and asserts that DOE's approval or disapproval of gas exports under NGA section 3 is not dispositive of the Commission's approval or disapproval of the CP Express Pipeline Project under the more exacting NGA section 7 standard.[215]

53.     We find our analysis consistent with *Oberlin II*.  There, the court explained that "nothing in Section 7 prohibits considering export precedent agreements in the public convenience and necessity analysis."[216]  The court affirmed the Commission's decision to credit contracts for firm transportation of gas bound for Canada as evidence of need in the Commission's NGA section 7 analysis, given Congress's "clear statutory directive" that natural gas exports to FTA nations "shall be deemed to be consistent with the public interest."[217]  The court concluded that the Commission adequately explained that the

---

[211] Rehearing Request at 35, 44-45 (citing *Oberlin I*, 937 F.3d at 607 and *Oberlin II*, 39 F.4th at 727-29).

[212] *Id.* at 44.

[213] *Id.* at 52-53.

[214] *Id.* at 53.

[215] *Id.* at 53-54.

[216] *Oberlin II*, 39 F.4th at 726.

[217] *Id.* at 726-27 (approving the Commission's reliance on DOE's finding that exporting gas was "not inconsistent with the public interest" under NGA section 3, not as a substitute for the Commission's own finding under NGA section 7's "public convenience and necessity" standard but as a justification for giving precedent agreements for the transportation of gas destined for export the same weight that the Commission gives to other precedent agreements).

project would yield domestic benefits from increasing transportation services for gas shippers regardless of where the gas is ultimately consumed.[218]

54.     In the Authorization Order, the Commission found that CP Express had demonstrated a need for the project through a precedent agreement for 100% of the CP Express Pipeline Project's capacity with CP2 LNG.[219]  The Commission also explained that "it is not an uncommon model for entities developing LNG terminals to construct and operate, through an affiliate, an associated pipeline to provide transportation and ensure delivery of the natural gas which will serve as feedstock for the liquefaction process."[220]  Further, the Commission averred that "affiliated LNG terminals, unlike affiliated local distribution companies, have no captive customers to whom they can pass the costs associated with their transportation contracts." [221]  Additionally, the Commission noted that DOE authorized CP2 LNG to export domestically produced LNG from its CP2 LNG Project to FTA countries.[222]  As we have expressed in related proceedings, "[i]f the Commission were precluded from considering the benefits represented by precedent agreements with shippers transporting gas for export in determining whether the interstate facilities are required by the public convenience and necessity, Congress' directive and intent, as expressed in [NGA] section 3 and various trade agreements, would be thwarted."[223]  Moreover, as we have found for other projects that may transport gas for export, benefits of the CP Express Pipeline Project include adding new transportation options for producers and shippers; strengthening the domestic economy[224] and the international trade balance; and supporting domestic jobs in gas production and transportation.[225]  We continue to find that the Commission appropriately

---

[218] *Id.* at 727.

[219] Authorization Order, 187 FERC ¶ 61,199 at PP 37-38.

[220] *Id.* P 38 & n.74.

[221] *Id.* P 38 (citing *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 24).

[222] *Id.* P 8.

[223] *Tenn. Gas Pipeline Co.*, 178 FERC ¶ 61,199 at P 33; *NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199 at P 15.

[224] *See* final EIS at 4-257 to 4-299 (describing benefits, including to the local economy, employment, tourism, and tax revenue streams).

[225] *See NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199 at P 17, *aff'd*, *Oberlin II*, 39 F.4th at 727; *see also Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at P 15 ("Looking at the situation broadly, gas imports and exports benefit domestic markets; thus, contracts for the transportation of gas that will be imported or exported are

relied on the precedent agreement with CP2 LNG, the shipper and owner of an LNG terminal, as evidence of need in its NGA section 7 determination.[226]

55.    Petitioners disagree with the Commission's reliance on *Alaska Gasline Development Corporation*,[227] *Freeport*,[228] and *Sabine Pass*[229] to support its position that determinations related to the import and export of natural gas are strictly within DOE's purview.[230]    Petitioners assert that each of the cited cases concerned the Commission's review of facilities under NGA section 3 and that those decisions do not limit the Commission's obligation to consider market need under NGA section 7.[231]    But the Commission never asserted that the decisions referenced by Petitioners limited the Commission obligation to consider market need under NGA section 7.    Instead, the paragraph of the Authorization Order cited by Petitioners generally discusses the Commission's and DOE's separate obligations under NGA section 3.[232]    We find Petitioners' arguments unavailing.    Despite Petitioners' assertions, we note that the court in *Oberlin II*, addressing the Commission's review of pipeline facilities under NGA

---

appropriately viewed as indicative of a domestic public benefit.    The North American gas market has numerous points of export and import, with volumes changing constantly in response to changes in supply and demand, both on a local scale, as local distribution companies' and other users' demand changes, and on a regional or national scale, as the market shifts in response to weather and economic patterns.    Any constraint on the transportation of domestic gas to points of export risks negating the efficiency and economy the international trade in gas provides to domestic consumers.") (citation omitted).

[226] Authorization Order, 187 FERC ¶ 61,199 at P 38.

[227] 171 FERC ¶ 61,134 at P 15.

[228] 827 F.3d 36.

[229] 827 F.3d 59.

[230] Rehearing Request at 54-56 (citing Authorization Order, 187 FERC ¶ 61,199 at P 27).

[231] *Id.* at 54-55.

[232] Authorization Order, 187 FERC ¶ 61,199 at P 27.

section 7, recognized that the import and export of natural gas are strictly within DOE's purview.[233]

56.     Petitioners next state that *Evangeline Pass*'s holding that the Commission need not review indirect effects of exported gas because DOE has exclusive authority over exports does not absolve the Commission of its statutory obligation to consider evidence of market need under NGA section 7.[234]  Specifically, they assert that *Evangeline Pass* was limited to the Commission's environmental review under NEPA and not its evaluation of market need under NGA section 7.[235]  On the contrary, the D.C. Circuit in *Evangeline Pass* explained:

> [The Commission] and [DOE] share regulatory authority over natural gas.  Section 7 of the [NGA] allows [the Commission] to issue "a certificate of public convenience and necessity" to any entity that seeks to construct, operate, or expand an interstate natural gas pipeline.  However, Section 7 does not reach foreign commerce. Foreign commerce instead falls under Section 3 of the [NGA].  That section grants [the Commission] regulatory authority over the construction, operation, and expansion of export facilities.  But no section of the [NGA] gives [the Commission] authority over the exported gas itself.  Instead, the "exclusive authority" over exported gas belongs to [DOE].[236]

Indeed, the court includes a helpful table explaining the "distinct scopes of authority mandated by Congress."[237]  In any event, there is ample precedent supporting the Commission's use of precedent agreements to transport natural gas bound for export as evidence of market need and, therefore, we find Petitioners' argument without merit.[238]

---

[233] *Oberlin II*, 39 F.4th at 723.

[234] Rehearing Request at 55.

[235] *Id.*

[236] *Evangeline Pass*, 100 F.4th at 210 (citations omitted).

[237] *Id.*

[238] *See, e.g.*, *Oberlin II*, 39 F.4th at 726 ("Nothing in Section 7 prohibits considering export precedent agreements in the public convenience and necessity analysis."); *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at P 29 ("We believe that when considering a proposed project under section 7, it is appropriate to credit precedent agreements for transportation of gas volumes to facilities exporting LNG to countries

### iii.    **Additional Arguments**

57.    Petitioners assert that, had the Commission looked beyond the precedent agreement, there is unrebutted evidence showing no market need or public use for the CP Express Pipeline Project.[239]  They claim that the project will not serve domestic load growth, will increase domestic consumer costs, will harm domestic manufacturing competitiveness, and that the public cannot use or benefit from it.[240]  Petitioners also argue that, although DOE has approved exports to FTA countries, that approval did not entail any determination of the strength of the market for exports and that approval of Venture Global's pending non-FTA remains uncertain.[241]  Petitioners argue that the Commission's certification of the CP Express Pipeline Project under NGA section 7, amidst such market uncertainties and without a sufficient inquiry into the LNG market, was arbitrary and capricious.[242]

58.    The Commission takes a broad look in assessing actions that may accomplish Congress's goal to encourage orderly development of reasonably-priced supplies of natural gas.[243]  Congress directed, in NGA section 3(c), that the importation or exportation of natural gas from or to FTA nations "shall be deemed to be consistent with the public interest," and that such applications "shall be granted without modification or

---

with an FTA as supporting a public convenience and necessity finding."); *Columbia Gulf Transmission, LLC*, 178 FERC ¶ 61,198 at P 17 ("The Commission may rely on a pipeline sponsor's precedent agreements with an LNG export facility as evidence of need in its Section 7 finding."); *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 16 ("we continue to find that the Commission appropriately relied on a precedent agreement with Venture Global, the shipper and owner of an LNG terminal, as evidence of need in its NGA section 7 finding"); *NEXUS Gas Transmission, LLC*, 172 FERC ¶ 61,199 at PP 15-17 (finding that the Commission may "consider precedent agreements with shippers that plan to transport domestic gas for export to be evidence of the need for a proposed project, and hence a basis for a public convenience and necessity finding").

[239] Rehearing Request at 56, 61-62.

[240] *Id.* at 56.

[241] *Id.* at 58-59 (discussing DOE's temporary pause on approval of new LNG exports to non-FTA countries).

[242] *Id.* at 59.

[243] *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at PP 15-16; *NAACP v. FPC*, 425 U.S. 662, 669-70 (1976) (noting this principal purpose in the NGA alongside subsidiary purposes like addressing conservation, environmental, and antitrust questions).

delay."[244]  As we explained above, this standard sets out a general presumption favoring such authorizations.[245]  While these provisions of the NGA are not directly implicated by CP Express's application under NGA section 7(c), as we have previously explained, they do inform our determination that the proposed pipeline is in the public convenience and necessity because the pipeline will support the public interest of exporting natural gas to FTA countries.[246]  Given these congressional mandates, DOE's authorization for exports to FTA nations is sufficient regardless of any uncertainty at this time about proposed exports to non-FTA nations.  We therefore find, as we have done in similar instances, that it is permissible for the Commission to consider precedent agreements with LNG export facilities as one of the factors bearing on the public interest in its public convenience and necessity determination.[247]

59.     Petitioners next state that there is not sufficient market need because the CP Express Pipeline Project will potentially be commercially inoperable and, if operating only under Phase I, will be operating at less than 50% capacity.[248]  Specifically, Petitioners argue that the CP Express Pipeline Project's capacity will only be used if LNG is purchased from the CP2 LNG Project and that the commercial operability of both Projects is uncertain because of the contingent nature of Phase II of the CP2 LNG Project and the conditions placed on the LNG offtake agreements.[249]  Petitioners assert that the Commission's refusal to confront evidence bearing on market need or whether the CP Express Pipeline Project will provide benefits runs counter to the NGA.[250]

60.     We disagree.  The fact that the CP Express Pipeline will be built in two phases and initially operate at less than 50% capacity does not undermine our market need analysis. As an initial matter, it is not uncommon for projects to be built in phases for a number of

---

[244] 15 U.S.C. § 717b(c) (emphasis added); *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 39.

[245] *Alaska LNG*, 67 F.4th at 1188 (quoting *W. Va. Pub. Servs. Comm'n*, 681 F.2d at 856); *Freeport II*, 867 F.3d at 203; *EarthReports*, 828 F.3d at 953.

[246] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 39.

[247] *See, e.g.*, *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 16; *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 39; *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at PP 10-20.

[248] Rehearing Request at 57.

[249] *Id.* at 57-58.

[250] *Id.* at 61-62.

reasons unrelated to market need.[251]  In any event, as we explained in the Authorization Order and here on rehearing, CP2 LNG has already received authorization from DOE to export annually up to approximately 28 MTPA of LNG to FTA countries, i.e., the peak achievable capacity of Phases I and II.[252]  The CP Express Pipeline Project will supply feed gas to the CP2 LNG Project, providing up to 4,400,000 Dth/day of firm natural gas transportation service, built in corresponding phases.[253]  Nevertheless, CP Express executed a binding precedent agreement with CP2 LNG for 100% of the firm transportation service provided by Phases I and II of the CP Express Pipeline Project for a term of twenty years at negotiated rates.[254]  This precedent agreement represents significant evidence of market need and is not undermined by Petitioners' contentions. Petitioners' suggestion that CP2 LNG will not have sufficient offtake agreements in the future to handle 100% of CP Express Pipeline's capacity is speculative, unsupported, and belied by the evidence in the record.[255]  In any event, CP2 LNG has no captive customers to whom they can pass the costs associated with their transportation contracts[256] and CP Express is at risk for underutilization of the facilities if it does not contract for their full

---

[251] *See, e.g.*, *Port Arthur LNG, LLC*, 187 FERC ¶ 61,058, at P 3 (2024) (construction to occur in three phases);; *Driftwood LNG LLC*, 167 FERC ¶ 61,054 at P 13 (construction of pipeline to occur in three phases to match corresponding construction schedule of LNG facility).  We note that a project sponsor may choose to phase the development of its projects for ease of construction, physical route complexity, permitting timeline constraints, or completion of environmental studies and mitigation.

[252] Authorization Order, 187 FERC ¶ 61,199 at P 8 (citing *Venture Global CP2 LNG, LLC*, FE Docket No. 21-131-LNG, Order No. 4812 (Apr. 22, 2022)).

[253] *Id.* P 10.

[254] *Id.* P 14.  CP Express is required to affirm that it has executed firm contracts for the capacity levels and terms of service represented in the signed precedent agreements, prior to commencing construction.  *Id.* at ordering para. (G).

[255] *See* Rehearing Request at 58 (listing firm offtake agreements for 9.25 MTPA, approximately half of the total nameplate capacity of both phases); *see also* Venture Global August 13, 2024 Answer to Motion for Stay at 18 (identifying offtake agreement for an additional 2 MTPA, thus exceeding the nameplate capacity of Phase I).  It is speculative to assume CP2 LNG will not have sufficient offtake agreements when its facility is operational, particularly since it already has sufficient offtake agreements for at least Phase I prior to construction activities even taking place.

[256] Authorization Order, 187 FERC ¶ 61,199 at P 38.

capacity.[257]  Accordingly, the evidence in this proceeding supports the market demand for both phases of the CP Express Pipeline Project.[258]

### b.     Impacts on Landowners

61.     Petitioners also argue that landowners face harms from signing easement agreements under the threat of eminent domain, reduced property values, noise and ground disturbance, financial losses and damage to their local businesses, and increased air pollution.[259]  Petitioners disagree with the Commission's conclusion that the CP Express Pipeline Project is not expected to have more than a negligible effect on property values and claim that the Commission failed to account for safety concerns, increased insurance costs, and financial damage to local businesses.[260]

62.     As the Commission has previously explained, we encourage companies to address all of the potential impacts raised by Petitioners through landowner negotiations.[261]  The landowner easement agreement process provides an opportunity for landowners to express their concerns to the pipeline company and to negotiate site-specific plans to

---

[257] *Id.* P 55.  We note that if future circumstances require modifications to CP Express's certificate, it may seek an amendment.  *Transcon. Gas Pipe Line Co.*, 141 FERC ¶ 61,091, at P 84 (2012) ("Transco subsequently filed to downsize its originally-proposed Market Link Expansion Project and to construct it in two phases (Phase I and II) over two years to meet a revised market need.").

[258] Under NGA section 7(e), the Commission considers whether a project is required by the present or *future* public convenience and necessity.  *See Oberlin II*, 39 F.4th at 728 (emphasizing that NGA section 7(e) "allow[s] FERC to grant a certificate when the facility 'is *or will be* required by the present *or future* public convenience and necessity'") (emphasis added in original) (citing 15 U.S.C. § 717f(e).

[259] Rehearing Request at 82.

[260] *Id.* (citing Authorization Order, 187 FERC ¶ 61,199 at P 41); *see also id.* at 82-83 (citing, as an example, impacts to Jerryd Tassin's property and business).

[261] *Cheyenne Connector, LLC*, 168 FERC ¶ 61,180, at P 111 (2019) ("The Commission encourages applicants to obtain easements from landowners through mutually negotiated agreements.").  *Midwestern Gas Transmission Co.*, 116 FERC ¶ 61,182, at P 142 (2006) (stating that the Commission encourages applicants and landowners to discuss environmental, construction, and right-of-way issues within the easement agreement negotiations to ensure that property owners' interests are considered).

meet their needs.[262]   Typically, the landowners themselves are in the best position to
determine the sufficient level of compensation and method of payment that would best
suit their situation.[263]   The Commission's general policy is to encourage applicants to
negotiate for the use of a right-of-way or workspace as opposed to using eminent
domain.[264]   The Commission also encourages pipeline companies to engage with project
stakeholders throughout the life of the project, and provide all stakeholders and
potentially impacted residents with informational materials, and hold community
meetings to enable stakeholders to learn about the project, and educate project developers
about local concerns.[265]

63.     Here, we agree with the findings in the Authorization Order that CP Express has
taken appropriate steps to minimize adverse economic impacts on landowners and
surrounding communities.[266]   The CP Express Pipeline Project's location and design were
selected to minimize impacts to landowners, and CP Express revised its pipeline route
based on conversations with landowners during the pre-filing process to reduce those
impacts to the extent practicable.[267]   Addressing substantially similar arguments to those
raised by Petitioners, the Commission responded that the CP Express Pipeline Project is
not expected to have more than negligible effects on property values, that the final EIS
included protective conditions, adopted in the Authorization Order, to mitigate
construction impacts on landowner property,[268] and further noted that as of June 2022,
CP Express had secured purchase/lease agreements for 94% of the project's aboveground
facilities and anticipated that it would be able to secure agreements for the remaining

---

[262] *Mountain Valley Pipeline, LLC*, 171 FERC ¶ 61,232, at P 138 (2020).

[263] *Midwestern Gas Transmission Co.*, 116 FERC ¶ 61,182 at P 61.

[264] *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048, at P 241 (2016);
*see also Midwestern Gas Transmission Co.*, 116 FERC ¶ 61,182 at P 142 (stating
that the Commission encourages applicants and landowners to discuss environmental,
construction, and right-of-way issues within the easement agreement negotiations to
ensure that property owners' interests are considered).

[265] *PennEast Pipeline Co.*, 162 FERC ¶ 61,053, at P 39 (2018), *vacated on other
grounds*, 177 FERC ¶ 61,197 (2021) (citing FERC, *Suggested Best Practices for Industry
Outreach Programs to Stakeholders* at 11-17 (2015)).

[266] Authorization Order, 187 FERC ¶ 61,199 at P 40.

[267] *Id.* (citing final EIS at 3-37).

[268] *Id.* P 41 (citing final EIS at 4-298).

aboveground tracts.[269]  We note that, to the extent CP Express has not reached an agreement with landowners, the issues and effects raised by Petitioners will be resolved through the eminent domain process.[270]  Accordingly, we find that the Commission adequately addressed landowner concerns regarding the economic impact of the project on the use and value of their land.

### D.     **Public Benefits**

64.     Petitioners assert that the Commission failed to articulate any public benefits to justify authorization of the CP Express Pipeline Project under NGA section 7.[271] Petitioners argue that the need for the CP Express Pipeline Project comes from the affiliate precedent agreement with CP2 LNG, and that there is no nexus with domestic usage, sale, or consumption, and thus, no public benefit.[272]  They argue that the need analysis must center on how the project benefits U.S. consumers since the purpose of the NGA is to protect U.S. consumers from corporate abuse and "encourage the orderly development of gas infrastructure at reasonable prices."[273]  Petitioners claim that export pipelines and affiliate precedent agreements do not provide any of the benefits outlined in the Certificate Policy Statement.[274]  They contend that the Commission failed to articulate benefits related to the CP Express Pipeline Project, other than noting in its NGA section 3 analysis that the CP2 LNG Project will contribute to energy security in Japan, Germany, and globally, and failed to explain whether or how these international benefits informed its NGA section 7 analysis or how global benefits will benefit the U.S domestic public

---

[269] *Id.* (citing final EIS at 4-299).

[270] *Midwestern Gas Transmission Co.*, 116 FERC ¶ 61,182 at P 65 ("In an eminent domain proceeding, the court will require the pipeline to compensate the landowner for the economic value of the right-of-way, as well as for any damages incurred during construction.  The level of compensation paid in a condemnation proceeding would be determined by the court.").

[271] Rehearing Request at 62.

[272] *Id.*

[273] *Id.*

[274] *Id.* (describing public benefits as including meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives) (citing Certificate Policy Statement, 88 FERC at 61,744).

interest.[275]  Specifically, Petitioners assert that the Commission failed to appropriately weigh and consider investments and employment,[276] tax incentives and indirect benefits,[277] global demand and national security,[278] and benefits to natural gas producers and other public interest benefits.[279]

65.    As an initial matter, we note that, in describing the public benefits, Petitioners largely cite to the Commission's socioeconomic discussion regarding the CP2 LNG Project and assert that the Commission failed to appropriately consider these benefits, or lack of benefits, in its NGA section 7 analysis.[280]  Petitioners appear to conflate the Commission's evaluation of the socioeconomic impacts under NEPA with the Commission's determination of project need under the public convenience and necessity standard of NGA section 7.[281]  Petitioners also appear to conflate the Commission's consideration of the public benefits and the potential harms from the CP Express Pipeline Project under NGA section 7 with the Commission's approval of the CP2 LNG Project under NGA section 3 and its consideration of evidence on the issue of whether the project is inconsistent with the public interest.[282]  In NGA section 7 proceedings, the environmental analysis under NEPA, including socioeconomic impacts, is one part of the Commission's analysis used to decide whether and under what terms to authorize construction.[283]  NGA section 3's public interest standard is distinct from NGA section

---

[275] *Id.* at 63.

[276] *Id.* at 64-67.

[277] *Id.* at 67-69.

[278] *Id.* at 69-74.  As noted above, the Commission does not authorize the importation or exportation of the commodity itself.  Therefore, impacts and effects of global demand are outside the scope of this proceeding.  *See supra* P 35.

[279] Rehearing Request at 74-75.

[280] *Id.* at 64-67 (investments and employment); *id.* at 67-69 (tax incentives and indirect benefits); *id.* at 69-74 (global demand and national security); *id.* at 74-75 (benefits to natural gas producers and other public interest benefits).

[281] 15 U.S.C. § 717f(e).

[282] *See Annova LNG Common Infrastructure, LLC*, 169 FERC ¶ 61,132, at P 18 (2019), *order on reh'g*, 170 FERC ¶ 61,139 (2020).

[283] Certificate Policy Statement, 88 FERC ¶ at 61,749.

7's public convenience and necessity standard.[284]  As explained above, NGA section 3 sets out a general presumption favoring authorizations; it does not charge the Commission with demonstrating that the benefits of a proposal outweigh its potential harms.[285]  As discussed below, the Commission adequately evaluated community investment, employment, and tax incentives.[286]

66.     With regard to NGA section 7, and consistent with the Certificate Policy Statement, the Commission determined that there is no potential for subsidization on the CP Express Pipeline Project,[287] that CP Express's precedent agreement with CP2 LNG for 100% of the CP Express Pipeline Project's capacity constituted significant evidence of project need,[288] that the CP Express Pipeline Project will not have adverse impacts on existing shippers or other pipelines and their existing customers, and that the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.[289]  The Commission then analyzed the environmental impacts, including socioeconomic impacts,[290] of the project.  Accordingly, the Commission satisfied the required analysis under the NGA, which is informed by but differs from the required analysis under NEPA.[291]

67.     Finally, Petitioners assert that, although the Commission did not allege any benefits to gas producers, production, or enhanced supply diversity, to the extent the Commission tries to do so on rehearing, Petitioners argue that there will be no domestic

---

[284] *See Annova LNG Common Infrastructure, LLC*, 169 FERC ¶ 61,132 at P 18; *Cameron LNG, LLC*, 104 FERC ¶ 61,269, at P 12 (2003); *see also Atl. Richfield Co.*, 50 FERC at 61,667 ("Section 7 requires that an affirmative finding of public necessity be made before authorization may be granted, while section 3 requires a finding of detriment to the public interest be made before authorization may be denied.").

[285] *Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 16; *Alaska Gasline Dev. Corp.*, 172 FERC ¶ 61,214 at P 16 (noting that section 3 is "decidedly different standard than exists under section 7 of the NGA").

[286] *See infra* section III.E.7.

[287] Authorization Order, 187 FERC ¶ 61,199 at P 36.

[288] *Id.* P 37.

[289] *Id.* P 42

[290] Final EIS at 4-257 to 4-329.

[291] *See Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,200, at P 32 (2024).

benefits from the CP Express Pipeline Project and that the Commission has disclaimed any ability or authority to rely on such benefits or related impacts based on the D.C. Circuit's finding that DOE, not the Commission, has exclusive authority over the effects of LNG exports on gas production and use.[292]

68.    As we explained above, given the NGA has deemed FTA exports to be in the public interest, we need not rely on the benefits put forth by Petitioners. Nevertheless, we view transportation service for all shippers as providing domestic public benefits, and do not weigh various prospective end uses differently for the purpose of determining need.[293] This includes shippers transporting gas in interstate commerce for eventual export, since such transportation will provide domestic public benefits, including: adding new transportation options for producers and shippers; boosting the domestic economy[294] and the balance of international trade; and supporting domestic jobs in gas production and transportation.[295]

69.    Nevertheless, upstream natural gas producers will benefit from the project by being able to access additional markets for their product.[296]  And, as already determined by DOE, exportation of the natural gas to FTA countries is not inconsistent with the public interest.  The final EIS found that the Projects would result in an increase in the local population,[297] increased employment opportunities, increased demand for housing and public services, and an increase in state and local government revenues.[298]  The final EIS concluded that construction of the Projects would result in minor positive economic

---

[292] Rehearing Request at 74 (citing Authorization Order, 187 FERC ¶ 61,199 at PP 27, 166 and *Freeport*, 827 F.3d at 47-48).

[293] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 40; *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at P 18.

[294] *See* final EIS at 4-257 to 4-299 (describing benefits, including to the local economy, employment, tourism, and tax revenue streams).

[295] *Jordan Cove Energy Project L.P.*, 171 FERC ¶ 61,136 at P 40; *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at P 18.

[296] *Oberlin II*, 39 F.4th at 727 (concluding that the Commission adequately explained that the project would yield domestic benefits from increasing transportation services for gas shippers regardless of where the gas is ultimately consumed); *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 15.

[297] Final EIS at 4-258 to 4-260.

[298] *Id.* at 4-257 to 4-258.

impacts[299] and would not have a significant adverse impact on local populations, employment, provision of community services, housing, or property values.[300]  The final EIS also concluded that operation of the Projects would have a minor positive effect on the local governments' tax revenues due to the increase in property taxes that would be collected.[301]  Accordingly, we find that there is a net positive benefit to the domestic economy.  Any public benefit, no matter how small, in addition to the significant evidence of need as demonstrated by the long-term, binding precedent agreement executed with CP2 LNG, furthers the Commission's finding that the CP Express Pipeline Project is required by the present or future public convenience and necessity.  And, despite Petitioners' assertions, the fact that the Commission noted these benefits does not charge the Commission with considering potential downstream or upstream effects.[302]  Therefore, we continue to find that the CP Express Pipeline Project is required by the public convenience and necessity and that the purportedly conflicting evidence in the record[303] does not outweigh the significant evidence of market need as demonstrated by the long-term, binding precedent agreement.

     **E.**       **<u>NEPA</u>**

         **1.**       **<u>Purpose and Need</u>**

70.     Petitioners assert that, contrary to NEPA, the Commission adopted Venture Global's statements of purpose and need without modification and failed to engage in an independent inquiry on the issue, despite comments stating that the purpose and need

---

    [299] These minor positive impacts would be due to increases in construction jobs, payroll taxes, purchases made by the workforce, and expenses associated with the acquisition of material goods and equipment.  *Id.* at 1-12.

    [300] *Id.*

    [301] *Id.* at 1-13.

    [302] *See Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1478 (D.C. Cir. 1990) (*NWF*) (stating that the Commission's consideration of a particular benefit as one factor in its evaluation of the project did not bind it to consider harms and benefits); *Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 16.

    [303] *See* Rehearing Request at 56-62 (asserting that that the CP Express Pipeline Project will only operate at 50% capacity and is contingent on the CP2 LNG Project, that it will not serve domestic load growth, and that DOE's approval of exports to FTA nations did not entail an examination of foreign market strength).  As discussed herein, we dispute these unsupported contentions.

statements were too narrow.[304]  Petitioners maintain that the Commission's approach fell below standards set by Council on Environmental Quality's (CEQ) regulations that agencies summarize the underlying purpose and need rather than adopt Venture Global's statement, limiting the Commission's analysis of alternatives.[305]

71.     NEPA provides that agencies include "a detailed statement" of "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal."[306]  An agency uses the purpose and need statement to define the objectives of a proposed action and then to identify and consider reasonable alternatives.[307]  Courts have upheld federal agencies' incorporation of applicants' project purpose and need in environmental documents and as a basis for evaluating alternatives.[308]  When an agency is asked to consider a specific proposal, the needs and goals of the applicant should be taken into account.[309]

72.     We recognize that a project's purpose and need may not be so narrowly defined as to preclude consideration of reasonable alternatives.  Nonetheless, an agency need only consider alternatives that will bring about the ends of the proposed action, and the evaluation is "shaped by the application at issue and by the function that the agency plays

---

[304] Rehearing Request at 111-14.

[305] *Id.* at 114.

[306] 42 U.S.C. § 4332(c)(iii) (stating that agencies must include "a detailed statement" of "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal."); *see* 40 C.F.R § 1502.13 (2022).

[307] *See Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999).

[308] *E.g.*, *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (*City of Grapevine*); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) (*Citizens Against Burlington*) (explaining that the evaluation of alternatives is "shaped by the application at issue and by the function that the agency plays in the decisional process").

[309] *Citizens Against Burlington*, 938 F.2d at 196; *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,047, at P 48 (2024).

in the decisional process."[310]  Moreover, because the alternatives considered under NEPA are informed both by "the project sponsor's goals," [311] as well as "the goals that Congress has set for the agency,"[312] i.e., the goals set in enacting the NGA, the Commission's consideration of alternatives includes the no-action alternative and reasonable alternatives that achieve the purpose of the project.

73.     The Commission does not plan, design, build, or operate natural gas transmission infrastructure.[313]  As an independent regulatory commission, the Commission reviews proposals to construct and operate LNG and certain pipeline facilities.[314]  Accordingly, the project proponent may appropriately be a source for identifying the purpose for developing, constructing, and operating a project.[315]

74.     As explained in the final EIS, the purpose of the CP2 LNG Project "is to liquefy, store, and export a nameplate liquefaction capacity of 20 MTPA of liquefied LNG, with approximately 28.0 MTPA capacity possible under optimal conditions, to overseas markets via marine transport by ocean-going vessels," and to "promote a global natural gas trade and greater diversification of global supplies."[316]  This purpose and need statement is consistent with court and Commission precedent and we find that the final EIS appropriately relied on CP2 LNG's stated purpose and need for the CP2 LNG Project.[317]  The purpose of the CP Express Pipeline "is to create the firm transportation capacity needed to transport 4.4 billion cubic feet per day (Bcf/d) of feed gas required for the proposed LNG export operations from natural gas supply points in east Texas and southwest Louisiana to the Terminal Facilities."[318]  Courts have found that a statement of purpose and need for a Commission-jurisdictional natural gas pipeline project that

---

[310] *Citizens Against Burlington*, 938 F.2d at 199.

[311] *Id.* at 196.

[312] *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 598-99 (4th Cir. 2018).

[313] Final EIS at 1-3.

[314] *Id.*

[315] *Id.*

[316] *Id.*

[317] *City of Grapevine*, 17 F.3d at 1506; *Alaska Gasline Dev. Corp.*, 172 FERC ¶ 61,214 at P 37.

[318] Final EIS at 1-3.

explained where the gas must come from, where it will go, and how much the project would deliver, allowed for a sufficiently wide range of alternatives but was narrow enough that there were not an infinite number of alternatives.[319]  We find the Commission's articulation of the purpose and need for the Projects to be consistent with court precedent.[320]

## 2.   **Alternatives**

### a.   **No-Action Alternative**

75.     Petitioners also disagree with the Commission's no-action alternative analysis,[321] asserting that it does not comply with CEQ guidance.[322]  They maintain that the Commission's no-action alternative analysis is not a genuine no-action alternative because the Commission's purpose and need statement and view of energy sources available to end-users were too narrow.[323]  Therefore, Petitioners assert that the no-action alternative fails to serve as an appropriate "measuring stick" to compare the benefits of the proposed action with the environmental impacts.[324]

---

[319] *Sierra Club v. U.S. Forest Serv.*, 897 F.3d at 598-99.

[320] *Id.* at 598 ("We have explained, 'The statement of a project's purpose and need is left to the agency's expertise and discretion, and we defer to the agency if the statement is reasonable.' . . . . We further explained that we should consider 'the nature of the proposed federal action' informed by 'the project sponsor's goals,' as well as 'the goals that Congress has set for the agency.'") (quoting *All. for Legal Action v. F.A.A.*, 69 F. App'x 617, 622 (4th Cir. 2003)) (internal citations omitted); *see Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 84.

[321] Rehearing Request at 114-15 (citing final EIS at 3-37).

[322] *Id.* at 115 (citing CEQ, *Forty Most Asked Questions Concerning CEQ's Nat'l Env't Pol'y Act Reguls.*, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981) (defining "no action" in instances involving federal decisions on proposals for projects and reminding all federal decision makers not to "simply assume that if the federal action does not take place, another action will perfectly substitute for it and generate identical emissions, such that the action's net emissions relative to the baseline are zero.")).

[323] *Id.*

[324] *Id.* at 114-15.

76.     An agency may eliminate alternatives that will not achieve a project's goals or are otherwise unreasonable.[325]  "Agencies may reject unreasonable alternatives after only brief discussion" when those alternatives are impractical or fail to further the proposed action's purpose.[326]  It is well-settled that NEPA does not mandate particular results, including the selection of the least environmentally damaging alternative, so long as each alternative is adequately discussed and a brief explanation is provided for why an alternative is rejected.[327]

77.     Here, the final EIS concluded that, under the no-action alternative, "the Project would not be developed and CP2 LNG's and CP Express's objective of liquefying and exporting natural gas to foreign markets would not be realized" and, thus, the potential environmental impacts discussed in the final EIS would not occur.[328]  The final EIS provided a sufficient "measuring stick" for comparison of the impacts of the proposed action.[329]  Indeed, "courts have upheld similarly brief descriptions of no action alternatives, noting that 'merely because a no action proposal is given a brief discussion does not suggest that it has been insufficiently addressed.'"[330]  An agency does "not act unreasonably in rejecting the no-action alternative on the ground that it would not meet

---

[325] *Alaska LNG*, 67 F.4th at 1182.

[326] *Id.* ("An alternative is reasonable if it is 'technically and economically practical or feasible and meet[s] the purpose and need of the proposed action.' 43 C.F.R. § 46.420(b) (2019). . . . 'NEPA's injunction that agencies consider the environmental impacts of "all reasonable alternatives" does not substantively constrain an agency's choice of objectives.'. . . . '[S]ome alternatives will be impractical or fail to further the proposed action's purpose'") (citation omitted).

[327] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 352 (1989) (*Methow Valley*); 40 C.F.R. § 1502.14(a) (2022) (stating that agencies shall "[e]valuate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination"); *see also Alaska LNG*, 67 F.4th at 1182 ("Because some alternatives will be impractical or fail to further the proposed action's purpose, agencies may reject unreasonable alternatives after only brief discussion.").

[328] Final EIS at 3-37.

[329] *See El Paso Nat. Gas Co.*, 136 FERC ¶ 61,175, at PP 11-12 (2011) (concluding that substantially similar language was sufficient).

[330] *Id.* PP 11-12 (quoting *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998) (*Morrison*)).

the purpose and need of the proposed project."[331]  Here, the final EIS observed that, although it would be speculative to predict what actions may occur, "if the no-action alternative is selected, it is possible that renewable energy sources (e.g., solar power), traditional energy sources (e.g., coal or fuel oil), or traditional long-term energy sources (e.g., nuclear power) could be used in lieu of the Projects.[332]  It also noted that "the location of the facility and use of the fuel (electricity, heating, industrial feed stock, etc.) would also be speculative" and that "alternative energy sources would not meet the Project[s] objective of liquefying natural gas for export and are beyond the scope of [the final EIS]."[333]  Based on the foregoing, we find that the final EIS sufficiently defined and considered the no-action alternative and appropriately determined that the no-action alterative outcome, although speculative, would not meet the Projects' stated purpose and need.[334]

### b.    CCS System Alternatives

78.    Petitioners also argue that the Commission failed to explore other, more extensive CCS alternatives.[335]  Petitioners maintain that CP2 LNG only proposes to capture emissions from the pipeline gas pretreatment process, amounting to only 5% of total GHG emissions, and that the Commission should have considered alternatives such as post-combustion CCS which would avoid or mitigate larger amounts of GHG emissions.[336]  They argue that the Commission failed to address multiple comments requesting such alternatives.[337]  Petitioners assert that, contrary to NEPA, the Commission failed to meaningfully respond to comments requesting consideration of

---

[331] *Morrison*, 153 F.3d at 1067; *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005) ("Alternatives that do not advance the purpose of the [project] will not be considered reasonable or appropriate.").

[332] Final EIS at 3-37.

[333] *Id.*

[334] *Id.*

[335] Rehearing Request at 165.

[336] *Id.* at 165-66.

[337] *Id.* at 166 (citing For a Better Bayou March 13, 2023 Comments to DEIS at 19-20; NRDC March 13, 2023 Comments to DEIS at 9-10)

such alternatives and also disagree with the Commission's assessment that the use of CCS beyond what is proposed is outside the scope of the final EIS.[338]

79.     As we explained above, NEPA requires the Commission "to evaluate the environmental impacts from a proposal before the Commission, including reasonable alternatives to the proposal, but . . . NEPA does not require a detailed analysis of every alternative proposed."[339]  The Commission may reject alternatives when the alternatives are deemed only remote and speculative possibilities, or where the alternatives will be impractical or fail to further the proposed action's purpose.[340]  Moreover, an agency's consideration of alternatives under NEPA is "shaped by the application at issue and by the function that the agency plays in the decisional process."[341]  Courts review both an agency's stated project purpose and its selection of alternatives under the "rule of reason," where an agency must reasonably define its goals for the proposed action, and an alternative is reasonable if it can feasibly achieve those goals.[342]  Where, as here, a federal agency is not the sponsor of a project, "the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor *in the siting and design of the project*."[343]

80.     Here, each alternative was evaluated to determine whether it would:  (1) meet the stated purpose of the project; (2) be technically and economically feasible and practical; and (3) offer a significant environmental advantage over the proposed action.[344]  Although Petitioners assert that the Commission should have considered more extensive CCS alternatives, such as post-combustion CCS, Petitioners fail to explain whether such an alternative is technically and economically feasible and practical, or how such an

---

[338] *Id.* (citing final EIS at 4-561, app'x N-61 & N-21).

[339] *Weaver's Cove Energy, LLC*, 114 FERC ¶ 61,058, at P 68 (2006).

[340] *Ala. v. U.S. Army Corps of Eng'rs*, 704 F. Supp. 3d 20, 133 (D.D.C. 2023) (D.D.C. Nov. 9, 2023) (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978) (*Vt. Yankee*) and *Alaska LNG*, 67 F.4th at 1182).

[341] *Tex. E. Transmission, LP*, 185 FERC ¶ 61,038, at P 37 (2023) (citing *Citizens Against Burlington*, 938 F.2d at 199).

[342] *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133, at P 115 (2023).

[343] *City of Grapevine*, 17 F.3d at 1506 (quoting *Citizens Against Burlington*, 938 F.2d at 197) (emphasis added); *Saguaro Connector Pipeline, LLC*, 188 FERC ¶ 61,029 at P 104; *Transcon. Gas Pipe Line Co.*, 185 FERC ¶ 61,133 at P 115.

[344] Final EIS at 3-36.

alternative would offer a significant environmental advantage.  In particular, although Petitioners argue that the Commission failed to address specific comments, we note that the referenced comments only contained generalized assertions that the Commission should consider more "aggressive," "ambitious," or "robust" CCS facilities without providing specific alternatives for the Commission to address.[345]  As we have stated in prior proceedings, "a broad analysis, based on generalized assumptions rather than reasonably specific information, will not meaningfully help the Commission make decisions, e.g., evaluating potential alternatives."[346]  The Commission "need not 'undertake exhausting inquiries, probing for every possible alternative, if no viable alternatives have been suggested by the parties, or suggest themselves to the agency.'"[347] The burden was on Petitioners to develop such contentions.[348]  In any event, as stated below, the CCS facilities outside of the CP2 LNG Project fence-line are outside of the Commission's jurisdiction, and the Commission is not required to include reasonable alternatives not within the jurisdiction of the lead agency.[349]

### 3.  GHGs

81.    Petitioners raise two arguments in support of their contention that the Commission failed to properly consider GHG emissions:  (1) the Commission erred by not determining whether the Projects' GHG emissions were significant;[350] and (2) the Commission erred by not evaluating the "effects" and "significance" of the GHG emissions.[351]  Petitioners assert several variations of the same essential argument, that the Commission is required by regulations, both the Commission's and CEQ's, and by

---

[345] For a Better Bayou March 13, 2023 Comments to DEIS at 19-20; NRDC March 13, 2023 Comments to DEIS at 9-10; *see also* Rehearing Request at 166 (citing Commission staff responses to comments in final EIS at 4-561 and final EIS, app'x N-61, N-21).

[346] *Dominion Transmission, Inc.*, 155 FERC ¶ 61,234, at P 24 (2016).

[347] *Minisink*, 762 F.3d at 111 & n.9 (quoting *Citizens for Allegan Cnty., Inc. v. FPC*, 414 F.2d 1125, 1133 (D.C. Cir. 1969)).

[348] *Fla. Gas Transmission Co.*, 8 FERC ¶ 61,039, at 61,115 (1979) (citing *Sierra Club* v. *Calloway*, 499 F.2d 982 (5th Cir. 1974)).

[349] *Infra* section III.E.6.

[350] Rehearing Request at 117-20.

[351] *Id.* at 120-25.

Commission practice to make a binary, case-specific determination of the significance of the Projects' GHG emissions.[352]

82.     We disagree.  The Commission has fulfilled its responsibilities under NEPA to consider reasonably foreseeable GHG emissions attributable to the project.  As discussed below, we are not obligated to make a binary determination of the significance of the climate impacts based on those emissions, nor are we required to do so for impacts for which the significance is unknown.

### a.     The Commission is not required to make a significance determination when an EIS is prepared.

83.     The D.C. Circuit's recent decision in *East 300* affirmed that neither NEPA, nor CEQ's NEPA-implementing regulations, nor circuit precedent require that the Commission formally label a project's reasonably foreseeable GHG emissions as "significant or insignificant."[353]  The court held that the Commission "amply discussed the 'significance' of . . . emissions—by estimating the amount of increased emissions, comparing them to national and statewide totals, setting forth downstream harms in qualitative terms, and even giving monetary, present-value estimates of the harms."[354]

84.     NEPA requires the Commission to discuss the environmental effect of any action "significantly" affecting the quality of the human environment.[355]  As the

---

[352] *See generally id.* at 116-25.

[353] 104 F.4th at 346.

[354] *Id.*; *see also Evangeline Pass*, 100 F.4th at 214 (affirming use of this analysis); *Alaska LNG*, 67 F.4th at 1183-84 (same).  *C.f. N.J. Conservation Found. v. FERC*, 111 F.4th 42, 55-56 (D.C. Cir. 2024) (*N.J. Conservation Found.*) (finding *East 300* inapplicable based on Court's finding that the Commission did not dispute in the present proceeding, that "it is generally obligated to make a significance determination for each category of emissions.").

[355] 42 U.S.C. §4332(2)(C); *Env't Health Tr. v. FCC*, 9 F.4th 893, 900 (D.C. Cir. 2021) (explaining that agency must prepare an environmental impact statement "if the agency proposes a major Federal action that stands to significantly affect the quality of the human environment") (quoting 42 U.S.C. § 4332(C) (cleaned up)).

*East 300* court recognized, a definitive finding of significance "is immaterial where the agency simply prepares the EIS."[356] Petitioners point to no statutory provision or other authority that contradicts the court's holding.

85.    We also disagree with Petitioners claim[357] that section 1502.16(a)(1) of CEQ's regulations[358] obligates the Commission to make a binary "significance" determination regarding the Projects' GHG emissions. This regulation provides that an EIS shall discuss "the environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts."[359] CEQ's regulations do not specifically define significance but state in section 1501.3(b) that, for purposes of determining the appropriate level of NEPA review, agencies are to consider the potentially affected environment and degree of the effects of the action including short-and long-term effects and effects on public health and safety.[360] Neither section 1502.16(a)(1) nor 1501.3(b) directs an agency, in developing an EIS, to make a binary decision on the significance of any environmental effect. In this proceeding, the final EIS's qualitative discussion of the potential adverse impacts in the Projects' region from climate change,[361] which are triggered by increased atmospheric concentrations of GHGs,

---

[356] *East 300*, 104 F.4th at 346 (citing 40 C.F.R. § 1508.9(a)(1)) (2024). *See also* 42 U.S.C. § 4336(b)(2) (2024) ("An agency shall prepare an environmental assessment with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown . . .").

[357] Rehearing Request at 120, 124.

[358] 40 C.F.R. §1502.16(a)(1) (2024). On May 1, 2024, CEQ issued updated regulations that went into effect for new NEPA processes begun after July 1, 2024. 40 C.F.R. § 1506.12 (2024). This action is subject to CEQ's previous regulations; thus, citations throughout this order will refer to the 2022 regulations. *See* 18 C.F.R. § 380.1 (stating that the Commission will comply CEQ regulations); *but see Marin Audubon Soc'y v. FAA*, No. 23-1067, 2024 WL 4745044, slip op. at 20 (D.C. Cir. 2024) (holding that CEQ had no lawful authority to promulgate binding regulations and questioning but not deciding whether another agency could permissibly adopt CEQ's regulation or incorporate them by reference).

[359] 40 C.F.R. § 1502.16(a)(1).

[360] *Id.* § 1501.3(b) (determining the appropriate level of NEPA review).

[361] Final EIS at 4-557 to 4-561.

satisfied these CEQ requirements to discuss the significance of the impacts.[362]  CEQ's
January 2023 Interim Guidance on the consideration of GHGs lends further support for
the position that CEQ's regulations do not require a binary significance determination.
The CEQ Interim Guidance explicitly "does not establish any particular quantity of GHG
emissions as 'significantly' affecting the quality of the human environment."[363]  While
CEQ guidance is not binding on the Commission as a general matter, this guidance
underscores the fact that agencies are not obligated to make a significance determination
regarding GHGs, and illustrates the lack of metrics for determining significance in this
context.

86.     We also disagree with Petitioners' assertion that the Commission's regulation,
18 C.F.R. § 380.7 (2024), and Commission practice require it to identify in an EIS
whether each environmental impact is "significant."[364]  Section 380.7 requires, in
relevant part, that "the staff conclusion section will include summaries of . . . (a) The
significant environmental impacts of the proposed action," among other items.[365]
This regulation is not a general mandate that the Commission's environmental review
include a binary determination that each environmental impact is either significant or
insignificant.  Rather, our regulation merely specifies that, in addition to the content
requirements for EISs prescribed by CEQ's regulations, specifically 40 C.F.R. § 1502.10
(2024),[366] that Commission EISs also include a conclusion section that summarizes just
those environmental impacts that were identified as significant.  Where, as here, the
significance of the projects' reasonably foreseeable GHG emissions' impacts on climate

---

[362] *East 300*, 104 F.4th at 346 (affirming the Commission's qualitative discussion
of GHG emissions as satisfying NEPA); *see also Sabal Trail*, 867 F.3d at 1374 (noting
that under 40 C.F.R. § 1502.16(b), the Commission's EIS "needed to include a *discussion*
of the 'significance'" of the GHG emissions attributable to the project) (emphasis added).

[363] *See* CEQ, *Nat'l Env't Pol'y Act Guidance on Consideration of Greenhouse Gas
Emissions & Climate Change*, 88 Fed. Reg. 1196, 1198 (Jan. 9, 2023) (CEQ Interim
Guidance).

[364] Rehearing Request at 117-18.

[365] 18 C.F.R. § 380.7(a).

[366] Section 1502.10 of CEQ's regulations sets a standard format for EISs that
requires a:  cover; summary; table of contents; purpose and need for action; alternatives;
affected environment and environmental consequences; submitted alternatives
information, and analyses; and a list of preparers.

change is unknown,[367] consistent with section 380.7, a summary of those impacts would not be included the EIS's conclusion section.

87.    We also affirm that, notwithstanding *Northern Natural Gas Company* (*Northern Natural*),[368] it is the Commission's practice to not make a binary significance determination for GHG emissions and to instead rely on a qualitative discussion of the potential adverse effects, as upheld by the D.C. Circuit in *East 300*.[369]  To the extent the Authorization Order was not clear, we confirm, consistent with the holding in *East 300* and as discussed below, that we are unable to determine whether GHG emissions are significant or insignificant.  Further, we conclude that the Commission's significance determination in *Northern Natural* does not represent Commission policy or practice and, for the reasons discussed below, is hereby overruled.[370]

88.    In *Northern Natural*, the Commission compared the project's reasonably foreseeable GHG emissions to the total of GHG emissions in the United States as well as to state inventories, finding that the project's contribution to climate change would not be significant.[371]  The Commission's significance determination in *Northern Natural* was sui generis, and did not provide a threshold or numerical limit or establish a methodology that the Commission could use to determine the significance of GHG emissions in future cases.[372]  The fact that the Commission felt itself able to determine that the particular amount of GHG emissions in that proceeding were insignificant did not imply that the Commission could likewise determine what level of GHG emissions would be significant or insignificant in any other case.  In fact, the Commission in *Northern Natural* cited to

---

[367] *See* Authorization Order, 187 FERC ¶ 61,199 at PP 179-180; final EIS 4-559.

[368] 174 FERC ¶ 61,189 (2021).

[369] *See supra* P 83 (citing *East 300*, 104 F.4th at 346).

[370] The Commission may abandon prior precedent provided that the change is permitted under the relevant statutes and that we acknowledge the departure and explain that we believe the new position is better.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (when an agency makes a change in policy, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates").  *See also Grace Petroleum Corp. v. FERC*, 815 F.2d 589, 591 (D.C. Cir. 1987) (recognizing the Commission's "well-settled right" to "overrule established precedent" provided that it offers a reasoned explanation for doing so).

[371] *N. Nat. Gas Co.*, 174 FERC ¶ 61,189 at PP 34-36.

[372] *Id.* PP 33-36.

the Commission's then-pending 2021 Notice of Inquiry, which sought information on options to assess significance of the effects of GHG emissions, to bolster the idea that the Commission would have the ability to assess significance in the future.[373]  Since *Northern Natural* was decided, the Commission has spent several years further developing its understanding of issues surrounding GHG emissions, going as far as to issue an Interim GHG Policy Statement, which the Commission subsequently converted to draft form (draft GHG Policy Statement).[374]  Despite the record established in the draft GHG Policy Statement proceeding, without exception, the Commission has concluded that it is unable to make significance determinations in cases where the issue has arisen, as explained in detail in a number of orders.[375]  For this reason, and because the basis upon which the Commission determined significance in *Northern Natural* was unsupported by any identified tool or method,[376] we find that we cannot rely on that case as precedent for evaluating significance, even as a *de minimis* floor.[377]  Accordingly, as discussed herein, we will continue to consider and contextualize adverse GHG impacts on a case-by-case basis in accordance with our responsibilities under the NGA and NEPA.[378]

89.      Further, nothing about the pendency of the draft GHG Policy Statement has affected the Commission's ability to consider all evidence submitted into the record for an individual project.[379]  As explained below, the Commission has not identified criteria

---

[373] *Id.* PP 33, 36.

[374] *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022)*; Order on Draft Policy Statements*, 178 FERC ¶ 61,197 at P 2 (stating the Commission would not apply the draft GHG Policy Statement to pending or new projects until the Commission issued any final guidance after public comment).

[375] *See, e.g.*, *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,047, at PP 95-105 (2024), *order on reh'g*, 187 FERC ¶ 61,200, *dismissed sub nom. Sierra Club v. FERC*, No. 24-1138, 2024 WL 3764462 (D.C. Cir. 2024); *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at PP 56-63, *reh'g denied*, 183 FERC ¶ 62,153 (2023); *ANR Pipeline Co.*, 179 FERC ¶ 61,122, at PP 34-44 (2022).

[376] *Id.*

[377] *See supra* note 372-373.

[378] *See supra* section III.E.3.

[379] The D.C. Circuit has held that the Commission is not required to apply the GHG Draft Policy Statement.  *See Healthy Gulf v. FERC*, 107 F.4th 1033, 1040-41

or a scientifically accepted tool or method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.  That remains the case.

    **b.**    **The Commission cannot characterize the Projects' GHG emissions as significant or insignificant.**

90.   The D.C. Circuit explained in *New Jersey Conservation Foundation* that "even if [the Commission] is not required to make a significance determination," it must explain its inability to do so to avoid running afoul of APA requirements.[380]  We clarify that we cannot characterize any project's GHG emissions as significant or insignificant because we are unable to identify any accepted tool or method, including use of the social cost of GHGs, that would allow us to determine what level of GHG emissions' contribution to adverse climate change impacts is significant under NEPA.[381]  We note that to date, no other Federal agency, including the U.S. Environmental Protection Agency (EPA) and CEQ, has established either an accepted tool or method or a threshold for determining significance that the Commission could adopt.[382]

91.   To date, the only tool or method that petitioners purport enables the Commission to determine significance is the social cost of GHG calculator.  The social cost of GHG is not a specific technical tool, but rather refers to estimates of the social costs, expressed as a dollar value, associated with the impacts from emitting an additional metric ton of either carbon dioxide, methane, or nitrous oxide.  The tool was designed to help policymakers understand the social impact of emissions when undertaking a cost-benefit

---

(D.C. Cir. 2024) (*Healthy Gulf*) (upholding the Commission's decision not to apply the GHG Draft Policy Statement); *Evangeline Pass*, 100 F.4th at 214-15 (same).

[380] *N.J. Conservation Found.*, 111 F.4th at 56.

[381] *See, e.g.*, *Tenn. Gas Pipeline Co.*, 181 FERC ¶ 61,051, at P 34 (2022) ("[T]he Commission did not characterize [GHG] emissions as significant or insignificant because we currently have no methodology for doing so."), *aff'd sub nom. East 300*, 104 F.4th 336; *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 75 ("[W]e note that there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria."), *aff'd sub nom. Evangeline Pass*, 100 F.4th 207; CEQ Interim Guidance, 88 Fed. Reg. 1196, 1200 (Jan. 9, 2023) ("This guidance does not establish any particular quantity of GHG emissions as 'significantly' affecting the quality of the human environment.").

[382] For this reason, we reject Petitioners' allegation that other agencies have used the social cost of GHG for project-level review.  Rehearing Request at 123.

analyses associated with rulemaking proceedings.[383]  With respect to the utility of the
social cost of GHGs, the final EIS disclosed an estimate of these costs.[384]  However,
consistent with the Commission's past statements, we are currently unable to identify any
criteria to determine what monetized values are significant for NEPA purposes.[385]
Therefore, we do not view calculating the social cost of GHGs as a means to determine
whether any project's GHG emissions are significant or insignificant, a conclusion that
the D.C. Circuit has now upheld many times.[386]  Rather, we intend to continue to

---

[383] *See ANR Pipeline Co.*, 188 FERC ¶ 61,063, at P 50 (2024) (citing *Fla. Se.
Connection, LLC*, 164 FERC ¶ 61,099, at P 35 (2018)); *see also* EPA July 26, 2018
Comments in PL18-1-000 ("Further, with regard to the discussion of the social cost of
carbon, EPA notes that tool was developed to aid the monetary cost-benefit analysis of
rulemakings.  It was not designed for, and may not be appropriate for, analysis of project-
level decision-making.").

[384] Final EIS at 4-180; *see also* Authorization Order, 187 FERC ¶ 61,199 at P 168.
The social cost of GHGs tool converts GHG emissions estimates into a range of dollar-
denominated figures; it does not, in itself, provide a tool or method for judging
significance.

[385] *E.g., Tenn. Gas Pipeline Co.*, 181 FERC ¶ 61,051 at P 37, *aff'd sub nom. East
300*, 104 F.4th 336; *Tenn. Gas Pipeline Co.*, 180 FERC ¶ 61,205 at P 75, *aff'd sub nom.
Evangeline Pass*, 100 F.4th 207.

[386] *See, e.g., East 300*, 104 F.4th at 346 ("FERC need not attempt to monetize
those emissions through a Social Cost of Carbon model which FERC views as unreliable
for analyzing individual projects."); *Evangeline Pass*, 100 F.4th at 214 (upholding the
Commission's decision to estimate and publicly disclose the social cost of carbon values
but not to rely on the social cost of carbon tool because of pending litigation challenging
it and because, in the Commission's words, it had "not determined which, if any,
modifications were needed to render that tool useful for project-level analyses"); *Alaska
LNG*, 67 F.4th at 1184 (upholding as reasonable the Commission's decision to compare
the Project's direct emissions with existing Alaskan and nationwide emissions but not to
apply the social cost of carbon for reasons the court had previously accepted:  (1) "the
lack of consensus about how to apply the social cost of carbon on a long time horizon,"
(2) that "the social cost of carbon places a dollar value on carbon emissions but does not
measure environmental impacts as such," and (3) "FERC has no established criteria for
translating these dollar values into an assessment of environmental impacts"); 
*EarthReports*, 828 F.3d at 956 (upholding the Commission's decision not to use the
social cost of carbon tool for the same three reasons); *Adelphia*, 45 F.4th 104 (also
upholding the Commission's decision not to use the social cost of carbon); *Appalachian
Voices*, 2019 WL 847199 (unpublished) (same).

calculate and publish the social cost of GHGs for reasonably foreseeable GHG emissions, as one means to fulfill NEPA's purpose to inform the public.[387]

92.    We recognize that where, as here, there are reasonably foreseeable incremental GHG emissions attributable to a proposed project, the project will increase the atmospheric concentration of GHGs and will contribute cumulatively to climate change.[388]  We also acknowledge that, while climate change impacts taken individually may be manageable for certain communities, the impacts of compound events can be greater than the sum of their parts[389] and acknowledge that climate change impacts may be more prevalent in and could pose particular risks to environmental justice communities.[390]

93.    Petitioners allege that the social cost of GHGs tool can be used to assess significance and that the Commission can be required under 40 C.F.R. § 1502.21(c) to use the tool if it is considered a method generally accepted in the scientific community.[391] Petitioners argue that the cases cited in the Authorization Order holding that the Commission is not required to use the social cost of GHGs tool either did not consider section 1502.21(c) or held that arguments based on this regulation had been waived.[392]

94.    We disagree that section 1502.21(c) requires the Commission to use the social cost of GHGs.  Section 1502.21(c) provides that if the means to obtain information relevant to reasonably foreseeable significant adverse impacts are not known or if the costs of obtaining it are unreasonable, an agency must include an "evaluation of such impacts

---

[387] *See Methow Valley*, 490 U.S. at 349 (explaining that NEPA's EIS requirement "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision); *Sabal Trail*, 867 F.3d at 1367 ("[The] environmental impact statement . . . ensures that [the] environmental consequences [of the agency's action], and the agency's consideration of them, are disclosed to the public.").

[388] Final EIS at 4-559.

[389] *Id.* at 4-558.

[390] The Commission's environmental justice analysis for this project discussed the block groups that are considered to be environmental justice communities.  Authorization Order, 187 FERC ¶ 61,199, at P 124.

[391] *Id.* at 122 (citing *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021) (*Vecinos I*)).

[392] *Id.* at 122-23 (citing *Alaska LNG*, 67 F.4th at 1184; *Adelphia*, 45 F.4th at 112).

based upon theoretical approaches or research methods generally accepted in the scientific community."[393] As discussed above, Commission staff disclosed an estimate of the social cost of GHGs. The issue, therefore, is not one of incomplete or unknown information, but rather that the information provided by the social cost of GHG tool does not provide a basis for a significance determination.[394] Moreover, we note that the Commission has thoroughly addressed the applicability of 40 C.F.R. § 1502.21(c) (2024)in other proceedings and we adopt those conclusions here.[395] Further, we disagree with Petitioner's conclusions of waiver in *Alaska LNG* and *Adelphia*. In *Alaska LNG*, the court touched on that jurisdictional question only after explicitly holding that use of the social cost of GHGs tool is not required.[396] Similarly, in *Adelphia*, the D.C. Circuit found that petitioners failed to raise the argument that section 1502.21(c) required the Commission to use the social cost of GHG tool, but nevertheless upheld the Commission's decision not to use the social cost of carbon.[397]

95.     Petitioners recognize that, in *Healthy Gulf*, the D.C. Circuit upheld the Commission's decision to not use the social cost of GHGs tool because it "has not yet identified criteria that would allow it to non-arbitrarily determine when identified social costs become significant under NEPA,"[398] but argue that the court did not address using

---

[393] 40 C.F.R. § 1502.21(c)(4). While Petitioners cite to § 1502.21(c), their argument relies only on § 1502.21(c)(4).

[394] *Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136, at P 32 (2024); *Gas Transmission Nw. LLC*, 187 FERC ¶ 61,023, at P 118 (2024).

[395] *N. Nat. Gas Co.*, 186 FERC ¶ 61,064, at P 23 & n.77 (2024); *see also Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 at PP 90-101, *order on reh'g*, 185 FERC ¶ 61,080, at PP 53-61 (2023), *vacated on other grounds*, *City of Port Isabel v. FERC*, 111 F.4th 1198 (D.C. Cir. 2024) (*City of Port Isabel*) (concluding that "because the social cost of GHGs tool was not developed for project level review and . . . does not enable the Commission to credibly determine whether the GHG emissions are significant, section 1502.21 of the CEQ regulations does not require its use in this proceeding"); *Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047, at PP 18-25, *order on reh'g*, 185 FERC ¶ 61,079, at PP 38-45 (2023) (same).

[396] *See Alaska LNG*, 67 F.4th at 1184 (holding that the Commission's decision to compare the project emissions with state and nationwide emissions rather than using the social cost of carbon was reasonable, and subsequently stating that, "in any event," the petitioner waived its ability to make the argument).

[397] *Adelphia*, 45 F.4th at 112.

[398] *Healthy Gulf*, 107 F.4th at 1042.

the social cost of GHGs in the context of open-ended inquiries and that the court did not address section 1502.21(c).[399]  Petitioners note that, in *East 300*, the D.C. Circuit held that the Commission had satisfied its obligation to discuss the significance of GHG emissions by estimating the social cost of carbon, alongside comparing emissions with state and national totals, but the court did not address how the social cost of GHGs estimates could satisfy this obligation where the Commission concurrently disclaimed its use of the social cost estimates.[400]  Accordingly, Petitioners claim that the Commission should use the social cost of GHG estimates to discuss the significance of the GHG emissions attributable to the Projects.[401]

96.    We disagree.  The D.C. Circuit in *Healthy Gulf*, citing *Alaska LNG* and *EarthReports*, explicitly upheld the Commission's decision not to use the Social Cost of GHGs for the very same reason articulated in this proceeding.[402]  As discussed above, section 1502.21(c) involves a separate issue—lack of information—which we explained is not the reason we cannot assess significance.[403]  We reject Petitioners' assertion that the Commission should engage in an "open-ended"[404] discussion of the "significance" of GHGs using the monetized results from staff's calculation of the social cost of GHGs. We do so because the same reasons that undermine the tool's utility for making a binary significance determination also undermine its value as information to support the Commission's meaningful consideration of the Projects' cumulative impact on climate change.[405]

---

[399] Rehearing Request at 124.

[400] *Id*. (citing *East 300*, 104 F.4th at 346).

[401] *Id.*

[402] *See Healthy Gulf*, 107 F.4th at 1041 (citing *Alaska LNG*, 67 F.4th at 1183-84 and *EarthReports*, 828 F.3d at 956); *see also* Authorization Order, 187 FERC ¶ 61,199 at PP 179-180 (explaining why the Commission is unable to determine the significance of reasonably foreseeable GHG emissions).

[403] *See supra* P 94.

[404] To the extent Petitioners suggest that the Commission should engage in a qualitative discussion of GHG emissions, we note that the Commission has done so in the Authorization Order and here on rehearing.  *See* Authorization Order, 187 FERC ¶ 61,199 at PP 164-180; *see supra* section III.E.3.

[405] *Supra* P 91 & note 386.

97.     NEPA ensures that "relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."[406]  Here, consistent with the purposes of NEPA and for informational purposes, Commission staff disclosed an estimate of the social cost of GHGs.[407]  The Commission included this analysis in the Authorization Order.[408]  The Commission also placed the Projects' GHG emissions in context by comparing them to the total GHG emissions of the United States as a whole and at the state level.[409]  Accordingly, the Commission has fulfilled its responsibilities under NEPA.

98.     Petitioners dispute the sufficiency of the Commission placing the Projects' GHG emissions in context by comparing them to the total GHG emissions of the United States and at the state level.[410]  Petitioners argue this does not provide analysis of the emissions' effects and therefore does not satisfy 40 C.F.R. § 1508.1(i)(4) (2024).[411]  Petitioners also note that various sources have found that comparison to emissions inventories is not an adequate way to discuss GHG emissions.[412]

99.     We find Petitioners' arguments unavailing.  The Commission did not indicate that GHG comparisons with national and state inventories are intended to indicate the significance of the emissions or that such comparison was intended to fall within the

---

[406] *Methow Valley*, 490 U.S. at 349.

[407] Authorization Order, 187 FERC ¶ 61,199 at P 179 (citing final EIS at 4-560 to 4-561).  "Commission staff have not identified a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Project's incremental contribution to GHGs."  *Id.* n.428 (citing final EIS at 4-559).

[408] *Id.* PP 165-180.

[409] *Id.* PP 171-172.

[410] Rehearing Request at 121.

[411] *Id.*

[412] *Id.* at 122.  We note that Petitioners rely on *Diné Citizens Against Ruining our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023) (*Diné Citizens*) to support its argument that comparisons with emission inventories is not an adequate way to discuss GHG emissions, *see* Rehearing Request at 122; however, we find petitioners argument unavailing because this proceeding does not include a carbon budget as did *Diné Citizens*. 59 F.4th at 1042, n.11 (rejecting agency's comparison of GHGs to regional, national, and global levels, but in the context of failing to consider arguments raised in comments that the agency should have applied the "carbon budget" or explained why it did not).

definition of "effects" or "impacts" under section 1508.1(i)(4).[413]  Instead, as we explained in the Authorization Order, the comparison "allows us to place project emissions in context."[414]  The D.C. Circuit, addressing substantially similar arguments, has explicitly held that the Commission acts reasonably by comparing a project's emissions with nationwide and state inventories.[415]  The fact that EPA and CEQ might not recommend this methodology in every instance does not preclude its utilization by the Commission.[416]

### 4.    Impacts to Commercial and Recreational Fishing and Local Communities

100.    Petitioners argue that the Commission failed to take a "hard look" at the impacts of the project on the commercial fishing industry.  Specifically, Petitioners argue that the Commission failed to fully evaluate two impacts from the project to the commercial fishing industry:  (1) impacts to fish, shrimp, and oyster habitat and populations; and (2) impacts to the ability of commercial fisherman to safely access fishing locations due to marine traffic.[417]

101.    According to Petitioners, the Commission has ignored the risk that temporary impacts on shrimp and fish populations will result in permanent adverse effects on the commercial fishing business and has dismissed the concerns of commercial fishermen

---

[413] 40 C.F.R. § 1508.1(i)(4).

[414] Authorization Order, 187 FERC ¶ 61,199 at PP 171-172.

[415] *Alaska LNG*, 67 F.4th at 1184 (discussing *EarthReports*, 828 F.3d 949) ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions …. [the Commission's] approach was reasonable and mirrors analysis we have previously upheld.").

[416] *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024, at P 37 (2024); *see also Citizens Against Burlington*, 938 F.2d at 201 (stating that, under the rule of reason, a lead agency does not have to follow other agencies' comments, it just has to take them seriously).

[417] Rehearing Request at 125.

in the area.[418]  Similarly, the Petitioners allege that the Commission did not adequately consider impacts on marine traffic.[419]

102.    On the contrary, the Commission considered the impacts from project construction and operation on the commercial fishing industry in the project area, including the potential for increased disruptions to recreational and commercial fisherman at alternative site locations, potential socioeconomic impacts on commercial fisheries and shrimping, impacts to commercial fisheries and fisherman in environmental justice communities, and cumulative temporary and permanent impacts on commercial fishing.[420]  While the analysis found some serious and potentially long-term impacts to wildlife, including aquatic species, both directly and as a result of habitat conversion,[421] it also took into account the project-specific plans and procedures designed to minimize or avoid impacts on wildlife species and habitats.[422]  Similarly, while the final EIS and Authorization Order found potential impacts on commercial fisheries,[423] it also noted continuing commitments to communication with the local fishing community.[424]

103.    Petitioners also disagree with the Commission's assessment that the impacts on recreational and commercial fishing would be localized and less than significant, with only temporary and minor cumulative impacts.[425]  They maintain that fishermen have

---

[418] *Id.* at 125-126.  Among the evidence of impacts cited to by the Petitioners is the Response to Form Letters.  However, as discussed above, these filings were untimely and the Commission was not compelled to rely upon them.  *See supra* section II.C.

[419] Rehearing Request at 126 to 128.  The Petitioners also take issue with the fact that Venture Global's Community Advisory Group does not include any commercial fisherman among its members.  *Id*. at 128.  While the Commission did consider the reports of the Advisory Group, among other information in the EIS, the Commission cannot dictate the membership of a group that Venture Global formed voluntarily.

[420] *See* Authorization Order, 187 FERC ¶ 61,199 at P 110.

[421] *Id.* P 108.

[422] *Id.* P 109.

[423] *Id.* P 112.

[424] *Id.* P 113.

[425] Rehearing Request at 77 (citing Authorization Order, 187 FERC ¶ 61,199 at P 113).

already noticed a decline of up to 50% in their annual catch due to existing facilities.[426] Petitioners insist that the Commission did not address these and other impacts and further argue that the Commission's reliance on Venture Global's Community Advisory Group for identifying concerns is insufficient, that Venture Global has historically failed to address fishermen's concerns, and that fishermen have not had adequate input or been given sufficient consideration by regulators.[427]

104.    We find that the Commission adequately considered these effects for both Projects.  As an initial matter, we note that fish and shrimp catches are highly individualized and may be affected by a variety of factors.  One such example is the fact that shrimp harvest seasons, which are managed by the Louisiana Department of Wildlife and Fisheries (Louisiana DWF), may be different from year-to-year.[428] Accordingly, it is not clear that this decline of up to 50% in annual catch is attributable to LNG facilities.  Regardless, the Commission fully responded to Petitioners' arguments in the Authorization Order.[429]  Petitioners fail to identify specific shortcomings of the Commission's analysis, other than to disagree with the conclusions reached.

105.    Petitioners next argue that the addition of another terminal will increase ship traffic by 17%, add seven to eight carrier visits per week, require commercial and recreational vessels to exit the channel 4-5 times per day due to security zone requirements, increase turbidity, and cause powerful wakes that may cause safety concerns and damage property.[430]  They argue that the increase in ship traffic will make it more difficult for fishers and shrimpers to make a living and decrease economic output.[431]  Petitioners maintain that the CP2 LNG Project is below a bottleneck in the ship channel known as the "firing line" where shrimp migrate and that the final EIS fails

---

[426] *Id.* at 78 (citing Response to Form Letters at Ex. 5); *see id.* at Ex. 4 at ¶¶ 22-23.

[427] *Id.* at 78-79 (citing final EIS at 4-270 and Authorization Order, 187 FERC ¶ 61,199 at PP 113, 137); *see also id.* at 79 (citing the Commission's denial of FISH's late motion to intervene as an example of lack of consideration by regulators).  We address Petitioners' assertions regarding FISH's motion to intervene above, *see supra* section II.A.

[428] Final EIS at 4-267 to 4-268.

[429] Authorization Order, 187 FERC ¶ 61,199 at PP 107-113 (discussing impacts and mitigation measures and concluding that construction and operation impacts on recreational and commercial fishing would be localized and less than significant).

[430] Rehearing Request at 79-80.

[431] *Id.* at 80.

to account for how marine traffic may impact access to this area.[432] Petitioners also aver that the final EIS minimizes the impact of marine traffic on commercial fishing vessels and that the Commission's conclusion that only a few vessels use the Calcasieu Ship Channel at night is contrary to evidence in the record.[433]

106.    We disagree and find that the Commission appropriately considered the impacts of increased ship traffic on commercial and recreational fishing.  As an initial matter, we note that concerns regarding marine traffic and waterways are within the jurisdiction of the U.S. Coast Guard (Coast Guard).[434] The marine facilities would include two LNG loading docks and a shared berthing area on Monkey Island.[435] Marine deliveries during construction would use barges to deliver equipment and bulk material for site preparation.[436] At the Phase 1 construction peak, 32 barges a week are anticipated.[437] Based on the Calcasieu Shipping Channel's existing traffic patterns and capacity, the final EIS concluded that additional marine traffic during construction is not expected to result in waterway congestion or significantly impact other waterway users such as fishermen and recreational users.[438] The Commission also found that, although Project construction is anticipated to occur during peak fishing and recreational seasons, due to the overall size of the waterway and access to and maneuverability within the Calcasieu Ship Channel, fishing and recreational activities would not be significantly affected by the proposed use of barges.[439]

107.    During operation of the CP2 LNG Project and after completion of Phase 2, seven to eight LNG carrier visits are anticipated per week.[440] During operations, LNG carriers in transit could impact commercial and recreational fishing vessels within the Calcasieu Ship Channel because they would be required to give way while the LNG carrier

---

[432] *Id.*

[433] *Id.* at 80-81.

[434] Final EIS at 1-6; *Freeport LNG Dev., L.P.*, 116 FERC ¶ 61,290, at P 14 (2006).

[435] Final EIS at 4-294.

[436] *Id.*

[437] *Id.*

[438] *Id.*

[439] Authorization Order, 187 FERC ¶ 61,199 at P 111 (citing final EIS at 4-321).

[440] Final EIS at 4-294.

passes.[441]  After the LNG transit is complete, fishing vessels could resume fishing activities throughout the Calcasieu Ship Channel.[442]  Typically, shrimp are most active at night when few vessels are using the Calcasieu Ship Channel.[443]  Petitioners cite the dissent for its assertion that this finding contradicts the 2019 Port of Lake Charles Calcasieu Ship Channel Traffic Study (Marine Traffic Study), which concluded that all vessels were able to transit the channel at night with no further restrictions and no preference to either day or night transits.[444]  The study does not undermine the Commission's findings, but stands for an independent point. It can be true, as the study indicates, that the rules and restrictions of the Calcasieu Ship Channel require no nighttime restrictions.[445]  It can also be true, as the final EIS suggests, that fewer vessels actually use the Calcasieu Ship Channel at night.[446]  In any event, the final EIS recognized that the increase in delays associated with LNG carrier transit would have a moderate, but not significant impact on commercial fishing.[447]  Upon review of CP2 LNG's Letter of Intent and Waterway Suitability Assessment, the Coast Guard, which has jurisdiction over marine traffic, issued a Letter of Recommendation recommending that the Calcasieu River Ship Channel be considered suitable in its current state for accommodating the type and frequency of LNG marine traffic associated with the CP2 LNG Project.[448]  Thus, we disagree that the Commission's statements are contradictory with regard to marine traffic.

108.  Accordingly, we recognized that potential impacts on commercial fisheries from operation of the CP2 LNG Project include:  disturbances in vessel traffic corridors which fishing and shrimping vessels may need to traverse; difficulty accessing fishing locations as a result of large vessels associated with the project; and impacts to the number of fish,

---

[441] *Id.* at 4-270 (approximately 20 to 25 minutes while the vessel passes and approximately 1 hour during maneuvering in the turning basin).

[442] *Id.* at 4-270, 4-295.

[443] *Id.* at 4-270.

[444] Rehearing Request at 127.

[445] *See* Marine Traffic Study at 16, 20.

[446] *See, e.g.,* final EIS at 4-270, 4-284 to 4-285, Table 4.10.8-2 (showing number of nightshift personnel significantly below dayshift personnel).

[447] *Id.* at 4-270.

[448] *Id.* at 4-295.

shrimp, or crab a commercial vessel may be able to catch.[449]  The Commission recognized that permanent impacts on recreational and commercial fisheries in the Calcasieu Ship Channel may occur due to the loss of available fishing areas from operation of the LNG terminal's marine facilities and LNG carrier traffic.[450]  Nevertheless, the final EIS concluded and we agree that, given the CP2 LNG Project's proximity to the mouth of the Calcasieu River (about 1 mile) and the year-round use of the area by commercial fishing vessels, the increase in delays associated with LNG carrier transit would have a moderate, but not significant impact on commercial fishing.[451]

109.    The Commission also found that, based on consultation between Commission staff and Louisiana DWF, impacts on shrimping vessels would be greatest near the terminal south of the Firing Line where shrimping occurs year-round and where vessel traffic and dredging associated with the LNG terminal would occur.[452]  The final EIS, however, determined that the area in which project activities would occur does not have any unique features or habitat characteristics that would draw recreational or commercial users to this particular location versus other locations within the Calcasieu Ship Channel.[453]

110.    Based on the foregoing, and as explained in the final EIS, we find that the Commission fully addressed the impacts from project construction and operation, including from marine vessel traffic, on the commercial and recreational fishing industry in the project area.[454]

111.    Petitioners next argue that construction and dredging activities will displace aquatic species and critical habitats important to fishermen's livelihoods.[455]  They disagree with the findings in the final EIS that marine species are unlikely to be impacted any differently than the current dredging activities, despite increases in

---

[449] Authorization Order, 187 FERC ¶ 61,199 at P 111 (citing final EIS at 4-321).

[450] *Id.*

[451] Final EIS at 4-270.

[452] Authorization Order, 187 FERC ¶ 61,199 at P 112 (citing final EIS at 4-321).

[453] *Id.*

[454] *Id.* PP 107-113.

[455] Rehearing Request at 81.

dredging activities,[456] and further assert that impacts from artificial lighting, habitat conversion, and construction noise are dismissed by the Authorization Order.[457] Petitioners also maintain that Venture Global has not consulted with fisherman when dredging and has previously done so just before the summer shrimping season, and that dredging during the fishing season is expected to continue.[458]

112.    As explained in the final EIS, CP2 LNG proposes dredging to occur 6 days per week for 12 to 18 consecutive months.[459] CP2 LNG would adhere to all Corps and Louisiana Department of Natural Resources (Louisiana DNR) permit conditions to minimize impacts associated with dredging activities.[460] The Calcasieu Ship Channel adjacent to the marine facilities is open for shrimp harvesting year-round (outside waters).[461] The area immediately surrounding the dredge activities would likely not be suitable for shrimp harvesting.[462] This impact would be limited to the extent of the sediment plume and be temporary during dredge activities.[463] Moreover, because shrimp and crabs are mobile, some of the populations would be expected to disperse during construction or maintenance activities, but it is also likely that some could also be harmed or killed by equipment.[464] As the Commission noted in the Authorization Order, CP2 LNG would minimize impacts on water quality by using a hydraulic suction dredge, where turbidity would be focused close to the river bottom and would equate to a storm event within a short distance of the cutterhead.[465] The final EIS also concluded that construction and operation impacts on fish, shrimp, and blue crabs would be localized

---

[456] *Id.* (citing final EIS at 2-25 and 4-178) (explaining that dredging will occur six days a week for 12-18 months and displace 6.4 million cubic yards of material).

[457] *Id.* (citing Authorization Order, 187 FERC ¶ 61,199 at P 110).

[458] *Id.* at 81-82 (citing Response to Form Letters at Ex. 4 and Authorization Order, 187 FERC ¶ 61,199 at P 125).

[459] Final EIS at 4-270.

[460] *Id.*

[461] *Id.*

[462] *Id.*

[463] *Id.*

[464] *Id.* at 4-271.

[465] Authorization Order, 187 FERC ¶ 61,199 at P 127 (citing final EIS at 4-318).

and are not expected to have a significant impact on commercial fisheries.[466]  The final EIS also concluded that the Project is expected to have a temporary but not significant impact on commercial harvest activities.[467]  We find that the Commission fully responded to Petitioners' dredging arguments.

113.    Petitioners also argue that the CP2 LNG Project will limit the use of the remaining public docks, which are increasingly becoming privatized, and further inhibit the ability for fishermen to conduct their business.[468]  Petitioners argue that the Commission failed to seriously consider or quantify these impacts.[469]

114.    We disagree.  The final EIS did not find construction and operation impacts on recreational and commercial fishing to be significant.[470]  In particular, and as noted above, the final EIS found that the area in which project activities would occur does not have any unique features or habitat characteristics that would draw recreational or commercial users to this particular location versus other locations within the Calcasieu Ship Channel and, thus, determined that there would not be significant impacts.[471]  The CP2 LNG Project will be located about 1 mile from the mouth of the Calcasieu River, leaving approximately 25 river miles upstream (which includes the Calcasieu Ship Channel and Calcasieu Pass) containing the same fish common to the lower estuarine area.[472]  Petitioners fail to identify any unique features or characteristics of the area to be affected by the Projects or explain whether or why other fishing docks may or may not be available.

---

[466] Final EIS at 4-271.

[467] *Id.* at 4-270.

[468] Rehearing Request at 82.

[469] *Id.*

[470] Authorization Order, 187 FERC ¶ 61,199 at P 113; *see* final EIS at 4-271 ("construction and operation impacts on fish, shrimp, and blue crabs would be localized and are not expected to have a significant impact on commercial fisheries."); *see id.* at 4-274 ("we anticipate Project construction and operation would not negatively impact any recreational fishing, given the fact that these activities are not restricted to the relatively small sections of the Project footprint that could provide potential fishing opportunities").

[471] Final EIS at 4-321; Authorization Order, 187 FERC ¶ 61,199 at P 113.

[472] Final EIS at 4-273 to 4-274 ("spotted sea trout, southern flounder, and red drum (redfish) are commonly found in the lower portion of the river").

115.     Petitioners also argue that the CP2 LNG Project will increase noise, light, and air pollution,[473] as well as visual and land use impacts, which will affect the local community and recreation.[474]  The Commission sufficiently addressed increases in noise,[475] light,[476] visual resources,[477] and land use impacts.[478]  The final EIS found that construction and operation of the Projects would result in limited adverse environmental impacts, except for significant impacts on visual resources, including within environmental justice communities, and the Projects' contribution to significant cumulative visual impacts.[479]  Most adverse environmental impacts would be temporary or short-term during construction and operation, but long-term and permanent environmental impacts would also occur as part of the Projects.[480]  The final EIS recommended specific mitigation measures for the construction and operation of the Projects to avoid or reduce impacts, which the Commission adopted.[481]

116.     NEPA requires agencies to take a "hard look" at environmental impacts of a proposed action.[482]  We continue to find that we have done so with respect to the consideration of impacts on commercial fisheries by considering all potential impacts. While the Petitioners argue that different conclusions could be drawn, NEPA guarantees the process of considering potential impacts, "not specific outcomes."[483]  Our analysis of the impacts fulfilled our responsibilities under the statute.

---

[473] *See infra* section III.E.11.

[474] Rehearing Request at 83.

[475] Final EIS at 4-376 to 4-397.

[476] *Id.* at 4-251 to 4-255.

[477] *Id.* at 4-251 to 4-255.

[478] *Id.* at 4-237 to 4-245.

[479] *Id.* at 5-1.

[480] *Id.*

[481] Authorization Order, 187 FERC ¶ 61,199 at P 198.

[482] *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989) (*Marsh*).

[483] *Mass. v. NRC*, 708 F.3d 63, 37 (1st Cir. 2013) (citing *Town of Winthrop v. FAA*, 535 F.3d 1, 4 (1st Cir. 2008)).

## 5.     **Safety**

### a.     **Weather Events and Flooding**

117.    Petitioners argue that climate change will make hurricanes, flooding, and extreme heat more severe and frequent, posing a greater risk to coastal infrastructure, yet the Commission relies on historic meteorological and climate hazards.[484]  They aver that the Commission's forward-looking analysis in the final EIS contains flaws regarding the Projects' ability to withstand climate-driven extreme weather hazards.[485]  Petitioners maintain that pipeline and terminal infrastructure, including LNG loading infrastructure, will be outside the proposed 31.5-foot storm wall and that the Commission failed to consider impacts to extreme weather events.[486]

118.    We disagree.[487]  As explained in the final EIS, outside of the storm wall, the Projects would involve the construction of two marine LNG loading docks and accompanying turning basins and three cryogenic pipelines for LNG transfer from the storage tanks to the docks (Marine Facilities).  CP2 LNG would install two approximately 1.1-mile-long LNG transfer lines as well as a spare third LNG transfer line, a vapor return transfer line, and associated utilities between the CP2 LNG Project and Marine Facilities.[488]  The final EIS discussed hurricanes and other meteorological events that could cause flooding, including climate change impacts to meteorological events, and made three recommendations to ensure the facilities would be resilient to flooding events, which were adopted in the Authorization Order.[489]  The Authorization Order also discussed hurricanes, flooding, relative sea level rise, and shoreline erosion.[490]  Environmental Condition 39 requires CP2 LNG to design the floodwall to a 500-year

---

[484] Rehearing Request at 128-29.

[485] *Id.* at 129.

[486] *Id.* at 129-30.

[487] Petitioners' fault the Commission for relying on historic evaluations of meteorological and climate hazards, yet they also fault the Commission for conducting forward-looking analyses in response to comments to the draft EIS requesting such analyses.  *Id.* at 129-30.  As discussed herein, we find no fault in the Commission's analysis, and find that the Commission complied with its NEPA obligations.

[488] Final EIS at 4-416.

[489] *Id*. at 4-448 to 4-453.

[490] Authorization Order, 187 FERC ¶ 61,199 at PP 103-106.

mean recurrence interval with consideration of wind-driven wave effects, local subsidence, site settlement, shoreline recession, erosion and scour effect, and sea level rise based on National Oceanic and Atmospheric Administration (NOAA) projections.[491] Environmental Condition 40 requires that the floodwall be periodically monitored and maintained to no less than a minimum elevation of 500-year mean recurrence interval flood event and that facilities are protected for the life of the LNG terminal considering settlement, subsidence, and sea level rise.[492]

119.    As discussed in the final EIS, the marine transfer lines outside the stormwall enclosure would be horizontally directionally drilled under the waterway.[493] This would protect those portions of the marine transfer line from flood loads.  In addition, the marine facilities outside of the enclosure are primarily located on platforms elevated 30 feet or more above the North American Vertical Datum of 1988.[494]  The marine transfer piping and other marine facilities would be located atop the marine platforms.  Therefore, the marine transfer piping and facilities would be located at a similar elevation and provide similar protection as the stormwall enclosure.  Moreover, the marine transfer lines that transition from belowground to the 30-foot elevated height would not be used to load marine vessels during flooding events, which would minimize any risk to the public. Therefore, we agree with the Authorization Order that the storm surge floodwalls would provide adequate protection for the CP2 LNG Project and that the project would be designed and maintained to withstand potential changes from climate change and any changes due to climate change would not present a significant impact to the safety of the LNG facilities.[495]  Based on the foregoing, we find that the Marine Facilities would be similarly protected.

120.    The CP Express Pipeline Project would be buried with a minimum of 3 feet of cover in upland and wetland areas and a minimum of 4 feet of cover in open water areas, which would protect the pipelines from the direct physical forces of storm surges and floodwater.[496]  The pipelines would have a concrete coating or other anti-buoyancy

---

[491] *Id.* at env't. cond. 39.

[492] *Id.* at env't. cond. 40.

[493] Final EIS at 4-416.

[494] *See* Application at Resource Report 13, Volume I, Section 13.2.1.

[495] Authorization Order, 187 FERC ¶ 61,199 at P 106.

[496] Final EIS at 4-96.

measures to prevent the pipelines from floating.[497]  In compliance with PHMSA regulations at 49 C.F.R. § 192, *et. seq.*, CP Express would monitor for pipeline exposure and potential third-party intrusions onto its permanent easement to determine if there have been any changes in the pipeline cover over time.[498]  CP Express would conduct additional inspections after significant storm events.[499]  The determination of the geographic extent of any such inspection would be made on a case-by-case basis and would depend on the geographic extent and severity of the storm event.[500]  If the pipeline were to become exposed, CP Express would add soils or lower the pipeline to adjust the depth of cover.[501]  Based on the proposed measures to protect the facilities from coastal erosion and long-term sea level rise, we agree with the conclusions in the final EIS that the Projects would not be significantly affected by coastal processes.[502]

121.    Petitioners also argue that the CP2 LNG Project will be vulnerable to flooding during a Category 4 hurricane, despite contrary conclusions contained in the final EIS.[503] Petitioners combine the Commission's storm surge and wave height estimates with the addition of forecasted 2055 sea level rise of 2.1 feet and assert that a Category 4 hurricane could produce storm water levels up to 31.9 feet which would overtop the 31.5-foot storm wall, and with a Category 5 hurricane under a similar analysis, overtopping the storm wall by nearly 10 feet.[504]  Petitioners argue that the Commission failed to discuss risks associated with water overtopping the storm wall.[505]

122.    In addition to the Marine Facilities discussed above, the CP2 LNG Project will be enclosed for flood protection by construction of storm surge protection walls.[506]  The

---

[497] *Id.*

[498] *Id.*

[499] *Id.*

[500] *Id.*

[501] *Id.*

[502] *Id.*

[503] Rehearing Request at 130.

[504] *Id.*

[505] *Id.* at 131.

[506] Final EIS at 4-449.

Commission generally evaluates the design of LNG facilities against a 500-year Stillwater Flood Elevation (SWEL).[507]  The final EIS used the maximum envelope of water (MEOW) storm surge inundation maps generated from the Sea, Lake, and Overland Surge from Hurricanes (SLOSH) model developed by the National Oceanic and Atmospheric Administration (NOAA) National Hurricane Center.[508]  The final EIS concluded that the relative sea level rise could be expected to increase 1 foot 3 inches (1.26 feet) based on the difference between NOAA 2017 intermediate projection of approximately 0.84 foot for relative sea level rise in 2025 and approximately 2.1 feet for sea level rise in 2055.[509]  There are a range of figures, inputs, and assumptions in our analysis of the potential flood levels at and near the CP2 LNG Project site.[510]  Upon consideration of these inputs, the final EIS stated that the 31.5-foot above mean sea level storm surge wall would be well above the 17.9-22.3 feet total height from the 10-12 feet projected 500 year SWEL based on NOAA SLOSH MEOWs.[511]  Indeed, the storm surge wall would be higher than a strong Category 4 hurricane with an approximate 18.7 foot MEOW, 10.0 feet mean wave height, 1.26 foot sea level rise, the 0.67-1.0 foot expected settlement, and 0.525 foot of local subsidence yielding over 30 years.[512]

123.    Here, Petitioners use the estimated 2055, 2.1-foot sea level rise in order to come up with a figure above the 31.5-foot storm surge wall elevation.  However, the Petitioners' use of 2.1 feet sea level rise did not consider approximately 0.84-foot relative sea level rise that has already occurred since 2000.  For the 30-year design life of the CP2 LNG Project (from 2025 through 2055), the projected additional relative sea level rise would be 1.26 feet.[513]  In addition, the cited study in Environmental Condition 39 states that "knowing whether adaptation actions are required within the next 30 years or afterwards informs decisions about initial designs, the adaptations required, and the

---

[507] SWEL refers to the elevated water level at the coast during a flood event, not including the effects of waves.

[508] Final EIS at 4-450.

[509] *Id.*

[510] *Id.* at 4-449 to 4-451.

[511] *Id.* at 4-450.

[512] *Id.*

[513] *See id.* at 4-450.

metrics that would trigger adaptation."[514]  The requirement for the design to be based upon sea level rise for a 30-year span is consistent with that report.  In addition, the Petitioners neglect the requirements of Environmental Condition 40 that requires CP2 LNG to file a monitoring and maintenance plan, which ensures the storm surge floodwalls be maintained to no less than a minimum elevation of 500-year mean recurrence interval flood event; and that the facilities be protected for the life of the LNG terminal considering settlement, subsidence, and sea level rise.  This would ensure the continued protection from flooding.  Therefore, we find no reason to dispute or change the conclusions in the Authorization Order.

124.    Petitioners next assert that the Commission improperly dismissed concerns regarding the risk associated with the impacts from a Category 5 hurricane.[515]  Petitioners disagree with the Commission's evaluation of historical records through 2020 and argue that the Commission fails to account for recent years that they claim shows increasing risks.[516]  Petitioners also disagree with the Commission's application of an historical assessment that there is no known Category 5 hurricane that has made direct landfall within 60 nautical miles of the Project site and instead argues that based on a forward-looking evaluation, the Project site will be subject to increasingly frequent storms.[517]  Petitioners also argue that the Commission's evaluation of the 500-year flood event is flawed for looking at historical analysis instead of forward-looking risks.[518]

125.    Courts have recognized that "NEPA analysis necessarily involves some 'reasonable forecasting,' and that agencies may sometimes need to make educated assumptions about an uncertain future."[519]  As the final EIS explained "there is no known

---

[514] NOAA, *Global and Regional Sea Level Rise Scenarios for the United States* at 9 (February 2022).

[515] Rehearing Request at 131.

[516] *Id.* (arguing that 2021 had 21 names storms and four major hurricanes, 2022 had 14 named storms and two major hurricanes, and 2023 had 20 names storms and three major hurricanes).  We note that the number of hurricanes in any given year may be influenced by any number of factors and predicting them is difficult.  Final EIS at 4-89.  In fact, "most modeling studies project a decrease (or little change) in the global frequency of hurricanes."  *Id.* at 4-452.

[517] Rehearing Request at 131-32 (citing final EIS at 4-449 and Ex. 50).

[518] *Id.* at 132.

[519] *Sabal Trail*, 867 F.3d at 1374 (citing *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (*Del. Riverkeeper*)).

historic Category 5 Hurricane, which has made direct landfall within 60 nautical miles of Project site."[520]  As explained in the final EIS, CP2 LNG would meet or exceed the minimum federal requirements for LNG facilities in the U.S. that then meet or exceed design requirements in codes and standards for other essential infrastructure in the U.S. These more resilient design requirements make these facilities more resilient against projected increases due to climate change.[521]  In addition, the final EIS explains hurricane intensities (i.e., wind) are projected to increase on average by 1 to 10 percent, however most modeling studies project a decrease (or little change) in the global frequency of hurricanes.  For CP2 LNG, a 10,000 year return period would equate to 171 mph 3-second gust wind speed, which would be approximately 9 percent higher than the wind speed that would be required in the American Society of Civil Engineers (ASCE)/Structural Engineering Institute (SEI) 7, *Minimum Design Loads and Associated Criteria for Buildings and Other Structures*, for the most essential facilities in the U.S. and would be higher than the projected 1 to 10 percent (5 percent average) increase in hurricane intensity projected by studies evaluating impacts of climate change on future hurricane intensities.[522]  In addition, while ASCE/SEI 7 and DOT PHMSA federal regulations require only a 100-year flood event, the Authorization Order requires the storm surge barrier to withstand a more stringent 500 year event consistent with more current codes and standards, such as National Fire Protection Association (NFPA) 59A (2019 and later editions), *Standard for the Production, Storage, and Handling of Liquefied Natural Gas,* and ASCE/SEI 24 (2014) edition, *Flood Resistant Design and Construction*, adopted in the International Code Council, *International Building Code* (2015 and later editions).  Thus, we find the design of the CP2 LNG Project reasonable; and Petitioners' claims amount to "nothing more than hypotheticals with no evident basis in fact or experience."[523]  Although courts have held that NEPA requires reasonable forecasting, NEPA does not require a "crystal ball" inquiry.[524]  An agency "is not

---

[520] Final EIS at 4-449.

[521] *Id*. at 4-452.

[522] We note that data suggests that the CP2 LNG Project site can withstand Category 5 hurricane storm surge SWEL, without waves, equivalent to more than 10,000 year mean return intervals.  *Id.* at 4-450.  The site could also withstand a Category 4 hurricane equivalent or exceeding an approximate 183 mph 3-second gust wind speed and equivalent or exceeding an approximate 10,000-year mean return interval.  *Id.*

[523] *Mich. Pub. Power Agency v. FERC*, 963 F.2d 1574, 1580 (D.C. Cir. 1992) (*Mich. Pub. Power Agency*); *see also id.* ("Administrative agencies are afforded wide deference in predicting the likelihood of future events.").

[524] *Vt. Yankee*, 435 U.S. at 534.

required to engage in speculative analysis"[525] or "to do the impractical, if not enough information is available to permit meaningful consideration,"[526] or to "foresee the unforeseeable."[527]

126.    Nevertheless, as explained above, the final EIS evaluated the design against a 500-year event utilizing forward-looking data[528] and accounted for increases in precipitation, hurricane intensity, and sea level rise.[529]  The Commission took historical meteorological and climatological trends and events and extrapolated that data into the future using these predicted increases.  Thus, to the extent the Commission utilized historical data as one factor to inform its forward-looking predictions, we find such approach reasonable[530] and, thus, we disagree that the Commission's evaluation of the 500-year flood event is flawed for looking at historical analysis instead of forward-looking risks.

127.    We acknowledge that any prediction of future weather patterns, behaviors, or events involves some reasonable speculation.  Here, however, we find the CP2 LNG Project design appropriately accounts for both historical tropical activity and future environmental changes and effects.[531]  Accordingly, we agree that "the project would be designed and maintained to withstand potential changes from climate change and any

---

[525] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078 (9th Cir. 2011) (*N. Plains Res. Council*).

[526] *Id.* (quoting *Env't. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006)).

[527] *Concerned About Trident v. Rumsfeld*, 555 F.2d 817, 829 (D.C. Cir. 1976).

[528] Final EIS at 4-447 to 4-453.

[529] *Id.* at 4-451 to 4-452.

[530] An agency's choice among reasonable analytical methodologies is entitled to deference.  *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004) (*Cmtys. Against Runway Expansion*) (citing *Citizens Against Burlington*, 938 F.2d at 201).

[531] The final EIS found the 31.5-foot storm surge wall sufficient for a strong Category 4 hurricane, as discussed above.  *See supra* P 122.  Moreover, the final EIS also noted that the data "suggests that the site design can withstand Category 5 Hurricane storm surge SWEL, without waves, equivalent to more than 10,000 year mean return intervals."  Final EIS at 4-450.

changes due to climate change would not present a significant impact to the safety of the LNG facilities."**532**

128.    Petitioners next argue that the Commission's analysis fails to account for cascading or compounding extreme weather events which they assert will become increasing likely due to climate change.**533**  Petitioners cite to Hurricane Delta which closely followed Hurricane Laura's path as an example of such compounding effects and asserts that the Commission failed to discuss Hurricane Delta or flooding risks from potential debris interfering with the Project's water drainage systems.**534**

129.    As discussed above, the Commission is not required to engage in speculation and, thus, cannot assess hypothetical scenarios where storms or weather events are compounded or follow in close succession.  Nevertheless, as explained in the final EIS, "while the climate change impacts taken individually may be manageable for certain communities, the impacts of compounded extreme events (such as simultaneous heat and drought, or flooding associated with high precipitation on top of saturated soils) may exacerbate preexisting community vulnerabilities and have a cumulative adverse impact on environmental justice communities."**535**  An analysis of unknown weather events of unknown intensity and within an unknown time period sometime in the future is too speculative to provide meaningful consideration.**536**

130.    In response to Petitioners' flooding concerns, we note that the design and operation of all stormwater discharge and treatment facilities would be in accordance with applicable regulations and permits, including Louisiana Pollutant Discharge Elimination System (Louisiana PDES) program regulations under the Clean Water Act (CWA), administered by the Louisiana Department of Environmental Quality (Louisiana DEQ).**537**  Floodplain storage, drainage flow, water quality, and flood management would

---

**532** Authorization Order, 187 FERC ¶ 61,199 at P 106.

**533** Rehearing Request at 132.

**534** *Id.*

**535** Final EIS at 4-549.

**536** While speculation is implicit in NEPA, agencies are not required "to do the impractical, if not enough information is available to permit meaningful consideration." *N. Plains Res. Council*, 668 F.3d at 1078 (citing *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d at 1014).

**537** Final EIS at 2-25.

be regulated by the Louisiana DNR/Office of Coastal Management (OCM).[538] Accordingly, we find this proceeding is not the appropriate forum for determining compliance with CP2 LNG's CWA permits.[539]  Petitioners' concerns are more appropriately addressed to the Louisiana DNR OCM.[540]  In any event, under Environmental Condition 10, Venture Global will be required to comply with all applicable permits prior to construction and under Environmental Conditions 7 and 8, Venture Global will be responsible for continued compliance with all permits and mitigation measures.[541]  We find these conditions adequately address Petitioners' concerns.

131.    Petitioners also argue that the Commission failed to consider the increased air pollution that the CP2 LNG Project may emit during hurricanes and other extreme weather.[542]  Petitioners cite to events at Sabine Pass LNG[543] and Freeport LNG,[544] as well as weather events such as Winter Storm Uri and Hurricane Harvey, as examples of extreme weather events that caused increases in air pollution.[545]  Petitioners aver that the Commission must examine whether extreme-weather pollution risks are becoming more

[538] *Id.* at 4-124.  CP2 LNG has submitted a Hydrologic Modification Impact Analysis to the Louisiana DNR OCM for the CP2 LNG Project.  *Id.*

[539] *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024 at P 74 (citing *San Diego Gas & Elec. Co.*, 96 FERC ¶ 61,117, at 61,448 (2001)).

[540] *Id.*  The Commission often relies on other agencies' expertise for assessing impacts.  *Id.*; *Millennium Pipeline Co.*, 161 FERC ¶ 61,229, at P 132 (2017); *see also EMR Network v. FCC*, 391 F.3d 269 (D.C. Cir. 2004) (finding agency properly relied outside agency expertise).

[541] Authorization Order, 187 FERC ¶ 61,199 at envtl. conds. 7, 8, 10.

[542] Rehearing Request at 134.

[543] *Id.* (stating that "Sabine Pass experienced significant unplanned emission releases due to Hurricane Laura—including 51.5 tons of methane, 7.5 tons of nitrogen oxide, and 64.4 tons of carbon monoxide").

[544] *Id.* (asserting that Freeport LNG released air pollutants leading up to Hurricane Beryl, including over 1000 pounds each of ethylene and propane, over 1500 pounds of carbon monoxide, over 760 pounds of nitrogen oxides from the liquefaction flare, 3300 pounds of CO, and 426 pounds of $NO_x$).

[545] *Id.*

frequent and severe, particularly when considered cumulatively with air pollution in the region.[546]

132.    The EPA and the states are vested with authority under the Clean Air Act (CAA) to implement and enforce regulations to reduce air pollution, including to establish mitigation measures.[547]  Louisiana DEQ is responsible for enforcing the federally authorized state implementation plan to comply with air quality standards according to the CAA.[548]  We find that this proceeding is not the appropriate forum for determining compliance with CAA permits, particularly with regard to events affecting CP2 LNG that have not occurred, which is a matter within the jurisdiction of the Louisiana DEQ.[549]  As we noted above, any prediction of future weather patterns, behaviors, or events is speculative.  Therefore, an assessment of possible air pollution emitted from the CP2 LNG Project in the future from some unspecified event would render any analysis too speculative to permit any meaningful consideration.[550]  We have, however, found that "most modeling studies project a decrease (or little change) in the global frequency of hurricanes."[551]  The operating history of the U.S. LNG industry has been relatively free of safety-related incidents resulting in adverse effects on the public or the environment.[552]  Nevertheless, we recognize that incidents have occurred, including those cited by Petitioners.[553]  Additional conditions have been imposed in response to these events.[554]  We find that the Commission appropriately considered Petitioners' concerns.

---

[546] *Id.* at 134-35.

[547] Final EIS at 1-20; *Millennium Pipeline Co.*, 145 FERC ¶ 61,007, at P 50 (2013); *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 at PP 112-17.

[548] *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024 at P 74; *Columbia Gas Transmission, LLC*, 145 FERC ¶ 61,257, at P 43 (2013).

[549] *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,024 at P 74 (citing *San Diego Gas & Elec. Co.*, 96 FERC ¶ at 61,448).

[550] *Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136 at P 35 (citing *Transcon. Gas Pipe Line Co.*, 156 FERC ¶ 61,092, at P 91 (2016)).

[551] Final EIS at 4-452

[552] *Id.* at 4-410.

[553] *Id.* at 4-410 to 4-411 (detailing several incidents over the years).

[554] *Id.*

## b.    **Coastal Erosion**

133.    Petitioners disagree with the Commission's assessment that the CP Express Pipeline Project would not be affected by erosion of the Gulf of Mexico shoreline within the 30-year design lifespan of the CP2 LNG Project based on erosion rates of between 5 and 30 feet per year.[555]  Instead, Petitioners maintain that the CP Express Pipeline Project will have a lifespan of at least 50 years, resulting in 1,500 feet of erosion which could place pipeline components at risk.[556]  Petitioners argue that the Commission failed to account for this increased erosion.[557]

134.    We find Petitioners' arguments unpersuasive.  Near the Projects, shoreline erosion is typically between 5 to 30 feet per year.[558]  The portion of the Projects closest to the shore is where the CP Express Pipeline Project enters the CP2 LNG Project's Gas Gate Station which is over 1,000 feet north of the shoreline.[559]  We disagree with Petitioners' use, again, of the upper-bound of the predicted erosion range and a 50-year lifespan to support its assertion that there will be 1,500 feet of erosion.  We note that it is just as likely that erosion will occur at a rate closer to the lower-bound estimates (or somewhere in between), and Petitioners provide no support for their use of only the upper-bound forecast.  Petitioners also fail to discuss the additional protective measures that would be incorporated into the CP2 LNG Project terminal site design, which the Commission concluded would cause the CP Express Pipeline Project to not be affected by erosion of the Gulf of Mexico shoreline within the 30-year design lifespan of the CP2 LNG Project.[560]  These measures also include, as discussed above, a requirement that CP2 LNG maintain the storm surge walls to withstand a minimum of a 500-year mean occurrence interval in consideration of relative sea level rise, local subsidence, site settlement, shoreline recession, erosion and scour effect, and wind-driven wave effects.[561]  Moreover, Environmental Conditions 30 and 36 require inspections to detect erosion and

---

[555] Rehearing Request at 132-33 (citing final EIS at 4-96).

[556] *Id.* at 133 (citing final EIS at 4-259, Table 4.10.1-2).

[557] *Id.*

[558] Final EIS at 4-96.

[559] *Id.*

[560] *Id.* at 4-96, 4-397 to 4-505 (explaining the various reliability and safety requirements for the Project).

[561] Authorization Order, 187 FERC ¶ 61,199 at env't condition 39.

for CP2 LNG to develop an erosion control and prevention plan for the dock area.[562] Thus, erosion will be constantly monitored and corrective measures taken as necessary.

135.   Finally, we note that regardless of the proposed LNG terminals design life, once in operation, the CP2 LNG Project will be subject to regular on-site inspections by Commission staff for as long as the facilities remain subject to our jurisdiction.[563]  We find these ongoing requirements sufficient to address Petitioners' concerns.

### c.   High Temperatures

136.   Petitioners next assert that the Commission ignored EPA's recommendation to examine the risks that extreme temperatures pose to building materials and seals.[564] Petitioners cite findings from the Cybersecurity & Infrastructure Security Agency that extreme heat threatens critical infrastructure across the country and that the Commission must examine whether the CP2 LNG Project will pose greater risks if materials are exposed to increasingly high temperatures, particularly due to its dependence on refrigeration.[565]

137.   Any building materials that utilize concrete will be subject to quality assurance and quality control procedures as required by environmental condition 43 of the Authorization Order.[566]  During construction, concrete samples will be tested to determine if the concrete complies with the project specifications for temperature, air content, density, and compressive strength.  Once installed, CP2 LNG would establish an inspection program to periodically assess the condition of all structural elements that includes concrete foundations and supports.  In addition, equipment that utilize industrial seals such as valves, pumps, compressors, etc. would be designed to operate in a wide range of temperatures.  Generally, these seals would not be exposed to ambient temperatures because valve seals would be inside the valve body and compressor/pump seals would generally be enclosed within the equipment.  Furthermore, the specific

---

[562] *Id.* at env't conditions 30 & 36.

[563] Authorization Order, 187 FERC ¶ 61,199 at env't conditions 132-135 (requiring reports and monitoring *for the life* of the CP2 LNG Project); *Nat'l Grid LNG LLC*, 165 FERC ¶ 61,031, at P 67 (2018).

[564] Rehearing Request at 133.

[565] *Id*. (citing Ex. 55, Cybersecurity & Infrastructure Security Agency, Extreme Heat, https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/extreme-weather-and-climate-change/extreme-heat).

[566] Authorization Order, 187 FERC ¶ 61,199 at env't condition 43.

temperature range for these seals would be dependent on the material of construction (i.e., rubber, ceramic, graphite, silicone, Teflon, metal, composite, etc.). These seals have an upper temperature limit that ranges from approximately 250°F to 1000°F. Thus, any potential extreme heat event is not expected to cause seal failures. Furthermore, as required by environmental condition 130 of the Authorization Order, CP2 LNG must develop plans for preventative and predictive maintenance programs to perform periodic or continuous equipment condition monitoring.[567] In addition, as required by environmental condition 132 of the Authorization Order, CP2 LNG will be subject to regular field inspections conducted by Commission staff, as a result of which staff could identify and assess any future issues.[568] Moreover, as explained in the final EIS, CP2 LNG will meet or exceed the minimum federal requirements for LNG facilities in the U.S. that then meet or exceed design requirements in codes and standards for other essential infrastructure in the U.S.[569] We find CP2 LNG's compliance with these design requirements and the Authorization Order sufficient to address Petitioners' concerns. to address Petitioners' concerns. sufficient to address Petitioners' concerns. to address Petitioners' concerns.

### d.    <u>Flaring</u>

138.    Petitioners maintain that day and night flaring already causes impacts to the community which the Commission failed to address or remedy the frequency of flaring or ensure such occurrences will not repeat with the CP2 LNG Project.[570]

139.    As explained in the final EIS, "flares are used only for start-up, shutdown, routine maintenance, and non-routine venting of emissions due to excess pressure."[571] The Commission acknowledged that several commenters expressed concern over the duration of flaring at the Venture Global Calcasieu Pass LNG terminal and concerns as to whether the flaring activities for CP2 LNG would differ."[572] In response to these concerns, the

---

[567] *Id.* at env't condition 130.

[568] *Id.* at env't condition 132.

[569] Final EIS at 4-452.

[570] Rehearing Request at 83 (citing Authorization Order, 187 FERC ¶ 61,199 at P 132 and John Allaire March 12, 2023 Comments); *id.* at 149.

[571] Final EIS at 4-359.

[572] *Id.*

final EIS provided detailed analysis of anticipated flaring at the CP2 LNG terminal.[573]
Specifically, the final EIS explains that flaring would be conducted as part of CP2 LNG's
commissioning and start-up activities and that, given the nature of commissioning, the
frequency of flaring is unpredictable.[574] "According to Venture Global, Calcasieu Pass is
experiencing unanticipated issues that require daily corrective, testing, and rectification
work, thereby prolonging the duration of commissioning."[575] According to CP2 LNG,
"these circumstances do not raise any safety concerns and while the flaring conducted at
Calcasieu Pass LNG in 2022 was within the limits imposed by the facility's Title V
permit [], such issues have resulted in flaring that is both longer in duration and more
frequent than anticipated." Once commissioning has been completed, flaring for start-up,
shutdown, and periodic routine maintenance is expected to be greatly reduced.[576] We
find that the Commission fully addressed the comments concerning flaring.

## 6.    CCS System

140.   Petitioners argue that the Commission failed to take a hard look at the
environmental impacts of the non-jurisdictional portion of the proposed CCS system,
including the $CO_2$ send-out pipeline and sequestration wells.[577] Specifically, Petitioners
assert that the Commission's analysis of the CCS system under its cumulative impacts
analysis is insufficient because it does not describe the effects of this infrastructure on
wetlands, waterbodies, air, and species and that, instead, the Commission should have
evaluated the CCS system as a connected action.[578] Petitioners argue that the CP2 LNG
Project and the jurisdictional CCS facilities within the fence-line are interdependent parts
that cannot proceed without the non-jurisdictional $CO_2$ pipeline and injection facilities
and that neither has substantial independent utility.[579] Petitioners argue that the non-
jurisdictional components of the CCS system are federal projects because they require

---

[573] *Id.* at 4-359 to 4-361.

[574] *Id.* at 4-359 to 4-360.

[575] *Id.* at 4-360.

[576] *Id.*

[577] Rehearing Request at 162-63.

[578] *Id.* at 163-64.

[579] *Id.* at 164-65.

federal approvals and that separate agencies' actions can be connected for purposes of the connected actions regulation.[580]

141.    As we explained in the Authorization Order, CP2 LNG's CCS system will capture, compress, and sequester approximately 500,000 tons of $CO_2$ from feed gas entering the CP2 LNG Project.[581]  As part of the pretreatment process, $CO_2$ will be removed from the feed gas as $CO_2$ vapor and sent to the on-site carbon capture facility, where the $CO_2$ vapor will be compressed, condensed into a liquid, and pumped to a higher pressure.[582]  The resulting $CO_2$ liquid will then be routed to a $CO_2$ send-out pipeline for injection into saline aquifers approximately three miles offshore.[583]  In the Authorization Order, the Commission concluded that the CCS facilities located within the terminal fence-line up to the entry point of the send-out pipeline was subject to the Commission's jurisdiction under NGA section 3(e).[584]  Accordingly, the Commission considered this jurisdictional portion of the CCS system in its overall NEPA analysis.[585]  With these facts in mind, we turn to the arguments raised by Petitioners.

142.    We disagree that the Commission was required to consider the non-jurisdictional CCS facilities as a connected action in its NEPA review.  As an initial matter, the Commission is only required to "evaluate, in a single review, proposals or parts of proposals that are related closely enough to be, in effect, a single course of action."[586]

[580] *Id.* at 165 (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 35-36, 48-51 (D.C. Cir. 2015) and *City of Bos. Delegation v. FERC*, 897 F.3d 241, 251-52 (D.C. Cir. 2018) (*City of Bos.*)).

[581] Authorization Order, 187 FERC ¶ 61,199 at P 9.

[582] *Id.*

[583] *Id.*

[584] *Id.* P 21.

[585] Petitioners do not dispute this exercise of jurisdiction.

[586] 40 C.F.R. § 1501.3(b).  A proposal "means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can *meaningfully evaluate its effects*."  40 C.F.R. § 1508.1(ff) (emphasis added); *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048 at P 54.  Further, for the purposes of NEPA, "'projects' . . . are described as 'proposed actions,' or proposals in which action is imminent."  *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1229 (10th Cir. 2008) (*Wilderness Workshop*);

Courts have indicated that, in considering a pipeline application, the Commission is not required to consider in its NEPA analysis other potential projects for which the project proponent has not yet filed an application, or where construction of a project is not underway.[587]  NEPA "does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions."[588]

143.    We recognize that Venture Global has filed an application for a carbon sequestration permit with the EPA and with Louisiana DNR;[589] however, that application was received by the EPA on July 25, 2023, just 3 days before the Commission issued its final EIS, and received by the Louisiana DNR on February 5, 2024, over six months following issuance of the final EIS.[590]  Accordingly, we find that the CCS proposal cannot be said to be "imminent" for purposes of connected actions consideration.[591] The Commission has found proposals not sufficiently imminent in similar situations.[592]

---

*O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 236 (5th Cir. 2007) (*O'Reilly*); *E. Shore Nat. Gas Co.*, 181 FERC ¶ 61,233 at P 27.

[587] *Minisink*, 762 F.3d at 113 n.11; *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048 at P 48 & n.77.

[588] *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.20 (1976) (*Kleppe*).

[589] Louisiana DNR, Class VI Carbon Sequestration Program, Permits and Applications, https://www.dnr.louisiana.gov/index.cfm/page/1695 (last visited Nov. 27, 2024).

[590] July 28, 2023 Notice of Availability of Final EIS.  Indeed, at the time the final EIS was issued, the pipeline alignment, platform location, and well location were in the siting stage of project development.  Final EIS at 4-523.

[591] We note that in the event the CCS facilities become unavailable, the $CO_2$ removed from the feed gas can be routed to the jurisdictional facilities and equipment for final disposition.  Authorization Order, 187 FERC ¶ 61,199 at nn.15, 37.  Thus, whether or not the non-jurisdictional facilities are built, the Commission's approval of the Project will not be affected.

[592] *See, e.g.*, *E. Shore Nat. Gas Co.*, 181 FERC ¶ 61,233, at P 32 (2022) (finding project should not have been considered in an Environmental Assessment because it was not imminent); *PennEast Pipeline Co.*, 164 FERC ¶ 61,098 at P 135 (finding projects should not have been considered in an EIS because they "were not imminent"); *Const. Pipeline Co.*, 154 FERC ¶ 61,046, at P 96 (2016) (stating that the project alleged to be

144.    Regardless, the Commission was not required to consider those components of the CCS facility outside of its jurisdiction.  "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration."[593]   NEPA's implementing regulations provide that actions are "connected" if they:  (i) automatically trigger other actions that may require EISs; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) are interdependent parts of a larger action and depend on the larger action for their justification.[594]   In the context of natural gas infrastructure projects, the D.C. Circuit has focused on the projects' "degree of physical and functional interdependence and their temporal overlap."[595]   The requirement that an agency consider connected actions in a single environmental document is to "prevent agencies from dividing one project into multiple individual actions"[596] with less significant environmental effects and "to prevent the government from 'segmenting' its *own* 'federal actions into separate projects and thereby failing to address the true scope and impact of the activities that should be under consideration.'"[597]

145.    Nevertheless, NEPA does not require the Commission to evaluate as connected actions major federal actions outside of its control.[598]  As the court in *Alaska LNG*

---

a connected action was only in the pre-filing process, and, therefore, was not a proposed action); *Tenn. Gas Pipeline Co.*, 154 FERC ¶ 61,191, at P 56 (2016) (same).

[593] *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 19 (quoting *Del. Riverkeeper*, 753 F.3d at 1313).

[594] *Del. Riverkeeper*, 753 F.3d at 1309; 40 C.F.R. § 1501.3(b).

[595] *Evangeline Pass*, 100 F.4th at 212; *Food & Water Watch v. FERC*, 28 F.4th 277, 291 (D.C. Cir. 2022) (*Food & Water Watch*).

[596] *Myersville*, 783 F.3d at 1326.

[597] *Big Bend*, 896 F.3d at 423; *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d at 49 (quoting *Del. Riverkeeper*, 753 F.3d at 1313); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 21).

[598] *Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136 at P 60; *see also Tenn. Gas Pipeline Co.*, 157 FERC ¶ 61,254, at P 70 (2016) (stating that because the Commission did not have jurisdiction over powerplant, it could not be a connected action); *Freeport LNG Dev., L.P.*, 167 FERC ¶ 61,155, at P 30 (2019) ("Sierra Club fails to cite to any

explained, NEPA's connected actions requirements "ensure that agencies consider the environmental impacts of closely related actions; however, they do not, and cannot, expand [the Commission's] jurisdiction."[599]  Similarly, the D.C. Circuit in *El Puente v. United States Army Corps of Engineers* stated that the agency had "convincingly argue[d] that it was not required to consider the potential impact of [a federal action], at least as a "connected action," because the Corps has no regulatory authority over the construction or operation of [the area of federal regulation]."[600]  We also note that the CEQ regulations have distinguished between connected actions, cumulative actions, and similar actions with regard to the necessary scope of an EIS.[601]  Only for cumulative actions do the regulations specifically include actions "regardless of what agency (Federal or non-Federal) or person undertakes such actions."[602]  No similar language applies to connected actions.[603]

146.    We recognize that the D.C. Circuit in *City of Port Isabel* recently remanded the Commission's authorizations involving a similar CCS system and required the Commission to evaluate it as a connected action.[604]  We find that case distinguishable.  In *City of Port Isabel*, Rio Grande LNG filed a limited amendment that proposed to incorporate CCS facilities into the *already-approved* site and design of Commission-jurisdictional Rio Grande LNG terminal, necessitating additional NEPA analysis by the Commission.[605]  Although the Commission asserted that it was not required to evaluate the CCS facilities as a connected action, the court in *City of Port Isabel* held, at least in

---

case where 'connected action' has been found to encompass two actions by two separate federal agencies").

[599] *Alaska LNG*, 67 F.4th 1176, 1185 ("We decline to adopt [petitioners] aggressive reading of 40 C.F.R. § 1508.25, which conflicts with our precedent and would require the Commission to consider the indirect effects of actions beyond its delegated authority.")

[600] 100 F.4th 236, 249 (D.C. Cir. 2024).

[601] *Tenn. Gas Pipeline Co.*, 187 FERC ¶ 61,136 at P 61.

[602] *Id.* (citing 40 C.F.R. § 1508.25(a)(2) (1979)).

[603] *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206 at P 22.

[604] *City of Port Isabel*, 111 F.4th 1212-13.

[605] Rio Grande LNG, Notice of Schedule for the Preparation of an Environmental Assessment for the Proposed Carbon Capture and Sequestration System Amendment (filed December 2, 2022).

part, that because the application for limited amendment for the CCS facilities was pending before the Commission at the same time as the court's first remand requiring the Commission to revisit aspects of its environmental analysis and approval of the project, the Commission was required to evaluate the CCS facilities as a connected action.[606]  In this case, the Commission determined that the CCS facilities located within the CP2 LNG Project fence-line up to the entry point of the send-out pipeline was subject to the Commission's jurisdiction under NGA section 3(e).[607]  Accordingly, unlike in *City of Port Isabel*, the Commission considered the jurisdictional portion of the CCS system in its overall NEPA analysis and approval of the CP2 LNG Project site and design. Importantly, the court in *City of Port Isabel* had no occasion to consider the scope of the Commission's environmental review vis-à-vis the connected actions doctrine.

147.    Based on the foregoing, we disagree that the non-jurisdictional $CO_2$ pipeline and injection facilities of the CCS system are connected actions with the CP2 LNG Project for purposes of NEPA review.  Instead, we find that the Commission was not required to consider the components of the CCS system outside of its jurisdiction in its NEPA analysis as a connected action.

148.    Nevertheless, where improper segmentation is usually concerned with projects that have reached the proposal stage, or are within the agency's jurisdiction, a cumulative impact analysis requires the Commission to include present, proposed, and reasonably foreseeable future actions in its review.[608]  Thus, even in circumstances where projects have not reached the "proposal" stage, or may be outside of an agencies' jurisdiction, NEPA still requires the agency to evaluate reasonably foreseeable actions, and we have found cumulative impacts analysis sufficient.[609]

149.    Here, the Commission requested that CP2 LNG "[p]rovide details regarding CP2 LNG's proposed [CCS], including . . . (i) a description and location of all associated

---

[606] *City of Port Isabel*, 111 F.4th 1212-13.

[607] Authorization Order, 187 FERC ¶ 61,199 at P 21.

[608] *O'Reilly*, 477 F.3d at 236–37 (citing *Env't Def. Fund v. Marsh,* 651 F.2d 983, 999 (5th Cir. 1981)); *Wilderness Workshop*, 531 F.3d at 1229.

[609] *Minisink*, 762 F.3d at 113 n.11 (finding cumulative impacts analysis sufficient where proposal submitted to the Commission once construction already began on another project); *ANR Pipeline Co.*, 185 FERC ¶ 61,191, at P 55 (2023) ("We find that the potential impacts of the non-jurisdictional electric transmission line and substation are sufficiently addressed in the EA's cumulative impacts section."); *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048 at P 49 (stating that the Commission evaluated projects as cumulative impacts even though there were no pending proposals).

facilities (e.g., capture equipment, sequestration wells, and pipeline); (ii) description of impacts on land use type and acreage, water resources (including number of impacted waterbodies), safety, air and noise, and any other impacted resources . . . ."[610]  In response, CP2 LNG indicated that the initial portion of the pipeline will be installed via horizontal directional drilling, but[611] CP2 LNG also stated that "impacts outside the Terminal site cannot be further described at this time" and that "the pipeline alignment, platform location, and well location are in the siting stage of project development."[612]  Accordingly, at the time of the data request, information related to the Commission's cumulative impact analysis was simply unavailable given the early stages of project development.  Indeed, as identified above, CP2 LNG's application to the EPA and Louisiana DNR for a carbon sequestration permit three days before and six months after the Commission issuance of its final EIS, respectively, and even then, it is not clear whether the permit application contains finalized plans or routes for the other components of the CCS system, e.g., $CO_2$ pipeline.  Accordingly, the Commission conducted cumulative impact analyses with the information available with respect to the non-jurisdictional CCS system.[613]  Thus, we find that our analysis has complied with NEPA and applicable precedent and we disagree that the Commission failed to adequately consider cumulative impacts.

150.    We also find the Commission's NEPA analysis of the CCS facilities consistent with directives in *Delaware Riverkeeper*.[614]  There, the D.C. Circuit determined that the Commission's NEPA analysis violated the segmentation rule because it failed to evaluate the environmental effects of four Commission-jurisdictional upgrade projects and remanded the proceeding back to the Commission for further consideration of segmentation and cumulative impacts.[615]  On remand, the Commission prepared a supplemental analysis to examine the additive environmental impacts of the four Commission-jurisdictional projects, as well as to incorporate the projects into the

---

[610] Commission July 15, 2022 Data Request at 3.

[611] CP2 LNG July 22, 2022 Response to Data Request at 1-4.

[612] *Id.*

[613] *See* final EIS at 4-516, 4-523 (identifying CP2 LNG's CCS project as a project and reasonably foreseeable future action with the potential to contribute to cumulative impacts); *id.* at 4-523 – 4-524 (analyzing non-jurisdictional CCS facility components workspace in geology and soils).

[614] 753 F.3d 1304.

[615] *Id.* at 1308-09.

cumulative impacts analysis.[616]  The Commission used the term additive impacts to refer to the combine direct and combined indirect impacts of the four Commission-jurisdictional projects.[617]  Here, the Commission examined the additive environmental impacts of the Commission-jurisdictional CCS facilities by incorporating them into the Commission's review of the entire Project, and examined the cumulative environmental impacts of the non-jurisdictional CCS facilities.[618]  We find this consistent with the Commission's NEPA obligations, and, importantly, we note that Petitioners fail to explain how an analysis of the non-jurisdictional facilities would materially differ under a connected actions analysis as opposed to cumulative analysis.[619]

151.    Last, we also find that other federal and state authorities will consider the environmental impacts from the non-jurisdictional CCS facilities.  Although "the lead agency supervises the preparation of the environmental document where more than one federal agency is involved, the 'lead agency' designation does not alter the scope of the project before the Commission either for approval or environmental review."[620]  The lead

---

[616] *Tenn. Gas Pipeline, L.L.C.*, 153 FERC ¶ 61,215, at P 21 (2015), *order on reh'g*, 156 FERC ¶ 61,007 (2016).

[617] *Tenn. Gas Pipeline, L.L.C.*, 153 FERC ¶ 61,215 at n.38.

[618] Final EIS at 1-13 ("[F]or purposes of the NEPA analysis, we evaluate the portion of the CCS system within the LNG Terminal footprint as FERC jurisdictional components of the Project; while the proposed CO2 pipeline and ancillary facilities under EPA's jurisdiction are considered non-FERC jurisdictional in this EIS."); *id.* at 1-14 ("[P]otential environmental impacts associated with all non-jurisdictional facilities located outside of the Project footprint are discussed in section 4.14 (Cumulative Impacts)."); *see also id.* at 4-516, 4-523 (identifying CP2 LNG's CCS project as a project and reasonably foreseeable future action with the potential to contribute to cumulative impacts); *id.* at 4-523 to 4-524 (analyzing non-jurisdictional CCS facility components workspace in geology and soils).

[619] *See Rockies Express Pipeline LLC*, 154 FERC ¶ 61,139 (2016) ("an agency is not required to analyze actions in the same environmental document if that agency did not intend to segment its review to minimize its cumulative impacts analysis"); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 50 ("Sierra Club adds a step that the regulation does not support: The connected actions regulation requires agencies to review the picture as a whole rather than conduct separate NEPA reviews on pieces of an agency-action jigsaw puzzle; it does not add a multitude of private pieces to the puzzle and so require review of a much larger picture").

[620] *Elba Liquefaction Co.*, 157 FERC ¶ 61,195, at P 15 (2016) (citing 40 C.F.R. § 1501.5(a)).

agency role does not "make the Commission responsible for ensuring a cooperating federal agency's compliance with its own NEPA responsibilities."[621]  NEPA is not intended to require duplication of work by state and federal agencies.[622]  "Neither should NEPA be construed to require the [an agency] to essentially federalize an environmental review process that has already been delegated to federally approved state programs."[623]

152.    As we explained in the Authorization Order, the geological sequestration of $CO_2$ is subject to the EPA's jurisdiction under the UIC program.[624]  The State of Louisiana has primary enforcement authority for CCS projects under the federal UIC program.[625]  The Louisiana DNR administers the UIC Class VI program in Louisiana.[626]  In addition, the CCS system will require other federal permits and/or consultations with the Corps, U.S. Department of Commerce, the National Oceanic and Atmospheric Administration, the National Marine Fisheries Service, and the U.S. Fish and Wildlife Service.[627]  At the state level, the CCS system will require permits and/or consultations with the Louisiana DEQ, Louisiana DWF, Louisiana Department of Culture, Recreation, and Tourism, and the Louisiana Office of State Lands.[628]

---

[621] *Id.*

[622] *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 196 (4th Cir. 2009) (citing 40 C.F.R. § 1506.2(b) ("Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements . . .")).

[623] *Id.*; *Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 401 (9th Cir. 1989) ("ordinary notions of efficiency suggest a federal environmental review should not duplicate competently performed state environmental analyses").

[624] Authorization Order, 187 FERC ¶ 61,199 at n.16.

[625] *Id.*

[626] *Id.* (citing *State of Louisiana Underground Injection Control Program*; *Class VI Primacy*, 89 Fed. Reg. 703 (Jan. 5, 2024)).

[627] CP2 LNG July 22, 2022 Response to Environmental Information Request at attach. 1-a.

[628] Final EIS at 1-16 to 1-19, table 1.5-1.

7.      **Socioeconomics**

a.      **Investments and Employment**

153.    Petitioners assert that the Projects will be assembled on site from modules that are constructed overseas and shipped intact to the U.S., significantly decreasing domestic benefits, and instead benefitting the economies of foreign nations, and increasing Venture Global's profit margin.[629]  Petitioners maintain that because only 10% of Projects' costs will be spent locally or regionally, the Commission should have considered this factor.[630]

154.    As an initial matter, the modular method of construction is applicable only to the CP2 LNG Project and not the CP Express Pipeline Project.  With regard to the CP2 LNG Project, the final EIS acknowledges that CP2 LNG "anticipates that a significant portion of materials, equipment, and modular plant components (including the liquefaction units) would be brought to the site by barge."[631]  CP2 LNG "intends to have the pretreatment and liquefaction equipment and piping prefabricated at an offsite location as modules and transport the modules to the site for installation."[632]   The final EIS also expressly recognized that "an estimated 10 percent of [the Projects] costs would be spent at locally or regionally based suppliers."[633]  Therefore, despite Petitioners' assertions, the Commission considered this factor.

155.    Petitioners also assert that Venture Global's offshore construction model will reduce the number and tenure of domestic jobs, with many of the engineering and construction jobs going to foreign workers, thus, decreasing any employment benefits resulting from the Project.[634]  Petitioners argue that most of the jobs associated with the Project will be by non-residents.[635]  Petitioners point to evidence from the construction of

---

[629] Rehearing Request at 64.

[630] *Id.*

[631] Final EIS at 2-24, 4-539.

[632] *Id.* at 4-423.

[633] *Id.* at 4-263.

[634] Rehearing Request at 64-65.

[635] *Id.* at 65-67.

Venture Global's CP1 LNG facility[636] as well as Sabine Pass's LNG facility[637] explaining that most of the workforce was from out-of-state and did not generate significant new business development.[638]

156.    The Commission sufficiently considered the employment benefits flowing from the Projects.  The final EIS explained that "[t]he percentage of the workforce that is locally sourced would be dependent upon several factors, including the availability of local workers, the timing of need for different skilled trades, and the timing of other proposed or ongoing projects in the study area."[639]  The final EIS states that Venture Global anticipates employing approximately 30% of its local workers for construction of the CP2 LNG Project, and 50% for construction of the CP Express Pipeline Project.[640]  Nevertheless, the final EIS recognized that because the Projects "include modular construction methods . . . several of the generated jobs may occur outside of Cameron and Calcasieu Parishes, and even outside of the U.S."[641]  The final EIS also estimated that the temporary workforce for the Projects could peak at approximately 7,550 workers, with about 40% of that workforce being non-local.[642]  We agree with the assessment in the final EIS that, although the Projects "would generate a large number of jobs over a

---

[636] *Id.* at 65-66 (citing Response to Form Letters at Ex. 4) (explaining observations from RV park indicating that Venture Global undercut local business by contracting with companies to house out-of-state workers and that a majority of vehicle license plates were from out-of-state); *id.* at 66-67 (citing U.S. Census Bureau dataset and explaining that any new jobs created by Venture Global's CP1 LNG facility were offset by losses elsewhere and that during construction, civilian jobs actually decreased).

[637] *Id.* at 66 (citing IEEFA November 14, 2023 Comments at 4) (explaining that the Sabine Pass LNG facility did not generate significant new business development with indirect new jobs).

[638] *Id.*

[639] Final EIS at 4-263.

[640] *Id.*  The final EIS noted that the CP2 LNG Project would employ an average of 1,600 to 3,200 construction jobs for a period of about 4 years and the CP Express Pipeline Project would employ approximately 830 construction jobs for a period of about 28 months.  *Id.* at 4-539.

[641] *Id.*

[642] *Id.*

period of about 4 years, the overall effect on local unemployment would likely not be significant."<sup>643</sup>

157.    Petitioners next argue that the actual number of permanent jobs remains unclear, that record evidence shows the number could be as low as 130 as opposed to 250, and that the Commission should have requested additional information from Venture Global and further evaluated this economic benefit.<sup>644</sup>

158.    Despite Petitioners' claim that the number of permanent jobs could be as low as 130, the record evidence cited by Petitioners, i.e., comments in support of the project, provide no basis for that figure.<sup>645</sup>  Bare assertions without evidence is insufficient.<sup>646</sup>  In any event, the Commission appropriately considered and disclosed the number of permanent jobs that may be created for both Projects.<sup>647</sup>  The final EIS explained that "[a]pproximately 250 full-time workers would be hired for the [CP2 LNG Project] and approximately 10 full-time workers would be hired for the [CP Express Pipeline Project]."<sup>648</sup>  These figures are supported by detailed analyses provided by CP2 LNG  in its application with the Commission.<sup>649</sup>  We continue to find that the record evidence supports a finding that the Projects will create approximately 260 permanent jobs.<sup>650</sup>  In any case, the provision of even 130 jobs would represent an economic benefit.

---

<sup>643</sup> *Id.*

<sup>644</sup> Rehearing Request at 65.

<sup>645</sup> *Id.* (citing Jane Brown March 27, 2024 Comment).

<sup>646</sup> *Entergy Ark., Inc.*, 141 FERC ¶ 61,269, at P 30 (2012) ("The Commission has long held that protestors must provide more than unsubstantiated allegations in support of their positions"); *Midwest Indep. Transmission Sys. Operator, Inc.*, 131 FERC ¶ 61,173 at P 93 (2010).

<sup>647</sup> We note, as discussed previously, the Commission does not weigh the public benefits against potential harms in its NGA section 3 public interest determination.

<sup>648</sup> Final EIS at 4-320; CP2 LNG December 2, 2021 Application at 42.

<sup>649</sup> *See generally* CP2 LNG December 2, 2021 Application at Resource Report 5

<sup>650</sup> *See* Final EIS at 4-264 ("It is reasonable to assume that the 260 new permanent jobs associated with the Terminal Facilities and Pipeline System would lead to additional indirect employment opportunities and growth in both Cameron and Calcasieu Parishes.").

159.    Next, although Petitioners express concerns with Venture Global contracting with companies to house out-of-state workers for its CP1 LNG project,[651] we note that this is outside the scope of this proceeding.  Nevertheless, the final EIS recognized that "[s]hort-term cumulative impacts on housing from the increased workforce could include higher occupancy and increased room rates for hotels and motels, less availability at recreational vehicle parks, longer commutes for workers living outside the study area, and higher rental costs associated with the increased demand for accommodation."[652]

160.    Moreover, although Petitioners cite to a comment that they claim supports the view that a majority of laborers at the CP1 LNG facility were from out-of-state,[653] we find such assertions of no moment.  In the comment cited by Petitioners, Southeast Laborers' District Council asserted that it surveyed Venture Global's jobsite parking lots in Calcasieu Parish and estimated that of the approximately 1,000 vehicles parked in two parking lots, three-quarters of the vehicles had out-of-state license plates, while only one-quarter of the vehicles had Louisiana license plates.[654]  As an initial matter, we do not consider counting vehicles in a parking lot to be an accurate representation of workforce demographics.[655]  We also find it inappropriate to count vehicle registrations associated with other, unrelated Venture Global projects in the area and extrapolate that data to the yet-to-be-constructed Projects in this proceeding.  Thus, such arguments are at best premature.  In any event, as expressed above, Venture Global anticipates employing approximately 30% of the workforce locally.  Even if we could appropriately extrapolate the data, this is not far from the 25% allegedly observed by Southeast Laborers' District Council.[656]

---

[651] Rehearing Request at 65-66 (citing Response to Form Letters at Ex. 4).

[652] Final EIS at 4-540.

[653] Rehearing Request at 66 (citing Southeast Laborers' District Council March 11, 2022 Comment at 11).

[654] Southeast Laborers' District Council March 11, 2022 Comment at 11

[655] Indeed, a large influx of out-of-state vehicles at any given moment could be caused by a variety of factors.  For example, such a visual survey does not account for out-of-state employees who may have decided to permanently reside in Calcasieu Pass but may have failed to update their vehicle registrations.  In addition, we find the underlying data unreliable because the numbers are expressed in approximations, and it is unclear which Venture Global jobsite was observed.

[656] Southeast Laborers' District Council March 11, 2022 Comment at 11.  We note that, regardless of percentage, out-of-state workers bring many local benefits such as

161.   Petitioners also assert since the CP1 LNG facility began operations, and that businesses, churches, hospitals, and homes sit abandoned with nearly half of the Cameron Parish population remaining when compared to 2005.[657]

162.   Petitioners, however, fail to explain how LNG projects have caused these declines. Multiple factors may cause and/or contribute to declining socioeconomic conditions.  The final EIS explained that "in 2018 and 2019, the Louisiana economy was in the midst of an industrial boom" and that "[l]ow natural gas prices, together with the long-term prospect that they would remain low, encouraged a large number of firms (particularly in the chemical sector) to announce expansion of existing industrial plants or construction of new plants in Louisiana."[658]  Urban and rural parishes benefited from an improving economy.[659]  The global COVID-19 pandemic paused this growth, and it is estimated that Louisiana lost 105,400 jobs (-5.3%) in 2020.[660]  Calcasieu and Cameron Parishes make up the Lake Charles metropolitan statistical area (MSA), which is one of nine MSAs in Louisiana.[661]  The Lake Charles MSA is dominated by three industries: petrochemicals (including natural gas liquefaction and export), gambling, and aircraft repair.[662]  Thus, the economy relies on much more than LNG facilities.  In 2020, the COVID-19 pandemic had devastating consequences for both parishes, with both the casino market and industrial construction resulting in the loss of approximately 7,000 jobs in the Lake Charles MSA.[663]  Nevertheless, recovery in the Lake Charles MSA is expected as there are $13 billion in LNG projects underway and another $58 billion potential projects forecast for the area.[664]  Based on the foregoing, it is reasonable to conclude that the local economies in fact may benefit from such projects.

---

higher demand for rent, *see* final EIS at 4-265 to 4-266, and increased tax revenue, *see id.* at 4-275, to name a few.

[657] Rehearing Request at 67.

[658] Final EIS at 4-260.

[659] *Id.*

[660] *Id.*

[661] *Id.* at 4-261.

[662] *Id.*

[663] *Id.*

[664] *Id.*

### b.    <u>Tax Incentives and Indirect Benefits</u>

163.    Petitioners next argue that any alleged employment benefits are outweighed by costs to local taxpayers.[665] Specifically, Petitioners argue that various tax abatements,[666] tax incentives,[667] and rebates[668] will diminish the economic benefits of the Projects.[669] Petitioners cite Venture Global's Plaquemines facility as an example and claims that it received ITEP benefits of $834 million and Quality Jobs benefits of $29.8 million over 10 years at its Plaquemines facility, amounting to roughly $2.9 million tax break per job created.[670] Petitioners argue that the Commission must consider the impact of these tax breaks in its analysis of Project benefits and that such revenue could have alternatively been used for the local community, which does not have a sales tax.[671] Petitioners cite to an analysis of Louisiana's ITEP program as evidence that projects that receive ITEP tax breaks have no statistically significant correlation with job growth or personal income growth, and that, the opposite actually occurs.[672]

164.    The Louisiana tax abatements, incentives, and rebates cited by Petitioners are primarily matters of State concern and outside the scope of this proceeding.[673] While

---

[665] Rehearing Request at 67, 69.

[666] Petitioners point to Louisiana's Industrial Tax Exemption Program (ITEP) which would provide an 80% tax abatement on ad valorem tax for a five-year period. *Id.* at 67.

[667] Petitioners point to Louisiana's Quality Jobs tax incentive, which could provide up to a 6% rebate on annual payroll expenses for up to 10 years. *Id.* at 67-68.

[668] Petitioners argue that Venture Global could qualify for state sales and use tax rebates on capital expenses or a 1.5% Project facility expense rebate for qualifying expenses. *Id.* at 68.

[669] *Id.* at 67-69.

[670] *Id.* at 68; *see also id.* (stating that the tax breaks for Venture Global's CP1 LNG facility will be greater).

[671] *Id.*

[672] *Id.* at 69 (citing Response to Form Letters at Ex. 18).

[673] *Confederated Salish & Kootenai Tribes Energy Keepers, Inc.,* 153 FERC ¶ 61,217, at P 21 (2015) ("[T]he Commission is not a taxing authority and the tax impacts of projects are not within our jurisdiction."); *N.Y. Power Auth.*, 118 FERC ¶ 61,206,

CP2 LNG may apply for such tax benefits, it is up to the state of Louisiana to approve such requests and outside of the Commission's control. Regardless, the Commission considered potential tax incentives in its consideration of the Projects' benefits. The final EIS acknowledged that CP2 LNG "may apply for the State of Louisiana's Industrial Tax Exemption Program which, according to current rules, would provide an 80 percent tax abatement on ad valorem tax for a 5-year term with a possible extension for another 5-year term."[674] The final EIS further hypothesized that if "accepted into the program, the Project would pay approximately $50 million per year in property taxes during a 10-year abatement period, and then approximately $160 million per year following the abatement period."[675] Nevertheless, "[d]uring operations, the Project[s] would continue to generate income and sales taxes."[676] "Total payroll for these workers would be approximately $24 million annually, which would generate state income tax in Louisiana."[677] Accordingly, the Commission considered operational impacts on local taxes, government revenues, and the attendant indirect benefits in its conclusion that "the Project[s] would have a minimal positive impact on local economies and stimulate indirect expenditures."[678]

## 8.     Impacts to Rice's Whale

165.    Petitioners next raise concerns about the adequacy of consideration of impacts on the Rice's whale, an endangered species that has been documented off the coast of Louisiana in the Gulf of Mexico. Specifically, the Petitioners argue that: (1) the EIS did not take the requisite hard look at the project's effects on the Rice's whale; and (2) the failure to conduct a formal section 7 consultation on the Rice's whale violates the Endangered Species Act (ESA).

### a.     Hard Look at Impacts on Rice's Whale

166.    Petitioners argue that the final EIS fails to disclose or analyze the direct effects of the construction and operation of the project on the Rice's whale population. Specifically, the Petitioners allege that the references to the Rice's whale are brief, few,

---

at P 87 (2007), *reh'g denied*, 120 FERC ¶ 61,266 (2007) ("[T]he tax impacts of a hydroelectric project are a matter of state law, and not within our jurisdiction.").

[674] Final EIS at 4-276.

[675] *Id.*

[676] *Id.*

[677] *Id.*

[678] *Id.*

and vague and the discussion in the final EIS "fails to disclose the degree of potential harm."[679]  They further argue that the analysis in the final EIS is inadequate because the discussion of the Rice's whale was included in a discussion of impacts to whales generally, rather than a more specific discussion of impacts specific to the Rice's whale,[680] and that the discussion did not adequately reference the extended range of the whales through the central and western Gulf of Mexico.[681]  In addition to the direct impacts on the Rice's whale, the Petitioners argue that the analysis of cumulative impacts is insufficient because the appropriate projects were not considered.[682]  Because of these alleged deficiencies, the Petitioners argue that the final EIS must be supplemented with further discussion of impacts on the Rice's whale.[683]

167.    As explained in the Authorization Order, the final EIS considered impacts to whales, including the Rice's whale, and analyzed vessel strikes and impacts from marine pollution.[684]  In addition to considering specific impacts to whales, the final EIS considered impacts to marine mammals generally and recognized that the project carries the risk of both injury and mortality to marine species resulting from vessel strikes.[685]  Nevertheless, the final EIS found that such strikes are unlikely due to the use of mitigating measures, including the use of established, well-traveled shipping lanes and the use of NMFS's Vessel Strike Avoidance Measures.[686]  Similarly, implementation of the Coast Guard's Shipboard Oil Pollution Emergency Plan will reduce potential impacts from marine pollution associated with marine traffic.[687]  Based on these analyses, the final EIS concludes that the construction and operation of the project may affect but is

---

[679] Rehearing Request at 174.

[680] *Id.* at 175.

[681] *Id.* at 174.

[682] *Id.* at 177.

[683] *Id.* at 182.

[684] Authorization Order, 187 FERC ¶ 61,199 at P 89; *see also* final EIS at 4-224.

[685] Final EIS at 4-184.

[686] *Id.*

[687] Authorization Order, 187 FERC ¶ 61,199 at P 92.

not likely to adversely affect the Rice's whale, a conclusion with which the NMFS agrees.[688]

168.    Petitioners object to the reliance on mitigation measures to reach final conclusions on the impacts on the Rice's whale, arguing that such mitigation measures may not be implemented and therefore should not be considered.[689]  It is a long-accepted practice to consider planned mitigation measures when evaluating the potential impacts of a proposed action.[690]  Based upon consideration of all the information in the record, including potential mitigating factors, we continue to find that the project is not likely to adversely affect any listed species, including the Rice's whale.[691]

169.    Petitioners next claim that the Commission's consideration of cumulative impacts on Rice's whale was insufficient.  They argue that the final EIS focuses too narrowly on the incremental effects of the project and that the final EIS should not have focused its cumulative impacts only on vessel strikes.[692]  Moreover, the Petitioners argue that the range of projects considered is too narrow.[693]

170.    On the contrary, the cumulative impacts analysis was based on a consideration of the reasonable impacts of the CP2 LNG Project.  Firstly, because whales are limited to offshore waters, the cumulative impacts analysis excluded construction activities.[694] Consideration of impacts included impacts from increased LNG carrier traffic from the CP2 LNG Project, and marine traffic associated with other existing and proposed LNG projects and oil and gas development in the Gulf of Mexico.  While the project would contribute to a minor cumulative increase in vessel traffic and would pose a risk to whales, the magnitude of the increase would not be significant, in part because LNG carriers would use established and well-traveled shipping lanes and offshore spill

---

[688] *See id.* P 93.

[689] Rehearing Request at 176.

[690] *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 581-82 (9th Cir. 2016) (NEPA requires consideration of "appropriate mitigation measures that would reduce the environmental impact of the proposed action.") (citing 42 U.S.C. § 4332(2)(C)(ii)).

[691] Authorization Order, 187 FERC ¶ 61,199 at P 93.

[692] Rehearing Request at 178-79.

[693] *Id.* at 180.

[694] Final EIS at 4-535.

plans.[695]  In addition, the final EIS concluded that these impacts would be permanent, but not likely to be significant.[696]  We agree.

171.  Petitioners take issue with the range of projects considered in the final EIS as contributing to cumulative impacts, arguing that it is too narrow.[697]  As discussed above, the final EIS establishes a "geographic scope" in which various resources may be affected by both a proposed project and other past, present, and reasonably foreseeable future actions."[698]  This scope is unique to each impact, defined based on the characteristics of the resource and how far the CP2 LNG Project's effects might extend.[699]  The final EIS concluded that limiting cumulative impacts for aquatic species—including Rice's whale—would sufficiently account for impacts that would be directly affected and for indirect impacts.[700]  We continue to find that the scope of impacts considered for the cumulative impact of the project was appropriate.

172.  Petitioners further argue that the Commission should supplement the final EIS in light of information related to the Rice's whale published by other agencies.[701]  Whether to complete a supplemental EIS is left to agency discretion.[702]  New information must be sufficient to show that the remaining federal action will affect the environment in a significant manner or to a significant extent *not already considered*.[703]  In other words, a supplemental EIS "must only be prepared where new information provides a *seriously different* picture of the environmental landscape."[704]  Here, the information presented by

---

[695] Authorization Order, 187 FERC ¶ 61,199 at P 94; Final EIS at 4-535.

[696] Authorization Order, 187 FERC ¶ 61,199 at P 94; Final EIS at 4-535.

[697] Rehearing Request at 180.

[698] *Kleppe*, 427 U.S. at 413-14; *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 n.6 (9th Cir. 2002) ("[W]e defer to the agency's determination of the geographic scope of its analysis under NEPA.").

[699] Final EIS at 4-507.

[700] *Id.* at Table 4.14-1.

[701] Rehearing Request at 182-183.

[702] *Marsh*, 490 U.S. at 373; *Friends of the River v. FERC*, 720 F.2d 93, 109-10 (D.C. Cir. 1983).

[703] *Marsh*, 490 U.S. at 374.

[704] *Stand Up for Cal.! v. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021)

Petitioners pre-dates the final EIS and contains recommendations from other agencies on their programmatic activities, as well as NMFS's proposal to designate the Gulf's central and western-shelf break as critical habitat for the Rice's whale. These actions or documents neither implicate the potential impacts of this project nor it constitute new information. Therefore, we continue to find that supplementation is not required to appropriately consider the direct, indirect, or cumulative impacts of the project on the Rice's whale. Further, as the Commission stated in the Authorization Order, should NMFS designate critical habitat for the Rice's whale, Commission staff will coordinate any necessary consultation with NMFS at that time.[705]

### b.    ESA Consultation

173.    Petitioners argue that the Commission violated Section 7 of the ESA by failing to conduct formal consultation with NMFS regarding impacts to the Rice's whale.[706] The Commission conducted informal consultation with NMFS, after which NMFS concurred with the final EIS's conclusion that the project is not likely to adversely affect the Rice's whale.[707] Despite this conclusion, the Petitioners argue that the Commission and NMFS should re-initiate consultation, primarily because NMFS has recently proposed designation of critical habitat for the Rice's whale that would include areas throughout the Gulf of Mexico that could be directly impacted by the CP2 LNG Project.[708]

174.    A proposal to designate critical habitat for a listed species does not trigger re-initiation of consultation under the ESA.[709] In the future, should NMFS designate critical habitat for the Rice's whale, Commission staff will coordinate any necessary

---

(emphasis in original) (quoting *Friends of Cap. Crescent Trail v. FTA*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (internal quotation marks omitted)).

[705] Authorization Order, 187 FERC ¶ 61,199 at P 95. NMFS has proposed, but not finalized, a critical habitat designation for the Rice's Whale. NFMS, *Endangered and Threatened Species; Designation of Critical Habitat for the Rice's Whale,* 88 Fed. Reg. 47,453 (July 24, 2023).

[706] Rehearing Request at 184.

[707] Authorization Order, 187 FERC ¶ 61,199 at P 93.

[708] Rehearing Request at 187.

[709] *See* 40 C.F.R. § 402.16 (2022).

consultation with NMFS.[710]  Furthermore, if reconsultation is required, then only when such consultation is complete will it be possible to determine whether it is necessary to supplement the NEPA analysis.[711]

## 9.    Wetland Impacts

175.    Petitioners argue that the conclusions in the final EIS regarding the impacts from the project on wetlands are arbitrary and do not comply with NEPA.[712]  In particular, the Petitioners argue that the final EIS is incomplete and should not have relied on mitigation measures to categorize the final impacts.[713]  In addition, they argue that the analysis of cumulative impacts was incomplete, particularly when considering the overall loss of wetlands in Louisiana.[714]

176.    The final EIS includes extensive discussion of impacts to wetlands from both construction and operation of the project.  The final EIS acknowledges that there will be permanent impacts to wetlands associated with construction and operation of the Terminal Facilities, but concluded that through compliance with mitigation measures instated by CP2 as well as the Corps[715] and the Louisiana DNR, the impacts on wetlands due to construction of the Terminal Facilities would not be significant.[716]  The final EIS further acknowledged impacts from pipeline construction and other temporary workspaces.[717]  These impacts differ based on the specific type of wetland being disturbed, but all impacts would be mitigated by rehabilitation and revegetation, the

---

[710] Authorization Order, 187 FERC ¶ 61,199 at P 95; *Driftwood LNG LLC*, 186 FERC ¶ 61,112, at P 19 (2024). NMFS has proposed, but not finalized, a critical habitat designation for the Rice's Whale. 88 Fed. Reg. 47,453 (July 24, 2023).

[711] *Driftwood LNG LLC*, 186 FERC ¶ 61,112 at P 20.

[712] Rehearing Request at 188.

[713] *Id.*

[714] *Id.* at 191.

[715] CP2 LNG will be required to obtain permits from the Corps for permanent loss of wetland habitat; mitigation measures will be required by the Corps as part of the permitting process.  Final EIS at 4-135.

[716] *Id.*

[717] *Id.* at 4-136 to 4-140.

timing of which will also vary by wetland type.[718]  Therefore, the impacts from construction were found to be temporary and not significant.[719]  Overall, due to the use of mitigation measures contained in the Project-specific Procedures, Corps and Louisiana DNR permits, and Commission staff recommendations, the final EIS found that impacts on wetlands would be adequately minimized, but permanent, with the majority of adverse impacts occurring at the CP2 LNG Project site.[720]  Similarly, while impacts to wetlands would include impacts within environmental justice communities, through the use of mitigation measures, these impacts would not be significant.[721]  While Petitioners argue that reliance on mitigation measures is inappropriate,[722] as discussed above, the Commission may appropriately consider planned mitigation measures when evaluating the potential impacts of a proposed action.[723]

177.    The final EIS established a geographic scope to consider the cumulative impacts on wetlands from both the Projects and other past, present, and reasonably foreseeable future actions.[724]  The analysis recognized that other Commission-licensed projects within this scope would be required to adhere to Commission procedures, and other non-Commission-regulated projects would likely follow similar mitigation measures. Therefore, most of the impacts from the Projects and other projects identified within the geographic scope would not result in a significant cumulative impact on wetlands.[725]  We continue to find that both the direct and cumulative impacts to wetlands from the Projects would not be significant.

---

[718] *Id.* at 4-137.

[719] *Id.* at 4-139.

[720] *Id.* at 4-141.

[721] *Id.* at 4-319.

[722] Rehearing request at 188.

[723] *Methow Valley*, 490 U.S. at 353 (holding that "it would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act").

[724] Final EIS 4-506 to 4-523.

[725] *Id.* at 4-530.

10.    **Environmental Justice**

178.    Petitioners argue that the Commission's authorization of the Projects demonstrates disregard for the adverse impacts on environmental justice communities and that the Commission failed to afford the proper weight to environmental justice communities.[726] Petitioners concede that the Commission acknowledged some harms to those communities in its final EIS[727] but allege that the Commission failed to account for the disproportionate and adverse impact on the viewshed and failed to adequately consider the disproportionate impacts of climate change on environmental justice communities.[728] Petitioners assert that emissions alone will disproportionately affect and exacerbate existing health issues and environmental conditions in low-income and minority populations.[729]

179.    We disagree with the claimed omissions.[730]  The final EIS determined that potential impacts on the identified environmental justice communities may include flooding, impacts to surface water resources, wetlands impacts, visual impacts, socioeconomic impacts, recreational and commercial fishing impacts, traffic impacts, and air and noise impacts from construction and operation.[731]  The final EIS also determined that environmental justice concerns were not present for other resource areas such as geology, soils, wildlife, land use, or cultural resources due to the minimal overall impact the Projects would have on these resources and/or the absence of any suggested connection between such resources and environmental justice communities.[732]

180.    With regard to the CP2 LNG Project, the Commission determined that construction and operation would have a disproportionate and adverse impact on environmental justice communities because the impacts would be predominantly borne

---

[726] Rehearing Request at 85.

[727] *Id.*

[728] *Id.* at 86.

[729] *Id.*

[730] Authorization Order, 187 FERC ¶ 61,199 at PP 119-163; final EIS at 4-299 – 4-329.

[731] Final EIS at 4-317 to 4-327.

[732] *Id.* at 4-318.

by those communities.[733]  Specifically, the Commission found that visual impacts on environmental justice communities near the terminal would be significant[734] and that the project would contribute to significant cumulative visual impacts on environmental justice communities.[735]  The remainder of the temporary and permanent adverse impacts on water resources, wetlands, socioeconomics, traffic, air quality, and noise in environmental justice communities from construction and operation of the CP2 LNG Project would be less than significant.[736]

181.    With regard to the CP Express Pipeline Project, the Commission determined that the construction and operation of the CP Express Pipeline Project (including meter stations, contractor yards, and park and ride locations) would have a disproportionate and adverse impact on environmental justice communities because the impacts would be predominantly borne by those communities, but the Commission determined that the impacts would be less than significant.[737]  The Commission concluded that operation would have permanent adverse impacts on visual resources in environmental justice communities, including from removal of forested vegetation and periodic vegetation clearing within the permanent right-of-way.[738]

182.    Last,  because we cannot identify a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Projects' incremental contribution

---

[733] Authorization Order, 187 FERC ¶ 61,199 at P 162.

[734] *Id.*  As noted in the Authorization Order, the Commission may determine that impacts are disproportionate and adverse, but not significant within the meaning of NEPA and in other circumstances an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA.  *Id.* n.257 (citing EPA, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (Promising Practices) at 3, https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf).  Here, the Commission acknowledged that visual impacts on environmental justice communities would be significant.  *Id.* PP 131, 162.  We note that for all other resource categories, the Commission determined that impacts would be less than significant.  *Id.*  PP 162-63.

[735] *Id.* (citing final EIS at 4-328 to 4-329, 4-546, app. J)

[736] *Id.* (citing final EIS at 4-329).

[737] Authorization Order, 187 FERC ¶ 61,199 at P 162 (citing final EIS at 4-328).

[738] *Id.* P 163.

to GHGs,[739] we cannot meaningfully consider the disproportionate impacts of climate change on environmental justice communities.  As discussed in detail above, for GHG emissions the Commission satisfied the required hard look under NEPA.

## 11.    Air Impacts

183.    Petitioners argue that the Commission's use of Significant Impact Levels (SIL) in this proceeding is improper for the same reasons articulated by the D.C. Circuit in *Healthy Gulf*,[740] and assert that the Commission improperly concluded that the Projects would only contribute a minor amount to cumulative air impacts despite ambient air quality exceeding the EPA's National Ambient Air Quality Standards (NAAQS) for nitrogen dioxide ($NO_2$) and particulate matter less than 2.5 micrometers ($PM_{2.5}$).[741] Petitioners maintain that, although the Projects' contribution to modeled exceedances fall below the SILs, they are not facially insignificant and are more than *de minimis* contributors to cumulative impacts.[742]  Petitioners aver that this error affected the Commission's environmental analysis and public interest determinations.[743]

184.    In *Healthy Gulf*, which was issued after the Authorization Order, the D.C. Circuit disagreed with the Commission's determination there that the cumulative effects of a project's $NO_2$ emissions were insignificant because its incremental $NO_2$ emissions fell below the 1-hour $NO_2$ SIL at each NAAQS exceedance location.[744]  The court remanded the proceeding to the Commission to either explain how its use of the 1-hour $NO_2$ SIL is consistent with a proper cumulative effects analysis or to adequately assess the cumulative effects of the project's $NO_2$ emissions using a different methodology.[745] The court also directed the Commission to reevaluate its NGA section 3 public interest determination because it was based on a deficient NEPA analysis.[746]  In *City of Port Isabel*, the court remanded authorization orders for other LNG projects for failure to issue

---

[739] *Id.* P 179 n.428 (citing final EIS at 4-5-559).

[740] 107 F.4th 1033.

[741] Rehearing Request at 136-39 (citing *Healthy Gulf*, 107 F.4th at 1042-45).

[742] *Id.* at 137-38.

[743] *Id.* at 138-39.

[744] *Healthy Gulf*, 107 F.4th at 1044.

[745] *Id.*

[746] *Id.* (citing *Vecinos I*, 6 F.4th at 1331).

a supplemental EIS[747] where the Commission "issu[ed] an entirely new and significantly expanded" environmental analysis "that reached new conclusions" in an order, without a separate NEPA document.[748]

185.    Given the D.C. Circuit's specific directives to the Commission in *Healthy Gulf* and *City of Port Isabel*, we set aside the Authorization Order, in part, solely regarding the Commission's analysis of $NO_2$ and $PM_{2.5}$, for the purpose of conducting additional environmental review.[749]  Issues related to the Commission's analysis of $NO_2$ and $PM_{2.5}$, as well as other air quality issues raised by Petitioners,[750] will be addressed in a future order to be issued upon completion of the environmental review.

186.    Due to the initiation of supplemental NEPA proceedings, no authorization to proceed with construction of the CP2 LNG Project or CP Express Pipeline Project will be issued, including by the Director of the Office of Energy Projects, until the Commission issues a further merits order.[751]  The Commission's decision here regarding the authorization to proceed is based on the unique facts and record of this case.  We acknowledge that this course of action will result in delay and require additional analysis by the Commission.  However, the Commission must seek to ensure that authorizations are legally durable, and, in light of the D.C. Circuit's recent opinions, we believe that this is the most prudent way to ensure legal durability.  As reflected throughout this order, the Commission remains confident in this authorization, which is why, except as otherwise discussed herein, the Authorization Order remains in full force and effect.[752]

---

[747] *City of Port Isabel*, 111 F.4th at 1215.

[748] *Id*.

[749] Concurrently with this order, Commission staff is issuing a notice disclosing the schedule for a supplemental EIS.  In so doing, we are not prejudging the result the Commission may reach on any issue set for further environmental review.

[750] *See generally* Rehearing Request at 135-62.

[751] To date, no requests to proceed with construction have been authorized by Commission staff.

[752] 15 U.S.C. § 717r(c).

Document Accession #: 20241127-3065       Filed Date: 11/27/2024

<u>The Commission orders</u>:

In response to Petitioners' request for rehearing, the Authorization Order is hereby modified and set aside, in part, as discussed in the body of this order.

By the Commission.  Commissioner Chang is not participating.

( S E A L )

Carlos D. Clay,
Acting Deputy Secretary.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify that this filing complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains less than 5,200 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that this filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this filing has been prepared in Century Schoolbook 14-point font using Microsoft Word.

*/s/ Caroline Reiser*
Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Petitioners'

Joint Motion for Clarification or, in the Alternative, Amendment with

the United States Court of Appeals for the District of Columbia Circuit

by using the appellate CM/ECF system on December 23, 2024, and that

all parties or their counsel of record are registered as ECF Filers and

that they will be served by the CM/ECF system.

*/s/ Caroline Reiser*
Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org