ORAL ARGUMENT NOT YET SCHEDULED

No. 24-1291(L), 24-1292, 25-1157

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

TRAVIS DARDAR, *et al.*,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

_____

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

_____

### PETITIONERS' JOINT MOTION FOR STAY PENDING REVIEW

Megan C. Gibson                          Spencer Gall
Southern Environmental Law Center        Southern Environmental Law Center
122 C Street NW, Suite 325               120 Garrett Street, Suite 400
Washington, D.C. 20001                   Charlottesville, Virginia 22902
(202) 828-8382                           (434) 977-4090
mgibson@selc.org                          sgall@selc.org


*Counsel for Travis Dardar, Nicole Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, For a Better Bayou, and Fishermen Involved in Sustaining Our Heritage*

***Additional counsel listed on inside cover.***

Caroline Reiser
Thomas Zimpleman
Gillian Giannetti
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington D.C., 20005
(202) 717-8341
creiser@nrdc.org

*Counsel for Natural Resources Defense Council*

Rebecca McCreary
Sierra Club
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595 ext. 103
rebecca.mccreary@sierraclub.org

*Counsel for Louisiana Bucket Brigade, Healthy Gulf, Sierra Club, Texas Campaign for the Environment, and Turtle Island Restoration Network*

Dated September 5, 2025

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.**    **Parties**

    1.    Petitioners

        In No. 24-1291, Petitioners are Travis Dardar, Nicole Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, For a Better Bayou, Fishermen Involved in Sustaining Our Heritage, and Natural Resources Defense Council.

        In No. 24-1292, Petitioners are Louisiana Bucket Brigade, Healthy Gulf, Sierra Club, Texas Campaign for the Environment, and Turtle Island Restoration Network.

        In No. 25-1157, Petitioners are Nicole Dardar, Travis Dardar, Kent Duhon, Fishermen Involved in Sustaining Our Heritage, For a Better Bayou, Healthy Gulf, Louisiana Bucket Brigade, Mary Alice Nash, Natural Resources Defense Council, Sierra Club, Jerryd Tassin, Texas Campaign for the Environment, Anthony Theriot and Turtle Island Restoration Network.

    2.    Respondent

        Federal Energy Regulatory Commission

3.      Respondent Movant-Intervenors

            Venture Global CP2 LNG, LLC

            Venture Global CP Express, LLC

**B.    Rulings Under Review**

1.      Order Granting Authorizations Under Section 3 and 7 of the Natural Gas Act, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-000 & CP22-22-000, 187 FERC ¶ 61,199 (June 27, 2024).

2.      Order Addressing Arguments Raised on Rehearing And Setting Aside Prior Order, In Part, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-000 & CP22-22-000, 189 F.E.R.C. ¶ 61,148 (Nov. 27, 2024).

3.      Order Addressing Arguments Raised on Rehearing and Granting Clarification, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-000 & CP22-22-000, 191 FERC ¶ 61,153 (May 23, 2025).

4.      Order Addressing Arguments Raised on Rehearing, *Venture Global CP2 LNG, LLC*, Nos. CP22-21-003 & CP22-22-003, 192 FERC ¶ 61,157 (Aug. 15, 2025).

**C.    Statement of Related Cases**

The petition on review has not previously been before this Court or any other court. Counsel for Petitioners are unaware of any related cases within the meaning of DC Circuit Rule 28(a)(1)(C).

iv

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases .............................................. iii

Table of Contents ...................................................................................................v

Table of Authorities .............................................................................................. vi

Glossary................................................................................................................. ix

Introduction and Time Exigencies ..........................................................................1

Relief Requested ....................................................................................................5

Standard of Review ................................................................................................5

Argument................................................................................................................5

    I.    Petitioners Are Likely to Succeed on the Merits. ......................................5

        A.   FERC Failed to Weigh Manifest Adverse Impacts. ...........................7

        B.   FERC Failed to Identify any Benefits.............................................12

    II.   Petitioners Will Suffer Irreparable Harm Without a Stay...........................17

        A.   Construction Activities Will Irreparably Injure Commercial Fishermen.........................................................................................18

        B.   Construction Activities Will Cause Irreparable Environmental Injury...........................................................................................20

    III.  The Remaining Factors Favor a Stay.......................................................22

Conclusion ...........................................................................................................23

Exhibit List...........................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531, 545 (1987)......................................................................21

*Atl. Refin. Co. v. Pub. Serv. Comm'n of N.Y.,*
360 U.S. 378, 391 (1959)........................................................................6

*City of Clarksville, Tenn. v. FERC,*
888 F.3d 477, 479 (D.C. Cir. 2018).....................................................16

*City of Oberlin v. FERC,*
937 F.3d 599, 602 (D.C. Cir. 2019)....................................................6, 7

*EarthReports, Inc. v. FERC,*
828 F.3d 949, 953 (D.C. Cir. 2016)........................................................6

*Env't Def. Fund v. FERC,*
2 F.4th 953, 967 (D.C. Cir. 2021) ("*Spire*")..............................5, 14, 17

*FPC v. Transcon. Gas Pipe Line Corp.,*
365 U.S. 1, 17 (1961)..............................................................................6

*Healthy Gulf v. FERC,*
132 F.4th 544 (D.C. Cir. 2025) ("*Driftwood*").............................14, 15

*League of Women Voters of U.S. v. Newby,*
838 F.3d 1, 12 (D.C. Cir. 2016).............................................................22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,*
463 U.S. 29, 43 (1983............................................................................7, 13

*New Jersey Conservation Found. v. FERC,*
111 F.4th 42, 62-63 (D.C. Cir. 2024) ..................................................7

*Nken v. Holder,*
556 U.S. 418, 425-26 (2009) ....................................................5, 17, 21

vi

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
   145 S. Ct. 1497, 1511 (2025)........................................................................10, 11

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
   6 F.4th 1321, 1331 (D.C. Cir. 2021)....................................................9

*Wisconsin Gas v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985)..............................................................20

**Federal Statutes**

15 U.S.C. § 717b(a) ....................................................................................13

15 U.S.C. § 717b(e) ....................................................................................6

15 U.S.C. §§ 717b(e), 717f(e)....................................................................13

15 U.S.C. § 717f(e) ...................................................................................6, 14

Administrative Procedure Act, 5 U.S.C. § 551 *et seq* .................................5

National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*..................5

Natural Gas Act, 15 U.S.C. §§ 717b and 717f...........................................5

**Rules**

Fed. R. App. P. 18(a)(2)(A)(ii) ..................................................................1

**Regulations**

40 C.F.R. § 1502.16(b) (2022).....................................................................10

Exec. Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353,
   8353 (Jan. 29, 2025) ..........................................................................22

Exec. Order 14156, *Declaring A National Energy Emergency*, 90..........23

**Administrative Agency Proceedings**

*Certification of New Interstate Natural Gas Pipeline Facilities*,
   88 FERC ¶ 61,227, 61,743 (Sept. 15, 1999).......................................12

*Certification of New Interstate Natural Gas Pipeline Facilities*,
   88 FERC ¶ 61,227, 61, 744 (Sept. 15, 1999).......................................16

Final Environmental Impact Statement for Venture Global CP2 LNG,
LLC's *et al.* CP2 LNG and CP Express Projects under CP22-21 et
al., at 4-206, Accession No. 20230728-3008 (July 28, 2023)
("EIS") ................................................................................3, 20

*KeySpan LNG, L.P.*,
112 FERC ¶ 61,028, PP28, 58 (July 5, 2005 ......................................13

*Notice to Proceed with Full Site Preparation of the CP2 LNG
Terminal and Construction of the CP Express Meter Station,*
Docket Nos. CP22-21 & CP22-22, Accession No. 20250728-3071
(July 28, 2025) ..................................................................17

*Notice to Proceed with Pipeline Construction*, Docket No. CP22-22,
Accession No. 20250626-3092 (June 26, 2025)..................................17

*Spire STL Pipeline LLC*,
181 FERC ¶ 61,232, 62,660 (Dec. 15, 2022) ....................................21

*Variance Approval for 7-day dredging*, Docket No. CP22-21,
Accession No. 20250709-3047 (July 9, 2025) ...................................18

*Venture Global Calcasieu Pass, LLC*,
190 FERC ¶ 61,167, P5 (Mar. 20, 2025)..........................................22

*Venture Global CP2 LNG, LLC*,
187 FERC ¶ 61,199 (June 27, 2024) ("Authorization Order")..........................1

*Venture Global CP2 LNG, LLC*,
189 FERC ¶ 61,148, PP185-86 (Nov. 27, 2024) ("Rehearing
Order") ................................................................4, 12, 14

*Venture Global CP2 LNG, LLC*,
191 FERC ¶ 61,153 (May 23, 2025) ("Cumulative Effects Order") 4 *Venture Global
CP2 LNG, LLC*,
189 FERC ¶ 61,005 (2024) ......................................................1

*Venture Global CP2 LNG, LLC*,
192 FERC ¶ 61,155 (2025)......................................................1

# GLOSSARY

| | |
|---|---|
| **Authorization Order** | Order Granting Authorizations Under Section 3 and 7 of the Natural Gas Act, Venture Global CP2 LNG, LLC, 187 FERC ¶ 61,199 (June 27, 2024) |
| **CP2** | Calcasieu Pass 2 Venture Global's proposed liquefied natural gas plant and export terminal in Southwest Louisiana. |
| **EIS** | Final Environmental Impact Statement for Venture Global CP2 LNG, LLC's et al. CP2 LNG and CP Express Projects under CP22-21 et al., Accession No. 20230728-3008 (July 28, 2023) |
| **FERC** | Federal Energy Regulatory Commission |
| **LNG** | Liquefied Natural Gas |
| **NGA** | Natural Gas Act |
| **NEPA** | National Environmental Policy Act |
| **Pipeline** | CP Express Pipeline that would supply the CP2 LNG Export Terminal. |
| **Project** | Calcasieu Pass 2 LNG Terminal and CP Express Pipeline, collectively. |
| **Rehearing Order** | Venture Global CP2 LNG, LLC, 189 FERC ¶ 61,148 (Nov. 27, 2024) |

| **Rehearing Request** | Request for Rehearing and Motion for Stay of For a Better Bayou et al., Docket Nos. CP22-21 and CP22-22, Accession No. 20240729-5111 (July 29, 2024) |
|---|---|
| **Terminal** | Calcasieu Pass 2 Venture Global's proposed liquefied natural gas plant and export terminal in Southwest Louisiana. |

## INTRODUCTION AND TIME EXIGENCIES

Pursuant to Federal Rule of Appellate Procedure 18, Petitioners move for a stay pending review of the Federal Energy Regulatory Commission ("FERC") orders challenged in this case.[1]

Petitioners challenge FERC's authorization of Venture Global's liquefied natural gas ("LNG") liquefaction plant and export terminal in Southwest Louisiana called Calcasieu Pass 2 ("CP2" or "Terminal") and the 85-mile CP Express Pipeline ("Pipeline") that would supply it (collectively "the Project"). Exhibit 1, *Venture Global CP2 LNG, LLC*, 187 FERC ¶ 61,199 (June 27, 2024) ("Authorization Order"). Venture Global plans to build the Project adjacent to its operating Calcasieu Pass 1 export terminal in Cameron, Louisiana, atop already overburdened fishing and environmental justice communities.

The Project is the latest FERC-sanctioned blow to communities in Southwest Louisiana. Following years of reflexive approvals of LNG export terminals, FERC has transformed the region—once known for its thriving fishing industry and natural beauty—into an industrial hub for foreign commerce, leaving American communities, industry, and ecosystems to bear the costs. *See* Exhibit 2, Request for

---

[1] Petitioners twice moved for a stay before FERC, which FERC twice denied. *See Venture Global CP2 LNG, LLC*, 189 FERC ¶ 61,005 (2024); *Venture Global CP2 LNG, LLC*, 192 FERC ¶ 61,155 (2025); *see also* Fed. R. App. P. 18(a)(2)(A)(ii).

1

and Motion for Stay of For a Better Bayou *et al.*, Docket Nos. CP22-21 and CP22-22, Accession No. 20240729-5111 (July 29, 2024) ("Rehearing Request"). As if the Venture Global facilities were not enough for the residents of Southwest Louisiana to bear, FERC has approved several other LNG facilities and expansions in the immediate vicinity that are either under construction or awaiting final investment decisions. Rehearing Request at 21–24 (outlining the several LNG export facilities approved by FERC but not yet built).

Meanwhile, the vast majority of FERC-approved LNG facility capacity nationwide, roughly an additional 35.93 billion cubic feet per day, has yet to become operational. *See* Rehearing Request at 24–26 & n.127.[2] Yet if all the export facilities approved by FERC became fully operational tomorrow, the United States would export nearly half of our domestic production, harming our economy and consumers. *See id.* at 51, 56–60. This unchecked expansion magnifies the cumulative harms to Gulf Coast communities—harms that are now becoming acute for Petitioners with construction of the Project.

This stay request turns on the imminent and irreparable harms that are now unfolding. FERC recently allowed Venture Global to start unrestricted construction

---

[2] *See* Exhibit 3, Dep't of Energy, *The Temporary Pause on Review of Pending Applications to Export Liquefied Natural Gas* (Feb. 2024) ("48 billion cubic feet per day (Bcf/d) of U.S. natural gas–an amount equal to over 45% of current domestic production.") (Filed at FERC as Ex. 28 to Rehearing Request).

of the Pipeline and high-impact construction activities for the Terminal, including
dredging seven days a week in the heart of a commercial fishery during peak
season.[3] Dredging causes the direct mortality of shrimp and benthic organisms, ,
which are an important food source for many species of fish. Exhibit 4, Final
Environmental Impact Statement for Venture Global CP2 LNG, LLC's *et al.* CP2
LNG and CP Express Projects under CP22-21 et al., at 4-206, Accession No.
20230728-3008 (July 28, 2023) ("EIS"). But as then-Commissioner Clements
recognized in dissent from the Authorization Order, FERC arbitrarily disregarded
community warnings that "a single season of decreased shrimp catch threatens to
irrevocably end shrimping business ventures in the area" and "bankrupt the
famil[ies]." Authorization Order P18 & n.66 (Clements, Comm'r, dissenting).

Compounding the harms to this fishing season, on August 4, 2025, Venture
Global was involved in dredging operations when sediment-laden spoil escaped
containment and spilled across hundreds of acres of marsh, burying crab traps,
oyster beds, and killing wildlife. The dredge material not only smothered oyster
reefs, but it also trapped aquatic life, killing almost every shrimp, crab and fish in the

---

[3] This motion focuses on harms caused specifically by project *construction*
and happening now. Once construction is complete, project *operation* would cause
extensive distinct harms, especially related to air pollution.

immediate area. *See* Exhibit 5, Supplemental Declaration of James Hiatt and attachments.

Petitioners include local fishermen and community members whose livelihoods are at stake. Petitioners initially sought a stay in September 2024, shortly after FERC approved the Project (Doc. 2076251), but FERC represented that "construction [was] not imminent" and Petitioners could make their motion again once it began (Doc. 2078163 at 2); the Court also declined to enter a stay at that time (Doc. 2084283). Circumstances have changed. In the intervening year, FERC admitted the Authorization Order ran afoul of this Court's precedent, attempted to correct its errors with additional analysis of air pollution impacts, and prohibited construction in the meantime. Exhibit 6, *Venture Global CP2 LNG, LLC*, 189 FERC ¶ 61,148, PP185–86 (Nov. 27, 2024) ("Rehearing Order"). FERC subsequently issued a new air pollution analysis but failed to cure its original deficiencies and introduced new ones. Exhibit 7, *Venture Global CP2 LNG, LLC*, 191 FERC ¶ 61,153 (May 23, 2025). Without regard for administrative rehearing, FERC authorized construction activities almost right away. *Id.* P103. A stay is now necessary and appropriate to protect against the ongoing irreparable harm to Petitioners, the Gulf Coast communities, and the environment they depend upon.

## RELIEF REQUESTED

The Court should stay the Authorization Order and related FERC approvals pending review.

## STANDARD OF REVIEW

When considering a motion to stay, the Court considers four factors: (1) whether Petitioners have "made a strong showing" that they are "likely to succeed on the merits," (2) whether Petitioners "will be irreparably injured absent a stay," (3) "whether issuance of the stay will substantially injure the other parties," and (4) whether a stay would be in the public interest. *Nken v. Holder*, 556 U.S. 418, 425–26 (2009). The last two factors "merge when the Government is the opposing party." *Id.* at 435.

On the merits, the Court reviews FERC's actions under "the arbitrary and capricious standard of the Administrative Procedure Act." *Env't Def. Fund v. FERC,* 2 F.4th 953, 967 (D.C. Cir. 2021) ("*Spire*").

## ARGUMENT

## I.    PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS.

Petitioners are likely to succeed on the merits because FERC violated the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717b and 717f, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure

Act, 5 U.S.C. § 551 *et seq*, when it approved the Project. In this motion, Petitioners focus on FERC's failure under the NGA to meaningfully weigh the Project's harms and benefits before approving it.

FERC may not approve an application under Section 7 of the NGA unless it finds the proposed project "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). This standard requires FERC to "evaluate all factors bearing on the public interest," *Atl. Refin. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959), and decide whether "a balance of all the circumstances weighs against certification." *FPC v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 17 (1961). Ultimately, FERC will authorize a project "only if a project's public benefits (such as meeting unserved market demand) outweigh its adverse effects (such as deleterious environmental impact on the surrounding community)." *City of Oberlin v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019). Under Section 3 of the NGA, FERC must engage in a similar balancing of benefits and harms in deciding whether to approve the export terminal. *See* 15 U.S.C. § 717b(e). Although FERC applies Section 3 as a rebuttable presumption that favors approval, FERC's ultimate obligation under the NGA is to safeguard the public interest. *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 953 (D.C. Cir. 2016).

Here, FERC's approval of the Project was arbitrary because it both disregarded overwhelming harms and exaggerated unsubstantiated benefits. FERC

turned a blind eye to record evidence establishing the Project's serious adverse impacts—including the fact that the loss of even one season can sound the death knell for the local commercial fishing industry. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins*., 463 U.S. 29, 43 (1983). FERC's cursory treatment of the purported public benefit and market need fell well short of what is required by this Court's precedent, ran "counter to the evidence before the agency," and "entirely failed to consider an important aspect of the problem." *Id.* And in making the required determination of public convenience and necessity under Section 7, FERC failed to "show its reasoning" or "sufficiently evaluate[] the record evidence" when balancing the benefits and harms of the Project. *New Jersey Conservation Found. v. FERC*, 111 F.4th 42, 62-63 (D.C. Cir. 2024).

### A.    FERC Failed to Weigh Manifest Adverse Impacts.

 FERC can approve a project only if it determines, on the basis of an adequate record, that the "project's public benefits (such as meeting unserved market demand) outweigh its adverse effects" *Id.* at 62 (quoting *City of Oberlin*, 937 F.3d at 602). The Authorization Order is arbitrary because FERC failed to explain why the Project's benefits outweighed its serious and well-documented harms. FERC itself recognized that the Project would cause permanent or long-term impacts to commercial and recreational fishing in the Calcasieu Ship Channel, and adverse impacts to catch numbers and increased difficulties in accessing fishing locations.

7

Authorization Order PP111–12; *see also* Rehearing Order P110 (recognizing "that

permanent impacts on recreational and commercial fisheries in the Calcasieu Ship

Channel may occur due to the loss of available fishing areas from operation of the

LNG terminal's marine facilities and LNG carrier traffic."). Yet, instead of

addressing how these recognized harms factored into its authorization, the

Commission merely brushed them aside with a glib assertion that impacts on

recreational and commercial fishing would be "localized and less than significant"

with temporary and minor cumulative impacts on commercial fisheries.

Authorization Order P113.

      This reasoning is inadequate: having recognized concrete harms to the fishing

industry and ecosystem in Cameron, FERC was obligated under the NGA to explain

why nonetheless the alleged benefits outweighed these harms. Dissenting

Commissioner Clements recognized FERC's failure to "fully consider impacts on

commercial fishing and the people who rely on it for their livelihoods." *Id.* at

Comm'r Clements Dissent P18. FERC also failed to properly grapple with other key

deficiencies raised by Petitioners, including FERC's failure to address how an

increase of marine traffic will impact crucial fishing areas, and its inconsistent and

contradictory predictions regarding marine traffic's effects on commercial fishing

operations. Rehearing Request PP79-81; Authorization Order, Comm'r Clements

Dissent PP19–20 (finding these deficiencies in the Authorization Order). Because

FERC inaccurately minimized the impact of marine traffic on commercial fishing vessels, as well as the adverse impacts to the Cameron commercial industry itself, FERC's rosy predictions are unreliable. *See* Exhibit 8, Anthony Theriot Declaration, P20 ("Tanker traffic not only requires me to pause my work but passing ships disrupt the wildlife, turning up silt and mud and sucking shrimp and crabs to the bottom of the channel where I cannot catch them."); *id.,* P21 (expressing concern on dredging activities by Venture Global, given past witnessed and lived experience); *see also* Exhibit 9, Anthony Theriot Supplemental Declaration, P18 ("The new dredging started right before the spring shrimp season. […] Despite this, the company continues to disregard our business needs and operations."); Exhibit 10, James Hiatt Declaration, PP8, 10, 11 (dredging and increasing ship traffic for CP2 construction "would make it even *more* difficult for commercial fisher people to continue their work, which could result in the industry's collapse in Southwest Louisiana."). FERC further failed to provide an explanation as to how these recognized harms are outweighed by any alleged benefits, rendering its authorization arbitrary and capricious.

Further, because FERC's analysis of these impacts under NEPA was deficient, its NGA balancing of harms and benefits was doomed from the start. *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021). NEPA requires that when "economic or social and natural or physical

9

environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment." 40 C.F.R. § 1502.16(b) (2022). Whatever deference FERC is owed under NEPA, its choices ultimately must be "reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1511 (2025) (citations omitted). Here, FERC's EIS does not address the fact that the allegedly temporary impacts of construction and related dredging, which would "likely result in direct mortality" to benthic organisms and shrimp, EIS 4-206, could permanently destroy the businesses of the Petitioner fishermen and the commercial fishing industry in Cameron in one season. *See* Authorization Order, Comm'r Clements Dissent P18 (critiquing EIS for characterizing dredging harm as "temporary" since the benthic community is "expected to rebound within a few seasons," while ignoring record evidence that loss of even "a single season" could "permanently adversely affect commercial fishing businesses."); The majority noted her concerns generally but did not mention dredging or the permanent harm resulting from loss of one season; instead, it simply defaulted to the EIS despite the EIS not addressing this fact. *See* Authorization Order, PP107–13; *see also* Authorization Order, Comm'r Clements Dissent PP19–21 (outlining the "significant contradictions and omissions in the Commission's analysis of project impacts on commercial

fishing businesses," including increased marine traffic impacts, and impacts on

unique habitats that attract shrimp).

Moreover, while FERC acknowledged the intersection of commercial

fishermen and environmental justice communities as a relevant, impacted

population, *see* Authorization Order, Comm'r Clements Dissent P23, it again failed

to examine or weigh the harms to them, as Section 7 requires. For Petitioners, their

members, and other commercial fishermen in the area who reside in environmental

justice communities, the Project threatens to destroy their livelihoods. As

Commissioner Clements explained:

> [T]he deficiencies in the analysis of adverse impacts on
> fishing blind the Commission to the adverse impacts on
> members of [environmental justice] communities.
> [Environmental justice] communities are especially
> vulnerable to those impacts since one bad season can
> significantly disrupt fishing businesses, and low-income
> fishers without significant savings likely would be among
> those least likely to recover from that disruption.

*Id.* (citations omitted).

In sum, FERC identified harms but never fully examined them or justified

why they were outweighed. This failure of reasoning—compounded by a deficient

NEPA analysis that excluded foreseeable direct impacts—makes the Authorization

Order arbitrary under both the NGA and NEPA.

**B.    FERC Failed to Identify any Benefits.**

On the other side of the ledger, FERC made no serious attempt to engage with record evidence regarding the Project's lack of benefits. Instead, it relied on rebuttable presumptions to fill gaps in its reasoning while ignoring evidence rebutting those presumptions.

FERC erroneously claimed that it has no authority to weigh the harms and benefits from the construction and operation of an LNG export facilities because only the Department of Energy can issue licenses to export LNG as a commodity.[4] Even if that were true as to export facilities (and it is not), FERC would still be shirking its obligation to balance harms and benefits under Section 7. Consider this Project's components: the only alleged benefits provided by the Terminal are those of the gas exports that the Terminal would enable, and the only alleged benefits provided by the Pipeline are those provided by the Terminal. Exports or not, Section 7 requires that FERC weigh project benefits against the harms caused by project infrastructure—harms that unequivocally are within FERC's authority and obligation to consider. *See* Rehearing Request at 75–92 (discussing how FERC's attempt to disclaim responsibility does not absolve it of its statutory authority and

---

[4] *See, e.g.* Authorization Order P27 (disclaiming authority and responsibility on grounds that DOE "has not delegated to the Commission any authority to approve or disapprove the import or export of the commodity itself."); *see also* Rehearing Order P43.

12

obligations); Exhibit 11, Cumulative Effects Request for Rehearing of For a Better Bayou *et al.*, Docket Nos. CP22-21 and CP22-22, Accession No. 20250620-5476, at 44 (June 20, 2025) (same); Exhibit 12, *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 61,743 (Sept. 15, 1999) (discussing FERC's balancing test and factors considered, including "the proposal's market support, economic, operational, and competitive benefits, and environmental impact"); *see also State Farm*, 463 U.S. at 29. Moreover, "[FERC has] no record on the economic or other benefits from LNG exports and therefore cannot weigh them against the adverse impacts from construction and operation of the CP2 LNG Project." Authorization Order, Clements Dissent, P1, n. 5.

FERC cannot simply defer to the Department of Energy's export decisions and presume that a project will have domestic benefits. As an initial matter, the Department has not yet issued a final authorization for CP2 to export to Non-Free Trade Agreement countries. Even if it had, the Department applies a different standard to gas commodity export licenses than FERC applies to gas infrastructure. The Department approves commodity export licenses so long as they "will not be inconsistent with the public interest." 15 U.S.C. § 717b(a). FERC cannot conflate the standard for the Department to consider the export of gas as a commodity with its independent obligations to determine whether the proposed gas infrastructure would be in the public interest. *See* 15 U.S.C. §§ 717b(e), 717f(e); *see also* Exhibit

13

13, *KeySpan LNG, L.P.*, 112 FERC ¶ 61,028, PP28, 58 (July 5, 2005) (denying application for LNG facility based on safety concerns and conflict with public interest despite "the construction and operation of additional facilities to import LNG [being] vitally important to help meet energy demands.") For Section 7 infrastructure, FERC must make an affirmative finding that the project "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). "Otherwise," Congress instructed, "[the] application shall be denied." *Id.*

FERC failed from the outset because its Section 7 determination of market need and public benefit was arbitrary and contrary to law. FERC relied exclusively on an affiliate precedent agreement between two Venture Global entities, the Pipeline and the Terminal, to justify the Pipeline. But as this Court has recognized, a precedent agreement between corporate siblings has limited value as evidence of market need, especially when, as here, FERC was confronted with serious evidence undermining the affiliate agreement's probative value. *See Spire*, 2 F.4th 953, 973 (D.C. Cir. 2021) ("[E]vidence of 'market need' is too easy to manipulate when there is a corporate affiliation between the proponent of a new natural gas pipeline and a single shipper who have entered into a precedent agreement.") (citations omitted). Here, the Venture Global entity created to develop the Pipeline "executed a binding precedent agreement with CP2 LNG for 100%" of its capacity, "received no other bids or expressions of interest," and held no third-party contracts—facts FERC

14

acknowledges. Rehearing Order P8. This record stands in sharp contrast to *Healthy Gulf v. FERC*, 132 F.4th 544 (D.C. Cir. 2025) ("*Driftwood*"). There, the Court upheld FERC's finding of need because the LNG terminal was not the sole shipper, 4% of the subscribed capacity was contracted to two third-party shippers, and there was an unrebutted market study. *Id*. at 553–554. None of these conditions are present here.

Instead of a searching review, FERC devoted three paragraphs to alleged "market need," relying entirely on the affiliate precedent agreement. *See* Authorization Order PP36–38. But in relying solely on that agreement, FERC did not articulate any *domestic benefits* related to the construction and operation of the Pipeline in its Authorization Order. The record before FERC demonstrated that the Project will not provide any benefit to the community of Cameron, construction jobs will be performed by out-of-state workers, and a portion of permanent jobs created will displace existing jobs in other industries; to the extent there are new jobs created, those jobs are so heavily subsidized that they appear to be a losing proposition for the local economy. Rehearing Request at 64–69; *see also* Exhibit 14, *Local Fishermen, Landowners, and Organizations' Response to CP2 LNG and CP Express Form Letter Campaign*, Docket Nos. CP22-21, CP22-22, Accession No. 20240614-5192 (June 14, 2024) ("Form Letter Response," select exhibit excerpted and attached). FERC was also confronted with a study concluding that, after years of

15

operation, a peer export facility nearby "did not generate significant, vibrant new business development with indirect new jobs, and the local community did not thrive consistent with the prevailing economic theory."[5]

Nevertheless, FERC approved this massive export project with only a cursory examination of the record. FERC did not address whether any supposed *international benefits* could satisfy the public convenience and necessity standard of Section 7, nor whether any global effects would inure to the benefit of the American public. Scrutiny was especially important here because export pipelines generally do not provide any of the benefits contemplated by Section 7—*i.e.*, benefits to domestic consumers—including protecting consumers from corporate abuse and encouraging the orderly development of gas infrastructure at reasonable prices. *See* Exhibit 12, *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 61, 744 (Sept. 15, 1999) (enumerating domestic benefits); *see also City of Clarksville, Tenn. v. FERC,* 888 F.3d 477, 479 (D.C. Cir. 2018).

If FERC had looked beyond the precedent agreement and properly considered the record, FERC would have failed to find evidence that the Project is needed and found overwhelming evidence that it is not. Unlike in *Driftwood,* FERC here ignored

---

[5] Exhibit 15, IEEFA Comments re Final Authorization, at 4, CP2 LNG and CP Express Projects, Docket Nos. CP22-21, CP22-22, Accession No. 20231114-5044 (Nov. 14, 2023).

robust counter-evidence that: (1) the Pipeline will serve no domestic market and will instead facilitate gas exports to foreign markets, where demand for LNG is declining; (2) the Pipeline will not address any domestic load growth; and (3) the Project is likely to increase costs for American consumers while harming the domestic manufacturing sector. Rehearing Request at 56–62; *see also* Exhibit 14, Form Letter Response at Ex. 13 (*Industrial Energy Consumers of America, Notice of Intervention, Protest and Comment, U.S. Dep't of Energy*, at 3, FE Docket No. 21-131-LNG (March 11, 2022)) ("Foreign government state owned enterprises [...] have unfair market power over domestic consumers. For U.S. homeowners, this means higher costs for heating and electricity. For the manufacturing sector, the consequences are much greater.") By failing to engage with this counter-evidence, FERC violated the NGA and acted arbitrarily. *Spire*, 2 F.4th at 975.

## II.    PETITIONERS WILL SUFFER IRREPARABLE HARM WITHOUT A STAY.

Petitioners will suffer irreparable harm absent a stay. *Nken*, 556 U.S. at 434. FERC has authorized Venture Global to construct the Pipeline and fully prepare the Terminal site. Exhibit 16, *Notice to Proceed with Full Site Preparation of the CP2 LNG Terminal and Construction of the CP Express Meter Station,* Docket Nos. CP22-21 & CP22-22, Accession No. 20250728-3071 (July 28, 2025); Exhibit 17, *Notice to Proceed with Pipeline Construction*, Docket No. CP22-22, Accession No.

20250626-3092 (June 26, 2025). Venture Global is, with FERC's approval, racing ahead on a more intense and impactful schedule than FERC approved in its 2024 authorization. On July 9, 2025, FERC relaxed its own authorization conditions, allowing dredging to occur seven days per week at the height of summer shrimping season. Exhibit 18, *Variance Approval for 7-day dredging*, Docket No. CP22-21, Accession No. 20250709-3047 (July 9, 2025). FERC acknowledged dredging "would likely result in the direct mortality of benthic organisms, including less mobile life stages of managed species such as shrimp and benthic invertebrates, which are an important food source for many species of fish." EIS 4-206; Authorization Order P108.

These activities are already causing irreparable injury to the environment and to Petitioners' livelihoods.

**A.     Construction Activities Will Irreparably Injure Commercial Fishermen.**

The EIS predicted that dredging and spoil disposal would "result in the direct mortality of"—i.e., kill—shrimp and other species. EIS 4-206. This prediction has been borne out by Petitioners' experience. Petitioners Anthony Theriot, Travis Dardar, and Kent Duhon, along with the commercial fishermen members of petitioner Fishermen Involved in Sustaining our Heritage, make their living catching shrimp, oysters, and crabs in Calcasieu Pass. Prior LNG development in the area has

correlated with declines in these fishers' catch. *See* Exhibit 8, Theriot Decl. PP4–6, 11, 15–23; Exhibit 19, Motion to Intervene of FISH, Docket Nos. CP22-21 and CP22-22, Accession No. 20250331-5183, at 1, 2 (Mar. 31, 2025); *see also* Exhibit 10, Hiatt Decl. P11 ("[F]isher people also have to spend more time on each trip to obtain a sufficient catch for the day."). Petitioner Theriot, the co-owner of Cameron's last remaining shrimp shop and a fisherman himself, estimates that since 2022, when Venture Global began operating the Cameron Parish 1 terminal, his catch has dropped by over 50%, from around one million pounds of shrimp per year to under 150,000. *See* Exhibit 9, Theriot Supplemental Decl. P6; Continued or additional dredging for the CP2 project will prolong or exacerbate this problem. *See id.* PP3–5, 9–10, 18, 20.

The threat to fishermen's families and livelihoods from the Project is far from theoretical, and even a single season of reduced catch could put fishermen out of business. *See e.g.*, Exhibit 20, Task Force Letter on Protecting Louisiana's Shrimping Industry and Coastal Families, at 1 (Jan. 17, 2023) ("This industry is a priceless aspect of Louisiana culture as well as an economic engine in the state. This industry will be gone forever if you permit any more of the proposed facilities, all of which are huge companies based outside of Louisiana.") (Filed with FERC as Ex. 45 to Rehearing Request). Commissioner Clements recognized this in her dissent, noting that because of the precarious position of fishing businesses, "a single season

19

of decreased shrimp catch threatens to *irrevocably end shrimping business ventures in the area.*" Authorization Order at P18 (emphasis added) (citing public comments).

Additionally, an increase in ship traffic will exacerbate the challenges fishers and shrimpers face by causing increased pollution and churn, reduced catches, and decreased economic output from this sector of the economy.[6] Where economic losses threaten the existence of a business, even economic harm can be irreparable. *E.g.*, *Wisconsin Gas v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Of course, for Petitioners and many others who make their living on the water, losing a commercial fishery that has employed generations would be a much more than an economic or business loss.

## B. Construction Activities Will Cause Irreparable Environmental Injury

Construction of the Project will inevitably cause irreparable environmental harm. The Project footprints include, and will disturb, 2,308 acres of vegetation and over 1,400 acres of wetlands (with vegetated wetland included in both categories). EIS 4-143–144, 4-529. Several hundred acres of these vegetated areas (both wetland

---

[6] *See* Exhibit 21, Comments of Fishermen Involved in Sustaining our Heritage, *et al.*, on Environmental Impact Statement, Docket Nos. CP22-21 and CP22-22, Accession No. 20240117-5083 at 7 (Jan. 17, 2024) ("Wake from speeding tankers move, destroy, and bury traps in disturbed silt and sediment that finds its way into local's boat slips preventing them from ingress/egress to their property, and is destroying the bank.").

and upland) are forested, *id.* at 4-135, 4-144, and could not readily be restored to their existing conditions if the project was to be cancelled, given the time needed for trees to regrow. *Id.* at 4-137, 4-141. Even for areas without long-lived vegetation, restoration will likely be difficult and imperfect. *See, e.g.*, Order Reissuing Certificates, *Spire STL Pipeline LLC*, 181 FERC ¶ 61,232, 62,660 (Dec. 15, 2022), (Glick, Chair, concurring, P6) (noting that three years after the pipeline entered service, "several landowners' properties still ha[d] not been adequately restored, notwithstanding a Commission order and efforts by Commission staff to ensure that Spire fulfills its obligations to remediate the land affected by the pipeline."). This is one reason why courts have generally recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

Aside from vegetation and wetlands within the footprint, construction, dredging, and related activities will also have permanent impacts on nearby land and waters. Prior dredging activities resulted in extensive siltation of beaches, creating hazardous and unusable shoreline conditions, and the disposal of dredged material has polluted local properties. Exhibit 10, Hiatt Decl. P8. Similar impacts from the current dredging activities would likely be similar.

21

### III.     THE REMAINING FACTORS FAVOR A STAY.

The balance of hardships and public interest overwhelmingly favor a stay. *Nken*, 556 U.S. at 426. FERC would experience no harm from a stay, and any potential harm to Venture Global pales in comparison to the irreparable harm facing Petitioners. Venture Global has no urgent need to place the Project into operation on a particular timeline. Indeed, Venture Global's neighboring CP1 project entered operation years behind schedule (despite facing no environmental challenge to its FERC authorization), yet the delay did not threaten that project's commercial viability.[7] For fishermen like some Petitioners, the economic stakes could not be higher. *See supra* at 7-11; 17-20.

A stay would also serve the public interest. "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up). Because FERC approved the Project unlawfully, there is no public interest in construction on any timeline.

Even if the merits were a tossup (and they are not), the public interest would still favor a stay. The singular purpose of the Project is to export LNG for

---

[7] *See Venture Global Calcasieu Pass, LLC*, 190 FERC ¶ 61,167, P5 (Mar. 20, 2025) (summarizing this history).

consumption in foreign markets. But according to the President, "the national interest" requires "affordable and reliable energy" for American consumers, Exec. Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353, 8353 (Jan. 29, 2025), and existing supplies are "far too inadequate to meet our Nation's needs," Exec. Order 14156, *Declaring A National Energy Emergency*, 90 Fed. 8433, 8433 (Jan. 20, 2025). A recent report from the U.S. Energy Information Administration, the statistical and analytical agency within the Department of Energy, forecasts that the spot market price for natural gas will more than double between 2024 and 2026 as a result of "export growth that persistently outpaces U.S. natural gas production."[8] Crediting the President's declaration that it is "imperative" to "put[] the physical and economic wellbeing of the American people first," *id.*, there is simply no public interest in allowing Venture Global to race ahead with construction of this export-only project at the expense of the fishermen and communities who are already bearing the brunt.

## CONCLUSION

Petitioners respectfully request that the Court grant this motion and stay the Authorization Order and related FERC approvals pending review.

---

[8] *See* U.S. Energy Information Administration, *Short Term Energy Outlook (STEO)* at 3 (June 2025), available at https://www.eia.gov/outlooks/steo/archives/Jun25.pdf.

Dated: September 5, 2025

Respectfully submitted,

/s/ Megan C. Gibson
Megan C. Gibson
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
(202) 849-5953
mgibson@selc.org

Spencer Gall
Southern Environmental Law Center
120 Garrett Street, Suite 400
Charlottesville, Virginia 22902
(434) 977-4090
sgall@selc.org

*Counsel for Travis Dardar, Nicole Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, For a Better Bayou, and Fishermen Involved in Sustaining Our Heritage*

/s/ Gillian Giannetti
Caroline Reiser
Thomas Zimpleman
Gillian Giannetti
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington D.C., 20005
(202) 717-8341
creiser@nrdc.org

*Counsel for Natural Resources Defense Council*

24

Rebecca McCreary
Sierra Club
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595 ext. 103
rebecca.mccreary@sierraclub.org

*Counsel for Louisiana Bucket Brigade,*
*Healthy Gulf, Sierra Club, Texas Campaign*
*for the Environment, and Turtle Island*
*Restoration Network*

# EXHIBIT LIST

Ex. 1    Order Granting Authorizations Under Sections 3 and 7 of the Natural
Gas Act, Venture Global CP2 LNG, LLC, Docket Nos. CP22-21 and
CP22-22, Accession No. 20240627-3107, 187 FERC ¶ 61,119, June
27, 2024
("Authorization Order")

Ex. 2    Request for Rehearing and Motion for Stay of Intervenors, Docket
Nos. CP22-21 and CP22-22, Accession No. 20240729-5111, July 29,
2024
("Rehearing Request")

Ex. 3    The Temporary Pause on Review of Pending Applications to Export
Liquefied Natural Gas, U.S. Department of Energy, February 2024

Ex. 4    Final Environmental Impact Statement for the CP2 LNG and CP
Express Project, Docket Nos. CP22-21 and CP22-22, Accession No.
20230728-3008, July 2023
("EIS")

Ex. 5    Supplemental Declaration of James Hiatt, September 3, 2025

Ex. 6    Order Addressing Arguments Raised on Rehearing and Setting Aside
Prior Order, In Part, 189 FERC ¶ 61,148, Nov. 27, 2024
("Rehearing Order")

Ex. 7    Order Addressing Arguments Raised on Rehearing and Granting
Clarification, 191 FERC ¶ 61,153, May 23, 2025

Ex. 8    Declaration of Anthony Theriot, June 1, 2024

Ex. 9    Supplemental Declaration of Anthony Theriot, June 23, 2025

Ex. 10    Declaration of James Hiatt, September 13, 2024

26

Ex. 11    Cumulative Effects Request for Rehearing of For a Better Bayou, et al., Docket Nos. CP22-21 and CP22-22, Accession No. 20250620-5476, June 20, 2025

Ex. 12    Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61,227, September 15, 1999

Ex. 13    Keyspan LNG, L.P., 112 FERC ¶ 61,028, July 5, 2005

Ex. 14    Local Fishermen, Landowners, and Organizations' Response to CP2 LNG and CP Express Form Letter Campaign with Ex. 13, Docket Nos. CP22-21 and CP22-22, Accession No. 20240614-5192, June 14, 2024
("Form Letter Response")

Ex. 15    IEEFA Comments re Final Authorization, Docket Nos. CP22-21 and CP22-22, Accession No. 20231114-5044, November 14, 2023

Ex. 16    Notice to Proceed with Full Site Preparation of the CP2 LNG Terminal and Construction of the CP Express Meter Station, Docket Nos. CP22-21 and CP22-22, Accession No. 20250728-3071, July 28, 2025

Ex. 17    Notice to Proceed with Pipeline Construction, Docket Nos. CP22-21 and CP22-22, Accession No. 20250626-3092, June 26, 2025

Ex. 18    Variance Approval for 7-Day Dredging, Docket Nos. CP22-21 and CP22-22, Accession No. 20250709-3047, July 9, 2025

Ex. 19    Motion to Intervene of Fishermen Involved in Sustaining Our Heritage, Docket Nos. CP22-21 and CP22-22, Accession No. 20250331-5529, March 31, 2025

Ex. 20    Task Force Letter on Protecting Louisiana's Shrimping Industry and Coastal Families, January 17, 2023

Ex. 21    Comments of FISH, et al., on Environmental Impact Statement for the
          Venture Global CP2 and Venture Global CP Express Projects, Docket
          Nos. CP22-21 and CP22-22, Accession No. 20240117-5083, Jan. 17,
          2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure Rule 27(d) and 32(a), I certify that the foregoing motion complies with:

1. the type-volume limitations established by Rule 27(d)(2)(A), because this motion contains 5,200 words; and

2. the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

> */s/ Megan C. Gibson*
> Megan C. Gibson
> Southern Environmental Law Center
> 122 C Street NW, Suite 325
> Washington, DC 20001
> (202) 849-5953
> mgibson@selc.org
>
> *Counsel for Travis Dardar, Nicole Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, For a Better Bayou, and Fishermen Involved in Sustaining Our Heritage*

29

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of September, 2025, I have served the foregoing Petitioners' Joint Motion for Stay Pending Review on all registered counsel through the Court's electronic filing system (ECF).

*/s/ Megan C. Gibson*
Megan C. Gibson
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
(202) 849-5953
mgibson@selc.org

*Counsel for Travis Dardar, Nicole Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, For a Better Bayou, and Fishermen Involved in Sustaining Our Heritage*