ORAL ARGUMENT NOT YET SCHEDULED

**No. 24-1291 (L)**

**(Consolidated with 24-1292, 25-1157)**

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

TRAVIS DARDAR, et al.,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*,

———————————

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———————————

**PROOF JOINT OPENING BRIEF OF PETITIONERS**

———————————

Megan C. Gibson
SOUTHERN ENVIRONMENTAL
    LAW CENTER
122 C Street NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
mgibson@selc.org

Spencer Gall
SOUTHERN ENVIRONMENTAL
    LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, Virginia 22902
Telephone: (434) 977-4090
sgall@selc.org

***Additional counsel listed
on inside cover page***

Clara Derby
SOUTHERN ENVIRONMENTAL
   LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
cderby@selc.org

*Counsel for Petitioners Travis Dardar, Nicole Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, For a Better Bayou, and Fishermen Involved in Sustaining Our Heritage*

Caroline Reiser
Thomas Zimpleman
Gillian Giannetti
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

Nathan Matthews
EARTHJUSTICE
180 Steuart St., #194330
San Francisco, CA 94105
T: (415) 217-2183
F: (415) 217-2040
nmatthews@earthjustice.org

Rebecca McCreary
SIERRA CLUB
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595 ext. 103
rebecca.mccreary@sierraclub.org

*Counsel for Petitioners Louisiana Bucket Brigade, Sierra Club, Turtle Island Restoration Network, Healthy Gulf, and Texas Campaign for the Environment*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

### I.     Parties

**Petitioners** are: Travis Dardar, Nicole Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, For a Better Bayou, Fishermen Involved in Sustaining Our Heritage, Natural Resources Defense Council, Louisiana Bucket Brigade, Sierra Club, Turtle Island Restoration Network, Healthy Gulf, and Texas Campaign for the Environment.

**Respondent** is the Federal Energy Regulatory Commission.

**Intervenors** are Venture Global CP Express, LLC and Venture Global CP2 LNG, LLC.

No individuals or entities have yet sought leave to participate as *amicus curiae*.

### II.     Rulings Under Review

Petitioners challenge the following orders of the Federal Energy Regulatory Commission:

1. Order Granting Authorizations Under Section 3 and 7 of the Natural Gas Act, Venture Global CP2 LNG, LLC, Nos. CP22-21-000 &

CP22-22-000, 187 FERC ¶ 61,199 (June 27, 2024) (the "Authorization Order"), record item R.451,

2. Order Addressing Arguments Raised on Rehearing And Setting Aside Prior Order, In Part, Venture Global CP2 LNG, LLC, Nos. CP22-21-000 & CP22-22-000, 189 F.E.R.C. ¶ 61,148 (Nov. 27, 2024) (the "2024 Rehearing Order"), record item R.547.

3. Order Addressing Arguments Raised on Rehearing and Granting Clarification, Venture Global CP2 LNG, LLC, Nos. CP22-21-000 & CP22-22-000, 191 FERC ¶ 61,153 (May 23, 2025) (the "Post-SEIS Order"), record item R.658.

4. Order Addressing Arguments Raised on Rehearing, Venture Global CP2 LNG, LLC, Nos. CP22-21 & CP22-22, 192 FERC ¶ 61,157 (August 15, 2025) (the "August 2025 Rehearing Order"), record item R.757.

## III.   Related Cases

This case has not previously been before this Court or any other court.

As of this filing, the undersigned is not aware of any case pending before this Court that may be related to this case within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Nathan Matthews*
Nathan Matthews

*Counsel for Petitioners Louisiana Bucket Brigade, Sierra Club, Turtle Island Restoration Network, Healthy Gulf, and Texas Campaign for the Environment*

# TABLE OF CONTENTS

Certificate as to Parties, Rulings Under Review, and Related Cases ......i

Table of Contents..................................................................................iv

Table of Authorities...........................................................................vii

Glossary ..............................................................................................xiv

Jurisdictional Statement...................................................................1

Issues for Review ...............................................................................4

Statutes and Regulations..................................................................7

Statement of the Case ......................................................................8

    I.    Introduction .........................................................................8

    II.   Legal Framework ................................................................9

        A.   Natural Gas Act ...........................................................9

        B.   National Environmental Policy Act ....................................11

        C.   Clean Air Act ..............................................................13

    III.  Factual Background..........................................................15

        A.   Project Description...............................................................15

        B.   Project Vicinity...................................................................16

        C.   Procedural Background .......................................................17

Summary of Argument......................................................................21

Standing.............................................................................................26

Argument ...........................................................................................27

    I.    Standard of Review............................................................27

    II.   FERC's Interpretation and Application of the Natural Gas Act Was Unlawful and Arbitrary........................................................28

A.   FERC's Interpretation and Application of Section 3 Was Unlawful and Arbitrary. ...................................... 29

B.   FERC Could Not Dismiss All Harms as Insignificant or Inconsequential. .................................................. 33

C.   FERC Did Not Demonstrate That the Terminal Will Provide Benefits Outweighing Its Harms and Failed to Consider an Important Aspect of the Problem. ........................................ 39

D.   FERC Failed to Meaningfully Balance Harms and Benefits Before Approving the Pipeline. .............................................. 42

III.  FERC's Analysis of Air Pollution  Violated NEPA and the NGA .................................................................................. 47

A.   FERC's Conclusion That Air Quality Surrounding the Terminal Will Not Exceed the NAAQS Ignored Foreseeable Cumulative Sources of Pollution. ........................................ 49

   1.   FERC's Acceptance of Modeling That Contradicted FERC's Prior Analyses, and That Excluded the Magnolia LNG Terminal, Was Arbitrary. ................. 51

   2.   FERC's Refusal to Consider Ship Traffic from Other FERC-Approved LNG Terminals Was Arbitrary ...... 56

B.   FERC's Conclusion That Air Pollution That Does Not Exceed The NAAQS Does Not Cause Harm Is Unsupported and Contrary to Record Evidence. ........................................ 64

   1.   Analysis with EPA's COBRA Tool Demonstrates Foreseeable Health Impacts ...................................... 65

   2.   Venture Global's AERMOD Modeling Showing NAAQS Compliance Does Not Supersede COBRA's Predictions of Health Impacts. .................................. 69

   3.   FERC's Other Arguments Do Not Justify Ignoring the COBRA Predictions. .................................................. 74

   4.   Petitioners' COBRA Arguments Were Properly Before FERC and Are Properly Before This Court .............. 75

C.   FERC Failed to Consider Cumulative Impacts for The Moss Lake Pipeline Compressor Station.......................78

IV. FERC Did Not Take a Hard Look at Impacts on Commercial Fishing ...........................................................................80

V.   Remedy ...........................................................................87

Conclusion....................................................................................89

Certificate of Compliance ..........................................................92

Certificate of Service ..................................................................93

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Mun. Distrib. Grp. v. FERC,*
  100 F.4th 207 (D.C. Cir. 2024) .......................................................... 45

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ............................................................ 87

*Am. C.L. Union v. FCC,*
  823 F.2d 1554 (D.C. Cir. 1987) .......................................................... 41

*Am. Rivers v. FERC,*
  895 F.3d 32 (D.C. Cir. 2018) .......................................................... 2, 3

*Am. Trucking Ass'ns v. EPA,*
  283 F.3d 355 (D.C. Cir. 2002) ..................................................... 13, 71

*Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.,*
  360 U.S. 378 (1959) ............................................................................ 28

*Birckhead v. FERC,*
  925 F.3d 510 (D.C. Cir. 2019) .......................................................... 63

*Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy
  Comm'n,*
  449 F.2d 1109 (D.C. Cir. 1971) .......................................................... 58

*Cannon v. D.C.,*
  717 F.3d 200 (D.C. Cir. 2013) .......................................................... 64

*Citizens for Smart Growth v. Sec'y of Dep't of Transp.,*
  669 F.3d 1203 (11th Cir. 2012) .......................................................... 54

*City of Bos. Delegation v. FERC,*
  897 F.3d 241 (D.C. Cir. 2018) .......................................................... 74

\* Authorities upon which we chiefly rely are marked with asterisks.

*City of Davis v. Coleman,*
521 F.2d 661 (9th Cir. 1975)................................................................. 12

*City of Oberlin, Ohio v. FERC,*
937 F.3d 599 (D.C. Cir. 2019) .......................................................... 11, 42

*City of Oberlin v. FERC,*
39 F.4th 719 (D.C. Cir. 2022) ........................................... 43, 44, 45, 46

*City of Port Isabel v. FERC,*
111 F.4th 1198 (D.C. Cir. 2024) ........................................................ 76

*City of Port Isabel v. FERC,*
130 F.4th 1034 (D.C. Cir. 2025) .................................................... 12, 88

*Columbia Gas Transmission Corp. v. FERC,*
477 F.3d 739 (D.C. Cir. 2007) ............................................................ 63

*Comcast Corp. v. FCC,*
579 F.3d 1 (D.C. Cir. 2009) ................................................................ 88

*Ctr. for Biological Diversity v. FERC,*
67 F.4th 1176 (D.C. Cir. 2023) ..................................................... 30, 31

*Env't Def. Fund v. FERC,*
2 F.4th 953 (D.C. Cir. 2021) ............................................................... 44

*Evergy Kansas Cent., Inc. v. FERC,*
77 F.4th 1050 (D.C. Cir. 2023) ........................................................... 19

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ............................................................................ 31

*Healthy Gulf v. FERC,*
107 F.4th 1033 (D.C. Cir. 2024)
......................................................... 18, 49, 53, 56, 58, 60, 78

*Kleppe v. Sierra Club,*
427 U.S. 390 (1976) ............................................................................ 12

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ...................................................................... 28, 30

*Marsh v. Oregon Nat. Res. Council,*
490 U.S. 360 (1989) .................................................................. 12

*Michigan v. EPA,*
576 U.S. 743 (2015) .................................................................. 72

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto.*
*Ins. Co.,*
463 U.S. 29 (1983) .................................................................... 28

*Murray Energy Corp. v. Env't Prot. Agency,*
936 F.3d 597 (D.C. Cir. 2019) ................................................ 74

*\*N.J. Conserv. Found. v. FERC,*
111 F.4th 42 (D.C. Cir. 2024) ..................................... 29, 32, 38, 47, 88

*In re NTE Conn., LLC,*
26 F.4th 980 (D.C. Cir. 2022) ................................................ 33

*Pub. Serv. Co. of Colo. v. FERC,*
91 F.3d 1478 (D.C. Cir. 1996) ................................................ 40

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) .................................................................. 11

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n,*
481 F.2d 1079 (D.C. Cir. 1973) ........................................ 12, 61

*SEC v. Chenery,*
332 U.S. 194 (1947) .................................................................. 12

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
145 S. Ct. 1497 (2025) ......................................................... 11, 38

*Sierra Club v. FERC,*
68 F.4th 630 (D.C. Cir. 2023) ............................................. 2, 19

*Sierra Club v. FERC,*
827 F.3d 36 (D.C. Cir. 2016) ................................................ 10

*Sierra Club v. FERC,*
827 F.3d 59 (D.C. Cir. 2016) ................................................ 27

*Sierra Club v. FERC,*
    867 F.3d 1357 (D.C. Cir. 2017) ................................................. 68, 69, 73

*Sierra Club v. U.S. Dep't of Energy,*
    867 F.3d 189 (D.C. Cir. 2017) ............................................................ 10

*Smith Lake Improvement & Stakeholders Ass'n v. FERC,*
    809 F.3d 55 (D.C. Cir. 2015) ................................................................ 3

*Tennessee Gas Pipeline Co. v. FERC,*
    871 F.2d 1099 (D.C. Cir. 1989) ...................................................... 76, 77

*Theodore Roosevelt Conservation P'ship v. Salazar,*
    616 F.3d 497 (D.C. Cir. 2010) ......................................................... 54, 55

*United Steel v. Mine Safety & Health Admin.,*
    925 F.3d 1279 (D.C. Cir. 2019) ......................................................... 87

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
    6 F.4th 1321 (D.C. Cir. 2021) ...................................... 10, 27, 28, 29, 35

*W. Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy,*
    681 F.2d 847 (D.C. Cir. 1982) ............................................................ 29

*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC,*
    475 F.3d 319 (D.C. Cir. 2006) ............................................................ 33

## Statutes

5 U.S.C.
    § 706 .......................................................................................... 27

\*15 U.S.C.
§ 717b ................................................................................ 9
§ 717b(a) .................................................................... 28, 40
§ 717b(c) ........................................................................ 40
§ 717b(e) ........................................................................ 28
§ 717b(e)(1) ..................................................................... 9
§ 717f .......................................................................... 10
§ 717f(c) ....................................................................... 28
§ 717f(e) ............................................................. 10, 42, 43
§ 717r(b) ....................................................... 1, 2, 63, 64, 77

42 U.S.C.
§ 4332 ......................................................................... 11
§ 4332(2)(C) ................................................................... 11
§ 4332(C) ...................................................................... 81
§ 7151(b) ........................................................................ 9
§ 7409 ......................................................................... 13
§ 7409(b)(1) ............................................................... 13, 71
§ 7475(a)(3) ................................................................... 14
§ 7602(j) ...................................................................... 47
§ 7661(2)(B) ................................................................... 47

## Rules & Regulations

40 C.F.R.
§ 1502.9(d) .................................................................... 12
§ 1502.21 ...................................................................... 12
§ 1508.1(i)(1)-(3) ............................................................. 12

33 LA ADC Pt III
§ 919 .......................................................................... 58

## Administrative Agency Proceedings

*AES Sparrows Point LNG, LLC,*
  126 FERC ¶ 61,019 (2009) ................................................... 31

*Alaska Gasline Dev. Corp.,*
  172 FERC ¶ 61,214 (2020) ................................................... 31

*Bradwood Landing L.L.C.*,
    126 FERC ¶ 61,035 (2009)................................................. 30

*Certification of New Interstate Nat. Gas Pipeline Facilities*,
    88 FERC ¶ 61,227 (1999)................................................. 45

*Commonwealth LNG, LLC*,
    181 FERC ¶ 61,143 (2022)................................................ 34

*Commonwealth LNG LLC*,
    191 FERC ¶ 61,205 (June 18, 2025)....................................... 16

*Commonwealth LNG, LLC*, DOE, Order No. 5238-A (Aug.
    29, 2025) ............................................................... 40

*Jordan Cove Energy Project, L.P.*,
    154 FERC ¶ 61,190 (Mar. 11, 2016)...................................... 43

*Pac. Connector Gas Pipeline LP*,
    129 FERC ¶ 61,234 (2009)................................................ 31

## Other Authorities

*Air Plan Disapprovals; Interstate Transport of Air Pollution
    for the 2015 8-Hour Ozone National Ambient Air Quality
    Standards*, 88 Fed. Reg. 9,336 (Feb. 13, 2023)...................... 80

*Approval and Promulgation of Air Quality Implementation
    Plans; Louisiana; Infrastructure State Implementation
    Plan Requirements for the National Ambient Air Quality
    Standards*, 81 Fed. Reg. 35,674 (June 3, 2016)...................... 14

EPA, *Guidance Concerning the Implementation of the 1-hour
    $NO_2$ NAAQS for the Prevention of Significant
    Deterioration Program* (June 29, 2010) ............................. 80

EPA, *Guidance on Significant Impact Levels for Ozone and
    Fine Particles in the Prevention of Significant
    Deterioration Permitting Program* (Apr. 17, 2018)................... 14

EPA, Memorandum on Guidance on Significant Impact
    Levels for Ozone & Fine Particles in the Prevention of
    Significant Deterioration Permitting Program (April 17,
    2018) ................................................................................... 79

*Mercury and Air Toxics Standards*, 77 Fed. Reg. 9,303 (Feb.
    16, 2012) ............................................................................. 72

MERRIAM-WEBSTER*, Safe*, https://www.merriam-
    webster.com/dictionary/safe (last visited Oct. 12, 2025) ................... 71

*National Ambient Air Quality Standards for Ozone*, 80 Fed.
    Reg. 65,292 (Oct. 26, 2015) ..................................................... 71

*Primary National Ambient Air Quality Standards for
    Nitrogen Dioxide*, 75 Fed. Reg. 6,474 (Feb. 9, 2010) ......................... 71

*Reconsideration of the National Ambient Air Quality
    Standards for Particulate Matter*, 89 Fed. Reg. 16,202,
    16,226 (Mar. 6, 2024) ................................................. 13, 71

*Regulations Implementing National Environmental Policy
    Act of 1969*, 52 Fed. Reg. 47,897 (Dec. 17, 1987) .............................. 12

*Supplemental Finding That It Is Appropriate and Necessary
    To Regulate Hazardous Air Pollutants From Coal- and
    Oil-Fired Electric Utility Steam Generating Units*, 81 Fed.
    Reg. 24,420 (Apr. 25, 2016)....................................................... 72

# GLOSSARY

| | |
|---|---|
| COBRA | EPA's CO-Benefits Risk Assessment Health Impacts Screening and Mapping Tool |
| DOE | Department of Energy |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| LDEQ | Louisiana Department of Environmental Quality |
| LNG | Liquefied Natural Gas |
| µg/m3 | Micrograms per cubic meter |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |
| $NO_2$ | Nitrogen Dioxide |
| $PM_{2.5}$ | Fine Particulates |
| SEIS | Supplemental Environmental Impact Statement |
| SIL | Significant Impact Level |

# JURISDICTIONAL STATEMENT

These petitions challenge four Federal Energy Regulatory Commission ("FERC") orders. R.451 ("Authorization Order"); R.547 ("2024 Rehearing Order"); R.658 ("Post-SEIS Order"); and R.757 ("August 2025 Rehearing Order," together, "the Orders"). The Orders authorize construction and operation of Venture Global's proposed CP2 Liquefied Natural Gas ("LNG") export terminal ("Terminal") and the CP Express Pipeline ("Pipeline," together, "the Project"), issued pursuant to Natural Gas Act ("NGA") sections 3 and 7, 15 U.S.C. §§ 717b(e) and 717f(c), respectively. This Court has jurisdiction pursuant to 15 U.S.C. § 717r(b); all Petitioners intervened in the FERC proceedings,[1] filed timely requests for rehearing of FERC's orders, and filed timely petitions for review.

The first set of petitions, in Case Nos. 24-1291 and 24-1292, came after FERC's Authorization Order. After these petitions were filed, FERC granted Petitioners' first rehearing request in part. 2024 Rehearing Order P185 [JA___]. FERC paused construction, undertook a

---

[1] Authorization Order P15 [JA___] (granting intervention for all Petitioners but FISH); August 2025 Rehearing Order P1 n.2 [JA___] (granting FISH's intervention).

supplemental environmental impact statement, R.641 ("SEIS") [JA___],
and issued the Post-SEIS Order affirming FERC's authorization of the
Project. Petitioners then filed a second petition for review in case 25-
1157.

This Court has jurisdiction that could rest on several bases. First,
jurisdiction over all the FERC orders at issue here can rest on
Petitioners' timely rehearing request of the Authorization Order and
timely petitions in cases 24-1291 and 24-1292. FERC may take action
after a petition for review is filed but before the record is filed. 15 U.S.C.
§ 717r(b). The Court has jurisdiction to review such actions based on the
initial petition for review. *See Sierra Club v. FERC*, 68 F.4th 630, 646
(D.C. Cir. 2023), *vacated as moot by* 2023 WL 5537562 (D.C. Cir. 2023)
("*Mountain Valley*"). Petitioners' second rehearing request (R.693
[JA___], "Post-SEIS Rehearing Request") does not divest this Court of
the jurisdiction provided by the first petition for review, because the
second request for rehearing was filed *after* the petition for review and
concerned actions FERC took after Petitioners filed the petition. *Contra
Am. Rivers v. FERC*, 895 F.3d 32, 43 (D.C. Cir. 2018) (holding that a
second request for rehearing renders the petition premature when the

2

second request is filed *before* the petition); *see also Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

Alternatively, if Petitioners' second rehearing request rendered the first petitions unreviewable by this Court, *Smith Lake,* 809 F.3d at 56-57, the petition in Case 25-1157 provides jurisdiction. In this scenario, if the Post-SEIS Order was a rehearing order for which further requests for rehearing were not required before Petitioners sought judicial review, the 25-1157 petition was timely because it was filed on July 21, 2025, within 60 days of the Post-SEIS Order. *See id.* at 56-57 (where second request for rehearing not required, statute of limitations runs from order on which rehearing was sought). If, however, a rehearing request of the Post-SEIS Order was required before Petitioners could seek judicial review, *Am. Rivers*, 895 F.3d at 43-44, Petitioners met that requirement by submitting a timely rehearing request (R.693 [JA___]), that request was deemed denied (R.724 [JA____]), and the Case 25-1157 petition was both ripe and timely.

## ISSUES FOR REVIEW

1.  In authorizing the CP2 LNG Terminal under NGA section 3, which requires FERC to determine whether the Terminal's harms rendered it "[in]consistent with the public interest," was FERC's approval of the Terminal arbitrary where:

    a.  FERC insisted that it did not ask whether project harms outweighed the project benefits;

    b.  FERC did not address or distinguish Circuit and FERC precedent interpreting the statute to require such balancing;

    c.  FERC did not offer an alternative explanation of how to determine "consisten[cy] with the public interest";

    d.  the Terminal will have more than *de minimis* harm; and

    e.  FERC did not develop a record providing a basis for evaluating the magnitude of Terminal benefits.

2.  In authorizing the CP Express Pipeline under NGA section 7, which requires FERC to determine whether the Pipeline's benefits

outweigh its harms, was FERC's approval of the Pipeline arbitrary where the record provided evidence of nontrivial harm but no sufficient basis for evaluating the strength of benefits?

3.  Where FERC's discussion of air pollution rests on analysis of cumulative effects, which must include "reasonably foreseeable" actions, was it arbitrary and a violation of the National Environmental Policy Act ("NEPA") for FERC to exclude from analysis:

   a.  emissions from the Magnolia LNG terminal, which FERC has separately approved and which FERC initially found to be within the scope of pertinent cumulative effects: and

   b.  emissions from the ship traffic serving the LNG terminals that are included in the scope of FERC's cumulative effects analysis, where FERC estimated ship emissions in its parallel review for those individual terminals, and where other agencies have performed similar air analyses of ship emissions.

4. Where modeling in the record, conducted using an Environmental
   Protection Agency ("EPA") tool, estimated that the Project's air
   pollution would cause hundreds of premature deaths and other
   severe health impacts, was it arbitrary for FERC to dismiss this
   modeling as "superseded" by FERC's conclusion that the National
   Ambient Air Quality Standards ("NAAQS") would not be exceeded,
   despite EPA's repeated statements that pollution below the
   NAAQS can cause harm?

5. Was the SEIS's conclusion that there was no need to consider
   cumulative effects of air pollution around the Pipeline compressor
   station arbitrary, where the only modeling on this issue in the
   record indicates that the cumulative effect will be significant
   NAAQS exceedances?

6. Did FERC fail to take a hard look at impacts to the commercial
   fishing industry in the area, where FERC concluded aquatic
   species would recover from the harm of Project construction but

did not address evidence demonstrating that the fishing industry

could not survive that period of harm, and where the record

refutes FERC's assertion that the places adversely impacted by

the Project have no particular importance or unique

characteristics?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an

addendum.

## STATEMENT OF THE CASE

## I.  INTRODUCTION

The CP2 LNG Terminal is the eighth, and potentially largest, LNG export project FERC has approved along Louisiana's Calcasieu Ship Channel. EIS 3-39 to 3-40 [JA___-___]. The seven other LNG export facilities are already taking a toll on surrounding communities, including by increasing air pollution levels and impacting commercial fisheries. But FERC's review of CP2 failed to fully consider how allowing the construction and operation of yet another huge LNG export facility in the area will make a bad situation substantially—and unacceptably—worse.

The Terminal and Pipeline are both major sources of air pollution; the Terminal, in particular, will emit thousands of tons per year of criteria pollutants. EIS 4-368 [JA___]. Modeling indicates that the Project's pollution will cause hundreds of premature deaths, thousands of asthma attacks and missed school and work days, and other harm. R.608, 6 [JA___]. The Project also threatens calamity for the commercial fishing industry in Cameron, which is already suffering from declines in catch following FERC's approval of nearby LNG terminals. Commercial

fishers in the area are teetering on the brink, and even one bad season could drive families and fishing businesses into bankruptcy. Authorization Order, Clements Dissent P18 & n. 66 [JA___].

FERC's review of the Project violated the NGA, because it did not demonstrate that increasing the burdens on surrounding communities was justified. And by failing to examine how the Terminal and its associated Pipeline would exacerbate harms to local industry, the environment, and surrounding communities, FERC violated NEPA and the NGA. Vacatur is necessary to ensure that FERC fulfills its statutory obligations here.

## II.  LEGAL FRAMEWORK

### A.  Natural Gas Act

**NGA section 3** governs the import and export of natural gas. 15 U.S.C. § 717b. Section 3(e) specifically governs the infrastructure used for LNG exports: "the siting, construction, expansion, or operation of an LNG terminal." 15 U.S.C. § 717b(e)(1).

Congress vested authority over section 3 in the Department of Energy ("DOE"). 42 U.S.C. § 7151(b). In turn, DOE delegated its section

3(e) authority to FERC. DOE Delegation Order No. S1-DEL-FERC-2006, § 1.21.A (formerly No. 00.004.00A). This delegation is a limited one, conferring upon FERC *only* section 3(e) authority over LNG infrastructure; DOE retains "exclusive" authority under section 3(a) and (b) over exports of gas as a commodity. *Sierra Club v. FERC*, 827 F.3d 36, 40-41, 46 (D.C. Cir. 2016).

FERC will approve an LNG terminal under section 3(e) "unless it determines that the facility 'will not be consistent with the public interest.'" *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1326 (D.C. Cir. 2021) (quoting 15 U.S.C. § 717b(a)). The section 3 "public interest" standard is broad and requires consideration of environmental impacts. *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 202-03 (D.C. Cir. 2017).

**NGA section 7** governs pipelines that transport gas in interstate commerce. 15 U.S.C. § 717f. Under section 7, FERC may approve a pipeline only if FERC determines the pipeline is "required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). FERC "will issue a certificate of public convenience and necessity only if a project's public benefits (such as meeting unserved market demand)

10

outweigh its adverse effects (such as a deleterious environmental impact on the surrounding community)." *City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 602 (D.C. Cir. 2019) ("*Oberlin I*").

## B.  National Environmental Policy Act

NEPA "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). To serve that goal, NEPA mandates that federal agencies prepare an environmental impact statement ("EIS") before taking any major federal action significantly affecting the environment. 42 U.S.C. § 4332(2)(C). "The EIS must address the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1507 (2025); *accord* 42 U.S.C. § 4332.

Here, FERC relied on the NEPA regulations in effect in 2024. *See* August 2025 Rehearing Order P10 [JA___]. These regulations included

11

those promulgated by the Council on Environmental Quality[2] and

FERC, 52 Fed. Reg. 47,897 (Dec. 17, 1987). This Court accordingly

reviews FERC's actions for compliance with those regulations. *City of

Port Isabel v. FERC*, 130 F.4th 1034, 1039 (D.C. Cir. 2025) ("*Port Isabel

II*") (citing *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 n.2

(D.C. Cir. 2023)); *see also SEC v. Chenery*, 332 U.S. 194, 196 (1947).

These regulations codified existing judicial interpretation of the

statute, including the obligations to consider indirect effects, *City of

Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975), to consider

cumulative effects, *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976), to

engage in "reasonable forecasting and speculation" in the face of

incomplete information, *Scientists' Inst. for Pub. Info., Inc. v. Atomic

Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973), and to

"supplement" an initial EIS when confronted with new information,

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 370-72 (1989). *See* 40

C.F.R. §§ 1508.1(i)(1)-(3), 1502.9(d), 1502.21 (2024).

---

[2] The Council on Environmental Quality amended its regulations
multiple times; however, because differences between these revisions
are not important here, this brief cites the final version that was in
effect after May 2024.

## C.  Clean Air Act

This case indirectly implicates several programs of the Clean Air Act, in part because of FERC's reliance on permitting decisions delegated by the EPA to the Louisiana Department of Environmental Quality ("LDEQ").

Under one such program, EPA sets NAAQS for "criteria" pollutants. 42 U.S.C. § 7409. These are set at a level "requisite to protect the public health," including "an adequate margin of safety," *id.* § 7409(b)(1), but not necessarily at levels "below which [pollutants] are known to be harmless," *Am. Trucking Ass'ns v. EPA*, 283 F.3d 355, 360, 369-70 (D.C. Cir. 2002). EPA emphasizes that air pollution below the NAAQS can cause foreseeable harm. *Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*, 89 Fed. Reg. 16,202, 16,226 (Mar. 6, 2024) (summarizing scientific evidence as supporting a "no-threshold relationship" between long-term fine particulate ("PM$_{2.5}$") exposure and mortality). The NAAQS are set as proportions of the pollutant in the ambient air, such as parts per billion or micrograms per cubic meter ($\mu g/m^3$), measured across a defined time period.

13

Under the Clean Air Act's Prevention of Significant Deterioration program, new major stationary sources (like the Terminal and the Pipeline's Moss Lake compressor station) must, *inter alia*, "demonstrate" that their emissions will "not cause, or contribute to" any NAAQS violation. 42 U.S.C. § 7475(a)(3). In Louisiana, EPA has delegated Prevention of Significant Deterioration permitting to the LDEQ. *Approval and Promulgation of Air Quality Implementation Plans; Louisiana; Infrastructure State Implementation Plan Requirements for the National Ambient Air Quality Standards*, 81 Fed. Reg. 35,674, 35,676 (June 3, 2016). EPA allows permitting agencies to use so-called "Significant Impact Levels" ("SILs"), which identify an incremental increase in ambient air pollution, to help determine when new sources cause or contribute to a NAAQS violation. While SILs can be a helpful tool, EPA has emphasized that a project can "cause or contribute" to a NAAQS violation even where its incremental impact is less than the pertinent SIL.[3]

---

[3] EPA, *Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, 18. (Apr. 17, 2018), *available at*

## III.  FACTUAL BACKGROUND

## A.  Project Description

The Project is the proposed LNG export Terminal, called CP2, and the proposed Pipeline, called CP Express, which would supply the Terminal with gas. Authorization Order PP1-2 [JA___-___]. The Terminal would be in Cameron Parish, Louisiana, where a waterway called the Calcasieu Ship Channel meets the Gulf, and would consist of a plant to cool gas into a liquid, several LNG storage tanks, and two docks where LNG would be loaded onto ships for export. *See id.* P1 [JA___]. The main Pipeline would stretch about 85 miles from the Terminal to Jasper County, Texas, and would supply the Terminal with up to 4,400,000 dekatherms per day of gas from an existing pipeline system. *Id.* P2 [JA___]. The Pipeline would consist of this 85-mile mainline, a 34,800-horsepower gas-fired compressor station near Moss Lake, Louisiana, and other appurtenant facilities. *Id.* P11 [JA___].

The Terminal is one of the largest single LNG terminal projects FERC has ever approved, with a peak capacity of 28 million tons per

---

https://www.epa.gov/system/files/documents/2024-08/silguidance_july_2024.pdf.

annum. *Id.* P5 [JA___]. The Terminal will include two on-site gas-fired electric power plants, with a combined capacity of 1,470 megawatts, *id.* P7 [JA___], and will emit more than 8,500,000 tons of greenhouse gases per year. R.287 ("EIS"), 4-368 [JA___].

## B. Project Vicinity

As the name CP2 suggests, the Project is not the first of its kind. The Terminal would be adjacent to Venture Global's existing Calcasieu Pass project, sometimes called "CP1." *See* EIS 2-3 [JA___] (map). In addition, FERC has authorized six other LNG export projects along the Calcasieu Ship Channel. EIS 3-39 to 3-40 [JA___-___] (list), 4-510 [JA___] (map). CP1 and another project are already operating, EIS 3-39 [JA___], and several others are under construction.[4] One of them, Commonwealth LNG, would sit directly across Calcasieu Ship Channel, only a half mile from the Terminal. EIS 4-519 [JA___]; *Commonwealth LNG LLC*, 191 FERC ¶ 61,205 (June 18, 2025) (reapproved after remand).

---

[4] *See, e.g.*, Letter from David Swearingen (FERC) to JD Morris (Commonwealth LNG), Accession No. 20250918-3018 (Sept. 18, 2025) (authorizing Commonwealth LNG to commence site preparation).

In this region, fishing and shrimping are important parts of commerce and culture. Annually, the seafood industry contributes roughly $2.4 billion to Louisiana's economy. EIS 4-266 to 4-267 [JA___-___]. There are over 50 commercial fishing vessels operating out of the town of Cameron alone, and shrimp fleets use the Calcasieu Ship Channel year-round. EIS 4-267 [JA___]. However, commercial fishers in the area dread that the Project will irrevocably harm their industry, as they have seen declines in their catches since the onset of construction and operation of the adjacent Calcasieu Pass project. EIS 4-270 [JA___]. Many have expressed concern "that a single season of decreased shrimp catch threatens to irrevocably end shrimping business ventures in the area." Authorization Order, Clements Dissent P18 [JA___] (noting record evidence).

## C.  Procedural Background

In December 2021, Venture Global applied to FERC for authorization to construct and operate the Terminal under NGA section 3 and the Pipeline under NGA section 7. Authorization Order PP1-2 [JA___-___]. After considering protests and comments filed in response to the application, *id.* PP15-19 [JA___-___] and FERC's NEPA review,

17

*id.* PP78-85 [JA___-___], a divided FERC issued the Authorization Order and approved the Project over a dissent from Commissioner Clements on June 27, 2024. *See id.* PP1-3 [JA___-___]. Petitioners timely filed a joint request for rehearing. *See* R.470 ("2024 Rehearing Request") [JA___]. FERC did not act on the rehearing request within the time prescribed by the NGA, so the request was deemed denied on August 29, 2024. R.486 [JA___]. Petitioners then filed a pair of petitions, which the Court consolidated. Doc. 2073429 (No. 24-1291); Doc. 2073434 (No. 24-1292); Doc. 2073438 (consolidation order).

About two months later, FERC granted rehearing in part. Although FERC affirmed much of the Authorization Order, FERC explained it was "modifying the discussion in the Authorization Order, and setting aside the prior order, in part," 2024 Rehearing Order P2 [JA___], because, after FERC issued the Authorization Order, this Court held in *Healthy Gulf v. FERC*, 107 F.4th 1033, 1042-44 (D.C. Cir. 2024), that the same approach FERC relied on here to evaluate cumulative air impacts from the Project violated NEPA. 2024 Rehearing Order PP183-84 [JA___-___]. FERC initiated a supplemental

18

NEPA process and prohibited construction of the Project pending further proceedings. *Id.* P186 [JA___].

FERC issued a draft SEIS in February 2025. Petitioners submitted comments explaining that FERC's new approach to evaluating air quality impacts still violated NEPA. R.608 [JA___]. FERC issued the final SEIS on May 9, 2025. SEIS [JA___].

Two weeks later, FERC issued the Post-SEIS Order. Relying on the EIS and SEIS, FERC continued to find the Project should be approved, "modifying the discussion in the [prior orders] and continu[ing] to reach the same result." Post-SEIS Order PP2, 92-93 [JA___, ___-___]. Accordingly, FERC stated the Post-SEIS Order should be considered a supplement that merely implements the original Authorization Order. *See* Post-SEIS Order PP102-03 [JA___-___].

In an abundance of caution,[5] Petitioners sought rehearing of the Post-SEIS Order, R.693 [JA___], and when that request was deemed denied by operation of law on July 21, 2025, R.724 [JA___], filed a

---

[5] In similar circumstances, the Court has explained that nothing further is required to obtain judicial review of supplemental orders like the Post-SEIS Order. *See Evergy Kansas Cent., Inc. v. FERC*, 77 F.4th 1050, 1054-55 (D.C. Cir. 2023); *Mountain Valley*, 68 F.4th at 646.

petition for review, Doc. 216604 (No. 25-1157), which the Court consolidated with the prior petitions, Doc. 2127421 (order granting consolidation). FERC issued a substantive order on August 15, 2025, denying rehearing of the Post-SEIS Order. August 2025 Rehearing Order.

Construction of the Project is now underway. FERC announced in the Post-SEIS Order that "no further withholding of construction authorizations is required." Post-SEIS Order P94 [JA___]. On July 9, 2025, FERC approved a variance allowing Venture Global to dredge in the Calcasieu Ship Channel seven days a week.[6] In early August, Venture Global was involved in dredging operations near the Terminal when sediment-laden material escaped containment, burying crab traps, oyster beds, and killing wildlife, prompting Petitioners to seek a stay pending review. *See* Doc. 2133784 at 3.

---

[6] *See* Letter from Shannon Crosley (FERC) to J. Patrick Nevins (Latham & Watkins), Docket No. CP22-21-000, Accession No. 20250709-3047 (July 9, 2025).

## SUMMARY OF ARGUMENT

FERC's approval of the Terminal and Pipeline under Natural Gas Act sections 3 and 7 was arbitrary. Part II. Section 3 requires FERC to determine whether the Terminal's adverse impacts render it inconsistent with the public interest. FERC's insistence that, in making this determination, FERC does *not* ask whether harms outweigh the project benefit is an unexplained and unjustified departure from Circuit and FERC precedent. Moreover, FERC's failure to explain how it *does* make this determination means the path to FERC's conclusion cannot reasonably be discerned. Part II.A. Here, the evidence of harms from the Terminal and Pipeline demonstrate that adverse impacts could not be shrugged off as *de minimis*. Part II.B. For the Terminal, FERC cannot be found to have even implicitly weighed harms against benefits, because the record provides no way to assess benefits' magnitude. Part II.C. For the Pipeline, FERC agrees that section 7's "public convenience and necessity" standard requires balancing benefits against harms. The evidence of benefits FERC points to here—principally, the precedent agreement with the affiliated terminal—is evidence of some benefit, but

21

FERC has not explained how it weighed these benefits in its balancing. Part II.D.

FERC's analysis of air pollution violated NEPA, by failing to take the required hard look and by reaching the unsupported conclusion that impacts of air pollution would be insignificant. Part III. For the Terminal, FERC's finding of insignificance rests on FERC's assertion that when cumulative impacts are considered, the resulting air pollution will not exceed the NAAQS. But FERC's cumulative effects analysis violated NEPA, and failed to support this finding, because FERC omitted reasonably foreseeable sources of cumulative emissions. Part III.A. One source that was arbitrarily omitted from the modeling used in the SEIS's cumulative effects analysis is the Magnolia LNG terminal. FERC does not appear to have even become aware of this omission until after the SEIS and Post-SEIS Order were issued. Even if it was deliberate, this omission was unlawful. Because FERC has already approved Magnolia LNG, it is reasonably foreseeable. Omitting it was likely impactful, given that FERC's other analyses that have included Magnolia have consistently predicted cumulative emissions would cause NAAQS exceedances. Part III.A.1. Another source

improperly omitted from the cumulative effects analysis are emissions from ships serving the other LNG terminals, which were included. FERC's assertion that it does not have a tool for analyzing these emissions, and that in particular the AERMOD tool is unsuited to this task, is unsupported, directly refuted by the AERMOD documentation, and contradicted by the fact that other agencies have successfully used AERMOD to model impacts of mobile ship emissions. Part III.A.2. FERC's separate assertion that it does not have the data needed for analysis of cumulative ship emissions is refuted by the fact that FERC estimated already these emissions in FERC's NEPA analyses for the other individual LNG terminals. *Id.*

Separately, evidence in the record here—an analysis using EPA's EPA's CO-Benefits Risk Assessment Health Impacts Screening and Mapping Tool ("COBRA")—indicated that the Project's emissions would have health impacts even if pollution levels did not exceed the NAAQS. Part III.B.1. The presence of this project-specific factual analysis distinguishes cases that, absent anything similar, have upheld agency reliance on the NAAQS in analysis of potential health impacts. *Id.* Modeling showing that air pollution would not exceed the NAAQS did

not "supersede" the COBRA analysis, because as EPA has consistently stated, air pollution below the NAAQS can have foreseeable health impacts. Part III.B.2. FERC could not dismiss COBRA as a screening tool where the screening indicates that more sophisticated analysis was warranted, but where FERC provided none. Part III.B.3. FERC could not dismiss the COBRA analysis as untimely when it was presented in a comment on the draft SEIS and was discussed in the SEIS and Post-SEIS Order and it responded to FERC's new assertion that air pollution would not reach unhealthy levels. Part III.B.4.

As a final air pollution issue, FERC's refusal to consider cumulative impacts surrounding the Pipeline compressor station was arbitrary. The only cumulative modelling in the record indicates that air pollution around the compressor station will significantly exceed the NAAQS. FERC's new conclusion that the compressor station's individual incremental impacts will be below the SILs does not permit FERC to ignore this evidence of cumulative impacts. Part III.C.

FERC also violated NEPA because it failed to take a hard look at the harm the Project would inflict on the commercial fishing industry in Cameron. Part IV. FERC minimized impacts as temporary and localized

based on two unsupported premises. First, FERC incorrectly conflated impacts on the ecosystem with impacts to the fishing industry. While FERC admits construction activities will kill shrimp and other catch, FERC reasoned species would rebound within a few seasons and said overall impacts to commercial fishing would be insignificant. But FERC ignored that even one season of decreased catch can irrevocably end fishing businesses. Second, FERC wrongly assumed fishers can just fish elsewhere because the Project area is not unique. Untrue. The record establishes that the Project area sits atop the *only* part of the Calcasieu Ship Channel open for shrimping year-round and bifurcates an essential shrimp migration pathway, making it an especially productive fishing ground and an essential area of the ecosystem that sustains local catch, and thus the industry itself. Because FERC failed to take a hard look at the significant socioeconomic harms the Project would inflict on the local commercial fishing industry, its NEPA analysis was defective and FERC lacks a record capable of supporting its NGA determinations.

## STANDING

Petitioners are individuals and non-profit organizations with members whose concrete interests have already been, and will continue to be, adversely affected by the approval, construction, and operation of the Project.

Some are commercial fishers whose lives and livelihoods revolve around the waters near the Terminal. Lejuine Decl. ¶¶ 2, 11-12; Theriot Decl. ¶¶ 2-3. They face adverse impacts from the construction and operation of the Project, including declines in catch that hurt their income and could drive them out of business for good. Duhon Decl. ¶¶ 4, 9; Lejuine Decl. ¶¶ 11-12; Theriot Decl. ¶¶ 19, 23. Others live, work, and recreate in areas that will be adversely affected by the construction and operation of the Project. *See* Allaire Decl. ¶¶ 2, 5-8; Hiatt Decl. ¶¶ 2-3; Whitehurst Decl. ¶ 6. For some, pollution from the Project will reduce their use and enjoyment of their property and the surrounding areas, impact their health, and diminish their quality of life and enjoyment of the area for decades. Allaire Decl. ¶¶ 11, 17-18, 20-23; Nash Decl. ¶¶ 5, 15, 17; Theriot Decl. ¶ 24. These are concrete injuries, fairly traceable to FERC's approval of the Project, and would be

redressed by an order vacating that approval. *Sierra Club v. FERC*, 827 F.3d 59, 65-67 (D.C. Cir. 2016) ("*Sabine Pass*").

Petitioners that are organizations have associational standing on behalf of members who would have standing on their own. *Id.* at 65; *see also* Allaire Decl. ¶¶ 2, 5-8; Hiatt Decl. ¶¶ 2-3; Lejuine Decl. ¶ 2; Whitehurst Decl. ¶ 6. The organizational petitioners also meet the other elements of associational standing. This case is germane to their organizational purposes, *e.g.*, Lejuine Decl. ¶ 2; Allaire Decl. ¶¶ 6-8, and nothing about the claims asserted or relief requested requires their members to participate as individuals, *Sabine Pass*, 827 F.3d at 65.

## ARGUMENT

## I.  STANDARD OF REVIEW

The Administrative Procedure Act provides the standard of review here, *Vecinos*, 6 F.4th at 1327, 1331, and states that Courts "shall . . . hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. FERC must "examine the relevant data" and make "a rational connection between the facts found and the choice made."

27

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Where FERC "rests a decision, at least in part, on an infirm ground, [the Court] will find the decision arbitrary and capricious." *Vecinos*, 6 F.4th at 1331.

In "determining the meaning of statutory provisions," the Court "must exercise independent judgement." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). Although an agency's interpretation may be "informative to the extent it rests on factual premises within the agency's expertise," *id.* at 403 (cleaned up), the Court has the final word on the "best" interpretation. *Id.* at 400.

## II. FERC'S INTERPRETATION AND APPLICATION OF THE NATURAL GAS ACT WAS UNLAWFUL AND ARBITRARY

The NGA requires FERC to make independent judgments about whether the Terminal is "consistent with the public interest" under section 3 and whether the Pipeline is "required by the public convenience and necessity" under section 7. 15 U.S.C. §§ 717b(a), (e), 717f(c). Under either standard, FERC must consider "all factors bearing on the public interest," *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360

U.S. 378, 391 (1959), and its actions under the NGA must be the product of principled decisionmaking and reasonably explained, *N.J. Conserv. Found. v. FERC*, 111 F.4th 42, 63 (D.C. Cir. 2024); *W. Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 856-57, 866 (D.C. Cir. 1982).

Here, FERC violated the NGA in four ways. First, FERC approved the Terminal in reliance on an unlawful and arbitrary interpretation and application of its obligations under section 3. Second, FERC arbitrarily minimized substantial harms from the Project as inconsequential. Third, FERC approved the Terminal without demonstrating that its harms did not outweigh its benefits and entirely failed to consider an important aspect of the problem. Finally, FERC approved the Pipeline without conducting any meaningful balancing of its harms and benefits.

## A. FERC's Interpretation and Application of Section 3 Was Unlawful and Arbitrary.

When FERC reviews a proposed LNG export terminal under section 3(e), FERC considers whether the project "will not be consistent with the public interest." *Vecinos*, 6 F.4th at 1326 (quoting 15 U.S.C.

§ 717b(a)). Although this standard presumptively favors approval, the Court has upheld FERC balancing benefits against harms, including environmental harms. *See Ctr. for Biological Diversity*, 67 F.4th at 1188 (accepting FERC's section 3(e) determination as weighing whether "benefits" of a project are "outweighed by the projected environmental impacts.").

Here, FERC asserts that it "does not weigh the public benefits against potential harms" under section 3 and that "Petitioners['] characterization of the Commission's obligation under NGA section 3 as a 'balancing' is misplaced." 2024 Rehearing Order PP158 n.647, 41 [JA___, ___].[7] But under *Loper Bright*, the best interpretation of the provision must govern. FERC has not—and cannot—show that its contrary interpretation of section 3 is the "best" reading of the statute. 603 U.S. at 400.

FERC's insistence that section 3 does not involve balancing also marks an unexplained departure from FERC's own precedent. In *Bradwood Landing L.L.C.*, 126 FERC ¶ 61,035, P180 (2009), FERC

---

[7] The Authorization Order did not dispute that, in deciding whether the presumption favoring approval had been overcome, FERC balanced harms against benefits. Authorization Order P23 [JA___].

30

explained that under both sections 3 and 7, the "underlying principle" is that "a project is in the public interest if its benefits outweigh any potential adverse impact." FERC similarly described its actions under section 3 as "based on a balancing of the project against any adverse impacts" in *Pac. Connector Gas Pipeline LP*, 129 FERC ¶ 61,234, P21 (2009), and as involving "weigh[ing]" of "benefits against . . . adverse environmental impacts" in *AES Sparrows Point LNG, LLC*, 126 FERC ¶ 61,019, P26 (2009). None of FERC's subsequent section 3 decisions called this interpretation into question until the 2024 Rehearing Order.[8] The fact that FERC has neither "display[ed] awareness" of its departure from its past practice nor explained the reason for the change independently renders it arbitrary. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

---

[8] In *Alaska Gasline Dev. Corp.*, 172 FERC ¶ 61,214, P16 (2020), FERC stated that "section 3 of the NGA does not charge the Commission with demonstrating that the benefits of a proposal outweigh its potential harms," but context makes it clear that FERC was arguing that benefits did not need to be greater than the harms, not that balancing was inappropriate. *See id.* P33 (summarizing "the Commission's public interest balancing under section 3 of the NGA") and *Ctr. for Biological Diversity*, 67 F.4th at 1188 (on review of this decision, interpreting FERC as having weighed harms against benefits).

To that end, even if FERC could depart from these settled interpretations, FERC fails to offer a coherent alternative interpretation of what section 3 requires. While section 3 implies a presumption favoring approval, FERC neither disputes that the presumption is rebuttable nor that section 3 requires FERC to consider evidence of harms from the construction and operation of a project. 2024 Rehearing Order PP36-37 [JA___-___]. But to the extent FERC was faced with the task of deciding whether harms rebut the presumption favoring approval, FERC offers no explanation as to how it decides whether they have done so, other than to assert that FERC does *not* balance the harms against benefits. *Id.* P41 [JA___].

Particularly given FERC's failure to offer an alternative explanation, it is difficult to envision any plausible interpretation of section 3 that does not require balancing benefits against harms. FERC may not ignore record evidence that weighs against approving a project. *See N.J. Conserv. Found.*, 111 F.4th at 59. Yet, without contextualizing how those harms weigh against a project's benefits, how would FERC explain whether the evidence of harm overcomes the section 3 presumption? Saying "we'll know it when we see it," as FERC effectively

32

did here, is not an answer. *See In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) ("FERC's failure to identify the burden that ISO-NE was required to carry further supports the conclusion that FERC did not adequately explain why it was satisfied in this case."); *see also* 2024 Rehearing Order P37 [JA___] (insisting without explanation that section 3 presumption was not overcome).

Ultimately, the best interpretation of the statute, and FERC precedent, required FERC to balance harms against benefits in evaluating the Terminal. FERC says it has not done this, and the Court must take FERC at its word. *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 328-29 (D.C. Cir. 2006) ("Arbitrary and capricious review strictly prohibits us from upholding agency action based only on our best guess as to what reasoning truly motivated it.").

## B.  FERC Could Not Dismiss All Harms as Insignificant or Inconsequential.

While FERC disputes whether section 3 required it to weigh harms against benefits, FERC accepts that under section 3, it must consider evidence of harm, including environmental impacts, somehow. 2024 Rehearing Order PP36-37 [JA___-___]; August 2025 Rehearing

Order P31 [JA___]. FERC also accepts that section 7 requires balancing

benefits and harms. *See* Authorization Order P34 [JA___]. Accordingly,

whether through balancing or some other method, FERC is required to

consider evidence of a project's harms and explain why that evidence

did not compel denial. *See Commonwealth LNG, LLC*, 181 FERC ¶

61,143, PP2, 7 (Glick, Chair, concurring) (2022) ("[S]urely there is a

degree of adverse impact so great that the public interest requires the

Commission to reject a section 3 application."); *see also* Authorization

Order, Clements Dissent P1, n.5 [JA___] (["T]he CP2 LNG Project's

adverse environmental and socioeconomic impacts are so great that I

am compelled to find that approving the project is inconsistent with the

public interest.").

 FERC failed to do that here. FERC acted arbitrarily and

capriciously when minimizing the Project's harms as insignificant.[9]

Authorization Order P29 [JA___]; EIS 5-1 [JA___]; SEIS 19 [JA___]. As

an initial matter, FERC's conclusion that the Project's harms are

inconsequential cannot stand because it rests on a defective NEPA

---

[9] The EIS found that "impacts on visual resources," which are not
at issue here, would be "significant." EIS 5-1 [JA___].

analysis. As discussed below, FERC did not take a hard look at the Project's adverse impacts on air quality or commercial fisheries in the region. *See infra* Parts III and IV. This alone renders FERC's approval defective. *Vecinos*, 6 F.4th at 1331. And FERC cannot argue that all impacts are inconsequential because impacts (other than to scenery) are not "significant," since FERC did not take a position on the significance of greenhouse gas emissions. Authorization Order P180 [JA___].

Even if FERC could conclude that these impacts were not "significant" under NEPA, the record demonstrates they are not *de minimis* harms that FERC could impose on surrounding communities without justification.

For air pollution, the reasonably foreseeable consequence of FERC's repeated approval of the Project and other LNG terminals along the Calcasieu Ship Channel, and of other development around the Moss Lake Compressor Station, is that air quality will exceed multiple NAAQS. *See* Parts III.A and III.C. Moreover, even if the NAAQS are not exceeded, modeling performed using an EPA tool predicts that the incremental effect of the Project's air pollution will cause billions of dollars in health impacts, including hundreds of premature deaths. *See*

35

Part III.B. Accordingly, the record reflects that there are meaningful air pollution harms, and FERC has not explained whether or how these harms were considered in its public interest analysis.

For the commercial fishing industry, FERC conceded some permanent and long-term impacts, including adverse impacts on catch, 2024 Rehearing Order P108 [JA___]; EIS 4-206 [JA___], and a permanent loss of access and fishing areas in the vicinity of the Project, 2024 Rehearing Order P108 [JA___]. But FERC casually dismissed these harms, concluding that "most impacts would not be significant or would be reduced to less-than-significant levels," and suggesting that fishers can simply relocate, Authorization Order PP29, 112 [JA___, ___]; *see also* 2024 Rehearing Order PP112-14 [JA___-___].

That conclusion does not withstand scrutiny. The record shows that impacts will be consequential and that FERC ignored "the risk that temporary impacts on *fisheries* might permanently adversely affect commercial fishing *businesses*." Authorization Order, Clements Dissent P18 [JA___] (emphasis added); *accord* EIS App'x N, N-293 [JA___]. Furthermore, as FERC knows, "impacts on shrimping vessels would be greatest near the [T]erminal . . . where shrimping occurs year-round."

Authorization Order P112 [JA___]. FERC dismissed these harms as insignificant by insinuating that the fishers and industry can simply relocate, 2024 Rehearing Order P114 [JA___], and asserting there is nothing "unique" about this impacted fishing area, Authorization Order P112 [JA___]. Contrary to FERC's suggestion that these impacts are inconsequential because this area is not "unique," *id.* [JA___], the record shows that the opposite is true: the area around the Terminal is the *only* part of the Calcasieu Ship Channel that is open to shrimping year-round and bifurcates an essential migration pathway for shrimp in and out of Calcasieu Lake and nearby estuaries, making it an especially productive shrimping location. *See* Part IV; *see also* Authorization Order, Clements Dissent P20 [JA___] ("But the ship channel [. . .] *is* a special habitat."). Having been presented with significant harms—including economic harms to fishers and local industry—FERC's failure to consider and explain why that evidence did not compel denial of the Project was arbitrary.

Finally, FERC could not dismiss the Project's direct contributions to climate change as obviously inconsequential. Operation of the Terminal and Pipeline will directly emit 9.3 million tons of carbon

dioxide per year, Authorization Order P165 [JA___], the equivalent of driving 1,850,000 gas-fueled cars, *id.*, Clements Dissent P10 [JA___]. FERC cannot simply "walk[] away from" this "enormous" volume of greenhouse gases "with a fatalistic shrug." *See N.J. Conserv. Found.*, 111 F.4th at 63. FERC asserts that it does not know how to characterize these emissions as "significant or insignificant," Authorization Order P180 [JA___], and that it is not "obligated to" under NEPA, 2024 Rehearing Order P82 [JA___]. But even if FERC cannot (or need not) put a formal label these emissions, FERC's obligations under the NGA require it to explain why the Project's contributions to greenhouse gas emissions do not warrant denial of the Project. *Cf. Seven Cnty.*, 145 S. Ct. at 1514 ("The ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained."). FERC's failure to provide any such explanation here is arbitrary and capricious.

**C. FERC Did Not Demonstrate That the Terminal Will Provide Benefits Outweighing Its Harms and Failed to Consider an Important Aspect of the Problem.**

As explained in Part II.A, FERC's decision rested on its view that it was not required to, and did not, determine that the harms from the Terminal do not outweigh the benefits. Taking FERC at its word, this should be enough to require vacatur. However, even if the Court concludes FERC *did* attempt such balancing, the record here cannot support the conclusion that the Terminal's benefits outweigh (or are not outweighed by) its harms.

FERC's discussion of benefits from the Terminal is limited to invoking section 3(a)'s presumption favoring approval and the fact that DOE has approved exports from the Terminal to countries with which the United States has a free trade agreement. Authorization Order P23 [JA___]; 2024 Rehearing Order P46 [JA___]. Neither recital demonstrates that the construction and operation of the Terminal is consistent with the public interest despite its harms. The presumption cannot carry the day once harms are identified because FERC must explain why the harms do not rebut the presumption.

The fact that DOE approved exports from the Terminal to free trade agreement countries provides evidence that exports (and implicitly, the infrastructure to facilitate them) will provide *some* benefit. *See* 15 U.S.C. §717b(c). But DOE's export approval provides no evidence of whether these benefits are *greater* than the harm the Terminal will cause, because DOE does not consider LNG infrastructure impacts when approving exports themselves. Where DOE acts under section 3, 15 U.S.C. § 717b(a), its analysis is limited to the effects of the exports themselves; DOE does not consider infrastructure impacts when conducting an application-specific public interest review. *See* DOE, *Commonwealth LNG, LLC*, Order No. 5238-A, 21-22 (Aug. 29, 2025) (describing principles governing review).[10] Accordingly, DOE approvals reflect *only* a determination that exports provide benefits sufficient to offset the harms in DOE's wheelhouse. They are silent about whether the net benefits of exports (which are the only benefits of the Terminal FERC has identified) are also enough to outweigh the additional harms of the infrastructure. FERC cannot adopt or defer to a judgment DOE did not make. *Cf. Pub. Serv. Co. of*

---

[10] https://www.energy.gov/sites/default/files/2025-08/ord5238-A.pdf

*Colo. v. FERC*, 91 F.3d 1478, 1481 (D.C. Cir. 1996) (the Court "cannot defer to a vacuum"). Blindly following DOE caused FERC to ignore this important aspect of the problem.

To discharge its independent duty under section 3(e), FERC needed to make an additional judgment about the value of the Terminal's benefits in facilitating export relative to the harms of the Terminal. But FERC has "no record on the economic or other benefits from LNG exports and therefore [no ability to] weigh them against the adverse impacts from construction and operation of the CP2 LNG Project." Authorization Order, Clements Dissent P1 n.5 [JA___]. That was a problem of FERC's own making: FERC could have solicited input from DOE; it could have issued a conditional approval, identifying the Terminal's harms and withholding final authorization until DOE, as an exercise of its retained and supervisory authority, determines whether exports would provide sufficient benefits to overcome them; or it could have devised any number of other solutions. What FERC may not do is "throw up its hands" in the face of a difficult situation. *Am. C.L. Union v. FCC*, 823 F.2d 1554, 1572-73 (D.C. Cir. 1987). Where, as here, the record establishes that an LNG terminal will cause harm, FERC cannot

41

rationally conclude the harms do not outweigh the benefits without

knowing the benefits' magnitude.

## D. FERC Failed to Meaningfully Balance Harms and Benefits Before Approving the Pipeline.

For the Pipeline, there is no dispute that FERC was required to

balance harms and benefits. Authorization Order P34 [JA___]. Absent

an affirmative showing that benefits outweigh harms, FERC will not

approve a pipeline under section 7 of the NGA, *Oberlin I*, 937 F.3d at

602, and the "application shall be denied," 15 U.S.C. § 717f(e). Here,

FERC did not meaningfully balance harms and benefits or reasonably

explain how the latter outweigh the former.

In this case, FERC's public convenience and necessity analysis

relied almost exclusively on a single precedent agreement between two

Venture Global subsidiaries for the full capacity of the Pipeline.

Authorization Order PP37-38 [JA___-___]. A precedent agreement is a

contract between pipeline companies and shippers. The sole purpose of

the arrangement at issue here was to "transport feed gas to the

[Terminal]," where it will be liquified and exported as LNG. *Id.* PP2, 37

[JA___, ___]. In other words, the benefits side of the ledger rests on a

single precedent agreement that is a proxy for the foreign sales the Terminal would enable.

This creates two problems for FERC. First, the purported benefits of the Pipeline come from its ability to deliver gas to the Terminal, with which it is inextricably intertwined. Once FERC's approval of the Terminal is recognized as arbitrary and unlawful, the benefits of the Pipeline disappear.

Second, FERC's approval of the Pipeline was independently flawed. Even assuming FERC could credit the Pipeline with some quantum of benefits from the exports it would enable via the Terminal, FERC would need to decide if the magnitude of those benefits was enough to justify approving the Pipeline. Whereas exports are governed by the "public interest" standard of section 3, the Pipeline is governed by the more demanding "public convenience and necessity" standard of section 7. 15 U.S.C. § 717f(e). The fact that exports of gas are authorized under section 3 is "not dispositive of the question whether a pipeline proposed to transport that gas . . . is required by the public convenience and necessity." *City of Oberlin v. FERC*, 39 F.4th 719, 727 (D.C. Cir. 2022) (*"Oberlin II"*); *see also Jordan Cove Energy Project, L.P.,*

154 FERC ¶ 61,190, P40 (Mar. 11, 2016) ("The Commission has not

previously found a proposed pipeline to be required by the public

convenience and necessity under NGA section 7 on the basis of a DOE

finding under NGA section 3 that the importation or exportation of the

commodity natural gas . . . is consistent with the public interest.").

"[T]his means that an application could be denied a Section 7 certificate

despite having export precedent agreements if the overall benefits of

the proposed pipeline failed to outweigh the overall costs." *Oberlin II*, 39

F.4th at 727.

Merely pointing to the precedent agreement between the Terminal

and the Pipeline does not provide FERC with information needed to

conduct this weighing. While "precedent agreements are

always . . . important evidence of demand" and may, in some cases, be

enough to "demonstrate both market need and benefits that outweigh

adverse effects," the Court has made clear that precedent agreements

are not "always *sufficient* to show that construction of a proposed new

pipeline" satisfies the standard of section 7. *Env't Def. Fund v. FERC*, 2

F.4th 953, 972 (D.C. Cir. 2021). In general, precedent agreements, like

other evidence of market support, can be a proxy indicating that the

pipeline will benefit the public by, *e.g.*, "meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives." *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 61,748 (1999).

Here, FERC failed to explain how it weighed harms and benefits as required by Section 7. Merely pointing to the precedent agreement between the Terminal and the Pipeline is not enough because the agreement is just a proxy for exports. *Oberlin II*, 39 F.4th at 727. FERC offered only half-hearted gestures at other public benefits the Pipeline might provide. 2024 Rehearing Order PP68-69 [JA___-___]. For the most part, FERC simply repackaged the benefits of exports themselves, like providing "access [to] additional markets" for "upstream natural gas producers" and contributing to "the balance of international trade." *Id.* It is unclear how FERC could weigh these benefits, or those of exports themselves, given DOE's exclusive authority. *Ala. Mun. Distrib. Grp. v. FERC*, 100 F.4th 207, 213 (D.C. Cir. 2024). Beyond that, FERC identified only "minor positive [economic] impacts" from things like

45

"construction jobs, payroll taxes, [and] purchases made by the workforce." 2024 Rehearing Order P69 n.299 [JA___]. However, FERC explicitly treated these unsubstantiated non-export benefits as an afterthought, concluding that "[a]ny public benefit, no matter how small, in addition to the . . . binding precedent agreement executed with [the Terminal], furthers [FERC's] finding that the [Pipeline] is required by the present or future public convenience and necessity." *Id.* P69 [JA___].

Ultimately, FERC did not reasonably explain how the benefits it enumerated were weighty enough to tip the balance towards approving the Pipeline. Whatever value FERC might assign to the benefits of exports from the Terminal that the precedent agreement embodies, FERC cannot simply rest on the fact of those exports to discharge its duties under section 7. *Oberlin II*, 39 F.4th at 727. To the extent FERC did anything more, FERC simply listed benefits that even FERC thinks are meager. The record leaves no way of knowing whether and how FERC weighed the adverse impacts here against the Pipeline's purported benefits—just the end result. This is not reasoned decisionmaking; it is a "failure to conduct any meaningful balancing

46

[that] falls short of what is required by the NGA and this Court's precedent." *N.J. Conserv. Found.*, 111 F.4th at 63.

## III. FERC'S ANALYSIS OF AIR POLLUTION VIOLATED NEPA AND THE NGA

Both the Terminal and Pipeline will be "major sources" of criteria air pollutants. 42 U.S.C. §§ 7661(2)(B), 7602(j). Operation of the terminal will emit 1,335.7 tons of nitrogen oxides, 356.9 tons of volatile organic compounds, 476 tons of $PM_{2.5}$, and 258.9 tons of sulfur dioxide annually. EIS 4-368 [JA___]. Marine vessels (LNG carriers and associated tugboats) will emit another 81 tons of nitrogen oxides, 5.3 tons of $PM_{2.5}$, and other pollutants. EIS, 4-368 [JA___]. Operation of the Pipeline's Moss Lake compressor station will emit 480.6 tons of carbon monoxide, 198.8 tons of nitrogen oxides, 142 tons of volatile organic compounds, and 100.3 tons of $PM_{2.5}$. R.638, Attachment 1 p.2 [JA___].[11]

---

[11] The SEIS does not itself provide the emission totals underlying its analysis. For the terminal, the Post-SEIS Order indicates, P65 n.258 [JA___], that FERC is continuing to rely on the EIS's emission figures. For the pipeline, the SEIS 15 [JA___], relies on figures Venture Global provided in response to Sierra Club's comments on the draft SEIS.

The Terminal's emissions will increase surrounding air pollution. The Terminal will increase ambient 1-hour nitrogen dioxide ("$NO_2$") pollution by up to 143 μg/m³, SEIS 19 [JA___], 71% of NAAQS and nearly twenty times the SIL, *id.*; EIS 4-369 [JA___]. The Terminal also will increase annual $PM_{2.5}$ by 7% of the NAAQS and ozone by 6% of the NAAQS. SEIS 19 [JA___], EIS 4-370 [JA___], R.727, 5 [JA___].

Despite these increases, FERC concluded that "the emission impacts" of Project are "not significant." SEIS 19 [JA___]. For the Terminal, FERC argued that air quality will not exceed the NAAQS, and that air pollution will therefore have no impacts. SEIS 18 [JA___]. FERC is wrong. First, FERC's conclusion that the NAAQS will not be exceeded excluded foreseeable contributors to cumulative air quality. Second, air pollution below the NAAQS can have foreseeable adverse effects on human health. Here, for the first time, FERC was presented with modeling performed with EPA's COBRA tool, which forecasted the incremental health impacts of the Project's air pollution. FERC's refusal to consider impacts of air pollution that did not exceed the NAAQS, whether by using this COBRA analysis or some other methodology, was arbitrary.

48

For the Pipeline, FERC's SEIS and 2025 Orders no longer considered cumulative impacts at all. Instead, FERC asserted that since the Moss Lake compressor station's contribution to air pollution will not exceed any SIL, no further analysis was necessary. Because the record indicates that cumulative air pollution will exceed the NAAQS, FERC could not rely on the SILs to dismiss cumulative effects as insignificant. *Healthy Gulf*, 107 F.4th at 1043-44. And EPA's COBRA tool indicates that the compressor station will have foreseeable adverse health impacts regardless of whether its incremental contribution exceeds the SILs.

For these reasons, FERC failed to take the required hard look at the effects of the Project's air pollution, and to support its conclusion that the Project's air pollution would have "insignificant" impacts. SEIS 19 [JA___].

## A. FERC's Conclusion That Air Quality Surrounding the Terminal Will Not Exceed the NAAQS Ignored Foreseeable Cumulative Sources of Pollution.

NEPA requires FERC to consider "cumulative effects," *i.e.*, "effects on the environment that result from the incremental effects of the

action when added to the effects of other past, present, and reasonably foreseeable actions, regardless of what agency or person undertakes those actions." EIS 4-506 [JA___]; *see* August 2025 Rehearing Order P9 [JA___] (arguing that FERC continued to follow prior requirements to consider cumulative effects despite changes in NEPA regulations). Here, the SEIS and 2025 Rehearing Order's analysis of the Terminal's air pollution is inherently cumulative in nature: FERC argues that the Terminal's individual air pollution is insignificant *because* the cumulative impact on surrounding air quality will not exceed the NAAQS. SEIS 19 [JA___].

This conclusion is arbitrary because FERC got this result by excluding emissions from already-approved nearby FERC-jurisdictional projects, including (1) the Magnolia LNG terminal and (2) marine vessels serving other terminals along the Calcasieu Ship Channel. FERC cannot conclude that cumulative emissions will not exceed the NAAQS while ignoring sources that contribute to those cumulative emissions.

1.    **FERC's Acceptance of Modeling That Contradicted FERC's Prior Analyses, and That Excluded the Magnolia LNG Terminal, Was Arbitrary.**

The SEIS did not write on a blank slate in discussing cumulative air impacts in Cameron Parish. In this proceeding, the EIS and Authorization Order predicted that the cumulative impact on air quality would be to exceed the NAAQS for $NO_2$ and $PM_{2.5}$. Authorization Order P186 [JA___] (citing EIS 4-552 to 553 [JA___-___]); EIS 4-371, 4-373 [JA___, ___]. Three other recent FERC analyses have also concluded that the 1-hour $NO_2$ NAAQS will be exceeded in the area surrounding the terminal: the Commonwealth LNG EIS,[12] the Commonwealth SEIS,[13] and the Cameron LNG expansion Environmental Assessment.[14] FERC's Commonwealth SEIS, issued a week *after* the SEIS here, specifically found that air quality would exceed the NAAQS at places also within the "radius of impact" effected

---

[12] FERC, EIS for Commonwealth LNG Project, Docket No. CP19-502-001, Accession No. 20220909-3017, 4-392 (Sept. 9, 2022).

[13] FERC, SEIS for Commonwealth LNG Project, Docket No. CP19-502-001, Accession No. 20250516-3002, 17 (May 16, 2025).

[14] FERC, Environmental Assessment for Cameron LNG Amended Expansion Project, Docket No. CP22-41-000, Accession 20221202-3002, at 25-26 (Dec. 2, 2022), Cameron LNG, Response to Env. Info. Req., Docket No. CP22-41-000, Accession No. 20220622-5108, 3, (June 22, 2022).

51

by the Terminal's emissions, around the nearby town of Hackberry.
Post-SEIS Rehearing Request 16-19 [JA___-___].

The 2024 Rehearing Order recognized that, in light of the EIS's
conclusion that the NAAQS would be exceeded, additional analysis of
cumulative impacts was required. 2024 Rehearing Order PP183–85
[JA___-___] (citing *Healthy Gulf*, 107 F.4th at 1043–44). FERC then
instructed Venture Global to prepare renewed air modelling, which
FERC relied upon in the SEIS. Unlike FERC's four other recent
analyses of cumulative air quality in the region, this new analysis
concluded that NAAQS would *not* be exceeded. SEIS 19 [JA___]. FERC's
acceptance of the new modeling was arbitrary for two reasons.

First, FERC accepted the new modeling without demonstrating
awareness of why it reached a different conclusion than FERC's prior
analyses, indicating that FERC did not exercise independent judgment
on this issue. In explaining the differences between the SEIS and EIS,
the SEIS stated that the modeling it summarizes used an "updated"
"inventory" of other air pollution sources. SEIS 15, 18 [JA___, ___]. But
despite comments asking FERC to explain its different analyses, R.608,
26-29 [JA___-___], the SEIS failed to identify what any of those updates

52

were, or to explain their impact. Petitioners eventually discovered, by scrutinizing materials Venture Global submitted to LDEQ (but not to FERC), that one "update" was to omit the FERC-approved, not-yet-constructed Magnolia LNG terminal, which had been included in the previous analyses of cumulative air pollution. *See* Post-SEIS Rehearing Request 20 n.54 [JA___]. The August 2025 Rehearing Order was the first time FERC acknowledged Magnolia's omission. P15 n.54 [JA___]. Prior to the Post-SEIS Rehearing Request, there was no mention of this change in the FERC docket.

Second, omitting Magnolia would have been unlawful even if FERC had done it knowingly. NEPA requires FERC to consider all "reasonably foreseeable" contributors to cumulative effects. EIS 4-506 [JA___]; *Healthy Gulf*, 107 F.4th at 1043. The EIS's cumulative effects analysis appropriately included Magnolia, identifying it as a "project [or] reasonably foreseeable future action[] with potential to contribute to cumulative impact," specifically air quality. EIS 4-512, 4-515 [JA___, ___] (capitalization changed). The EIS explained that FERC authorized Magnolia in 2016, and that although construction had not started, FERC had extended its authorization. *Id.* 4-519 to 4-520 [JA___-___].

The SEIS and 2025 Orders did not argue that Magnolia is no longer reasonably foreseeable, nor could they have done so. In cumulative effects analyses, agencies may dismiss future projects as not reasonably foreseeable when they are proposed after NEPA review has commenced, or they are too undefined to be meaningfully assessed. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 513 (D.C. Cir. 2010). Magnolia is not such a project. FERC fully reviewed and authorized Magnolia before NEPA review of the Terminal began; Magnolia is not a project where "the parameters and specifics . . . would be a mere guess." *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1215 (11th Cir. 2012). FERC does not cite, and Petitioners are unaware of, any authority allowing an agency to conclude that a project the agency had already approved was not reasonably foreseeable.

Instead, FERC states that omitting Magnolia was proper because LDEQ omitted it from LDEQ's emission inventory. August 2025 Rehearing Order P15 [JA___]. But the question before LDEQ is not the same as the question before FERC. LDEQ did not assert that Magnolia was no longer reasonably foreseeable. LDEQ omitted Magnolia because

Magnolia's LDEQ-issued Prevention of Significant Deterioration permit had expired, Post-SEIS Rehearing Request 20 n.54 [JA___], and because LDEQ apparently only includes permitted, rather than merely proposed or otherwise foreseeable, sources in its inventory. *See* 33 LA ADC Pt III, § 919. Whether that is appropriate under the Clean Air Act is not at issue here. But the fact that this permit had expired does not mean Magnolia was no longer reasonably foreseeable for purposes of FERC's NEPA cumulative effects analysis, especially where FERC's authorization of it remained outstanding: "[A] project need not be finalized to be 'reasonably foreseeable.'" *Theodore Roosevelt*, 616 F.3d at 513.

FERC's reflexive adoption of LDEQ's analysis also ignores crucial differences in LDEQ and FERC's positions. Because Magnolia does not have current LDEQ authorization, LDEQ can address the cumulative impact of Magnolia and the Terminal in its future proceedings regarding Magnolia. But because FERC's authorization of Magnolia remains valid, FERC will have no future opportunity to address the cumulative impacts of the Terminal and Magnolia together. This underscores the importance of FERC's obligation to consider this

55

cumulative impact now. FERC cannot assume that LDEQ will resolve any such future problems, because FERC's authority and obligation under the NGA and NEPA is broader than LDEQ's. *Healthy Gulf*, 107 F.4th at 1043-44.

FERC therefore acted arbitrarily by accepting and relying on a cumulative effects analysis that omitted (perhaps without FERC's knowledge) emissions from Magnolia LNG. There is no reason to doubt that this omission was consequential. Of the projects included in the EIS's cumulative effects analysis, Magnolia appears to have been the second largest source of nitrogen oxides emissions. *See* 2024 Rehearing Request 145 [JA___] (collecting emission estimates for other LNG terminals). FERC's four recent cumulative effects analyses that included Magnolia all predicted exceedances of the 1-hour $NO_2$ NAAQS. Including Magnolia could have led to the same conclusion here, undermining FERC's argument that the Terminal's impacts would be insignificant.

## 2. FERC's Refusal to Consider Ship Traffic from Other FERC-Approved LNG Terminals Was Arbitrary.

FERC's cumulative effects analysis included stationary-source emissions from the Driftwood, Lake Charles, Cameron LNG Expansion,

Commonwealth LNG, Delfin, and (in 2024) Magnolia terminals. EIS 4-511 to 4-512 [JA___-___]. FERC's refusal to consider the emissions from ships that would transport LNG from these FERC-approved (but not yet fully operational) terminals in the area was arbitrary. The Authorization Order, which predicted NAAQS exceedances, found that those exceedances were "primar[ily] drive[n]" by existing sources "such as marine vessels operating in the nearby Calcasieu Ship Channel." Authorization Order P186 [JA___]. FERC's separate analyses for these other terminals each identified marine vessels as significant sources of emissions. 2024 Rehearing Request 145 [JA___] (reprinting figures from FERC EISs for those projects). But despite having identified ship traffic (in general) as a major contributor to air quality problems—and having identified LNG ship traffic as a large source of air pollution—the analysis for the Terminal considered only ship traffic from the Terminal and the affiliated CP1 terminal. Authorization Order P195 [JA___]. Excluding ship traffic associated with these other projects was arbitrary.

FERC's justifications for exclusion have changed over time, but none of the five explanations it has offered is sound.

First, FERC suggested that it could ignore ship emissions because LDEQ excluded them from *its* Clean Air Act analysis for the Terminal. *Id.* P185 [JA___]. FERC's obligations are different than LDEQ's. LDEQ, in preparing the inventory it uses for Clean Air Act permitting, only considers baseline air quality and emissions from approved stationary sources. *See, e.g.,* 33 LA ADC Pt III, § 919. NEPA does not ask FERC to determine whether LDEQ appropriately complied with the Clean Air Act; NEPA asks FERC to consider, *inter alia*, reasonably foreseeable cumulative impacts. *See Healthy Gulf*, 107 F.4th at 1043; *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1122-23 (D.C. Cir. 1971).

Second, FERC maintained that including cumulative ship emissions would not change FERC's analysis anyway. Authorization Order PP183-89 [JA___-___]. FERC is wrong. FERC's air analysis, borrowed from LDEQ's Clean Air Act analysis, concludes that modeling shows a significant impact when two things occur simultaneously: (1) ambient air pollution exceeds the NAAQS, and (2) the Terminal's incremental impact on ambient air pollution is greater than the SIL. *Id.* PP186-87 [JA___-___]. The EIS's modeling showed numerous instances

58

in which either (1) or (2) were satisfied, but none where both were. *See* 2024 Rehearing Request 144 [JA___]. The Authorization Order suggested that adding mobile ship emissions would not matter because it would not increase the Terminal's incremental contribution to any already-modeled NAAQS exceedance. *Id.* But this ignored the fact that adding cumulative ship emissions might reveal *new* NAAQS exceedances, and that, in those instances, the Terminal's incremental contribution may exceed the SIL. *Id.* FERC's Post-SEIS Order recognized this possibility when summarizing Petitioners' 2024 rehearing request, Post-SEIS Order P56 [JA___], and both that Order and FERC's August 2025 Rehearing Order appear to have abandoned the argument that adding mobile sources could not disturb FERC's conclusions. More broadly, Petitioners explained that FERC was required to consider cumulative effects even where the Terminal's contribution would not be individually significant, which required FERC to identify what the total cumulative effect would actually be. 2024 Rehearing Request 143-144 [JA___-___]; *see Healthy Gulf*, 107 F.4th at 1043-44.

59

Third, in the Post-SEIS Order,[15] FERC claimed that it did not have a methodology for analyzing cumulative mobile emissions, Post-SEIS Order P58 [JA___], but other agencies have demonstrated that such analysis is possible. FERC asserted that "AERMOD," the tool used here for analyzing non-ozone air impacts, "is not suitable for modeling . . . transient marine mobile sources," without explaining how FERC reached this conclusion. *Id.* Again, FERC is wrong. EPA guidance specifically states that AERMOD provides numerous tools for "mobile source modeling." Post-SEIS Rehearing Request 25 n.71 [JA___] (quoting EPA). The EPA, Army Corps of Engineers, and Port of Los Angeles have used AERMOD specifically to model the impact of emissions from ships and tugboats, as non-steady-state, mobile sources. *Id.*, 25-27 n.72, n.74, n.75 [JA___-___]. These other analyses demonstrated that AERMOD was not limited to treating emissions as originating from stationary "point" sources, and could model mobile source emissions in other more appropriate ways. In at least one proceeding, FERC accepted AERMOD modeling that does exactly

_____

[15] The 2024 Rehearing Order did not acknowledge or respond to Petitioners' arguments about air impacts of cumulative ship traffic.

that.[16] FERC offers no facts distinguishing the scenario here from other scenarios in which AERMOD was successfully used to model the impact of ship emissions. Therefore, the Court need not address FERC's argument that it would be inappropriate for a cumulative effects analysis to treat emissions from ships serving other terminals as coming from those terminals' locations, which is what FERC says it did for ships serving the Terminal and CP1. Post-SEIS Order P58 [JA___]; August 2025 Rehearing Order P20 [JA___].

Fourth, FERC's assertion that it lacks data for such an analysis is unsupported. *See* Post-SEIS Order PP58-63 [JA___-___]. "Reasonable forecasting and speculation is . . . implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Scientists' Inst. for Pub. Info., Inc.*, 481 F.2d at 1092. Here, FERC has not shown that such reasonable forecasting is impossible. FERC does not need to "seek" "mobile air emissions data

---

[16] Rio Grande LNG Project, Air Dispersion Modeling Report, Docket No. Cp16-454-000, Accession No. 20250121-5211, at 14 (Jan. 21, 2025) (explaining that ship emissions were modeled as a series of "volume" sources along the ship route).

from six other jurisdictional LNG terminals," Post-SEIS Order P59

[JA___], because its analyses for those terminals already estimated

shipping emissions. FERC cannot dismiss emissions it has already

foreseen as not reasonably foreseeable. FERC speculates that its data

"may" be unreliable because these terminals "may have undergone

changes." August 2025 Rehearing Order P20 [JA___]. FERC provides no

evidence of any pertinent changes, and FERC, as the agency responsible

for approving such changes, should know. FERC speculates that

"updates and refinements to emission inventories *may* impact the data

inputs and assumptions" used in prior reviews, *id.* (emphasis added),

again without inquiring whether such changes have occurred, or

demonstrating that such updates would be difficult to apply. Similarly,

FERC complains about "the number and importance of the many

assumptions that the Commission would need to make," Post-SEIS

Order P62 n.235 [JA___], but it has not identified what topics it would

need to make assumptions about. The record refutes FERC's assertion

that FERC does not have and cannot reasonably acquire information to

support analysis of the cumulative impact of ships serving other FERC-

jurisdictional LNG terminals. *Birckhead v. FERC*, 925 F.3d 510, 520

(D.C. Cir. 2019) ("NEPA . . . requires the Commission to at least *attempt* to obtain the information necessary to fulfill its statutory responsibilities").

The record also squarely refutes FERC's assertion that Petitioners waived challenges to FERC's claim about a lack of methodology or data. August 2025 Rehearing Order P17 [JA___]. Petitioners were not required to respond to arguments that FERC had not made. *Columbia Gas Transmission Corp. v. FERC*, 477 F.3d 739, 742-44 (D.C. Cir. 2007). The Authorization Order did not argue that FERC lacked a methodology or data for considering cumulative ship emissions. Petitioners therefore had "reasonable ground" for not presenting argument on those points, or evidence to rebut FERC's claims, in their 2024 Rehearing Request. 15 U.S.C. § 717r(b). Petitioners similarly had reasonable grounds for not introducing evidence in support of this rebuttal in an earlier rehearing request. *Contra* August 2025 Rehearing Order P21 [JA___] (arguing that evidence of other agencies' AERMOD analysis of mobile ship emissions is untimely).[17]

---

[17] Insofar as it is necessary to reintroduce this evidence, which was filed with FERC but which FERC purported to exclude, we request

Finally, the August 2025 Rehearing Order argued that *Seven County* supports FERC's limited approach; it does not. Any discretion FERC has over the geographic scope of analysis is irrelevant here, because FERC drew a line that included these other LNG terminals, and the ships travel up the Calcasieu Ship Channel, past the Terminal, en route to those terminals' locations. EIS 1-2, 2-3 [JA___, ___] (area and detail maps).

Having chosen to evaluate the Project's air pollution by asking whether the cumulative effect would be a NAAQS exceedance, FERC cannot refuse to consider the foreseeable impacts of other FERC-jurisdictional projects on cumulative air quality.

## B. FERC's Conclusion That Air Pollution That Does Not Exceed The NAAQS Does Not Cause Harm Is Unsupported and Contrary to Record Evidence.

Even if the Terminal does not cause air pollution to exceed the NAAQS, the Terminal will emit massive amounts of pollutants and will

---

leave to do so, based on the "reasonable ground" of not having notice of its relevance before the Post-SEIS Order. 15 U.S.C. § 717r(b). In the alternative, we request judicial notice of the evidence of other agencies' use of AERMOD to model mobile shipping emissions, which consists of government documents available directly from the government websites. *Cannon v. D.C.*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (citing Fed. R. Evid. 201).

degrade nearby air quality. *See* SEIS 19 [JA___]. This pollution will cause foreseeable harm, as documented by modeling performed with EPA's COBRA tool. FERC ignored the COBRA analysis because it relied on the NAAQS as a cutoff for its analysis. In doing so, however, FERC ignored record evidence indicating that the Project's emissions will cause premature deaths, asthma, and lost days of school and work. While this Court has upheld FERC's use of the NAAQS as a reference for air quality in other cases, those cases did not involve quantified projections of harm from exposure to a project's air pollution. FERC arbitrarily and capriciously dismissed that harm here, and the Court should require FERC to take a hard look at it.

### 1. Analysis with EPA's COBRA Tool Demonstrates Foreseeable Health Impacts

In response to the draft SEIS's prediction that pollution around the terminal would not exceed the NAAQS, SEIS 19 [JA___], and the assertion that emissions of air pollution would not have a significant impact, *id.* 20 [JA___], Petitioners used EPA's COBRA tool to estimate the health impacts resulting from the terminal and pipeline's air pollution.

EPA designed COBRA to provide a free, easy-to-use, peer reviewed tool for estimating the health impacts of actions that change air pollution emissions. R.692, How COBRA Works 2-8 [JA___-___]. COBRA is a simplified tool but it is "based on rigorous methods used by EPA," *id.*, 2 [JA___], and "technical peer reviewers found COBRA to be 'a valuable model that produces a screening tool that can contribute to policy analysis and public dialogue.'" *Id.*, 9 [JA___].

COBRA begins by asking users to input changes in emissions of pollutants from sources (such as gas fired power plants) in individual counties. R.692, COBRA User Manual 28 [JA___]. COBRA then performs three internal steps. How Cobra Works, 3 [JA___] (diagram).

First, it quantifies changes in air quality. Using the user-provided changes in emissions, data on the industry at issue and data on background air quality (taken from 2023, for COBRA's current version), COBRA estimates county-specific changes in ambient ozone and annual $PM_{2.5}$ levels. COBRA User Manual, 6 [JA___]. Although this first step's analysis is necessarily less precise than some analyses, EPA found that COBRA's internal modelling "compared well with" more sophisticated models like those used in Prevention of Significant Deterioration

66

permitting. COBRA User Manual, A-1 [JA___]; *accord* How COBRA Works, 8 [JA___] ("Results from COBRA approach have fared well in informal comparisons" with other models).

Second, COBRA estimates the health impacts. COBRA User Manual 7, B-1 [JA___, ___]. COBRA estimates changes in multiple health outcomes, including emergency room visits, hospital admissions, asthma onset, heart attacks, lost school and work days, premature mortality, (*i.e.*, premature deaths that will occur over the next twenty years from exposure to pollution during the modeled year), and infant mortality. *Id.*,8-9, 20, 39, 61 n.12 [JA___-___, ___, ___, ___]. For some impacts, such as premature death, COBRA predicts a range of outcomes, reflecting estimates derived from different epidemiological studies. *Id.*, 33 [JA___]. Finally, COBRA estimates the monetized equivalent of those health impacts. *Id.*, 24.

Here, Petitioners submitted COBRA's estimates of the health impacts of the terminal and pipeline in comments on the draft SEIS, using the SEIS's emission estimates. COBRA predicts that here, for each year of projected operation, the Terminal and Pipeline's combined air pollution will cause:

- 5.2 to 9 premature deaths (occurring over the next 20 years);

- 24 additional cases of asthma onset, and 4000 additional cases of asthma symptoms;

- 1500 lost school days and 400 lost work days; and

- In sum, health effects equivalent to $82 to $140 million in harm.

R.608, COBRA Analysis – EGU Sector [JA___-___]. Because FERC expects the Terminal and Pipeline to operate for at least 20 years (Authorization Order PP58-59 [JA___-___]; EIS 1-3 [JA___-___]), the Project will cause hundreds of premature deaths, which together with other impacts will equate to billions of dollars of harm.

This COBRA analysis distinguishes this Court's statement, in a footnote in *Sabal Trail*, that FERC had appropriately relied on the NAAQS as a tool for assessing health impacts in that case. August 2025 Rehearing Order P26 n.111 [JA___] (citing *Sierra Club v. FERC*, 867 F.3d 1357, 1370, n.7 (D.C. Cir. 2017) ("*Sabal Trail*")). In *Sabal Trail*, the Court held that "FERC appropriately relied on EPA's [NAAQS] as a standard of comparison for air-quality impacts," because NAAQS are "a generally accepted standard" and comparing project emissions to the

NAAQS "enable[s] decisionmakers and the public to meaningfully evaluate the project's air-pollution effects." 867 F.3d at 1371 n.7. But *Sabal Trail* did not have before it any evidence directly forecasting the health impacts that the specific project's pollution would cause, nor did any of the other cases FERC cites consider such evidence. *See* August 2025 Rehearing Order P29 n.111 [JA___]. While these cases indicate that comparison with the NAAQS can be meaningful in the absence of more specific information, nothing in them supports the conclusion that agencies can ignore more specific information when it is in the record.

## 2. Venture Global's AERMOD Modeling Showing NAAQS Compliance Does Not Supersede COBRA's Predictions of Health Impacts.

FERC refused to consider the harms predicted by the COBRA analysis. FERC's primary response is to claim that the AERMOD modeling demonstrated the NAAQS will not be exceeded here, and that "COBRA . . . is superseded by the EPA's NAAQS." August 2025 Rehearing Order P29 [JA___] (quoting SEIS App'x D, Table D-2, [JA___]). FERC does not explain *how* the NAAQS supersedes the COBRA analysis. But FERC implies that AERMOD and the NAAQS

provide a better estimate of harm—an argument refuted by EPA's own statements regarding the NAAQS and by the record here.

AERMOD only substitutes for COBRA's first step. AERMOD estimates what the resulting air quality will be, but provides no analysis equivalent to COBRA's second step, of how that air quality will affect people (or COBRA's third step, monetizing those harms). FERC suggests that compliance with the NAAQS makes these COBRA steps unnecessary and implies that EPA has concluded that pollution that does not violate the NAAQS is "safe," or at least "acceptable." FERC is wrong: EPA's air quality standards do not designate this level of pollution as "safe" or "acceptable."

First, FERC incorrectly asserts that the NAAQS have been "designated as *safe* by EPA." SEIS, Response to Comments Air 12 [JA___] (emphasis added); *accord* August 2025 Rehearing Order P29 n.115 [JA___]. EPA has *not* designated the NAAQS as "safe" in the ordinary meaning of the word: pollution below the NAAQS is not "free from risk."[18] EPA repeatedly has stated that while the NAAQS provide

---

[18] *See* MERRIAM-WEBSTER, *Safe*, https://www.merriam-webster.com/dictionary/safe (last visited Oct. 12, 2025).

a "margin of safety," 42 U.S.C. § 7409(b)(1), the NAAQS are not set at a

level "below which . . . pollutants are known to be harmless." *Am.*

*Trucking Ass'ns*, 283 F.3d at 360. Indeed, in setting the NAAQS for

many criteria pollutants, including $PM_{2.5}$ and $NO_2$, which the Project

will emit, EPA stated that there was no evidence of a threshold below

which the pollutant is harmless. 89 Fed. Reg. at 16,226; *Primary*

*National Ambient Air Quality Standards for Nitrogen Dioxide*, 75 Fed.

Reg. 6,474, 6,480 (Feb. 9, 2010). When setting the NAAQS for ozone,

another result of the Project's emissions, EPA similarly stated that if

there was a threshold below which ozone is harmless, studies indicated

that it must be below 40 or even 30 parts per billion, well below the 70

parts per billion NAAQS and the 65 parts per billion level predicted

here. *National Ambient Air Quality Standards for Ozone*, 80 Fed. Reg.

65,292, 65,303, 65,306, 65,309 (Oct. 26, 2015); R.727, 5 [JA___].

    EPA also recognizes that emission limits that reduce pollution

below the NAAQS have co-benefits from avoided premature deaths. In

its 2012 Mercury and Air Toxics Standards, EPA concluded that the

rule would provide $33 to $81 billion of co-benefits, largely from avoided

premature deaths, by reducing $PM_{2.5}$ and sulfur dioxide (which

71

contributes to secondary formation of PM$_{2.5}$). *Mercury and Air Toxics Standards*, 77 Fed. Reg. 9,303, 9,305-06 (Feb. 16, 2012). After the Supreme Court remanded the rule for additional consideration of costs, *Michigan v. EPA*, 576 U.S. 743 (2015), EPA reaffirmed that "there is a substantial body of scientific evidence supporting the existence of health impacts from exposure to PM$_{2.5}$, even at low concentrations below the NAAQS," that "there is no scientific basis for ignoring health benefits" of further reducing PM$_{2.5}$, and that the NAAQS did not limit EPA's ability to consider harm caused by pollution below the NAAQS in other regulatory contexts.[19] Similarly, EPA's COBRA User Manual explicitly states EPA's determinations that pollution below the NAAQS can cause foreseeable harm. EPA provides an example in which, in a particular county, the difference between annual PM$_{2.5}$ levels of 7.7 and 7.8 μg/m$^3$ (a 0.04 μg/m$^3$ change, rounded) for one year equates to 2.4 to 4.2 statistical adult premature deaths caused or avoided. COBRA User Manual, 39 [JA___].

---

[19] *Supplemental Finding That It Is Appropriate and Necessary To Regulate Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units*, 81 Fed. Reg. 24,420, 24,440 (Apr. 25, 2016).

Second, contrary to FERC, the NAAQS do not represent an EPA judgment about levels of pollution that are "acceptable" in general, nor would FERC be able to blindly defer to such a judgment. SEIS 14 [JA___]; Post-SEIS Order PP49, 72 [JA___, ___]; August 2025 Rehearing Order PP25, 29 [JA___, ___]. In deciding what level of pollution to "accept" in setting the NAAQS and administering the Prevention of Significant Deterioration, EPA faces a different question than the one before FERC in an EIS. Under those Clean Air act programs, all projects that would cause or contribute to a NAAQS violation are categorically prohibited, and EPA necessarily paints with a broad brush. FERC, however, makes a case-specific decision about whether a particular project is consistent with the public interest, informed by that project's harms and benefits. This requires a more nuanced approach, and FERC must do more than merely ensure that the project complies with the permitting requirements set by other authorities. *Sabal Trail*, 867 F.3d at 1375.

Moreover, while FERC can credit or extend deference to EPA's technical judgments, *City of Bos. Delegation v. FERC*, 897 F.3d 241, 255 (D.C. Cir. 2018), whether to "accept" a health impact, such as a given

number of foreseeable premature deaths caused per year, is a policy judgment each agency must make for itself when fulfilling its respective statutory responsibilities. *See Murray Energy Corp. v. Env't Prot. Agency*, 936 F.3d 597, 610 (D.C. Cir. 2019) (setting the NAAQS "necessarily requires the exercise of policy judgment."). While FERC can credit EPA's scientific judgments, FERC must exercise policy judgment for itself when approving a project under the NGA.

### 3. FERC's Other Arguments Do Not Justify Ignoring the COBRA Predictions.

FERC lobs several other criticisms of the COBRA tool, but none of them justify its decision to overlook its modeling.

FERC emphasizes that EPA has characterized COBRA as a "screening" tool. August 2025 Rehearing Order P29 [JA___]. The point of a screening tool is to identify whether an issue warrants additional analysis. Here, FERC has not argued (nor could it) that the hundreds of premature deaths, *etc.*, that COBRA predicts are so trivial that they can be dismissed as *de minimis*, nor that there would be no point in confirming or refining COBRA's estimates. The "screening tool" has done what it was supposed to do: identify a problem requiring further analysis. More sophisticated tools are available for predicting health

74

impacts that FERC could have employed to follow up on the COBRA analysis. *See* Post-SEIS Rehearing Request 38-39 [JA___-___].

FERC separately asserts a distinction without a difference in arguing that while COBRA may be suitable for "state or local agency screening and planning," that it is "unsuitable for project-specific analyses." August 2025 Rehearing Order P29 [JA___]. FERC has not identified any differences between project-specific review and other potential uses of COBRA, much less explained why those differences are pertinent. Asserting that there is a distinction is not the same as demonstrating that the distinction matters.

### 4. Petitioners' COBRA Arguments Were Properly Before FERC and Are Properly Before This Court.

Finally, the fact that the COBRA analysis was not presented in Petitioners' 2024 Rehearing Request does not prevent the Court from reaching the issue, *contra* August 2025 Rehearing Order P27 [JA___].

FERC relies on *Tennessee Gas Pipeline Co. v. FERC*, which held that "if a party does not raise an argument *that it could have raised* in its first petition for review of a Commission action, it cannot preserve that argument for judicial review simply by filing a second petition for rehearing from a subsequent Commission order which implicates the

75

same action." 871 F.2d 1099, 1110 n.18 (D.C. Cir. 1989). But that holding does not apply here for two reasons.

First, *Tennessee Gas* should not apply if the agency undertakes additional NEPA process after the initial request for rehearing. The point of the SEIS is to engage in additional factual development, informed by additional public participation. *City of Port Isabel v. FERC*, 111 F.4th 1198, 1210-11 (D.C. Cir. 2024) ("*Port Isabel I*"). Here, the SEIS addressed multiple developments, including acknowledgment of the need for additional analysis of cumulative effects, per *Healthy Gulf*, SEIS 2 [JA___]; updated background and modeling data, *id.* at 12 [JA___]; and addressed EPA's decision to lower the annual $PM_{2.5}$ NAAQS, Post-SEIS Order P10 [JA____]. Because of the SEIS proceeding, the finality concerns underlying *Tennessee Gas* do not apply here, at least for issues pertinent to the SEIS. Petitioners' COBRA arguments were first raised in timely comments on the draft SEIS. R.608, 5-7 [JA___-___]. Those comments were within the scope of the SEIS, and FERC has not argued otherwise. SEIS, App'x D, AIR-12 [JA___] (responding to this comment).

Second, unlike in *Tennessee Gas*, Petitioners had "reasonable ground" for not raising COBRA arguments previously, because FERC changed its analysis in the SEIS. In the EIS and Authorization Order, FERC did not dispute that air quality surrounding the terminal and compressor station would be unhealthy; FERC argued that the Projects' contributions to this unhealthy air would be below the SILs. EIS 4-370 to 4-373 [JA__,__]; Authorization Order P184 [JA___]. Petitioners did not need to offer additional factual support to establish that the predicted air pollution would have adverse health impacts.[20] The SEIS and subsequent rehearing orders pivoted and predicted that the NAAQS would not be exceeded, which made relevant the question of whether air pollution below the NAAQS was safe. Post-SEIS Order P72 [JA___]. Petitioners had reasonable ground for not disputing this issue until FERC raised it. Thus, Petitioners appropriately presented this

_____

[20] Because *Tennessee Gas* interprets 15 U.S.C. § 717r(b), its focus on whether a party could have raised arguments previously should be understood as a discussion of whether the party had reasonable ground for not having done so. However, nothing in *Tennessee Gas* suggests that the *only* way a party could ever have reasonable ground for not raising an argument would be inability to do so.

issue in their SEIS comments and Post-SEIS Rehearing Request, and it is properly before the Court.

## C. FERC Failed to Consider Cumulative Impacts for The Moss Lake Pipeline Compressor Station.

The SEIS concludes that Moss Lake's individual impacts will not exceed any SIL. FERC's decision to halt its analysis there violates NEPA and the NGA.

The only analysis in the record of cumulative effects surrounding the compressor station concluded that, when foreseeable future sources are considered, air pollution would exceed the 1-hour $NO_2$ and 24-hour $PM_{2.5}$ NAAQS by 40% and 27%, respectively. EIS 4-373 [JA___]. Other NAAQS may be foreseeably exceeded as well, but FERC has not modeled this. *Id.* The situation here is therefore the same as in *Healthy Gulf*: FERC has identified a cumulative effects problem, and FERC must do more than conclude that the project's incremental contribution to that problem is individually insignificant. 107 F.4th at 1043-44.

FERC errs in arguing that *Healthy Gulf* only applies where FERC reaches "the third step" of the Clean Air Act analysis. Post-SEIS Order P53 [JA___]. *Healthy Gulf* is a NEPA case, not a Clean Air Act case.

NEPA requires FERC to consider the cumulative effects of all actions, not only those actions that reach a certain stage of the Clean Air Act analysis.

The SEIS and subsequent Orders argue, for the first time and erroneously, that the SILs are both a threshold policy judgment of whether impacts are individually insignificant and a threshold for statistical significance that reflects whether there will be a foreseeable increase at all. August 2025 Rehearing Order P28 [JA___]. Although EPA did consider statistical variability in setting the $PM_{2.5}$ SILs, EPA's conclusion rested on "technical *and policy* considerations,"[21] and is not the minimum increase that can be foreseen, detected, or impactful. EPA has rejected use of the SILs in other contexts, concluding, for example, that it was appropriate to use a value lower than the ozone SIL when evaluating interstate ozone transport.[22] The COBRA User Manual

---

[21] EPA, Memorandum on Guidance on Significant Impact Levels for Ozone & Fine Particles in the Prevention of Significant Deterioration Permitting Program*,* 11, 12 (April 17, 2018) (emphasis added), available at https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf.

[22] *Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9,336, 9,342, 9,372 (Feb. 13, 2023).

further demonstrates EPA's belief that an 0.04 µg/m$^3$ change in annual PM$_{2.5}$, less than the SIL of 0.13 µg/m$^3$, can be meaningfully predicted and will have foreseeable health impacts. COBRA User Manual, 39 [JA___]. Finally, while statistical variability played *some* role in EPA's setting the PM$_{2.5}$ SIL, it played *no* role in the NO$_2$ SIL,[23] which is purely a rule of thumb for use in Prevention of Significant Deterioration permitting.

Thus, the evidence in the record is that the Moss Lake compressor station will be a major source of NO$_2$ and PM$_{2.5}$ emissions, that cumulative air pollution surrounding Moss Lake will reach unhealthy levels, and that Moss Lake will cause small but foreseeable increases in that unhealthy pollution. On these facts, *Healthy Gulf* did not permit FERC to forgo analysis of cumulative impacts.

## IV.  FERC DID NOT TAKE A HARD LOOK AT IMPACTS ON COMMERCIAL FISHING

The Project threatens calamitous harm to the commercial fishing industry in Cameron. FERC was required under NEPA to evaluate the

---

[23] EPA, *Guidance Concerning the Implementation of the 1-hour NO₂ NAAQS for the Prevention of Significant Deterioration Program*, 11-12 (June 29, 2010), https://www.epa.gov/sites/default/files/2015-07/documents/appwno2.pdf.

socioeconomic effects of construction and operation of the Project,
including the impacts to commercial fishing, and FERC acknowledged
as much. EIS 4-266 to 4-271 [JA___-___]; *see also* 42 U.S.C. § 4332(C);
Authorization Order, Clements Dissent P18 [JA___] (citing 40 C.F.R.
§ 1502.16(b) (2022)). But FERC failed to take a hard look and "did not
fully consider impacts on commercial fishing and the people who rely on
it for their livelihoods." Authorization Order, Clements Dissent P18
[JA___].

In the EIS, FERC downplayed the harm to commercial fishing as
negligible by characterizing the Project's adverse impacts as being
temporary and localized. *See, e.g.*, EIS 4-541, 4-545 [JA___, ___].
FERC's rosy predictions operated from two flawed premises.

First, the EIS's conclusion that effects would be only temporary
conflated impacts to the *aquatic ecosystem* with impacts to the *fishing
industry* it sustains. The EIS acknowledged that dredging and the
disposal of dredge spoil associated with construction of the Project
"would likely result in the direct mortality of benthic organisms,
including less mobile life stages of managed species such as shrimp and
benthic invertebrates, which are an important food source for many

species of fish." EIS 4-206 [JA___]; *see also* EIS 4-207 [JA___]. But the way the EIS dealt with these impacts—claiming "losses would be short term and the benthic community [would] rebound within a few seasons," EIS 4-206 [JA___]—does not work for the fishing industry. Even one season of diminished harvest could put many Cameron fishers out of business forever. *See* Authorization Order, Clements Dissent P18 & n.66 [JA___] (noting record evidence); EIS App'x N-293 [JA___] (comment warning that "discontinuity of one season" in the shrimp and crab fisheries "can bankrupt the family"). Commissioner Clements recognized as much, explaining that the record contained numerous warnings "that a single season of decreased shrimp catch threatens to irrevocably end shrimping business ventures in the area," but that "the EIS ignore[d] the risk that temporary impacts on *fisheries* might permanently adversely affect commercial fishing *businesses*." Authorization Order, Clements Dissent P18 [JA___] (emphasis added). Even if target species like shrimp "rebound within a few seasons," EIS 4-206 [JA___], it may be too late for the people who make a living catching them.

Second, the EIS is wrong that adverse impacts to commercial fishing from marine traffic during construction and operation of the Project would be localized and so could be readily avoided. There is no dispute that construction vessels and LNG carrier traffic during operations would restrict access to the Calcasieu Ship Channel and cause delays for commercial fishing boats, which must give way to the larger craft. EIS 4-270, 5-18 [JA___, ___]. The "impacts on shrimping vessels would be greatest near the Terminal . . . where shrimping occurs year-round and vessel traffic and dredging associated with the Terminal [f]acilities would occur." EIS 4-267 to 4-268 [JA___-___]; *see also* EIS 4-541, 5-18 [JA___, ___] (same). Indeed, commercial fishing boats in the Calcasieu Ship Channel may suffer the permanent "loss of available fishing areas due to operation of permanent marine facilities." EIS 4-545 [JA___].

Despite all this, the EIS concluded impacts from the Project would be insignificant because "the Project area does not have any unique features or habitat characteristics that would draw recreational or commercial users to this particular location." EIS 4-541 [JA___]; *id.* 4-545 [JA___] (same). FERC has persistently suggested that

83

"approximately 25 river miles upstream" of the Terminal are equally good. 2024 Rehearing Order P114 [JA___].

Not so. The EIS itself demonstrates that the area near the Terminal—where the adverse impacts will be greatest—is prime real estate. To start, the Project area is the *only* portion of the Calcasieu Ship Channel that is open for commercial shrimp harvesting year-round. *See* EIS 4-267 to 4-268 [JA___-___]; *see also* EIS 4-541, 5-18 [JA___, ___]. That's because Louisiana manages commercial fishing by dividing state waters according to the "inside/outside shrimp line (referred to as the 'Firing Line')," and year-round shrimp harvesting is allowed only in waters seaward of the Firing line. EIS 4-267 [JA___]. In the Calcasieu Ship Channel, the Firing Line sits just north of the Terminal, as shown below, which means the upstream river miles FERC thinks equivalent are often off-limits.

84



EIS 4-269 [JA___].

Moreover, the Project area bifurcates an essential migration pathway for shrimp in and out of Calcasieu Lake and the estuaries. *See* EIS 4-197 [JA___] (describing shrimp migration); *id.* 4-204 [JA___] (describing shrimp habitat in the Calcasieu Ship Channel). "The ship channel at the [F]iring [L]ine represents an especially popular shrimping location in part because it acts as a unique geographic bottleneck where shrimp migrate." Authorization Order, Clements

Dissent P20 [JA___]. During migration pulses, commercial fishing boats "cluster at the [Firing Line] in the ship channel in order to catch as many shrimp as possible." EIS 4-541 [JA___]. At bottom, the EIS does not support the claim that commercial fishers can just go somewhere else.

FERC perpetuated the same deficiencies in its orders. In the Authorization Order, FERC merely restated the conclusions of the EIS. Authorization Order PP107-13 [JA___-___]. Nowhere did FERC discuss the risk that temporary impacts to the aquatic ecosystem could spell permanent consequences for the commercial fishing industry in Cameron. *See id.* [JA___-___]; *see also* Authorization Order, Clements Dissent PP18, 21 [JA___, ___] (critiquing FERC for ignoring this issue). Likewise, FERC doubled down on its debunked position that the Project area "does not have any unique features" compared to "other locations within the Calcasieu Ship Channel." Authorization Order P112 [JA___]. So too in the 2024 Rehearing Order. There, FERC acknowledged that Petitioners raised these issues but rested on the deficient EIS and Authorization Order. *See* 2024 Rehearing Order PP101-16 [JA___-___].

Ultimately, FERC did not take a hard look at the adverse impacts that construction and operation of the Project would inflict on the commercial fishing industry in Cameron. These NEPA violations left FERC without a record capable of supporting its actions under the NGA. *Vecinos*, 6 F.4th at 1331.

## V.  REMEDY

This Court should vacate the Orders. Vacatur is the "ordinary practice" and "normal course" for unlawful and arbitrary and capricious agency actions. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)). Whether vacatur is appropriate depends on "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)" and "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (cleaned up).

Here, the Orders are riddled with serious deficiencies that go to the core of FERC's ultimate conclusion that the Terminal is not inconsistent with the public interest, and that the Pipeline is required

by the public convenience and necessity. The errors in both FERC's

NGA review and the NEPA analysis underlying it are fundamental. *See*

*Port Isabel II*, 130 F.4th at 1037. On remand, FERC will need to revisit

its evaluation of the Project's harms, correcting for the errors described

above in its assessment of adverse impacts to air quality and

commercial fisheries; address its failure to substantiate the Project's

benefits; redo its balancing of the Pipeline under section 7 of the NGA;

and undertake a balancing exercise of the Terminal's harms and

benefits under section 3 of the NGA. This is precisely the type of

"pervasively deficient agency action" that requires remand and vacatur.

*N.J. Conserv. Found.*, 111 F.4th at 64.

Any "disruptive consequences" of vacatur are "weighty only

insofar as the agency may be able to rehabilitate its rationale." *Comcast*

*Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009). "The disruption vacatur

would cause [to the Project] is significantly outweighed by the core

deficiencies in FERC's orders." *N.J. Conserv. Found.*, 111 F.4th at 65.

And unlike other projects that have come before this Court, this Project

is only in the preliminary phases of construction, thereby mitigating the

effects of vacatur on the applicant. In Cameron Parish, the community

and commercial fishing industry are already suffering initial adverse effects of the Project, and the harms will only continue to grow. The community should not be forced to endure the negative consequences of the Project when FERC has never meaningfully considered them. Accordingly, this Court should vacate the Orders and remand to FERC.

## CONCLUSION

For the reasons stated above, Petitioners respectfully request that the Court grant the petitions and vacate FERC's Authorization Order and subsequent orders.

Dated: October 14, 2025

Respectfully submitted,

*/s/ Nathan Matthews*
Nathan Matthews
EARTHJUSTICE
180 Steuart St., #194330
San Francisco, CA 94105
T: (415) 217-2183
F: (415) 217-2040
nmatthews@earthjustice.org

Rebecca McCreary
SIERRA CLUB
1650 38th Street, Suite 103W
Boulder, CO 80301
(305) 449-5595 ext. 103
rebecca.mccreary@sierraclub.org

*Counsel for Petitioners Louisiana Bucket Brigade, Sierra Club, Turtle Island Restoration Network, Healthy Gulf, and Texas Campaign for the Environment*

/s/ Megan C. Gibson
Megan C. Gibson
SOUTHERN ENVIRONMENTAL LAW CENTER
122 C Street NW, Suite 325
Washington, DC 20001
Telephone: (202) 828-8382
mgibson@selc.org

Spencer Gall
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, Virginia 22902
Telephone: (434) 977-4090
sgall@selc.org

Clara Derby
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
cderby@selc.org

*Counsel for Petitioners Travis Dardar, Nicole Dardar, Kent Duhon, Mary Alice Nash, Jerryd Tassin, Anthony Theriot, For a Better Bayou, and Fishermen Involved in Sustaining Our Heritage*

/s/ Caroline Reiser
Caroline Reiser

Thomas Zimpleman
Gillian Giannetti
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit set by this Court's September 3, 2025 Order, Doc. #213325, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 16,076 words, less than the 17,000-word limit set by the Court.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word for Windows Office 365 in 14 point Century Schoolbook.

*/s/ Nathan Matthews*
Nathan Matthews
EARTHJUSTICE
180 Steuart St., #194330
San Francisco, CA 94105
T: (415) 217-2183
F: (415) 217-2040
nmatthews@earthjustice.org

*Counsel for Petitioners Louisiana Bucket Brigade, Sierra Club, Turtle Island Restoration Network, Healthy Gulf, and Texas Campaign for the Environment*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of October, 2025, I have served the foregoing Joint Opening Brief, including the Addendum thereto, on all registered counsel through the Court's electronic filing system (ECF).

/s/ Nathan Matthews
Nathan Matthews
EARTHJUSTICE
180 Steuart St., #194330
San Francisco, CA 94105
T: (415) 217-2183
F: (415) 217-2040
nmatthews@earthjustice.org

*Counsel for Petitioners Louisiana Bucket Brigade, Sierra Club, Turtle Island Restoration Network, Healthy Gulf, and Texas Campaign for the Environment*